PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica, Boulevard, 11th Floor
Los Angeles, California 90067
Telephone:  (310) 277-6910
Facsimile:  (310) 201-0760
James I. Stang, Esq. (admitted *pro hac vice*)

-and-

780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: (212) 561-7700
Facsimile:  (212) 561-7777
Ilan D. Scharf, Esq.

Counsel for the Official Committee of
Unsecured Creditors of The Christian Brothers'
Institute and The Christian Brothers of Ireland, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| THE CHRISTIAN BROTHERS' INSTITUTE, *et al*. | : | Case No.: 11-22820 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |

----------------------------------------------------------------- x

**RESPONSE OF OFFICIAL CREDITORS COMMITTEE TO**
**DEBTORS' MOTION FOR AN ORDER ESTABLISHING**
**DEADLINES FOR FILING PROOFS OF CLAIM AND**
**APPROVING FORM AND MANNER OF NOTICE THEREOF**

The Official Committee of Unsecured Creditors (the "Committee") of The Christian

Brothers' Institute ("CBI") and Christian Brothers of Ireland, Inc. ("CBOI" and, collectively

with CBI, the "Debtors"), the debtors and debtors in possession in the above-captioned cases (the

"Cases") under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), by

and through its undersigned counsel, hereby submits its Response (the "Response") to the

Debtors' Motion for an order establishing deadlines for filing proofs of claim and approving the

form and manner of notice thereof (the "<u>Motion</u>") [Docket No. 170].  In support of its Response,

the Committee respectfully states as follows:

## <u>PRELIMINARY STATEMENT</u>

1.      The Committee  supports the Debtors' request for entry of an order

establishing a bar date for sexual abuse and other claims.  However, the Committee has two

limited objections to the relief requested in the Motion.  First, a bar date to set a deadline for

survivors to assert claims based on sex abuse should be conditioned on a schedule for completion

of due diligence by the Debtors to identify abuse survivors.  Second, the Court should require the

Debtors to modify the content of the notice and the form of the proof of claim for abuse

survivors.  As set forth in more detail below, the Committee's position is based on the following:

(a) the Debtors have not exercised sufficient efforts to ascertain the identity of or contact

information for known claimants; (b) the Debtors have not yet obtained alumni directories from

all the institutions where Brothers were assigned; (c) the Debtors' definition of "Sexual Abuse"

used in the notices and proof of claim form is deficient; (d) the terminology used in the proposed

notices does not reflect the legal terminology used in Canada, where sexual abuse occurred; and

(e) the Debtor's proposed publication notice is not adequate if the Debtors are not required to

provide direct notice by first class mail to known creditors and alumni.

2.      The Committee believes that the best interests of creditors, including sex

abuse survivors, is served by setting a bar date while still compelling the Debtors to abide by a

strict schedule to identify known or potential sex abuse survivors.  The Court has noted a number

of times that the Debtors are required to send actual notice to known sex abuse survivors who are

likely to have claims against the Debtors.  The Debtors have done virtually nothing to ascertain

the identity of known sex abuse survivors.  Instead, the Debtors belatedly began the process of

obtaining alumni directories from various schools where Brothers have taught since 1950.  The

2

Committee has reviewed the limited materials produced to date by the Debtors in an effort to aid the Debtors in identifying

3.    These Cases have been pending for nine months and the Committee cannot abide the Debtors' continued dilatory conduct in identification of sex abuse survivors. The Debtors use the relatively small number of sex abuse survivors identified in pending prepetition litigation to excuse their failure to monetize their real estate assets, yet at the same time drag their heels in obtaining information that would provide adequate notice to sex abuse survivors. The Court should not condone this "chicken or the egg" strategy. The Court should set a bar date now, order the Debtor to serve notices of the bar date, order the Debtors to complete their due diligence on a prompt schedule and order the Debtors to serve additional notices as due diligence produces the names of more parties to be noticed. The Committee reserves the right to seek an extension of the bar date if the Debtors' due diligence reveals that the notice period is inadequate in light of these belated efforts.

4.    In addition, the Committee has asked the Debtors to include certain terms that reflect criminal acts and sex abuse in the definition of Sexual Abuse in the notice of the bar date. These terms are "rape," "indecent assault," "indecent battery" and "undue familiarity." The Debtors have refused to include these terms in the definition of Sexual Abuse. The Committee understands that inclusion of these terms in the definition of sexual abuse will only serve to increase the likelihood that a survivor will assert a claim. The Debtors have not articulated a valid basis for their failure to include these terms in the definition. As such, the Committee requests that the Court direct the Debtors to include these terms in the definition of Sexual Abuse.

DOCS_LA:248205.3

5.      The Committee does not object to the setting of a bar date for creditors

other than sex abuse survivors and does not object to the Debtors' proposed notice program for

that bar date.

## BACKGROUND FACTS

6.      On April 28, 2011 (the "Petition Date"), each of the Debtors commenced

their Cases by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate

as debtors in possession.

7.      CBI alleges that it is a domestic not-for-profit 501(c)(3) corporation

organized under § 102(a)(5) of the New York Not-for-Profit Corporation Law.  CBOI alleges

that it is a domestic not-for-profit 501(c)(3) corporation organized under the Not-for-Profit

Corporation Law of the State of Illinois.  The Debtors allege that they were formed for the

purposes of, among other things, establishing, conducting and supporting Catholic elementary

schools.  The Debtors state that their "immediate need for relief before this court stems from the

fact that the [Debtors] have been named in numerous sexual abuse lawsuits which are alleged to

have occurred between approximately 30 to 50 years ago primarily in Washington State and St.

John's Newfoundland, Canada."  *Local Rule 1007-2 Affidavit* of Brother Kevin Griffith (the

"Griffith Aff.") dated April 28, 2011 [Docket No. 2] at ¶ 5.

8.      On May 2, 2011, the Court entered an order consolidating the Debtors'

Cases for administrative purposes only [Docket No. 8].  No trustee or examiner has been

appointed in these Cases.

9.      On May 11, 2011 the United States Trustee for Region 2 (the "U.S.

Trustee") appointed six members to the Committee.  On May 23, 2011, the U.S. Trustee

appointed a seventh member to the Committee.  The Committee is comprised of seven

4

individuals who are plaintiffs in cases pending against at least one of the Debtors in either Washington State or Canada.

**A.     The Congregation of Christian Brothers**

10.     The Congregation of Christian Brothers (the "Congregation") is a Catholic religious order founded in 1802.  The Congregation "is a canonical organization set up by the Roman Catholic Church as a teaching order under the church."[1]  The Congregation's members are referred to as "brothers."  The brothers are not ordained priests,[2] but take vows of poverty, chastity, and obedience.[3]  The Committee understands that the Congregation's religious mission is primarily focused on youth education.  The Congregation has delineated various geographic provinces throughout the world, including North America, in which the Congregation operates. The Congregation has had a continuous presence in North America since approximately the early twentieth century.[4]  Prior to approximately 1966, the Congregation had one North American Province (the "Old NAP") operating in the United States and Canada.  By the early 1960's, the Congregation divided its North American Province into three provinces: the Eastern American Province (the "Eastern Province"); the Western American Province (the "Western Province"); and the Canadian Province (collectively, with the Eastern Province and the Western Province, the "Three Provinces").[5]

---

[1] *See* Transcript of 341 meeting held on June 28, 2011 ("341 Tr.") at 23:13-16.  *See also* The Honorable S.H.S. Hughes, Q.C., Royal Commission of Inquiry Into the Response of the Newfoundland Criminal Justice System to Complaints , Vol. 1, p. 1 (May 31, 1991) (the "Hughes Commission Report") (available at http://lewisday.ca/ldllf.files/pdf/Mt.Cashel vol1.pdf (last visited on September 22, 2011)); Report of the Commission to Inquire Into Child Abuse, § 6.01 (May 2009) (available at http://www.childabusecommission.ie/rpt/01-06.pdf (last visited on September 22, 2011)) (the "Abuse Commission Report").

[2] *See* Hughes Commission Report at p. 5.

[3] *See* Abuse Commission Report at § 6.87.

[4] *See* Hughes Commission Report at p. 4 ("The Congregation of Christian Brothers was first established on North America as a separate province in New York in 1916"); Griffith Aff. at ¶ 4 ("[CBI] was formed in 1903…").

[5] *See Motion of Corporation of The Catholic Archbishop of Seattle to Seek Determination of the Extent of 11 U.S.C.*

5

11.     As of 2005, the Three Provinces merged into a single province (the "2005 Restructuring") called the Edmund Rice Christian Brothers North American Province (the "New NAP").[6]  The New NAP is headed by a Provincial Leader and a Provincial Leadership Team of seven brothers (all of whom are also the directors or trustees of each of the Debtors).[7]

## DUE DILIGENCE TO IDENTIFY CREDITORS

**A.     The Debtors Should Conduct a Thorough
Review of Their Records to Identify Likely Claimants**

12.     Nine months into these Cases, the Debtors still have not completed sufficient diligence of their existing records to identify known sex abuse survivors.  The Debtors state that they "are seeking some guidance from this Court as to defining the universe of known creditors." (Motion, para. 10).   The Court already has provided that guidance but the Debtors have blithely ignored it.  At the October 25, 2010 hearing (three months before the hearing on the Motion), the Court admonished the Debtors that their efforts to identify known creditors would have to go beyond a mere examination of their litigation files.  Despite this explicit instruction, the Debtors insist that "[o]ther than claims asserted by individuals who had commenced litigation or asserted a claim against the Debtors prior to the Petition Date, the Debtors have no other means to determine who should receive actual notice of the Sexual Abuse Bar Date." (Motion, para. 12).

13.     The assertion that a review of litigation claims or asserted claims is the only means to identify sex abuse survivors simply is untrue.  In fact, the Committee has demanded that the Debtors, among other things, review their entire archives to identify sex abuse

---

§ 362 Stay with Regard to Edmund Rice Congregation of Christian Brothers-North American Province (the "Archdiocese Motion") [Docket No. 69] at p. 8.

[6] See 341 Tr. at 32:12-21.

[7] See 341 Tr. at 22:20-23:5 and 38:20-39:11.

survivors.[8]  The information that the Committee has demanded the Debtors' review includes the personnel files of each and every Brother, correspondence between the Debtors or the New NAP (including its predecessor Provinces) and any other party, and minutes maintained by the New NAP (including its predecessor Provinces).   The Court and the Committee should not have to parse through arguments as to what constitutes a personnel file or what is or is not within the books and records of the incorporated debtors as opposed to the New NAP's archives.  The Debtors should review the entire archives of the New NAP(including its predecessor Provinces).

14.     Examples of the Debtors' records that could lead to the identification of sex abuse survivors arose in both the prepetition discovery in cases pending against the Debtors in Washington State and in the postpetition discovery between the Debtor and the Committee.  In the Washington State discovery, one of the Christian Brothers defendants produced a document that refers to parents complaining about a particular Brother.  A true and correct copy of the produced document is attached as **Exhibit A** hereto and filed under seal.  Also in the Washington State discovery, one of the Christian Brothers defendants produced a document that refers to allegations of a Brother abusing young boys.  A true and correct copy of the produced document is attached as **Exhibit B** hereto and filed under seal.  Notably, the Washington State discovery focused only on abuse in two schools in Washington State and not on abuse that may have occurred in other jurisdictions where the Brothers operated.

15.     In the course of postpetition discovery, the Debtors have produced some of the minutes of provincial leadership meetings of the different provinces that pre-existed the New NAP.  In those minutes, the Debtors' leadership expressly discussed or alluded to Brothers who may have sexually abused children.  The Committee provided excerpts of these minutes to

---

[8] The Committee has demanded that the Debtors search not only their own archives and records, but the archives and records of the New NAP, including any predecessor in interest thereto.

DOCS_LA:248205.3

the Debtors.  A true and correct copy of the Committee's email to the Debtors is attached hereto

as **<u>Exhibit C</u>** hereto and filed under seal.[9]

16.     The Debtors should conduct a thorough review of their records (and any

records of the New NAP) and identify the parents and children that were identified or referenced

in correspondence or other documents in the Debtors or the New NAP's possession, custody or

control in order to identify and provide notice to known claimants.  Once the Debtors have

complied with these requirements, they should certify their efforts to the Court, including a

specific response to each of the discussions contained in the foregoing Exhibits.

**B.      The Debtors Should Seek Documents From
          <u>the Congregation in Order to Identify Likely Claimants</u>**

17.     Prior to the commencement of these Cases, the Washington Superior

Court issued an order (the "<u>Order to Compel</u>") compelling the North American Province to

produce documents located with the Congregation in Rome that are relevant to sexual abuse

claims.  The North American Province sought discretionary appellate review of that order.  The

appellate hearing was scheduled on the petition date of these Cases and the hearing did not go

forward due to the automatic stay.   True and correct copies of the discovery motion and the

Superior Court's Order to Compel are attached hereto as **<u>Exhibits D</u>** and **<u>E</u>**, respectively.

18.     The Debtors also should be required to comply with the substance of the

Washington Superior Court's prepetition order to compel production of documents which, in

effect, would be a request to the Congregation for all documents related to the sexual abuse in

the North American Province (and its predecessor provinces) so that it has a complete file for

provincial archives and this bankruptcy case.  The request should be made within three (3)

---

[9] The Committee reserves the right to amend and/or supplement any request to the Debtors regarding, including requests that the Debtors' identify sex abusers or survivors.

business days of entry of the order on the Motion.  The Debtors should be ordered to file a copy

of the request with the Bankruptcy Court and all responses and replies in relation to that request,

other than the documents that are produced.  The Debtors should be ordered to provide all non-

privileged responsive documents to the Committee and counsel in the Washington Superior

Court action, subject to existing confidentiality agreements, and a privilege log, all within five

(5) days after receipt of the documents.

### DUE DILIGENCE TO IDENTIFY INSTITUTIONAL ALUMNI

19.    The Debtors acknowledge the importance of providing notice to the

alumni of institutions where Brothers were located.  (Motion, para. 10) ( "On the other hand, the

Debtors believe that to the extent a known abuser taught or performed ministry at a particular

institution, sending notice to alumni who attended the institution during the years in which the

known abuser was located at the institution is reasonable.").  Yet, the Debtors have not exercised

or completed sufficient diligence to identify institutional alumni who attended Brother-staffed

institutions when known sexual predators served at such institutions.  As early as mid-August

2011, the Debtors provided the Committee with a proposed bar date motion that contemplated

serving alumni of their schools and institutions with a bar date notice.  To date, twenty-eight (28)

subpoenas have been served.  The first subpoenas did not go out until December 12, 2011,

almost seven months after commencement of these Cases and thirteen days <u>after</u> the Motion was

filed.  Notably, if the parties had kept to the original December 22 hearing date for the Motion,

not a single directory would have been produced before the Court would have heard the Motion.

Moreover, the Debtors served six subpoenas as recently as January 10, 2012 (less than two

weeks before the scheduled hearing on this Motion).

20.    Some of the subpoenas have been provided to the Committee.  They are

one page long with a one page form transmittal letter.  The preparation of each of these

9

subpoenas and transmittal letters would not take more than 15 minues and the preparation of all

28 subpoenas and letters should not have taken more than a business day (or two at best). The

Committee cannot fathom why the Debtors have taken so long to prepare and serve the

subpoenas.

21.     Despite this record, the Committee believes that the Court should set a bar

date and order the Debtors to serve those alumni known to them with the form of notice that is to

be published. This notice should be sent within five (5) days after the Court's bench ruling on

the Motion. In conjunction with the hearing on the Motion, the Court will be considering

motions by several schools to, in effect, quash or limit the subpoenas. The Committee expects

the Court to rule on whether additional directories should be produced. If directories are to be

produced, they should be produced within five (5) days of the Court's bench ruling and the

Debtors should be required to send notices out to the alumni within three (3) business days after

receipt of the directories.

## INADEQUATE DEFINITION OF SEXUAL ABUSE

22.     The Court should not approve any of the documents attached to the

Motion that include the Debtors' definition of "Sexual Abuse" in the proposed Sexual Abuse

Proof of Claim Form (Motion, Ex. B) and Notice of Deadline For Filing Claims Relating To or

Arising From Sexual Abuse (Motion, Ex. D). The Debtors and the Committee consulted

regarding the definition of "Sexual Abuse" and the Debtors have rejected portions of the

definition proposed by the Committee. The Committee sought to include the following terms in

the definition of "Sexual Abuse":

    a.     rape;

    b.     indecent assault;

    c.     indecent battery; and

DOCS_LA:248205.3

d.      undue familiarity.

23.      The Debtors also seek to omit any reference to acts or omissions between an adult and a <u>non-consenting</u> adult.

24.      The Committee simply cannot understand how the Debtors can contend that rape, indecent assault and indecent battery are not appropriate examples of sexual abuse or that the enumerated acts against a non-consenting adult should be excluded.  Rape is not an ambiguous term; it is a crime under Article 130 of the New York State Penal Code as well as the laws of every other state.  Assault and battery are likewise crimes under New York law (and the law of every other state) and "indecent" is not an ambiguous term; the term "indecent" is used throughout the New York State Penal Code.  Committee counsel has been informed by experts regarding sexual abuse that the term "undue familiarity" is a means of eliciting responses to a bar date for sexual abuse.  Finally, intentional acts against a <u>non-consenting</u> adult (*i.e.*, rape of an adult) certainly may give rise to claims against the Debtors.

25.      The Debtors may be objecting because they are improperly conflating the description of "Sexual Abuse" with allowance and valuation of claims filed on the proof of claim form or whether claims are covered by insurance.  The Committee believes it is necessary to elicit claims that cover a broad range of conduct.  Expert testimony will reveal that abuse survivors often times may not recognize the abuse as sexual due to psychological, emotional and sociological factors.  The Committee is trying to overcome these limitations by providing a definition that provides alternative terminology to the term "sexual."  If a claim is filed that does not warrant a monetary award, the plan process for valuation of such claims will address the issue.

11

## CANADIAN TERMINOLOGY

26.    The Debtors commenced their Cases on account of, among other things, cases pending in Canada alleging sexual abuse by Brothers at the Mount Cashel Orphanage in Newfoundland, Canada during the period from the 1940s through the early 1960s.  There are dozens of such claims pending at this time.  As such, a substantial portion of claims against the Debtors are likely to be asserted by Canadian claimants.  Any bar date notices sent to Canada should be revised to reflect Canadian terminology and should also be served on entities analogous to U.S. entities.  For example:

a.    The term "attorney" is not used in Canada. The term should be "solicitor."

b.    "States" do not exist in Canada.  A "Province" is roughly analogous. In addition, there is no analogous entity in Canada to a county in the U.S.

c.    Canadian provinces do not have district attorneys.  Instead, a district attorney is analogous to a Crown Prosecutor.  As such, notices should be sent to Crown Prosecutors.

## PUBLICATION NOTICE

27.    The Committee and the Debtors have conferred regarding the publication of notices of the bar date.  Based on information available to the Committee, it agrees that the list of publications included in the Motion covers the appropriate geographic areas.  The Committee reserves the right to seek an order requiring publication in additional printed media, just as the Debtors reserved such right.  If the Court approves this portion of the Motion, the Debtors should not be allowed to deviate from the approved list without an order on notice and hearing.

28.    The Committee's agreement with the identity of the printed media does not constitute an agreement regarding the frequency of the publication of the notice.  If the Court does not order the Debtors to identify sex abuse survivors as requested herein, the Committee

will request a more frequent publication schedule.  The Debtors should provide the Court and the

Committee with a complete schedule of publishing costs so that the Court and the Committee

can assess the costs related to the benefits of more frequent publishing.

29.    The Committee has no objection to the concept of publishing notice of the

Sexual Abuse Bar Date through a company such as  24/7 RealMedia, Inc.  However, this form of

publication should not be in lieu of the Debtors performing the due diligence otherwise sought

by the Committee and already directed by the Court.

30.    The Debtors intend to send requests that the Sexual Abuse Bar Date

Notice be posted to various governmental agencies and officers and to various institutions.  In

addition, the Debtors should send a similar request to every Catholic diocese and parish where

the Christian Brothers staffed an institution.  To minimize the risk that the requests will ignored,

the request should issue from the Debtors (rather than their counsel) and the notice should state

that it is being posted at the request of the of the Debtors.  The Court should review and approve

the form of such requests and not rely solely on the Debtors' statement that they merely will

confer with the Committee regarding the form of such requests.  In addition, the Court should

order that the Debtors file a monthly report on the responses (or lack of response) to the Debtors'

requests.

## CONCLUSION

31.    The Committee respectfully requests that the Court enter an order

establishing a bar date for assertion of claims based on sex abuse if such order:

a.    requires the Debtors to complete due diligence (including

reviewing the personnel files of all Brothers, requesting documents from the Congregation in

Rome, reviewing the Debtors' and Province's books and records, reviewing the Debtors' and the

Province's archives, reviewing the Debtors' and the Province's correspondence files and

13

reviewing the Debtors and the Province's minutes) to ascertain the identity of known sex abuse survivors;

    b.  requires the Debtors to certify the completion of their due diligence efforts to the Court;

    c.  requires the Debtors to issue any outstanding subpoenas for alumni directories within three (3) business days of entry of the order;

    d.  requires the Debtors to comply with the substance of the Washington Superior Court's Motion to Compel;

    e.  includes a more expansive definition of "Sexual Abuse" as discussed above;

    f.  requires the Debtors to send out notices to any individuals listed on alumni directories produced after the bar date within three (3) business days of such production;

    g.  requires the Debtors to provide notice of the Sexual Abuse Claims Bar Date to individuals in Canada in a form that includes terminology that is applicable in Canada; and

    h.  requires the Debtors to request that each diocese and parish where Brothers were placed post a notice of the Sexual Abuse Claims Bar Date.

DOCS_LA:248205.3

Dated:    New York, New York
          January 17, 2012

PACHULSKI STANG ZIEHL & JONES LLP


*/s/ Ilan D. Scharf*
Ilan D. Scharf , Esq.
780 Third Avenue, 36th Floor
New York, NY  10017-2024
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777

-and-

James I. Stang (admitted *pro hac vice*)
10100 Santa Monica Blvd., Suite 1100
Los Angeles, California 90067-4100
Telephone:  (310) 277-6910
Facsimile:  (310) 201-0760

Counsel for the Official Committee of
Unsecured Creditors of The Christian Brothers'
Institute and The Christian Brothers of Ireland, Inc.

**Exhibit A**

**<u>REDACTED</u>**

**<u>SUBMITTED UNDER SEAL</u>**

**Exhibit B**

**REDACTED**

**SUBMITTED UNDER SEAL**

**<u>Exhibit C</u>**

**<u>REDACTED</u>**

**<u>SUBMITTED UNDER SEAL</u>**

**<u>Exhibit D</u>**

ASSIGNED TO THE HONORABLE RONALD KESSLER
Hearing Date: December 17, 2010
Without oral argument

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

| | |
|---|---|
| L.W., et al., | NO. 09-2-23995-9 SEA |
| Plaintiffs, | PLAINTIFFS' MOTION TO COMPEL |
| v. | DISCOVERY FROM ROME |
| CORPORATION OF THE CATHOLIC ARCHBISHOP OF SEATTLE, et al., | |
| Defendants. | |

## I.    RELIEF REQUESTED

The Christian Brothers defendants (1) are part of a worldwide organization that is based in Rome, (2) have leaders in Rome who ultimately decide who is hired, who is suspended, and who is fired, and (3) have sent their most damaging documents to Rome, including documents in support of hiring, suspending, and firing Brothers.  The latter includes a Brother who was removed by the leadership in Rome for molesting Briscoe children.

Plaintiffs respectfully request the Court order the defendants to supplement their discovery responses with information and documents from their headquarters in Rome.

PLFFS' MOTION TO COMPEL - 1 of 13
09-2-23995-9 SEA

PFAU COCHRAN VERTETIS KOSNOFF
701 Fifth Ave., Suite 4730
Seattle, Washington  98104
(206) 462-4334  -  FACSIMILE (206) 623-3624

## II.     RELEVANT FACTS

Plaintiffs allege the defendants (1) knew or should have known of the danger of childhood sexual abuse, (2) failed to take reasonable steps to protect them from that danger, and (3) were responsible for supervising and protecting them at the time.[1]

The Christian Brothers have denied these allegations[2] and assert that the Seattle Archdiocese, King County, or the State of Washington are liable.[3]

In its discovery responses, defendant NAP admits that it "is a Province within the Congregation of Christian Brothers":

> … The NAP is a Province within the Congregation of Christian Brothers. The Congregation of Christian Brothers is a society of lay religious founded in 1802 by Edmund Rice. … The ultimate internal authority over the whole Congregation has always been set forth in its Constitutions. The organizational structure of the Congregation, including the North American Province, is described in the Constitutions. The Constitutions has been amended several times, but the amendments have generally been for the purpose of modernizing the text of the Constitutions, not changing the overall organizational structure of the Congregation. Pursuant to CR 33(c), the NAP relies on the relevant Constitutions for a description of its organizational structure.

> Between 1940 1967, the Congregation was divided into Provinces and Region Centers. Within the Provinces and Region Centers were local communities. The major superiors were the Superior General, who governed the entire Congregation; the Province Leader, who governed his respective Province; and within the Province, the Local Superior, who governed his respective community. Each major superior could issue ordinances in his own name, but the authority of each was limited according to the Constitutions. The Province Leader was appointed by the Superior General with the consent of his Counsel.

---

[1] *See generally* Amended Complaint for Damages.

[2] *See generally* CONGREGATION OF CHRISTIAN BROTHERS-NORTH AMERICAN PROVINCE'S AND THE CHRISTIAN BROTHERS' INSTITUTE'S ANSWER TO PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES.

[3] The Congregation of Christian Brothers – North American Province's Responses to Plaintiffs' First Set of Interrogatories and Requests for Production to Congregation of Christian Brothers – Brother Rice Province, Eastern American Province – Congregation of Christian Brothers, f/k/a Congregation of Christian Brothers – North American Province, Amala Decl., Ex. 1, at 28.

PLFFS' MOTION TO COMPEL - 2 of 13
09-2-23995-9 SEA

PFAU COCHRAN VERTETIS KOSNOFF
701 Fifth Ave., Suite 4730
Seattle, Washington 98104
(206) 462-4334 - FACSIMILE (206) 623-3624

In 1966, the NAP split into the Eastern Province and the Western Province. The Western Province was also known as the Brother Rice Province. The organizational structure of the Western Province was the same as the organizational structure of the North American province.[4]

Although they claim that CBI had no relationship to Briscoe, the Christian Brothers admit that "the NAP operated Briscoe Memorial School on behalf of the Archdiocese pursuant to a contract, which speaks for itself and is the best evidence of its contents."[5]

Based on that admission and the terms of the referenced contract, the NAP operated Briscoe as a part of "the Christian Brothers of Ireland."[6]

## A.    The Headquarters and Leadership of the Defendants is in Rome

Brother Brian Walsh, the immediate past deputy leader of defendant NAP, has testified in line with that organizational structure.  In 1993, Walsh became the deputy leader of the Eastern American Province ("EAP"), one of the predecessor entities to defendant NAP. In 2002, he became the leader of that predecessor entity, and when defendant NAP was formed in 2005, he became its deputy leader.  He held that position until July 2008.[7]

When Walsh was first appointed to the leadership team of EAP, he was "nominated for the position by the brothers of the province in appointed by the congregation leader in Rome."[8]  Likewise, when Walsh was appointed deputy leader of NAP, he was "nominated by the brothers in North America and I was appointed by the congregation leader in Rome."[9]

---

[4] The Congregation of Christian Brothers – North American Province's Responses to Plaintiffs' First Set of Interrogatories and Requests for Production to Congregation of Christian Brothers – Brother Rice Province, Eastern American Province – Congregation of Christian Brothers, f/k/a Congregation of Christian Brothers – North American Province, Amala Decl., Ex. 1, at 23-24 (emphasis added).

[5] *Id.* at ¶ 2.7.

[6] Briscoe contract, Amala Decl., Ex. 2, at 2.

[7] Deposition of Brian Walsh, Amala Decl., Ex. 3, at 5-7, 11, 15.

[8] *Id.* at 8-11.

[9] *Id.* at 15-16.

PLFFS' MOTION TO COMPEL - 3 of 13
09-2-23995-9 SEA

PFAU COCHRAN VERTETIS KOSNOFF
701 Fifth Ave., Suite 4730
Seattle, Washington  98104
(206) 462-4334  -  FACSIMILE (206) 623-3624

In that leadership position, Walsh sent documents to Rome when a Brother would request exclausation (a leave of absence).[10]  In order to obtain an exclaustration, the Brother had to 'write a letter to the congregation leader stating your reasons."[11]  The request was sent directly to the congregation leader in Rome.[12]  In turn, the congregation leader would approve or reject the request.[13]  This process was required by the constitutions of the Brothers.[14]

Similarly, Walsh testified that the congregation leader in Rome must approve of a Brother who wants to take his vows to become a Brother, and the Brothers also had a "procurator general" in Rome who was responsible for handling Brothers who were dispensed from their vows.[15]  While he was on the leadership team of defendant NAP, Walsh sent the paperwork for up to 20 requests for dispensation to their headquarters in Rome.[16]

The "congregation leader" and the "Superior General" are the same position.  For example, when shown a letter to the "Brother Superior General" in Ireland regarding Briscoe from 1951, Walsh testified the recipient was the Superior General who was "in charge" of the entire Congregation and that "we call him the congregation leader these days."[17]

Walsh's testimony regarding Rome is similar to that of the archivist for defendant NAP, Brother DeLorenzo.  In his deposition, DeLorenzo admitted that "[t]here might be some

---

[10] *Id.* at 115-16, 140-44.

[11] *Id.* at 140-44.

[12] *Id.* at 116.

[13] *Id.* at 116, 143-44.

[14] *Id.* at 116-17.

[15] *Id.* at 116-18.

[16] *Id.* at 118.

[17] *Id.* at 171-72.

PLFFS' MOTION TO COMPEL - 4 of 13
09-2-23995-9 SEA

PFAU COCHRAN VERTETIS KOSNOFF
701 Fifth Ave., Suite 4730
Seattle, Washington  98104
(206) 462-4334  -  FACSIMILE (206) 623-3624

things from Rome because of our superior general."[18]   He also conceded that there is a

Christian Brothers archivist in Rome who oversees their archives in Rome:

> Q:     Is there a Christian Brothers archivist in Rome?

> A:     Yes.  Okay.  He is the new guy now. Yes, I guess he is the archivist. I've never contacted him, to be honest with you. …

> Q:     Have you ever visited – is there a Christian Brothers archives in Rome?

> A:     Yes, there is.

> Q:     Have you ever visited that archives?

> A:     Not where it is now, but one it was in the old – in 1988, I was in the archives.

> Q:     Could you please describe for us, please, the Christian Brothers' archives in Rome, at least as of 1988?

> A:     They were in a large room in the basement of the generalate.  The generalate was the home of the superior general in his counsel, and we also had an international center for brothers, which we called tertianship that was at – in the general area.  … In there were documents where – Brother Peter Fogerty from Australia was the archivist then, and he kept the documentation. He was secretary to the superior general in his counsel, and archivist of the congregation. He is the one I worked with, and I did a little internship of how to work and archives within the 1988.

> Q:     As of 1988, did you have any understanding of the types of documents that were maintained at the Christian Brothers' archives in Rome?

> A:     … There probably were – if a brother left the congregation and was a finally professed brother, and if you are finally professed, because we are a pontifical congregation, which means we are under the Pope and the Vatican, <u>the letters of dispensation from vows, they would have been kept in Rome</u>. …[19]

Like Walsh, Brother DeLorenzo also confirmed that NAP's headquarters is in Rome:

"After a particular brother accepts the assignment of writing a necrology, he writes it, and

---

[18] Deposition of Alexander DeLorenzo, Amala Decl., Ex. 4, at 22.

PLFFS' MOTION TO COMPEL - 5 of 13
09-2-23995-9 SEA

PFAU COCHRAN VERTETIS KOSNOFF
701 Fifth Ave., Suite 4730
Seattle, Washington  98104
(206) 462-4334  -  FACSIMILE (206) 623-3624

then it's sent to Rome to the generalate, general headquarters. It's the home where the congregational leader and his council live.[20]

Like Walsh and DeLorenzo, the archivist for the former Western Province, Brother Messick, has testified that the defendants, Rome, and the Rome archives are one big family:

> Q:     Okay.   What's the relationship between or what entity runs or controls the Rome archives?
>
> A:     Brother Wall and his immediate boss, the head archivist, would be of the jurisdiction of the General Council, and specifically the Superior General or Congregation Leader as he is now called.[21]

The evidence also shows that CBI is a part of this same worldwide organization. According to its articles of incorporation, all of its directors and members must be members "of the religious community known as 'the Christian Brothers'" or else "he shall at once forfeit all rights and privileges for membership in this corporation."[22]

Perhaps more importantly, CBI's Board of Trustees must include (1) the "Brother General of the Brothers of the Christian Schools of Ireland," (2) the "Brother Provincial of the Brothers of the Christian Schools of Ireland, American Province," and (3) four other members who "must be members of The Brothers of the Christian Schools of Ireland."[23]   Moreover, its chairman must be the "Brother General of The Brothers of the Christian Schools of Ireland."[24]

---

[19] *Id.* at 42-44 (emphasis added).

[20] *Id.* at 73.

[21] Deposition of Brother Paul J. Messick, Amala Decl., Ex. 5, at 161.

[22] Constitution of The Christian Brothers Institute, Amala Decl., Ex. 6, at 3.

[23] By-Laws of the Christian Brothers Institute, Amala Decl., Ex. 7, at 2.

[24] By-Laws of the Christian Brothers Institute, Amala Decl., Ex. 7, at 4-5.

PLFFS' MOTION TO COMPEL - 6 of 13
09-2-23995-9 SEA

PFAU COCHRAN VERTETIS KOSNOFF
701 Fifth Ave., Suite 4730
Seattle, Washington  98104
(206) 462-4334  -  FACSIMILE (206) 623-3624

Likewise, all of its regular members must be "persons who are professed members of the religious congregation of men known as 'The Brothers of the Christian Schools of Ireland.'"[25]

### B.    Defendant NAP Refuses to Account for the Knowledge and Documents of Its Headquarters and Archives in Rome, Even Though the <u>Only</u> Records Documenting Sexual Abuse at Briscoe Came from Rome

Despite a meet and confer, the Christian Brothers have stated they will not account for the knowledge and documents in Rome without a court order.[26]  Instead, they claim they have no relationship with Rome, and they claim they have previously "asked" Rome to produce responsive records.[27] The evidence does not support these claims.

Despite years of litigation, the Brothers have never accounted for the information and documents they have sent to Rome and they maintain in Rome.  At most, they were twice ordered to "request" records from Rome.  Realizing that such an order lacked any enforceable teeth, the Brothers sarcastically asked Rome to "consider" sending responsive records.  And while the second "request" included documents regarding notice of the danger of sexual abuse of children, it did not request documents regarding Briscoe and the Christian Brothers never produced any documents in response to that "request."[28]

When Plaintiffs pressed the Christian Brothers for the Rome documents, the Brothers' former counsel stated they had "requested documents from Rome, but not yet received a response."[29]  To date, the Christian Brothers have never been ordered to account for the

---

[25] By-Laws of the Christian Brothers Institute, Amala Decl., Ex. 7, at 1.

[26] Amala Decl., at ¶ 9.

[27] Amala Decl., at ¶ 9.

[28] Letter from Dougherty to Wall, dated September 21, 2009, Amala Decl., Ex. 8.

[29] Letter from Tompkins to Amala, dated September 29, 2009, Amala Decl., Ex. 9.

PFAU COCHRAN VERTETIS KOSNOFF
701 Fifth Ave., Suite 4730
Seattle, Washington  98104
(206) 462-4334  -  FACSIMILE (206) 623-3624

information and documents at their offices and archives in Rome, including their archives, and they never produced documents in response to their last "request" to Rome.[30]

Moreover, there is good reason to believe the most important documents in this case are kept in Rome because the Brothers previously produced sixteen pages from Rome showing (1) widespread abuse at Briscoe between the 1940s and 1960s, and (2) in the early 1980s, a Brother was dispensed for molesting children at four schools in the Midwest and at O'Dea High School.[31] While the Christian Brothers will no doubt respond to this motion by seeking "credit" for producing those these sixteen pages, the documents are a red herring because they only reflect abuse by an "accused Brother," rather than other Brothers or staff at Briscoe or other schools who molested children prior to 1970.[32]

There is also no genuine dispute that the Christian Brothers are aware of this evidence. Plaintiffs have attached a copy of a chapter of the report of the Commission to Inquire into Sexual Abuse, commissioned by Ireland, to investigate sexual abuse in that country, including sexual abuse perpetrated by the Christian Brothers. The chapter is entitled "Rome Files and documentary evidence" and outlines how the Brothers tried to secret the Rome documents away from the Commission.[33] It also describes the trove of records in Rome that severely undermine their purported ignorance of the danger of sexual abuse:

> The Rome Files were made available to the Committee after the Emergence hearings had been completed. They contained details of applications for dispensations or disciplinary hearings in respect of more than 130 Brothers. At least 40 of these cases referred specifically to improper conduct with boys. In the

---

[30] Amala Decl., at ¶ 10.

[31] Letter from Kruse to Shaffer, dated December 17, 2007, Amala Decl., Ex. 10 (including attached documents).

[32] Letter from Kruse to Shaffer, dated December 17, 2007, Amala Decl., Ex. 10.

[33] Chapter 6, The Congregation of Christian Brothers, Amala Decl., Ex. 11, at ¶¶ 6.159-6.171; *see also id.* at 6.260-6.268 (same).

PLFFS' MOTION TO COMPEL - 8 of 13
09-2-23995-9 SEA

PFAU COCHRAN VERTETIS KOSNOFF
701 Fifth Ave., Suite 4730
Seattle, Washington 98104
(206) 462-4334  -  FACSIMILE (206) 623-3624

majority of cases, the actual crime being investigated was not detailed, and phrases such as 'evidenced unsuitable moral character' or 'grave misconduct' or 'caused scandal' were used when recommending a dispensation. … The Rome Files make it impossible to contend that the issue of abuse and, in particular, sexual abuse of boys was not an urgent and continuing concern to the Congregation.[34]

These records are not surprising, as they have admitted "the Christian Brothers' 1972 Constitutions appear to suggest, that to the extent any response of documents would have been sent anywhere, such documents would likely have been sent to the Rome archives …"[35]

The few documents they have produced from Rome vividly demonstrate why it is disingenuous for the Brothers to claim that they are not a part of the Rome organization or that their Roman leadership was not calling the shots at Briscoe.  For example, in 1950, the Superior General wrote to the American Provincial regarding one of the Brothers who had admitted to molesting children at Briscoe and was being dispensed.  In that letter, the Superior General scolded his American Provincial for taking it easy on the pedophile Brother, particularly given their unique knowledge of the threat of pedophilia:

> I am afraid that you have shown a mistaken compassion for the offender.  Persons who have fallen, as he has done, rarely respond to such consideration.[36]

The Brothers have taken the position that they were not aware of the danger of pedophilia and that the conditions at Briscoe were the fault of the Archdiocese, the State of Washington, or King County.[37]  In support of that position, they recently argued to this Court that ""[a]s society's awareness and understanding of the problem of sexual abuse has

---

[34] *Id.* at ¶¶ 6.165 and 6.168.

[35] Declaration of Laura E. Kruse in Opposition to Plaintiff's Motion to Compel, Amala Decl., Ex. 12, at ¶¶ 7-8.

[36] Letter from Pro-Superior General to Brother Provincial, dated April 8, 1950, Amala Decl., Ex. 13.

[37] The Congregation of Christian Brothers – North American Province's Responses to Plaintiffs' First Set of Interrogatories and Requests for Production to Congregation of Christian Brothers – Brother Rice Province,

PLFFS' MOTION TO COMPEL - 9 of 13
09-2-23995-9 SEA

PFAU COCHRAN VERTETIS KOSNOFF
701 Fifth Ave., Suite 4730
Seattle, Washington  98104
(206) 462-4334  -  FACSIMILE (206) 623-3624

increased over the last four decades, so too has that of the Christian Brothers."[38]  Given this

position, Plaintiffs seek full discovery regarding their knowledge of the danger of childhood

sexual abuse and their role in Briscoe's operations.

### III.    STATEMENT OF ISSUE

Should the Christian Brothers defendants be ordered to supplement their discovery responses with relevant information and documents from their headquarters and archives in Rome?

### IV.    EVIDENCE RELIED UPON

This motion relies upon the Declaration of Jason P. Amala in Support of Plaintiffs' Motion to Compel Discovery from Rome ("Amala Decl.") and the pleadings and evidence previously filed in this case.

### V.    LEGAL ARGUMENT

Plaintiffs respectfully request the Court order the Christian Brothers defendants to

supplement their discovery responses with information and documents from their offices and

archives in Rome, including (1) documents showing what they knew or should have known

regarding the danger of sexual abuse of children prior to 1970, (2) Briscoe's operations, and

(3) the relationship between the Congregation of Christian Brothers, the Christian Brothers

Institute, the Christian Brothers Institute, Inc., and the Seattle Archdiocese.  This discovery is

relevant and within the custody or control of the Christian Brothers defendants.

**First,** this discovery is relevant because the key issues in this case are notice and

control.  *C.J.C. v. Corporation of the Catholic Bishop of Yakima*, 138 Wn.2d 699, 721-22,

985 P.2d 262 (1999) (a victim of childhood sexual abuse must prove the defendant owed him

---

Eastern American Province – Congregation of Christian Brothers, f/k/a Congregation of Christian Brothers – North American Province, Amala Decl., Ex. 1, at 28.

[38] Motion for Protective Order, filed November 29, 2010, at 11.

PFAU COCHRAN VERTETIS KOSNOFF
701 Fifth Ave., Suite 4730
Seattle, Washington  98104
(206) 462-4334  -  FACSIMILE (206) 623-3624

a duty to protect him from foreseeable harm and breached that duty); *T.S. v. Boy Scouts of Am.*, 157 Wn.2d 416, 421, 24-25, 138 P.3d 1053 (2006) (institutional knowledge of pedophilia was relevant to whether the defendant "was aware or should have been aware of the extent of the pedophilia threat during the period at issue … and whether [the defendant's] policies and procedures were timely and effective responses to the threat").

Even the Christian Brothers recently conceded that "[t]he paramount factual issue … is whether any defendant had notice of the threat posed by the alleged abusers."[39]  And as the Court knows well from their summary judgment motions, defendant CBI asserts it did not owe Plaintiffs a duty because it had no relationship with Briscoe or its Brothers.

**Second,** the Christian Brothers have a duty to produce discovery that is in their "possession, custody or control."  CR 34(b); *see also* CR 33(c) (a party must "furnish such information as is available to the party").  By its own admission, defendant NAP is a part of a "society of lay religious," the Congregation of Christian Brothers, that is based in Rome, and defendant NAP is ultimately controlled by the leadership in Rome.

This admission matches the testimony of Walsh, DeLorenzo, and Messick, who conceded (1) defendant NAP is part of the worldwide organization that is based in Rome, (2) their leaders in Rome decides who is hired, who is suspended, and who is fired, and (3) defendant NAP sends its most damaging documents to Rome, including documents in support of hiring, suspending, and firing Brothers.  Likewise, the evidence shows that the Superior General in Rome was actively involved with Briscoe's operations, including (1) the decision to dispense a Brother who molested a boy at Briscoe, and (2) the decision to admonish the

---

[39] Motion for Protective Order, filed November 29, 2010, at 3.

PLFFS' MOTION TO COMPEL - 11 of 13
09-2-23995-9 SEA

PFAU COCHRAN VERTETIS KOSNOFF
701 Fifth Ave., Suite 4730
Seattle, Washington  98104
(206) 462-4334  -  FACSIMILE (206) 623-3624

American Provincial of defendant NAP for showing "a mistaken compassion for the offender" based on their institutional knowledge of the danger of pedophilia.

Plaintiffs have sued the Congregation of Christian Brothers, and despite their best efforts to frame the defendant as just the "North American Province," the evidence shows that this is one, large, worldwide, unincorporated "society of lay religious" whose headquarters is in Rome, whose leadership is in Rome, whose damaging documents are sent to Rome, and whose leadership in Rome decided who was hired, suspended, and fired, including the Brothers at Briscoe.  It must account for the information and documents maintained in Rome. *State ex rel. Cannery Workers & Farm Laborers Union, Local 7 v. Superior Court for King County*, 30 Wn.2d 697, 700-01, 193 P.2d 362 (1948) (trial court properly sanctioned members of unincorporated association who schemed together to avoid producing documents).

The discovery that Plaintiff seek is relevant, the defendants have a legal duty to produce it, and they cannot evade that duty through self-serving assertions that belie their admissions and the testimony of their members.  Plaintiffs' motion should be granted.

## VI.    CONCLUSION

Plaintiffs respectfully request the Court grant their motion to compel.

Dated this 9th day of December 2010.

PFAU COCHRAN VERTETIS KOSNOFF PLLC

By _____
Michael T. Pfau, WSBA No. 24649
michael@pcvklaw.com
Jason P. Amala, WSBA No. 37054
jason@pcvklaw.com
Attorneys for Plaintiffs

PLFFS' MOTION TO COMPEL - 12 of 13
09-2-23995-9 SEA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## CERTIFICATE OF SERVICE

I, Bernadette Lovell, hereby declare under penalty of perjury under the laws of the State of Washington that I am employed at Pfau Cochran Vertetis Kosnoff PLLC, and that on this 9th day of December 2010, I served Plaintiffs' Motion to Compel Discovery from Rome, and the Declaration of Jason P. Amala in support thereof, via E-Service, Legal Messenger, and/or U.S. Mail as indicated below by directing delivery to the following individual(s):

*Counsel for Defendant Seattle Archdiocese:*
Karen Kalzer, Esq.
Patterson Buchanan
2112 Third Ave., Suite 500
Seattle, WA 98101
(206) 462-6700 - p
(206) 462-6701- f
kak@pattersonbuchanan.com

*Counsel for Defendant Christian Brothers:*
Jeffrey I. Tilden, Esq.
Jeffrey M. Thomas, Esq.
Gordon Tilden Thomas & Cordell, LLP
1001 Forth Avenue, Suite 4000
Seattle, WA 98154
(206) 467-6477- p
(206) 467-6292- f
jthomas@gordontilden.com

*Bernadette Lovell*
Bernadette Lovell
Legal Assistant to Michael T. Pfau

PLFFS' MOTION TO COMPEL - 13 of 13
09-2-23995-9 SEA

**<u>Exhibit E</u>**

ORIGINAL

Pfau Cochran Vertetis Kosnoff
DEC 21 2010
Seattle office

## IN THE SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

| | |
|---|---|
| L.W., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CORPORATION OF THE CATHOLIC ARCHBISHOP OF SEATTLE, *et al.*,<br><br>Defendants. | No. 09-2-23995-9<br><br>ORDER ON MOTION TO COMPEL DISCOVERY FROM ROME |

Plaintiffs have moved for an order requiring defendants to provide documents purportedly held in Rome, Italy. The court is unpersuaded by defendants' First Amendment argument. Having read all of the pleadings and declarations, it is hereby

ORDERED that defendants shall obtain and provide all demanded documents, as set forth on page 10 of Plaintiffs' Motion to Compel of 9 December 2010, including those in Italy; it is further

ORDERED that defense counsel shall serve a copy of this order upon the Christian Brothers' archivist in Rome, Italy and to the Apostolic Nuncio to the United States and obtain, serve and file proof of service.

This order does not presuppose the existence of a remedy should defendants fail to obtain the records in controversy. Should the records not be obtained, any remedy will take into consideration, *inter alia,* the good or bad faith of defendants and counsel in vigorously pursuing and acting upon this order; the response, if any, of the archivist and the Apostolic Nunciature; international law related to discovery in civil matters; publications from the Holy See relevant to the expectation of cooperation with civil authorities regarding the investigation of alleged acts of

**King County Superior Court**
**King County Courthouse**
**516 Third Avenue**
**Seattle, Washington 98104**
**(206) 296-9113**

1    abuse of minors or others within the purview of the Church.

2    DATED    17 December 2010.

3

4    RONALD KESSLER, Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

ORDER 2 of 2