**Hearing Date:  August 6, 2012 at 10:00 a.m.**

PACHULSKI STANG ZIEHL & JONES LLP
James I. Stang, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067-4100
Telephone: 310/277-6910
Facsimile: 310/201-0760

- and -

PACHULSKI STANG ZIEHL & JONES LLP
Alan J. Kornfeld, Esq.
Ilan D. Scharf, Esq.
780 Third Avenue, 36th Floor
New York, NY  10017-2024
Telephone: 212/561-7700
Facsimile: 212/561-7777

Attorneys for Official Committee of Unsecured Creditors
of The Christian Brothers' Institute and The Christian
Brothers of Ireland, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>THE CHRISTIAN BROTHERS' INSTITUTE, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 11-22820 (RDD)<br><br>(Jointly Administered) |

**SUPPLEMENTAL REPLY IN SUPPORT OF MOTION OF THE OFFICIAL**
**COMMITTEE OF UNSECURED CREDITORS FOR AUTHORITY TO ASSERT,**
**LITIGATE AND SETTLE CLAIMS ON BEHALF OF BANKRUPTCY ESTATE**
**RELATING TO FRAUDULENT CONVEYANCE TO ALL HALLOWS INSTITUTE**

The Official Committee of Unsecured Creditors (the "Committee") of The Christian

Brothers' Institute ("CBI") and The Christian Brothers of Ireland, Inc. ("CBOI"), the debtors and

debtors in possession (collectively, the "Debtors") in the above-captioned cases, submits this

supplemental reply in support of the Committee's *Motion for Authority to Assert, Litigate and*

*Settle Claims on Behalf of Bankruptcy Estate Relating to Fraudulent Conveyance to All Hallows*

DOCS_LA:256660.4 14012-002

*Institute* [Docket No. 302] (the "Motion").[1]  A hearing on the Motion (the "Hearing") is scheduled for August 6, 2012 at 10:00 a.m.

## PRELIMINARY STATEMENT

1.      By the Motion, the Committee seeks derivative standing to prosecute an action (the "Proposed Action") to avoid and recover, for the benefit of CBI's estate and its creditors, CBI's fraudulent transfer of All Hallows High School ("AHHS") to AHI.  The Committee already has obtained – even with only very limited discovery – both direct and circumstantial evidence of CBI's "actual" fraudulent intent with respect to the All Hallows Transfer, including an admission by CBI's former counsel that CBI transferred AHHS to protect itself from liability for sexual abuse claims, unrefuted evidence that CBI received no consideration in exchange for the All Hallows Transfer, and testimony establishing the close relationship between CBI and AHI.  The Debtors and the Committee also have stipulated that, for purposes of the Hearing, the value of AHHS is $8.5 million, while the estimated litigation cost of the Proposed Action is only $650,000.  In other words, the benefit to CBI's estate of the Committee's successful prosecution of the Proposed Action – *i.e.*, avoidance and recovery of AHHS or the value thereof – far outweighs the potential costs of the Proposed Action.  Thus, the Avoidance Claims are a valuable asset that CBI cannot afford to waste.

2.      In its objection [Docket No. 335] to the Motion (the "Objection"), CBI attempted to counter several of the Committee's allegations regarding the All Hallows Transfer.  Each of CBI's efforts to refute the Committee's allegations, however, is contradicted or unsupported by the evidence in this case or, at best, raises factual issues that are incapable of resolution at this stage of the proceedings.  *See In re Adelphia Commc'ns Corp. ("Adelphia")*, 330 B.R. 364, 377-

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion.

DOCS_LA:256660.4 14012-002

78, 380-81 (Bankr. S.D.N.Y. 2005) (granting derivative standing notwithstanding that defendants "challenged or sought to advance their explanations as to aspects of the [committee's] allegations or proof, or to argue additional facts," because factual disputes were "incapable of resolution" under Fed. R. Civ. P. 12(b)(6) and thus could not be decided in connection with committee's request for standing).  CBI's main challenges to the Committee's allegations, and the main weaknesses of those challenges, are as follows:

a.      CBI argues that it transferred AHHS to AHI, not to make itself "less of a target in any suit for damages" or to give itself "some protection from liability" as stated by its former counsel, but instead because AHI had become "viable" and was capable of "self-sustained independence" from CBI.  Objection at ¶ 8.  Not only did CBI fail to produce any documents to establish that, in fact, AHI was capable of supporting itself at the time of the All Hallows Transfer, but CBI's own FRCP 30(b)(6) designee also testified that (i) he has never seen any AHI financial statements from 1990, *i.e.*, the time of the All Hallows Transfer, and (ii) after the All Hallows Transfer, CBI continued to provide financial support to AHI until approximately 2005.

b.      CBI claimed in its Objection that the All Hallows Transfer was made in the "ordinary course" of business.  Objection at ¶ 16.  The documents produced by CBI and the deposition testimony of CBI's FRCP 30(b)(6) designee establish, however, that CBI has only made two other conveyances to its separately-incorporated educational institutions: (i) a 1946 conveyance to Iona College; and (ii) a 1964 conveyance to Iona Preparatory School.  To the extent that either of those conveyances even can be considered relevant to CBI's "ordinary course" argument, CBI has, at best, raised a question of fact that cannot and should not be decided in connection with the Motion.

-3-

c.     In the Objection, CBI challenged the timeliness of the Committee's

Avoidance Claim under 11 U.S.C. § 544(b)(1).[2]  According to CBI, there are factual

issues regarding when CBI's creditors reasonably could have discovered the fraudulent

nature of the All Hallows Transfer.  Objection at ¶ 24.  In particular, CBI claimed that the

All Hallows Transfer had been "well-publicized" and that a "[e]ven a cursory search on

ACRIS … would evidence" the All Hallows Transfer.  *Id.* at ¶ 16, 18.  As discovered

during the deposition of CBI's FRCP 30(b)(6) designee, however, (i) the supposedly

"well-publicized" nature of the All Hallows Transfer consisted of four articles published

between 2001 and 2006, only one of which has been provided to the Committee, and (ii)

even CBI's FRCP 30(b)(6) designee did not know what ACRIS was, much less what a

"cursory search" on ACRIS might reveal.

3.     Finally, in the Objection, CBI did not even attempt to argue that CBI credibly can

prosecute the Avoidance Claims.  In addition to the conflicts of interest identified in the Motion,

the documents produced by CBI to date have established that CBI's current counsel, Anthony

Dougherty, represented both CBI **and** AHI in connection with the All Hallows Transfer.  Thus,

the Committee is undeniably the only party in interest that legitimately can represent the interests

of the estate and its creditors with respect to the Avoidance Claims.

### ADDITIONAL FACTUAL BACKGROUND

4.     In preparation for the Hearing, the Committee served document production

requests on the Debtors (the "Document Requests"), a subpoena on AHI for the production of

---

[2] As discussed in the Committee's reply [Docket No. 339] (the "Reply"), CBI did not address the
Committee's Avoidance Claim under 11 U.S.C § 544(a), which is timely because the Committee will
seek to avoid and recover the All Hallows Transfer as a "hypothetical judgment creditor" without regard
to CBI's knowledge or the knowledge of any actual creditor of CBI as of the commencement of CBI's
chapter 11 case.  *See* Motion at ¶¶ 21, 29; Exhibit G to Motion at ¶¶ 23-29; Reply at ¶ 10(a).

DOCS_LA:256660.4 14012-002

documents and an FRCP 30(b)(6) designee (the "Subpoena"), and an FRCP 30(b)(6) deposition notice on CBI.  AHI refused to produce any documents or an FRCP 30(b)(6) designee in response to the Subpoena.  On July 26, 2012, the Debtors provided the Committee with a very limited production of documents in response to the Document Requests, and on July 30, 2012 CBI made its FRCP 30(b)(6) designee (Br. Kevin Griffith) available for deposition.

5.      CBI's response to the Committee's discovery efforts left much to be desired. With respect to CBI's limited document production, CBI failed to produce any financial documents to support its claim that CBI transferred AHHS to AHI in 1990 because AHI had become "viable" and was capable of "self-sustained independence" from CBI (which is not surprising, given that Br. Griffith later testified that AHI, in fact, was not financially independent in 1990 and continued to receive financial support from CBI through 2005).  The only document CBI produced as "support" for its explanation for the All Hallows Transfer was a 150+ page report regarding a community survey of Christian Brothers (the "Caulkins Report") that was released in September 1991 (*i.e.*, more than a year **after** CBI transferred AHHS to AHI).  With respect to the supposedly "well-publicized" nature of the All Hallows Transfer, CBI provided the Committee with one newspaper article, a November 3, 2005 article from the New York Times (the "NY Times Article").[3]  The NY Times Article described the action filed in 2005 in New York state court to avoid the All Hallows Transfer (the "2005 Action") and included quotes from the December 18, 1990 letter from John J. Duffy to Claude R. Thomson (the "Duffy Letter"), which was attached as Exhibit D to the complaint filed in the 2005 Action.[4]

6.      With respect to CBI's FRCP 30(b)(6) designation, CBI produced its current vice president, Br. Kevin Griffith, who has held a management position with CBI only since 2003.

---

[3] A copy of the NY Times Article is attached hereto as **Exhibit A**.
[4] A copy of the Duffy Letter was attached as Exhibit B to the Motion.

-5-

Br. Griffith based much of his deposition testimony on a forty-five minute telephone conversation he had with Br. James Moffett, who was a member of CBI's board of directors and a member of AHI's board of trustees in 1990 (*i.e.*, at the time of the All Hallows Transfer), and was one of the people involved with the Caulkins Report. *See* Transcript of Deposition of Br. Kevin Griffith, CFC ("Griffith Tr.") at 26:16-21, 42:15-23, 44:12-23.[5]  Br. Moffett lives in East Harlem and was available on July 30, 2012 – in fact, Br. Griffith's forty-five minute telephone conversation with Br. Moffett occurred on the day of Br. Griffith's deposition – yet CBI inexplicably chose not to designate Br. Moffett as its FRCP 30(b)(6) witness. *Id*. at 70:3-23. Furthermore, during his conversation with Br. Moffett, Br. Griffith somehow failed to ask Br. Moffett any questions about the Duffy Letter, which the Committee repeatedly has cited as evidence of CBI's "actual" fraudulent intent with respect to the All Hallows Transfer. *Id*. at 76:9-18, 77:10-13.

7.       Finally, on July 30, 2012, the Committee and the Debtors entered into a *Stipulation Regarding Hearing on Motion of Official Committee of Unsecured Creditors for Authority to Assert, Litigate and Settle Claims on Behalf of Bankruptcy Estate Relating to Fraudulent Conveyance to All Hallows Institute* [Docket No. 391] (the "Stipulation").  In the Stipulation, the Committee and the Debtors agreed, solely for purposes of the Hearing, that the estimated cost to CBI's bankruptcy estate of the prosecution of the Proposed Action is $650,000. Stipulation at ¶ 1.  Based on CBI's July 17, 2012 appraisal of AHHS, which estimated the value of AHHS as $8 million, and the Committee's July 9, 2012 appraisal of AHHS, which estimated

---

[5] A condensed copy of the Griffith Transcript is attached hereto as **Exhibit B**.

the value of AHHS as $9.6 million, the Committee and the Debtors also agreed, solely for

purposes of the Hearing, that the fair market value of AHHS is $8.5 million.  Stipulation at ¶ 2.[6]

**ARGUMENT**

8.      As set forth in the Motion, the Committee's request for derivative standing must

be evaluated under the two-part test established by the Second Circuit in *In re STN Enterprises,*

*Inc. ("STN")*, 779 F.2d 901 (2d Cir. 1985).  The *STN* test requires that the Court consider: (1)

whether the Committee has presented "a colorable claim or claims for relief that on appropriate

proof would support a recovery" and (2) whether the Proposed Action is "likely to benefit the

reorganization estate."  *STN*, 779 F.2d at 905.  Here, the Committee's request for derivative

standing satisfies the *STN* test because the Avoidance Claims are "colorable" claims that, if

successfully prosecuted, will benefit CBI's estate – which is now hopelessly insolvent and

unable to satisfy even non-sexual abuse claims – by millions of dollars more than the Proposed

Action will cost CBI's estate.[7]  *See Adelphia*, 330 B.R. at 373 (granting derivative standing to

committees "provides creditors and other stakeholders with the comfort that potentially valuable

(and sometimes critical) claims on behalf of the estate will be prosecuted").

**A.      The Avoidance Claims Are "Colorable" Fraudulent Transfer Claims**

9.      The first prong of the *STN* test requires "colorable" claims "that on appropriate

proof would support a recovery."  *STN*, 779 F.2d at 905.  "Caselaw construing requirements for

'colorable' claims has made it clear that the required showing is a relatively easy one to make."

*Adelphia*, 330 B.R. at 376.  To determine whether the Avoidance Claims are "colorable" claims,

"the Court must engage in an inquiry that is much the same as that undertaken when a defendant

---

[6] The Committee will provide copies of the AHHS appraisals to the Court upon request at the Hearing.
[7] The Committee reserves all rights to object to the non-sexual abuse claims, which primarily are claims
by Christian Brothers.

-7-

DOCS_LA:256660.4 14012-002

moves to dismiss a complaint for failure to state a claim." *In re KDI Holdings, Inc. ("KDI")*,

277 B.R. 493, 508 (Bankr. S.D.N.Y. 1999); *see also In re America's Hobby Center, Inc.*

*("America's Hobby Center")*, 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998) ("Because the

creditors' committee is not required to present its proof, the first inquiry is much the same as that

undertaken when a defendant moves to dismiss a complaint for failure to state a claim.").

10.     On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint is construed

liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable

inferences in the plaintiff's favor." *Drumm v. Suny Geneseo Coll.*, 2012 WL 2477015 (2d Cir.).

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678,

129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Id.*

11.     Applying this standard to a committee's request for derivative standing, the court

in *Adelphia* held that derivative standing was appropriate notwithstanding that the defendants

asserted numerous defenses and "challenged or sought to advance their explanations as to

aspects of the [committee's] allegations or proof, or to argue additional facts." *Adelphia*, 330

B.R. at 377-78.  The defendants' arguments relating to "factual challenges, factual explanations,

and factual supplements" were "simply one side's position on disputed issues of fact," and the

"great bulk of the matters" underlying the committee's claims involved "issues of fact and

context, all requiring further factual development and inquiry, and, quite possibly, trial." *Id*.

The issues raised by the defendants required factual inquiry and were "incapable of resolution"

under Fed. R. Civ. P. 12(b)(6), and therefore it was unnecessary for the court to decide those issues in connection with the committee's request for standing.  *Id*. at 380-81.

12.     In this case, the Avoidance Claims are "colorable" claims because the Committee has alleged facts sufficient to state plausible fraudulent transfer claims under 11 U.S.C. § 544 and N.Y. Debt. & Cred. Law §§ 276, 276-A, 278 and 279.  Although not required to do so at this stage of the proceedings, the Committee also has provided documents and other evidentiary support for its allegations.  Furthermore, as in *Adelphia*, CBI's challenges to the Avoidance Claims are either contradicted (or unsupported) by the evidence, or are based on disputed issues of fact that are incapable of resolution at this stage of the proceedings.  The Committee's allegations in support of the Avoidance Claims, and CBI's responses and/or defenses to those allegations, are as follows:

### (1)     CBI Transferred AHHS As Part of A Fraudulent Asset Protection Scheme

13.     In the Duffy Letter, CBI's former counsel admitted that the All Hallows Transfer was made "to make CBI less of a target in any suit for damages" and to give CBI "some protection from liability."  Duffy Letter at pg. 2.  Notwithstanding this direct admission of CBI's "actual" fraudulent intent, CBI contends that the All Hallows Transfer instead was made as part of a "strategic plan" to separately incorporate CBI's educational institutions and thereby arrange for the continued operation of the schools even if there were not enough Christian Brothers to administer the schools.  Griffith Tr. at 21:19-22:25.  According to CBI, the All Hallows Transfer was made to AHI in 1990 in accordance with the "strategic plan" because AHI had the financial means to operate as a separate institution.  *Id*. at 58:15-59:14.  The "strategic plan" and the data it allegedly was based upon (namely, the Caulkins Report and the CARA Report), however, all

-9-

post-date the All Hallows Transfer. *Id*. at 21:19-22:25, 27:21-28:13.[8]  In particular, the

"strategic plan" was unveiled in 1997 (7 years after the All Hallows Transfer), the Caulkins

Report was released in September 1991 (1½ years after the All Hallows Transfer), and the

CARA Report was released sometime in 1991 (at least 7 months after the All Hallows Transfer).

*Id*. at 23:15-17, 24:19-21, 27:21-28:13.  In light of this timing discrepancy, one is left to wonder

how the "strategic plan" and underlying reports could have factored into any decision-making

with respect to the All Hallows Transfer.[9]  Furthermore, CBI's claim that, in 1990, AHI had the

financial means to operate as a separate institution is belied by Br. Griffith's testimony that, after

the All Hallows Transfer, CBI continued to provide funds to AHI until approximately 2005.  *Id*.

at 63:4-9, 78:11-79:23.  Thus, CBI's attempt to offer its "strategic plan" as an alternate

"innocent" explanation for the All Hallows Transfer is inherently implausible.

14.    Even assuming that the factual infirmities of CBI's "innocent" explanation for the

All Hallows Transfer could somehow be cured, CBI's "innocent" explanation is legally

insignificant.  As discussed in further detail below, the Committee has not only presented direct

evidence of CBI's "actual" fraudulent intent, but also has provided evidence establishing

numerous "badges of fraud."  Under these circumstances, a finding of fraudulent intent is

appropriate notwithstanding CBI's assertion of an additional "innocent" motive.  *See, e.g.*,

*United States v. Engh*, 330 F. 3d 954, 956 (7th Cir. 2003) ("[r]egardless of what other

motivations for the transfer may have been present, a clear intent to avoid a creditor – the IRS –

was also present" based on numerous badges of fraud); *S.E.C. v. Haligiannis*, 608 F. Supp. 2d

---

[8] The CARA Report was a survey of Christian Brothers and members of other religious orders conducted by the Center of Applied Research for the Apostolate.  Griffith Tr. at 27:21-28:13.  CBI has failed to produce either the CARA Report or the "strategic plan" to the Committee.
[9] CBI has not produced any meeting minutes, "due diligence" documents, correspondence, financial statements, etc. regarding its decision to make the All Hallows Transfer.

DOCS_LA:256660.4 14012-002

444, 452 n.3 (S.D.N.Y. 2009) (transfer was intentionally fraudulent under Federal Debt Collection Procedures Act, based on numerous badges of fraud, because the "trend in modern cases" is to hold that a transfer is voidable even if the debtor is only partially motivated by fraudulent intent); *United States v. Patej*, 2002 WL 31689508, *7 (E.D. Mich.) (conveyance was intentionally fraudulent, where evidence included letter written by debtor admitting that he wanted to "render himself as uncollectible as possible," regardless of whether debtor was wholly or only in part motivated by fraudulent intent); *Firmani v. Firmani*, 332 N.J. Super 118, 123 (N.J. App. 2000) (rejecting claim that "innocent" motive saved the transfer, and holding that intent to hinder, delay or defraud creditors need not "be the exclusive motivation behind a transfer in order for the transfer to be deemed fraudulent").

15.    Finally, during the deposition of Br. Griffith, CBI's counsel, Anthony Dougherty, attempted to challenge the contents of the Duffy Letter by, essentially, cross-examining Br. Griffith with respect to purported "inaccuracies" in the Duffy Letter. The "inaccuracies" that CBI's counsel identified pertained to (a) the use of the term "trustees" instead of "directors," (b) a reference to "all assets" being transferred to CBI, which supposedly was "inaccurate" because two schools established in the 1950s in Massachusetts and New Jersey never belonged to CBI; and (c) the use of the term "congregation" when Mr. Duffy may have meant to use the term "province." Griffith Tr. at 113:5-25, 114:2-116:13, 118:21-121:25.[10] These supposed "inaccuracies" were unrelated to Mr. Duffy's description of the All Hallows Transfer, a contemporaneous transaction in which he and Mr. Dougherty represented both CBI and AHI. Thus, the inference that CBI has attempted to draw – *i.e.*, that because Mr. Duffy may have used

---

[10] To Br. Griffith's knowledge, CBI never attempted to correct the purported "inaccuracies" in the Duffy Letter, despite the fact that CBI's then-president, Br. Hennessey, was copied on the Duffy Letter. Griffith Tr. at 124:25-125:8; Duffy Letter at pg. 2.

-11-

incorrect terminology or failed to discuss unrelated transactions from the 1950s, he also incorrectly described the All Hallows Transfer – is unwarranted.  Furthermore, notwithstanding the supposed "inaccuracies" in the Duffy Letter, Mr. Dougherty continues to state in his biography that he gained "significant experience in representing not-for-profit, educational and religious institutions" from his mentor, Mr. Duffy.[11]

**(2)    A Close Relationship Existed Between CBI and AHI at the Time of the All Hallows Transfer, and CBI Retained Control Over AHHS After the All Hallows Transfer**

16.    CBI has not disputed the Committee's allegation that a close relationship existed between CBI and AHI at the time of the All Hallows Transfer, or the Committee's allegation that, after the All Hallows Transfer, CBI retained control over the fundamental aspects of the operation of AHHS.  The evidence supporting the Committee's allegations includes the following:

- The board of trustees of AHI is the highest level of governance of AHI.  Griffith Tr. at 39:5-9.  At the time of the All Hallows Transfer, five members of CBI's six-member board of directors were on AHI's six-member board of trustees, and those same five individuals also held a position of governance with the Eastern American Province, *i.e.*, the canonical entity associated with CBI at that time.  *Id*. at 37:19-39:17, 40:14-20, 42:15-23, 44:12-23.

- John Duffy, CBI's former counsel, and Anthony Dougherty, CBI's current counsel, represented both CBI and AHI in connection with the All Hallows Transfer.[12]

---

[11] A copy of Mr. Dougherty's biography is attached hereto as **Exhibit C**.

[12] The documents produced by CBI included (a) a Real Property Transfer Tax Return relating to the All Hallows Transfer that identified John Duffy as the attorney for both CBI and AHI and (b) a July 30, 1990

-12-

- There was a complete overlap of CBI's board of directors with AHI's board of trustees from April 1990 to 2005. Griffith Tr. at 37:19-39:17, 40:14-20, 42:15-23, 44:12-23. After the All Hallows Transfer, the highest level of governance of AHI and AHHS (*i.e.*, the board of trustees) did not change until the middle of 2005. *Id.* at 61:24-62:23.

- Lawrence T. Murphy, the chief school administrator of AHHS from approximately 1988 to 1997, was a Christian Brother. Griffith Tr. at 67:12-68:12.

- Between 2006 and the present, two to three members of CBI's board of directors have been on AHI's board of trustees, which since 2006 has been a three-member board. Griffith Tr. at 40:9-17.

- At this time, two members of CBI's board of directors are members of the board of trustees of AHI, and also have positions of governance with the Northern American Province, *i.e.*, the canonical entity currently associated with CBI. *Id.* at 35:16-24, 41:12-42:14. The third member of AHI's current board of trustees is a Christian Brother. *Id.* at 40:21-41:7.

**(3)** **The All Hallows Transfer Was Not Made In the Ordinary Course of Business**

17. In the Objection, CBI claims that the All Hallows Transfer was made in the "ordinary course" of business. *See* Objection at ¶ 16. In support of this claim, CBI asserts that "[o]ver the course of its century-long existence and in its ordinary course of business, CBI has conveyed many parcels of developed and undeveloped real property to schools that it had

letter (the "<u>Dept. of Finance Letter</u>") from Anthony Dougherty to the New York City Department of Finance submitting various applications on behalf of AHI relating to the All Hallows Transfer. *See* Griffith Tr. at 45:8-46:4, 49:2-19. A copy of the Real Property Transfer Tax Return, which was marked as Exhibit 5 during the deposition of Br. Griffith, is attached hereto as **Exhibit D**. A copy of the Dept. of Finance Letter, which was marked as Exhibit 6 during the deposition of Br. Griffith, is attached hereto as **Exhibit E**.

-13-

originally established, once they were viable and capable self-sustained independence."
Objection at ¶ 8.

18.      Since the Objection was filed, discovery has revealed that the "many parcels" referred to in the Objection were, in fact, only three properties (one of which was AHHS).  Aside from the All Hallows Transfer, CBI has conveyed only two other properties to its "stand-alone" educational institutions:  a conveyance to Iona College in 1946; and a conveyance to Iona Preparatory School in 1964.  Griffith Tr. at 72:9-74:14, 90:3-25.  Not only did these two conveyances take place long before the All Hallows Transfer, but CBI also has failed to provide any details regarding the circumstances of the other conveyances or any other information that might support its claim that, based on the other two conveyances, the All Hallows Transfer was part of the "ordinary course" of CBI's business.  Therefore, CBI has, at best, raised a question of fact with respect to its "ordinary course" argument.

### (4)      CBI Received No Consideration In Exchange for the All Hallows Transfer

19.      As set forth above, the inadequacy of consideration received in exchange for a transfer is one of the 'badges of fraud" indicating that the transferor acted with fraudulent intent.  Here, it is undisputed that CBI received **no** consideration in exchange for the All Hallows Transfer.  Griffith Tr. at 53:5-9; AHI Transfer Memorandum; Dept. of Finance Letter at pg. 6.[13]

### (5)      CBI Was Aware Of Its Exposure For Sexual Abuse Claims At the Time of the All Hallows Transfer

20.      The Committee has alleged that, at the time of the All Hallows Transfer, CBI had actual knowledge that individuals had been sexually abused by its members, that some of the sexual abuse survivors already had commenced litigation against CBI and that CBI had exposure

---

[13] A copy of the AHI Transfer Memorandum, which was marked as Exhibit 8 during the deposition of Br. Griffith, is attached hereto as **Exhibit F**.

-14-

for further sexual abuse litigation.  Motion at ¶ 10.  CBI has not denied that it was aware of the pending and potential sexual abuse claims against it at the time of the All Hallows Transfer.

### (6)   CBI's "Statute of Limitations" Argument, At Best, Raises Questions of Fact

21.   With respect to the application of New York's "discovery rule" to the Committee's Avoidance Claim under 11 U.S.C. § 544(b)(1), CBI has argued that "it is not out of the realm of possibility that a party devoid of knowledge of the All Hallows Transfer simply does not exist."  Objection at ¶ 18.[14]  In support of this claim, CBI contends that the All Hallows Transfer was "well-publicized" and that a "[e]ven a cursory search on ACRIS … would evidence" the All Hallows Transfer.  *Id.* at ¶ 16, 18.

22.   CBI has provided only one document to the Committee regarding the supposedly "well-publicized" nature of the All Hallows Transfer – the November 3, 2005 NY Times Article that described the 2005 Action and quoted extensively from the Duffy Letter (which, in turn, was attached as Exhibit D to the complaint filed in the 2005 Action).  *See* NY Times Article.  At his deposition, Br. Griffith testified that the "well-publicized" nature of the All Hallows Transfer consisted of the NY Times Article and three other articles published sometime between 2001 and 2006.  Griffith Tr. at 94:24-97:10.  CBI has not identified the newspapers or publications in which the other three articles appeared, and has not produced those articles to the Committee.  Thus, CBI has offered no basis for its conclusion that "it is not out of the realm of possibility"

---

[14] As set forth above, CBI has not addressed the Committee's Avoidance Claim under 11 U.S.C. § 544(a), by which the Committee will seek to avoid and recover the All Hallows Transfer as a "hypothetical judgment creditor" without regard to CBI's knowledge or the knowledge of any actual creditor of CBI as of the commencement of CBI's chapter 11 case.

-15-

that every potential creditor – including the sexual abuse claimants, who are spread across the United States and Canada – saw the articles regarding the All Hallows Transfer.[15]

23.     With respect to CBI's argument regarding what a "cursory search" on ACRIS might show regarding the All Hallows Transfer, the Committee repeatedly has pointed out that the mere recordation of a transfer deed does not give rise to a duty to inquire or impart constructive notice to a plaintiff seeking to set aside a fraudulent conveyance. *See, e.g.,* Motion at ¶ 32; Reply at ¶ 10(c). Moreover, even Br. Griffith, CBI's FRCP 30(b)(6) designee, did not know what ACRIS was, let alone what a "cursory search" on ACRIS might reveal. Griffith Tr. at 92:4-19.

24.     Therefore, for each of the reasons discussed above, the Committee's factual allegations are more than sufficient to establish a prima facie case for avoidance and recovery of the All Hallows Transfer as an "actual" fraudulent transfer. CBI's responses to the Committee's allegations are, at best, based on disputed issues of fact that are incapable of resolution at this stage of the proceedings. As a result, CBI's challenges to the Avoidance Claims do not alter the conclusion that the Avoidance Claims are "colorable" fraudulent transfer claims.

**B.     The Duffy Letter and Thomson Letter Are Not Protected by the Attorney-Client Privilege or the "Common Interest" Doctrine**

25.     Counsel for CBI has advised the Committee that CBI may seek to assert the attorney-client privilege and/or "common interest" doctrine with respect to (a) the Duffy Letter and (b) a December 12, 1990 letter from Claude Thomson to Mr. Duffy that prompted the Duffy Letter (the "Thomson Letter").[16] CBI's motivation for claiming that the Duffy Letter and the

---

[15] It is worth noting that Br. Griffith testified that he did not see any news releases from 1990 announcing the All Hallows Transfer, because he was missioned in Florida at that time. Griffith Tr. at 85:3-9.
[16] In light of CBI's claim of privilege with respect to the Thomson Letter, the Committee will provide a copy of the Thomson Letter to the Court for *in camera* review.

-16-

Thomson Letter are privileged is transparent:  CBI hopes to preclude the Committee from using

the Duffy Letter – which contains damning admissions as to CBI's fraudulent asset protection

scheme that have been in the public domain since at least 2005, when the Duffy Letter was filed

in the 2005 Action and quoted in the NY Times Article – and then intends to argue that the

Committee has insufficient evidence in support of the Avoidance Claims.

26.      CBI's strategic assertion of the attorney-client privilege or "common interest"

doctrine, however, has no bearing upon the Committee's request for standing.[17]  As set forth

above, the Court's evaluation of the Committee's request for standing "is much the same as that

undertaken when a defendant moves to dismiss a complaint for failure to state a claim." *KDI*,

277 B.R. at 508.  CBI's assertion of privilege with respect to the Duffy Letter and the Thomson

Letter, on the other hand, typically would be presented to the Court as a pretrial motion in limine

to exclude the Duffy Letter and the Thomson Letter, after the Committee had an opportunity to

conduct discovery as to CBI's claim of privilege.[18]  In other words, CBI's assertion of the

attorney-client privilege or "common interest" doctrine with respect to the Duffy Letter or the

Thomson Letter is not an issue that would be decided on a Fed. R. Civ. P. 12(b)(6) motion to

dismiss a complaint, and therefore is not an issue that should be decided in connection with the

Committee's request for standing.

27.      In the event, however, that the Court does consider CBI's privilege argument in

connection with the Motion, CBI cannot establish that either the attorney-client privilege or the

---

[17] Among other things, CBI has overlooked the fact that, even without the Duffy Letter, the Committee's request for derivative standing should be granted because the Committee has alleged sufficient facts, and provided supporting evidence, regarding the numerous circumstantial "badges of fraud" that exist with respect to the All Hallows Transfer.

[18] In the event that any subsequent proceedings are commenced concerning the Duffy Letter and/or the Thomson Letter, the Committee reserves all rights to revise, supplement or otherwise amend the arguments set forth herein with respect to the Duffy Letter and/or the Thomson Letter, and to conduct discovery concerning the Duffy Letter and/or the Thomson Letter.

-17-

"common interest" doctrine protect the Duffy Letter or the Thomson Letter because, as discussed in further detail below: (a) the Duffy Letter and Thomson Letter each lack an essential component of any attorney-client privileged communication – a communication between an attorney and a client; (b) CBI has waived any privilege that might otherwise have applied to the Duffy Letter; and (c) CBI cannot establish that the Duffy Letter or the Thomson Letter are protected by the "common interest" doctrine.

### (1)   The Duffy Letter and the Thomson Letter Are Not Attorney-Client Communications

28.   Under New York law, the attorney-client privilege only protects "a confidential communication between client and attorney, in the course of a professional relationship" that is "made for the purpose of seeking or providing legal advice or assistance" and is "primarily or predominantly of a legal character." *Aetna Cas. & Sur. Co. v. Certain Underwriters at Lloyd's London ("Aetna")*, 176 Misc. 2d 605, 608, 676 N.Y.S.2d 727, 730 (N.Y. Sup. Ct. 1998), *aff'd sub nom. Aetna Cas. & Sur. Co. v. Certain Underwriters at Lloyd's*, 263 A.D.2d 367, 692 N.Y.S.2d 384 (1999).[19] CBI, as the party asserting the attorney-client privilege, bears the burden of proving each element of the privilege. *In re Nassau County Grand Jury Subpoena Duces Tecum Dated June 24, 2003*, 4 N.Y.3d 665, 678, 830 N.E.2d 1118, 1126 (2005).

29.   In this case, CBI's assertion of the attorney-client privilege with respect to the Duffy Letter and the Thomson Letter fails at the outset because neither letter involves a communication between CBI and its counsel. Instead, the Duffy Letter and the Thomson Letter are merely letters exchanged between counsel for CBI (John Duffy) and a Canadian attorney (Claude Thomson) presumably acting as counsel for The Christian Brothers of Ireland in Canada

---

[19] Pursuant to Fed. R. Evid. 501, CBI's assertion of the attorney-client privilege is governed by New York law because New York law "supplies the rule of decision" with respect to the Avoidance Claims. Fed. R. Evid. 501.

-18-

("CBIC").  According to CBI's FRCP 30(b)(6) designee, CBI and CBIC were separate entities that shared no relationship with each other.  Griffith Tr. at 34:15-21, 35:12-15.  As a result, CBI cannot claim that the letter from John Duffy to Claude Thomson (*i.e.*, the Duffy Letter) was a communication between CBI and its counsel.  Moreover, Br. Griffith testified that Claude Thomson did not represent CBI; therefore, CBI cannot claim that the letter from Claude Thomson to John Duffy (*i.e.*, the Thomson Letter) was a communication between CBI and its counsel.  *Id*. at 31:8-16, 99:10-19.  Thus, the Duffy Letter and the Thomson Letter are not protected by the attorney-client privilege because neither letter is, in fact, an attorney-client communication.

### (2)   Any Attorney-Client Privilege That May Have Applied To The Duffy Letter Has Been Waived

30.     CBI's attempt to assert the attorney-client privilege with respect to the Duffy Letter fails for the additional reason that any privilege that might have attached to the Duffy Letter has long since been waived because (a) the Duffy Letter was attached as Exhibit D to the complaint filed in the 2005 Action, and (b) the contents of the Duffy Letter were quoted extensively in the NY Times Article regarding the 2005 Action.[20]  The burden is on CBI, as the party asserting the attorney-client privilege, to establish that the privilege has not been waived by such disclosure.  *New York Times Newspaper Div. of New York Times Co. v. Lehrer McGovern Bovis, Inc.*, 300 A.D.2d 169, 172, 752 N.Y.S.2d 642, 646 (2002).

31.     Under New York law, the "disclosure of a privileged document results in waiver of the privilege unless the party asserting the privilege meets its burden in proving that (1) it intended to maintain confidentiality and took reasonable steps to prevent its disclosure, (2) it

---

[20] The Duffy Letter may have been publicly disclosed as early as 1999.  The Committee is unaware of CBI ever having previously asserted any privilege with respect to the Duffy Letter.

-19-

promptly sought to remedy the situation after learning of the disclosure, and (3) the party in possession of the materials will not suffer undue prejudice if a protective order is granted." *AFA Protective Sys., Inc. v. City of New York*, 13 A.D.3d 564, 565-66, 788 N.Y.S.2d 128, 129-30 (2004) (defendant waived privilege where defendant knew for four years that memo was "in the possession of third parties who had the opportunity to make photocopies of it, as well as use and disseminate information contained therein, and took no action to retrieve it," and grant of protective order would result in undue prejudice to plaintiffs who had relied on relevant information in memo to support their pending summary judgment motion).[21]

32.    In this case, CBI cannot show that it "promptly sought to remedy the situation after learning of the disclosure" of the Duffy Letter in 2005 (if not earlier).  CBI was named as a defendant in the 2005 Action, and thus necessarily was aware that the Duffy Letter was attached as an exhibit to the complaint filed in the 2005 Action.  In addition, in a December 16, 2005 letter to plaintiffs' counsel in the 2005 Action, CBI's current counsel, Anthony Dougherty, threatened to seek sanctions against plaintiffs' counsel because, among other reasons, plaintiffs' counsel had "provided a copy of [the complaint] to Mr. Andrew Newman, a reporter for the New York Times at least seven days before filing it with the Supreme Court."  Exhibit F to Motion. Andrew Newman was the author of the NY Times Article, which discussed the 2005 Action and quoted the following passage from the Duffy Letter: "Within the last few years … in order to make C.B.I. less of a target in any suit for damages, we have been incorporating each school as a

---

[21] Federal courts also have recognized that "[i]nordinate delay in claiming the privilege can prejudice the adversary and may be deemed a waiver." *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 445 (S.D.N.Y. 1995); *see also Denney v. Jenkens & Gilchrist*, 362 F. Supp. 2d 407, 417 (S.D.N.Y. 2004) (finding waiver where party claiming privilege knew memo was in third party's possession three years earlier, but failed to demand return of memo despite knowledge that documents were being produced to the IRS and to plaintiffs).

DOCS_LA:256660.4 14012-002

separate corporate entity with its own board of trustees or directors and transferring title to the

school from C.B.I., e.g. to All Hallows Institute." *See* NY Times Article.

33.     Thus, CBI has known for **at least** seven years that the Duffy Letter had been

disclosed to third parties.  Furthermore, CBI has known for **at least** three months, *i.e.*, since the

Committee filed its Motion on May 1, 2012, that the Committee intended to use the Duffy Letter

in support of the Motion and in the Proposed Action.  Therefore, based on CBI's inordinate delay

in asserting the supposed privilege, CBI should be deemed to have waived any attorney-client

privilege that might otherwise have applied to the Duffy Letter.[22]

---

[22] CBI has not asserted that the Duffy Letter is protected under the work product doctrine.  Setting aside the issue of whether CBI could establish that the Duffy Letter is "work product" (which raises factual questions that, as discussed above, need not be determined at this stage of the proceedings), CBI also has waived any work product protection that otherwise might have applied to the Duffy Letter.  As stated by the Appellate Division of the New York Supreme Court:

> We find unpersuasive the contentions of [the LIRR] that the documents at issue … should be subject to a protective order. These documents were privileged under the attorney-client and attorney work product doctrines. However, the LIRR failed to exercise due diligence and reasonable care to protect the confidentiality of these documents by allowing one of them to be utilized during a deposition and the other document to be expressly referred to and quoted from in various litigation papers and briefs filed with the Supreme Court, this court, and the Court of Appeals. Furthermore, although opposing counsel first utilized one of the documents in the latter part of 1985 and the other in 1986, the LIRR did not move for a protective order until 1988. The repeated failure of the LIRR to take any action when the plaintiff quoted from the privileged documents in court papers and its failure to even raise the issue of privilege with respect to one of the documents for approximately 10 months after it had been utilized during a deposition, is indicative of the failure of the LIRR to exercise reasonable care and due diligence, and thus, constituted a waiver of the privilege.

*Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 162 A.D.2d 577, 578, 556 N.Y.S.2d 763, 764 (1990) (internal quotation omitted).  Here, as in *Clark-Fitzpatrick, Inc.*, CBI has waived any work product protection with respect to the Duffy Letter by, among other things, failing to take any action or even raise the issue of privilege when the Duffy Letter was: (a) filed with the complaint in the 2005 Action; (b) provided to a reporter for the New York Times, and quoted extensively in the NY Times Article; and (c) filed with, and quoted extensively in, the Motion.

-21-

**(3)    The Duffy Letter and the Thomson Letter Are Not Protected Under the "Common Interest" Doctrine**

34.    CBI also has indicated that it intends to argue that the Duffy Letter and the Thomson Letter are protected by a supposed "common interest" between CBI and CBIC.  The "common interest" doctrine is an exception "to the traditional rule that the presence of a third party, not an agent or employee of counsel, at a communication between counsel and a client is sufficient to deprive the communication of the confidentiality which is one of the pillars of the privilege."  *Aetna*, 676 N.Y.S.2d at 731-32.  Under New York law:

> … [A]ny "common interest" privilege must be limited to communication between counsel and parties with respect to legal advice in pending or reasonably anticipated litigation in which the joint consulting parties have a common legal interest.  The attorney-client privilege, even as expanded by the "common interest" exception, may not be used to protect communications that are business oriented or are of a personal nature.

*Aetna*, 676 N.Y.S.2d at 732; *see also In re Out-of-State Subpoenas*, 33 Misc. 3d 500, 516, 929 N.Y.S.2d 361, 375 (Sup. Ct. 2011) (same).[23]

35.    Thus, there are two main components of the "common interest" doctrine.  First, the "common interest" privilege only applies if the parties asserting the "common interest" are seeking legal advice with respect to pending or reasonably anticipated litigation against each of the parties.  *Aetna*, 676 N.Y.S.2d at 733 (doctrine only applies where "the common legal interest

---

[23] The "common interest" doctrine under federal common law has been similarly interpreted by courts in the Second Circuit.  Under federal common law, the parties "among whom privileged matter is shared must have a common legal, as opposed to commercial, interest" and "must have demonstrated cooperation in formulating a common legal strategy."  *Bank Brussels Lambert*, 160 F.R.D. at 447 (refusing to apply "common interest" doctrine where, while members of bank group shared a concern about the threat of shareholder litigation, there was no evidence that they formulated a joint legal strategy to deal with that possibility); *see also Bank of Am., N.A. v. Terra Nova Ins. Co. Ltd. ("Terra Nova")*, 211 F. Supp. 2d 493, 496 (S.D.N.Y. 2002) (key consideration is that the "common interest" must be identical, not merely similar, and must be legal, not solely commercial).  In the absence of some evidence of a coordinated legal strategy, the "common interest" doctrine "does not encompass a joint business strategy which happens to include as one of its elements a concern about litigation."  *Bank Brussels Lambert*, 160 F.R.D. at 447.

impacts potential litigation against all of the participants"); *Terra Nova*, 211 F. Supp. 2d at 498 (under New York law, "common interest" doctrine is "explicitly limited" to "communication between counsel and parties with respect to legal advice in pending or reasonably anticipated litigation"). Second, there "must be a substantial showing by parties attempting to invoke the protections of the privilege of the need for a common defense as opposed to the mere existence of a common problem." *Finkelman v. Klaus*, 17 Misc. 3d 1138(A), 856 N.Y.S.2d 23 (Sup. Ct. 2007) (quotations omitted); *see also Yemini v. Goldberg*, 12 Misc. 3d 1141, 1144, 821 N.Y.S.2d 384, 386 (Sup. Ct. 2006) (in order for "common interest" doctrine to apply, "the communication must necessarily involve the common defense of the parties" invoking the doctrine).

36.    Application of the "common interest" doctrine requires the satisfaction of both elements. For instance, in *Yemini*, the court held that the "common interest" doctrine did not protect communications between a corporation's president and a shareholder's attorney regarding the president's upcoming testimony in an action involving ownership of the corporation. 12 Misc. 3d at 1144, 821 N.Y.S.2d at 387. In that case, the party seeking disclosure of the allegedly protected communications had asserted claims against the president in another related suit, but the president was not a party to the action at bar and did not have a direct interest in the ownership of the corporation at issue. *Id*. As a result, the communications did not involve the "common defense" of the president and the shareholder, and were not protected by the "common interest" doctrine. *Id*.

37.    In this case, CBI cannot establish either element of the "common interest" doctrine. According to Br. Griffith, CBI's FRCP 30(b)(6) designee, there was no "pending or reasonably anticipated litigation" against both CBI and CBIC at the time the Duffy Letter and Thomson Letter were exchanged. Br. Griffith testified that CBI had no relationship with CBIC,

-23-

and did not share any liability with CBIC with respect to the abuse that occurred at Mt. Cashel Orphanage in Canada.[24]  Griffith Tr. at 75:14-76:8.  Br. Griffith also testified that, according to Br. Moffett, the possibility of the Mt. Cashel litigation being brought against CBI was "not under consideration."  *Id*.  CBI cannot, on the one hand, deny that it had any concerns regarding the Mt. Cashel litigation and, on the other hand, claim that the Duffy Letter and Thomson Letter were exchanged in anticipation of such litigation.

38.     For the same reasons, CBI cannot establish that the allegedly privileged communications pertained to any "common defense" of CBI and CBIC.  In other words, if CBI claims that it did not (and still does not) believe it shared any liability with CBIC, it is nonsensical for CBI also to claim that the Duffy Letter and Thomson Letter were exchanged in connection with any "common defense" between CBI and CBIC.  This conclusion is buttressed by the fact that neither the Duffy Letter nor the Thomson Letter contain any reference to possible defenses ("common" or otherwise) to any sexual abuse claims against CBI or CBIC, or to any other claims against CBI or CBIC.

39.     Therefore, to the extent that CBI asserts any privilege with respect to the Duffy Letter and/or Thomson Letter, and to the extent that the Court considers any such assertion of privilege in connection with the Motion, the evidence in this case demonstrates that CBI cannot show that the Duffy Letter or the Thomson Letter are protected under either the attorney-client privilege or the "common interest" doctrine.

---

[24] The Committee reserves all rights and all arguments with respect to (a) any relationship between CBI and Mt. Cashel Orphanage, (b) any responsibility of CBI with respect to Mt. Cashel Orphanage and (c) any liability CBI faced or anticipated in connection with Mt. Cashel Orphanage.

-24-

**C.      The Proposed Action Is Likely to Benefit CBI's Bankruptcy Estate**

40.      The Committee also has established the second element of the *STN* test, which requires that the Court consider whether the Proposed Action is likely to benefit CBI's estate. *STN*, 779 F.2d at 905.  In making this determination, the Court must evaluate the "probability of legal success and potential financial recovery" to CBI's estate, as well as the cost to CBI's estate of the Committee's prosecution of the Proposed Action.  *KDI*, 277 B.R. at 508.

41.      The Court need not "undertake a mini-trial" to determine the "probability of legal success" of the Proposed Action.  *STN*, 779 F.2d at 905.  Instead, the Court should "assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce."  *Id.* at 905-06.  Where, as here, the Committee has asserted "colorable" claims, the existence of some factual support for the Committee's allegations is sufficient to warrant a finding of the requisite "probability of legal success" of the Proposed Action.  *See, e.g., Adelphia*, 330 B.R. at 369, 381 (finding sufficient likelihood of success because there was some factual support for committee's allegations, but expressly refraining from making factual findings on disputed issues of fact); *America's Hobby Center*, 223 B.R. at 288 (derivative standing appropriate because fraudulent transfer claims had a "fairly good chance of success,"  where claims were "colorable" and described defense was "hardly a slam dunk").

42.      As described in detail above, the Committee already has obtained a significant amount of evidence in support of each of its factual allegations, and also has obtained evidence that is more than sufficient to raise questions of fact with respect to the potential defenses identified by CBI.  In addition, given the stipulated value of AHHS ($8.5 million), the potential "upside" of the Proposed Action vastly exceeds the relatively modest stipulated cost of

-25-

prosecution of the Proposed Action ($650,000).  Thus, the Proposed Action is a valuable asset,

which CBI cannot afford to waste.  CBI's counsel has informed counsel for the Committee that

approximately 400 sexual abuse claims have been filed.  In addition, CBI's amended Schedule F

[Docket No. 324] shows that the non-sexual abuse claims filed against CBI exceed $126

million.[25]  CBI's assets are grossly insufficient to satisfy even the non-sexual abuse claims filed

against CBI – in other words, CBI currently is hopelessly insolvent.  Thus, as stated by the court

in *Adelphia*, the Committee should be granted standing because "denying it standing could result

in the waste of one of the estate's most valuable assets" and "the litigation has enough of a

chance to be successful, to be much more than a reasonable economic bet." 330 B.R. at 383.

[remainder of page intentionally blank]

---

[25] As set forth above, the Committee reserves all rights to object to the non-sexual abuse claims, which primarily are claims by Christian Brothers.

-26-

## CONCLUSION

43.    Wherefore, the Committee respectfully requests that it be granted derivative

standing to assert, litigate and settle (subject to further Court approval) CBI's Avoidance Claims

against AHI, so that any of this Court's determinations with respect to the Avoidance Claims are

binding on CBI and its bankruptcy estate.


Dated:  New York, New York            PACHULSKI STANG ZIEHL & JONES LLP
        August 2, 2012


                                     */s/ Ilan D. Scharf*
                                     Alan J. Kornfeld, Esq.
                                     Ilan D. Scharf, Esq.
                                     780 Third Avenue, 36th Floor
                                     New York, NY  10017-2024
                                     Telephone:  (212) 561-7700
                                     Facsimile:  (212) 561-7777

                                     -and-

                                     James I. Stang, Esq. (admitted *pro hac vice*)
                                     10100 Santa Monica Blvd., 13th Floor
                                     Los Angeles, California 90067-4100
                                     Telephone:  (310) 277-6910
                                     Facsimile:  (310) 201-0760

                                     Counsel for the Official Committee of
                                     Unsecured Creditors of The Christian Brothers'
                                     Institute and The Christian Brothers of Ireland, Inc.

-27-

**Exhibit A**

# BishopAccountability.org

**Old Memo Ties Bronx School to Church Sex Scandal**

By Andy Newman
The New York Times [New York]
November 3, 2005

All Hallows High School in the Bronx is a handsome brown-brick structure overlooking a park off the Grand Concourse, home to 530 students and to a reputation for academic success. Its link to a notoriously abusive orphanage in Canada, 1,500 miles away and long demolished, seems hard to fathom.

For decades, though, the school and the orphanage were owned by the same Roman Catholic order, the Congregation of Christian Brothers. And as lawsuits against the brothers over the orphanage scandal grind on, an internal Christian Brothers memo written 15 years ago surfaced on Tuesday in a complaint filed at a Bronx courthouse.

The internal memo, lawyers for orphanage victims charge, shows that the Christian Brothers' 1990 sale of All Hallows was a sham transaction designed to hide their ownership, part of a strategy to minimize the amount victims could recover in a suit.

The Bronx complaint asks a judge to rule that the high school, which a commercial real estate broker recently valued at between $3 million and $10 million, really belongs to the Christian Brothers after all. The school is not the subject of any abuse complaints, but to the orphanage victims, it is fair game.

As numerous sexual abuse suits against Catholic institutions proceed, the question of church assets is central, because the size of a defendant's holdings is crucial in determining how much money the victims get. Over and over, dioceses, and in some instances religious orders, are being accused of, in one lawyer's words, "shuffling and hiding assets the way they shuffled and hid molester priests."

The law in New York and most states is that moving assets with the intent to hinder creditors constitutes fraud. Some church tactics have been blocked. In Spokane, Wash., a judge recently rejected the diocese's claim that the local parishes and not the diocese own the churches and schools. But the church has fought off most challenges to its property transfers, at least in part because intent to defraud is hard to prove.

That is where the Christian Brothers memo comes in.

The year was 1990. The orphanage, Mount Cashel, in St. John's, Newfoundland, was being exposed as the site of some of the most brutal and systemic sexual and physical abuse to come to light in any Catholic institution, before or since. Victims of rapes and beatings over the decades numbered in the hundreds. The scandal, thinly fictionalized, eventually became an acclaimed film, "The Boys of St. Vincent."

Facing an inevitable rash of lawsuits - there is no statute of limitations in Canada for sexual assault - the Christian Brothers created a corporation called All Hallows Institute. This institute then "bought" All Hallows High School from the order, for $10. So while the brothers kept running the school, they did not, technically, own it anymore.

A few months later, a Christian Brothers lawyer in New York wrote to a Canadian counterpart that the goal of creating new corporations and transferring schools to them, "e.g., to All Hallows Institute," was to make the order "less of a target in any suit for damages."

The memo, lawyers for the orphanage victims say, is something of a smoking gun.

"We've all kind of known behind the scenes that this is what these guys try to do," said Michael G.

Dowd, one of the lawyers for the orphanage victims. "Seldom do you catch them in the act."

The Christian Brothers' current lawyer, Anthony D. Dougherty, called the memo "fascinating" but would not immediately comment further. The complaint was filed jointly by 51 former residents of the Newfoundland orphanage and 38 former residents of what is alleged to have been a similarly vicious orphanage in Seattle.

The Congregation of Christian Brothers is a lay order founded in Ireland in 1802 to build schools for the poor. (It is separate from the better-known Institute of the Brothers of the Christian Schools, also known as De La Salle Christian Brothers or simply Christian Brothers.)

There are about 1,850 brothers worldwide, including 180 in the Eastern United States province, based in New Rochelle, N.Y., which operates, but does not necessarily own, 22 high schools and elementary schools, as well as Iona College in New Rochelle.

In Ireland, Australia, Canada and elsewhere, the order became noted for strictness that sometimes crossed the line into cruelty or worse, and the Mount Cashel orphanage was an extreme example.

A government inquiry begun in 1989 found that orphans as young as 6 were routinely beaten with four-foot leather bridle straps, belts and fists - for losing a library card, for catching a Christian Brother having sex with another boy, or for no reason at all. Brothers in long black cassocks violated the boys in their beds at night and in the showers in the morning.

More than 450 victims came forward. Eleven brothers were eventually convicted of sexual or physical assault.

The lawsuits came. The Canadian province of the Christian Brothers has paid out more than $18 million to 120 former residents, much of which was raised by selling off schools and other property.

A separate suit was filed in 1999 against the New Rochelle headquarters by men who lived at Mount Cashel before 1962, the year the Canadian province was carved out of the North American territory run from New Rochelle.

Lawyers in this second suit turned up the 1990 memo from John J. Duffy, a lawyer for the Christian Brothers Institute, as the New Rochelle headquarters is formally known, to a lawyer for the brothers in Canada.

"Within the last few years," Mr. Duffy wrote, "in order to make C.B.I. less of a target in any suit for damages, we have been incorporating each school as a separate corporate entity with its own board of trustees or directors and transferring title to the school from C.B.I., e.g. to All Hallows Institute."

Mr. Duffy, who worked for Davidoff & Malito, one of New York's most politically powerful law firms, died several years ago. The firm referred questions to the order's current lawyer, Mr. Dougherty.

A prominent lawyer for abuse victims, Jeffrey R. Anderson, predicted that the memo would be cited in many other cases against Catholic institutions as evidence of bad-faith accounting. A law professor at George Washington University who has served as an adviser to the Lutheran church, Robert Tuttle, said it was not clear that Mr. Duffy's memo could be relevant to any other case.

In the Bronx, the president of the high school, Paul Krebbs, said that although he was not qualified to speak on disputes over corporate property, he could say the school is thriving. All Hallows, he said, regularly sends 100 percent of its graduates, most of them poor and black or Hispanic, to four-year colleges. It is ranked in the top 50 out of 1,300 Catholic high schools nationwide by the Acton Institute for the Study of Religion and Liberty, a policy group.

For one 57-year-old Mount Cashel survivor who now lives in New York, though, the fact that the order runs any schools boggles the mind.

The man, who under court order may be identified only by his initials, W.W., said, "I am of the mind to just dissolve the entire institution because of its sins against humanity."

11-22820-rdd    Doc 394    Filed 08/02/12    Entered 08/02/12 20:29:18    Main Document
Pg 31 of 106

"That's the thing with the Catholic church," he added. "You never know, because it's such a powerful institution, how much they can still hide from the public."

Any original material on these pages is copyright © BishopAccountability.org 2004. Reproduce freely with attribution.

**Exhibit B**

Page 1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------X

In re:

THE CHRISTIAN BROTHERS'

INSTITUTE, et al.,                    Chapter 11

No. 11-22820 (RDD)

Debtors.          (Jointly Administered)


-------------------------------X



DEPOSITION OF BR. KEVIN GRIFFITH, CFC

New York, New York

July 30, 2012










Reported by:

Bonnie Pruszynski, RMR

JOB NO. 52133

Page 2

July 30, 2012
2:19 p.m.

Deposition of BR. KEVIN GRIFFITH, CFC, held at the offices of Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, New York, New York, before Bonnie Pruszynski, a Registered Professional Reporter, Registered Merit Reporter, Certified LiveNote Reporter and Notary Public of the State of New York.

Page 3

A P P E A R A N C E S:
PACHULSKI STANG ZIEHL & JONES
Attorneys for Official Committee of Unsecured Creditors of The Christian Brothers' Institute and The Christian Brothers of Ireland
   780 Third Avenue
   New York, New York
BY: ILAN SCHARF, ESQ.
   ALAN J. KORNFELD,  ESQ.

TARTER KRINSKY & DROGIN
Attorneys for Debtors
   1350 Broadway
   New York, New York 10018
BY:  ANTHONY D. DOUGHERTY, ESQ.
   SCOTT MARKOWITZ, ESQ.

Page 4

K. Griffin
      (Witness sworn.)
KEVIN GRIFFITH, CFC,
      called as a witness, having been first
      duly sworn, was examined and testified
      as follows:
EXAMINATION
BY MR. KORNFELD:
      Q    Would you state your full name for the record, please.
      A    Kevin Michael Griffith.
      Q    Brother Griffith, do you have a position with Christian Brothers' Institute?
      A    I do.
      Q    What is that position?
      A    I am vice president.
      Q    How long have you been a vice president?
      A    Since July of 2008.
      Q    Are you also a member of the board of directors of Christian Brothers' Institute?
      A    As, yes, vice president.  The board of trustees.
            MR. KORNFELD:  Let's mark as Exhibit 1 a document entitled "Local Rule

Page 5

K. Griffin
1007-2, Affidavit."
            (Griffith Exhibit 1, Local Rule 1007-2 Affidavit, in re Christian Brothers' Institute marked for identification.)
      Q    First, is this your affidavit filed on the first day of Christian Brothers' Institute's bankruptcy case?
      A    It appears to be, yes.
      Q    So, in paragraph one, you indicate that you are a vice president of the Christian Brothers' Institute; is that correct?
      A    Correct.
      Q    And then let's turn to paragraph 12. It says the debtor is managed through a board of directors, and a series of brothers, among them yourselves, are listed; is that correct?
      A    Correct.
      Q    So, you are both a vice president of Christian Brothers' Institute and a director of Christian Brothers' Institute; is that correct?
      A    Right.
      Q    So, my question, sir, was, are there any other brothers or anybody else who are officers of Christian Brothers' Institute?

Page 6

K. Griffin

A    Yes.

Q    Who are the other officers?

A    The president is Brother Hugh O'Neill.

Q    That's Hugh O'Neill?

A    Correct.

Q    In addition to Brother O'Neill, are there any other officers?

A    I believe treasurer/secretary is now Ms. Sarah Barber.

Q    You said Ms. Barber is now the secretary/treasurer.  Who was the secretary/treasurer before her?

A    Brother Vincent McNally.

Q    When did Brother O'Neill become the president of Christian Brothers' Institute?  Approximately is fine.

A    July of 2003 -- five, sorry.  July of 2005.

Q    You said you became a vice president when?

A    July of 2008.

Q    Before July of 2008, were you an officer of Christian Brothers' Institute?

Page 7

K. Griffin

A    I was not an officer.  I was a director.

Q    And -- and refresh my recollection.  You became a director in 2000 --

A    '3.

Q    Thank you.
     When did you become a brother?

A    1979.

Q    When did you first have management or oversight responsibility for Christian Brothers' Institute in any capacity, whether it be officer or director?

A    2003.

Q    As long as we are doing this, let's do quickly the same line of questioning for CBOI.

MR. DOUGHERTY:  For purposes of the record, Alan, are you deposing Kevin now in his capacity as a 30(b)(6) or --

MR. KORNFELD:  I was going to get there, but I always go sort of out of order, because --

MR. DOUGHERTY:  Well, for purposes of examining --

MR. KORNFELD:  But for purposes of

Page 8

K. Griffin

examining him, I am doing both.  I am not going to say I am going to do him personally and then start and do him in his corporate capacity, because I think that would be interminable.

MR. DOUGHERTY:  I agree with you, and I was wondering how we were going to do this, for purposes of setting forth the record, knowing that in his 30(b)(6) his answers would be -- CBI would be subject to his answers.  However, if you are asking him questions in his personal knowledge, personal knowledge outside of 30(b)(6), CBI would not be subject to his answers.

MR. KORNFELD:  Why don't -- why don't we do this, unless you have a disagreement or it doesn't work for you.  Obviously I am going to ask him some questions about CBOI also.  That's why we did this in both capacities.

To the extent that he's not testifying in his 30(b)(6) capacity when I am talking about CBI, just let me know.

MR. DOUGHERTY:  And the same goes

Page 9

K. Griffin

with CBOI.

MR. KORNFELD:  Well, CBOI I didn't do a 30(b)(6) notice.

MR. DOUGHERTY:  Exactly.

MR. KORNFELD:  So, CBOI we are going to assume that it's in his personal capacity.

MR. DOUGHERTY:  Fair enough.

MR. KORNFELD:  This is going to be 2.
     (Griffith Exhibit 2, Local Rule 1007-2 Affidavit in re the Christian Brothers of Ireland, Inc. marked for identification.)

MR. DOUGHERTY:  Just a point that Scott is raising.  I think it's a good point.  Although under the broad discovery rules, the question then is the line of inquiry with respect to CBOI is not very clear to us, since this is an examination with respect to the All Hallows conveyance, and how does CBOI line up with respect to that inquiry?

MR. KORNFELD:  Well, let me tell you what I am going to do about CBOI.

Page 10

K. Griffin

MR. DOUGHERTY: Sure.

MR. KORNFELD: I'm going to ask a limited line of questions just to get his corporate capacity. I would trust, although you will -- you will tell me if I walk over the line, I would trust I am probably not going to ask many other questions about CBOI, other than what's his position, what are his responsibilities, et cetera.

You good?

MR. DOUGHERTY: Just connect the dots for me. How is that relevant to the All Hallows conveyance?

MR. KORNFELD: I just want to get his position. I'm not sure it's all that relevant --

MR. DOUGHERTY: Fair enough.

MR. KORNFELD: -- honestly.

MR. DOUGHERTY: Are you okay with that?

MR. MARKOWITZ: I'm okay with it.

BY MR. KORNFELD:

Q    Brother Griffith, we put an Exhibit 2 in front of you. Is this your Local Rule 1007-2

Page 11

K. Griffin

affidavit in the CBOI case?

A    Yes.

Q    When did you become a vice president of CBOI?

A    July of 2008.

Q    When did you become a director of CBOI?

A    July of 2005.

Q    Let's go back to Exhibit 1, which is the CBI Local Rule 1007-2 affidavit.

You testified, and I did take notes this time, that you became a director of CBI in 2003. Did I take notes correctly?

A    Yes, you did.

Q    Who elected you a director of CBI?

A    The people who would have been the board of directors at that time.

Q    The board of directors of CBI?

A    Correct.

Q    Did anybody else, besides CBI's board of directors, vote to elect you a director of CBI?

A    Not to my knowledge, no.

Q    With respect to CBOI, which is reflected in the Local Rule 1007-2 affidavit we

Page 12

K. Griffin

have marked as Exhibit 2, who elected you a director of CBOI?

A    The directors at the time of CBOI.

Q    Did anybody else vote to elect you a director?

A    No.

Q    Brother Griffith, have you been deposed before?

A    No.

Q    Let me tell you, you are doing a very good job. A couple of ground rules that I am going to cover very briefly.

Everything anybody in this room says is being taken down by the court reporter. You understand that; right?

A    Yes.

Q    You understand that you are testifying here under penalty of perjury, as if you are in a court of law; correct?

A    Yes.

Q    And your counsel gets to make objections to my questions. Even though I may think my questions are really good, he gets to object to them. Unless he tells you not to answer

Page 13

K. Griffin

or you don't understand my question, you are to go ahead and answer them. Is that okay?

A    Sure.

Q    Okay. And you caught on to another -- another rule in the deposition that we all need to be mindful of. The court reporter can't take down nods of the head or shakes of the head. Um-huhs and un-uhs read the same way in the transcript, so try to answer yes or no or yeah or no.

And the other rule that I have got to remind myself of is that I'm going to do my best to let you finish your answer before I ask my next question. You try to let me finish my question before you answer. That will do two things. It will give us a cleaner record, and that will give Tony an opportunity to object to my question if he so desires.

Is that all okay with you?

A    Understood.

Q    If you need a break for any reason, please tell me, and we will take a break, okay?

A    Will do.

Q    And sort of as I implied before, if

Page 14

K. Griffin

you don't understand my question, tell me you don't understand it, and I will do my best to try to answer -- to try to ask a question that is -- that is more understandable.  Is that okay?

A   Yes.

Q   Do you have any questions for me?

A   No.

MR. DOUGHERTY:  I would just add that you cannot ask for a break with a pending, open question.

MR. KORNFELD:  That is a good point, too.

This will be 3, please.

(Griffith Exhibit 3, Official Committee's Second Amended 30(b)(6) Notice marked for identification.)

Q   We have marked as Exhibit 3 a document entitled "Official Committee of Unsecured Creditors' Second Amended Notice of Deposition of the Christian Brothers' Institute, Pursuant to Federal Rule of Civil Procedure 30(b)(6), With Respect to the Committee's Motion for Authority to Assert, Litigate and Settle Claims on Behalf of Bankruptcy Estate Relating to Fraudulent

Page 15

K. Griffin

Conveyance to All Hallows Institute."

First, have you seen Exhibit 3 before?

A   Yes.

Q   Are you testifying here on behalf of CBI with respect to the topics listed in Exhibit 3?

A   I am.

Q   What did you do to prepare to testify on behalf of CBI with respect to the topics listed in Exhibit 3?

A   I read through documentation that was provided to me by legal counsel.  I had a conversation with Brother James Moffett, M-O-F-E-T-T, about his knowledge of some of the items, and I had a conversation with legal counsel regarding said document.

Q   I am obviously not going to ask you about conversations with legal counsel.  That is off limits.  So, I don't want you to even inadvertently get into those conversations.  So, if your answer is getting into an area, even though my question doesn't call for conversations with legal counsel, that you -- if you are getting

Page 16

K. Griffin

into an area, in any event, that deals with conversations with legal counsel, just say that is based on conversation with legal counsel, and then we will stop.  Is that okay?

A   Yes.

Q   Okay.  First, with respect to the documents provided by legal counsel, did any of those documents refresh your recollection or provide you with information about events related to the 1990 All Hallows transfer?

A   Yes.

Q   What documents were those?

A   There were several documents that were -- there was a report from a group called the Caulkins report, and there were documents connected to the transfer of the deed from Christian Brothers' Institute to All Hallows.

Q   Anything else that you recall?

A   There were letters back and forth between Claude Thomson and John Duffy.

Q   Anything else?

A   There was, I believe, information about tax exemption status.

MR. KORNFELD:  With respect to the

Page 17

K. Griffin

Claude Thomson and John Duffy letter, obviously we have the letter from John Duffy to Claude Thomson.  We have looked through our files.  We do not see the letter from Claude Thomson to John Duffy that John Duffy is responding to.  We looked for your production -- we looked in your production and did not see the letter either.

Do you guys have that letter?

MR. DOUGHERTY:  We do.  We are preparing a -- we -- we are in the middle of examination, whether or not that is attorney-client privilege, and, Alan, you and I spoke on the phone briefly about it, and we have not made that determination whether or not we are going to file a motion before Judge Drain before the August 6th hearing.

We are examining whether or not New York recognizes that privilege, which is typically referred to here in New York as the common interest privilege.  We just haven't had sufficient time to make an informed legal opinion to present that to

Page 18

K. Griffin

CBI.

MR. KORNFELD: Okay. Well, I'm not going to debate this on the record, but we filed our motion probably about six weeks ago. That being said, I don't have it, so I can't examine about it.

MR. DOUGHERTY: Just so that we are clear, we just located it. It wasn't something that we were hiding from anyone, particularly from you, Alan. So, once we found it, we were able to read it in its holistic view, taking the position, now we understand what John was referring to in answering, and I believe that the common interest should prevail.

The question on whether or not that argument will carry the day on the 6th, we haven't concluded as such. And what I can do is provide you with a copy before our filing as a professional courtesy. But we do believe there is attorney-client privilege, and we would respectfully request the return of the John Duffy letter. But again, I haven't dotted the I's and crossed

Page 19

K. Griffin

the T's.

MR. KORNFELD: Okay, I hear you. I am not going to -- I'm not going to give you the myriad reasons why I believe that the letter is not privileged -- the letters are not privileged, and/or if there ever was any argument about privilege, there has been a waiver.

MR. DOUGHERTY: Attorney -- attorneys cannot waive the attorney-client privilege. You would agree with that; right?

MR. KORNFELD: I'm not going to debate this on the record.

MR. DOUGHERTY: Okay. Fair.

MR. KORNFELD: He's here, he has a limited amount of time. I understand he has to travel. I -- I am fully confident that I won't convince you that the letter is not privileged in any such debate.

MR. DOUGHERTY: And I am fully confident that I will never convince you while we sit here, so it's ultimately going to be up to Judge Drain. That's why the judges sit; right?

Page 20

K. Griffin

MR. KORNFELD: Yeah. If you are going to file any motion, I would just appreciate it sooner rather than later.

MR. DOUGHERTY: I would not do it the day before, that's for sure.

MR. KORNFELD: Is there -- would it be possible, just as a sort of a compromise, to provide us with the letter, allow me to -- provide -- provide the Claude Thomson letter, allow me to ask questions about it, and I would agree, obviously, that if Judge Drain agreed with you, that providing me the letter is not a waiver, and that any questions about it should be stricken from the record.

MR. DOUGHERTY: I don't see any reason why not, but I don't have a copy with me.

MR. KORNFELD: Can somebody e-mail it to Ilan?

MR. DOUGHERTY: We can certainly do that. Do you see -- I don't see a problem if they stip.

Why don't we go off the record and I

Page 21

K. Griffin

make a phone call, and, Ilan, I can have it e-mailed to you. Because you're going to see it anyway, and I think it's only fair that you be able to examine --

MR. KORNFELD: Okay.

MR. DOUGHERTY: -- with the proviso, of course, that you just laid out.

MR. KORNFELD: If Judge Drain sees it your way, it's not a waiver, I agree.

Let's go off the record.

(Discussion held off the record.)

MR. KORNFELD: Let's go back on.

BY MR. KORNFELD:

Q   Let's talk about the Caulkins report. Did I hear that correctly? Could you spell that, please?

A   I believe it's C-A-U-L-K-I-N-S.

Q   What is the Caulkins report?

A   The Caulkins report, in the late 1980s, early 1990s, the brothers recognized that there would be a time when we did not have the manpower to continue to administer the schools that were under our care, so we began to put together a plan to turn the schools into

Page 22

K. Griffin

independent schools with lay boards of directors, so that when the time came that there were no brothers available, the schools would be able to continue.

The Caulkins report asked a myriad of questions of the brothers with regards to ministry, with regards to community, with regards to vocation, et cetera. It was one in a series of documents. There was also a study called the CARA study from the Center -- CARA, Center of Applied Research for the Apostolate, which was done in conjunction with a number of religious orders, teaching orders of brothers, again, for the same purpose, recognizing that there would be a day when at least our brothers would not be able to continue to operate schools the way we had in the past, because we wouldn't have the manpower. Vocations had been drying up and dying out.

And all of that eventually led to creating separately -- helping to create separately incorporated educational institutions and led to what we call the strategic plan that identified our future connection to a myriad of schools.

Page 23

K. Griffin

Q    Do you recall the date of the Caulkins report?

A    I don't know the exact date, no, but I believe it's in the documentation.

MR. KORNFELD: Let's mark as Exhibit 4 a document that -- that might be it.

(Griffith Exhibit 4, Community Survey (Caulkins Report) September 1991 marked for identification.)

Q    Is the document I have put in front of you the Caulkins report?

A    I believe it is, yes.

Q    So that the date of the Caulkins report is September 1991; is that correct?

A    Correct.

Q    You referred to a document -- let me ask you first about the Caulkins report which we have marked as Exhibit 4. Did you have any role in connection with the preparation of the Caulkins report?

A    I suspect that the questions that were asked for the survey were questions that, as a brother at the time, I would have responded to.

Page 24

K. Griffin

Q    Now, the Caulkins report has this volume one analysis. There is a volume two that deals with data. Do you recall seeing that also?

A    I believe that is in the --

Q    In your production?

A    Correct.

Q    I didn't see a volume dealing with a strategic plan. Is there any strategic plan that is a part of volume one or volume two?

A    No. The strategic plan that I referred to?

Q    Yes, sir.

A    That was done at a later date. That was done after this.

Q    The strategic plan was done after September 1991; correct?

A    Correct.

Q    When was the strategic plan done?

A    I want to say it was work done for a couple of years and unveiled in 1997.

MR. KORNFELD: Tony and Scott, the strategic plan was not produced. I would like to get a copy of that. Is that okay?

MR. DOUGHERTY: Call for the

Page 25

K. Griffin

production, we will take it under advisement.

Q    Other than to have your answers to the survey questions that are reflected in Exhibit 4 recorded possibly -- because the answers are recorded anonymously. You would agree; right?

A    I don't recall whether I would have signed my name to it or not.

Q    Yeah. I don't -- I don't see any brothers' names in any of the comments that are listed. Do you see any brothers' names that are reflected in this, or are you aware of any?

A    There are no names reflected in what you are reading, no.

Q    Okay. So, other than to answer the survey that forms the basis of the Caulkins report that has been marked as Exhibit 4, did you have any role in connection with the preparation of the Caulkins report?

A    No.

Q    Did you talk to anybody who prepared the Caulkins report?

A    Recently or in 1991?

Q    In 1991.

7

Page 26

K. Griffin

A    I can't recall.  Like I said, the survey would have come to us and we would have filled -- I would have been one who filled out the survey.

Q    The survey came to you as a written document; right?

A    Yes.

Q    There wasn't like a census taker who came around and asked questions?

A    No, no.

Q    Did you talk to anybody who was responsible for the preparation of the survey and compilation of the survey data?

A    Not that I am aware of.

Q    Did you talk to anybody who had any involvement with the Caulkins report compilation?

A    I spoke with Brother Jim Moffett, who would have been one of the people at the time that the report was authorized, you know, helped it come about.

Q    What position did Brother Moffett hold at the time?

A    In 1991?  I believe he was vice president of CBI.

Page 27

K. Griffin

Q    Did you speak to anybody -- do you know what responsibility Brother Moffett had with respect to the Caulkins report?

A    No.

Q    Did you speak to anybody else who had any role in connection with the Caulkins report?

A    No.

Q    When was the first time you read the Caulkins report?

MR. DOUGHERTY:  Point of clarification.  The survey or this report that is presently before him?

Q    The report, not the survey.

A    I would suspect I read it after it was produced, when it came to us.  I presume that was in 1991, but I -- I don't know.  That was 20-something years ago.  But I'm sure we would have received copies of the findings of the survey, and I would have read them.

Q    What was the CARA study?

A    The CARA study was similar.  The CARA study was done by the Center for Applied Research for the Apostolate.  It was a larger study than our order, than the Christian Brothers.  It

Page 28

K. Griffin

included several orders of brothers, similar type, similar type questions, similar type purpose. Because of a lack of vocations, what will religious life in the United States look like ten years, 20 years from now.  What would be an appropriate response to how we deal with our apostolate, our ministries, our schools, et cetera.

Q    When was the CARA study done?

A    Around the same time.

Q    1991?

A    Approximately.

Q    Was the CARA study before or after the Caulkins report?

A    I don't know.

Q    Did you look -- in connection with your preparation to be the designated witness for CBI, did you look for any file that is entitled "All Hallows" or anything to that effect?

A    Did I personally look for a file?

Q    Yes.

A    No.

Q    Do you have any files related to All Hallows?

Page 29

K. Griffin

A    Do I have any files?

Q    Yes, sir.

A    No.

Q    Who keeps the files with respect to All Hallows?

A    I presume they are kept at All Hallows.

Q    Where did you obtain the documents that you obtained that your counsel provided to us with respect to All Hallows?

A    I obtained them from my legal counsel.

Q    Did you look to see whether there were any files anywhere else with respect to All Hallows that you might be able to get your hands on?

A    I did not.

Q    Is it possible there are files anywhere else besides legal counsel pertaining to All Hallows?

A    I think you would have to ask the people at All Hallows that question.

Q    We did.  They told us they didn't want to answer right now.

Page 30

K. Griffin

Let's talk about legal counsel for CBI. Who is legal counsel for CBI?

A    Anthony Dougherty.

Q    And Mr. Dougherty --

MR. DOUGHERTY:  I think he hasn't finished the question.

A    Anthony Dougherty, and then with regards to our bankruptcy, it would be Scott Markowitz as well.

Q    That is the Tarter Krinsky & Dragin firm; correct?

MR. DOUGHERTY:  Drogin.

Q    Drogin, I'm sorry.

A    Yes.

Q    How long has Tarter Krinsky & Drogin been legal counsel to CBI?

A    I don't know the exact amount of time. I have been director of CBI since 2003. They have been with us that entire time. I know they were with us -- I shouldn't say that. Can I rephrase that?

Q    Sure.

A    My recollection is that when we first started with Mr. Dougherty, he was not at Tarter

Page 31

K. Griffin

Krinsky & Drogin.

Q    Was he at Davidoff & Malito?

A    I don't know, to be honest.

MR. DOUGHERTY:  That is very good.

MR. KORNFELD:  Did I get it right?

MR. DOUGHERTY:  You did.

Q    So, we have two firms that one is presently legal counsel for CBI, which is Tarter Krinsky & Drogin, and prior to that, Davidoff & Malito. Both of those firms were firms that Mr. Dougherty was at; is that correct?

A    Correct.

Q    Any other firms, to your knowledge, that have provided legal services to CBI?

A    Not to my knowledge.

Q    Let's talk about other lawyers who have provided services to CBI. Now, I am not going to have you recite all the lawyers at Tarter Krinsky that may have been involved in the bankruptcy. There are -- fair to say, there are lawyers in addition to Mr. Dougherty and Mr. Markowitz who have provided services at Tarter Krinsky; correct?

A    I believe so.

Page 32

K. Griffin

Q    At Davidoff & Malito, were there other lawyers besides Mr. Dougherty who provided services to CBI?

A    Mr. -- I think that was the firm that Mr. Duffy was connected to.

Q    You are right. Any other lawyers besides Mr. Duffy and Mr. Dougherty at Davidoff & Malito that provided services to CBI?

A    I would have no knowledge. My -- my dealings with legal counsel for CBI have only been with Mr. Dougherty. So I can't speak to whether or not other people who were in the position that I am in now before me, whether or not they had dealings with other people. I don't know.

Q    But to your knowledge, there were no other attorneys for CBI during the time that you have been an officer and/or director of CBI; correct?

A    Correct.

Q    Has CBI ever had any Canadian attorneys?

A    Can you be more specific?

Q    Sure. Has CBI ever hired attorneys that are members of the Canadian bar?

Page 33

K. Griffin

A    I'm not sure, to be honest. I know -- I know that in our dealings with Mr. Dougherty, that he would be in contact with people in Canada. Whether or not they are hired by us or not, I presume they are.

Q    Did you ever talk to any attorneys for CBI in Canada?

A    No.

Q    To your knowledge, did any of the brothers who are affiliated with CBI talk to any attorneys for CBI that are Canadian attorneys?

A    I don't know the answer to that.

Q    You don't have any knowledge that they did, do you?

A    I don't.

Q    What is CBI Canada?

A    In the 1960s, prior to the 1960s, the Christian Brothers in North America were divided -- were one province, one canonical province. In 1962, I believe, because at that time, vocations were flourishing, many people were joining the brothers, a decision was made to canonically divide up the entities.

Q    That would be 1962?

Page 34

K. Griffin

A    1962, I believe the -- what was called the Canadian Vice-Province came into existence, and I believe in 1966, they became recognized as a province.

At the same time, in 1966, the Western American Province would have been formed, and the Eastern American Province.

CBIC would have been the corporation. As Christian Brothers' Institute was to the Eastern American Province, CBIC would have been to the Canadian province.

Q    CBIC is CBI Canada; correct?

A    Correct.

Q    So CBIC and CBI were separate entities; correct?

A    Correct.

Q    And CBI Canada -- strike that.

And the Canadian province and the Eastern province were separate provinces; correct?

A    Correct.

Q    And the provinces are ecclesiastical organizations; correct?

A    Correct.

Q    And CBI and CBI Canada are secular,

Page 35

K. Griffin

if you will, corporations; correct?

A    Correct.

Q    Did CBI Canada have its own board of directors?

A    I am not familiar with the structure of CBI Canada.

Q    CBI, which is the entity that you are testifying here on behalf of, it has, as we have covered, its own board of directors; correct?

A    Correct.

Q    What is the relationship of CBI to CBI Canada?

A    There is no relationship.  They are two separate corporations.

Q    Are any directors of CBI directors or trustees of All Hallows Institute?

MR. DOUGHERTY:  Point of clarification.  When?

MR. KORNFELD:  Good clarification.

Q    Let's start with the present.

A    Two of the directors of Christian Brothers' Institute are also directors of All Hallows Institute.

Q    And who are those brothers?

Page 36

K. Griffin

A    Daniel Casey and Raymond Vercruysse. V-E-R-C-R-U-Y-S-S-E

Q    How long, approximately is fine, has Brother Casey been a director of AHI?

A    Since approximately 2006.

Q    How long has Brother Vercruysse been a director of AHI?

A    Since 2008.

Q    Prior to Brothers Casey and Vercruysse being directors of AHI, were there directors of CBI that were also directors of AHI?

A    Yes.

Q    Let's start in 1990 and take the time of the transfer, March, April, 1990, and let me ask you, prior to the transfer from CBI to AHI, were there any directors of CBI that were also directors of AHI?

A    Can you rephrase that question, please?

Q    Sure.

Prior to the 1990 transfer from CBI of the All Hallows High School to AHI, were there directors of CBI that were also directors of AHI?

A    I don't know who the directors were

Page 37

K. Griffin

at that time.  I do know one of the documents speaks to directors at All Hallows.

Q    So, what do you know from that document?

A    It would seem that there was some overlap, but I'm -- I'm not sure of that.

Q    Okay.  Tell me why you say it would seem that there was some overlap.

A    Because the names seem to be similar.

Q    Which -- which were the names that seemed to be similar?

A    I would have to see the document.

Q    Okay.  But prior to the transfer, you believe that there was some overlaps based on your review of documents in preparation for your deposition?

A    Correct.

Q    Let's take immediately after the transfer, which would have been in April 1990. Again, we are talking about the transfer of the high school from CBI to AHI.  Was there an overlap of directors between CBI and AHI?

A    At that time, I believe five of the directors -- of the directors -- I believe all of

Page 38

K. Griffin

the directors of CBI and the directors of All Hallows would have been the same people.

Q    How long from April 1990 did -- was there a complete overlap of the directors of AHI and CBI?

A    Probably until 2005.

Q    Does AHI have directors or trustees, or the words are used interchangeably?

A    It's a two-tiered board.  There is a board of trustees, which is what I believe you are using as directors now, and then there is a predominantly lay board of directors, which is the second tier, which we would refer to as the board of directors.

Q    Okay.  When you were answering my questions, were you referring to AHI's board of trustees?

A    Yes.  I was --

Q    Go ahead.  I'm sorry.

A    I was taking what you said as directors as trustees.

Q    Okay.  So just to -- to be clear, so we have a -- a record that is not confusing, how long was there a complete overlap of CBI's

Page 39

K. Griffin

directors with AHI's board of trustees, starting in April 1990?

A    Probably until 2005.

Q    And again for the sake of clarity, the board of trustees of AHI was the governance entity that was the highest level of governance for AHI; correct?

A    The board of trustees was; correct.

Q    And when I asked you about Brother Casey and Brother Vercruysse, Brother Casey being a director of CBI, Brother Vercruysse being a director of CBI, both those gentlemen were trustees of AHI; correct?

A    Both of them are trustees.

Q    They are trustees.

A    Yes.

Q    Brother Casey since 2006, Brother Vercruysse since 2008; correct?

A    Vercruysse definitely 2008.  Casey probably since 2006.

Q    Fair enough.

So 2005, the complete overlap ends, and from 2005 to the present, are there two CBI director brothers who are trustee brothers of AHI?

Page 40

K. Griffin

A    Ask that question again, please.

Q    Probably better if I try to rephrase it; right?

So we got, until 2005, there is a complete overlap with directors and trustees between CBI and AHI; correct?

A    I believe so.

Q    And since -- since starting in 2006 to the present, how many directors of CBI are also trustees of AHI?

A    At times there would have been three.  At times there would have been two.

Q    How many members is the board of trustees of AHI?  Is it five?

A    The board of trustees of AHI is presently three.

Q    Okay.  Up until 2005, how much was it?

A    It would have been six.

Q    Who are the present trustees of AHI?  The present members of the board of trustees of AHI is a better question.

A    You want their names?

Q    Yes, sir.

Page 41

K. Griffin

A    Daniel Casey, Raymond Vercruysse, John Casey.

Q    Who is John Casey?

A    John Casey is a Christian brother who is in ministry in New Orleans, who is the chair of the board of trustees at All Hallows.

Q    Do any of CBI's board of directors have a position with the North American Province governance body, whatever that body may be?

A    Do any of the --

Q    Do any of the directors of CBI also have a position in governance with the North American Province, the ecclesiastical body?

A    Yes.

Q    Who has that position?

A    Hugh O'Neill.  This is CBI and the canonical entity?

Q    Correct.

A    Hugh O'Neill, myself, Dan Casey, Raymond Vercruysse, and Anthony Murphy, and John Barry Lynch.  Is that six?  Did I give you six names?

Q    You have got O'Neill, you, Casey, Murphy, John Lynch.

TSG Reporting - Worldwide     877-702-9580

Page 42

K. Griffin

A   John Barry Lynch.

Q   John Barry Lynch.

A   Is that six?

Q   That's five on my count.

A   O'Neill, Griffith, Casey, Vercruysse, Lynch and Murphy.

Q   I missed Vercruysse. How could I do that?

So, and this is -- Brother Vercruysse and Brother Daniel Casey you just mentioned were also AHI board of trustees members and also CBI board of directors members; correct?

A   They are the same persons, yes.

Q   In 1990, at the time of the transfer of the high school from CBI to AHI, were any of the members of CBI's board of directors also in a position of governance with the canonical entity?

A   Five of the six of them would have been.

Q   Who were those?

A   I believe Paul Hennessy, James Moffett, William Stoldt, John Casey, Donald Dwyer.

Q   In 1990, at the time of the transfer of the high school from CBI to AHI, were any of

Page 43

K. Griffin

the members of AHI's board of trustees also in a position of governance with the canonical entity?

A   Could you repeat that a little slower, please?

Q   Sure.

In 1990, at the time of the transfer of the high school from CBI to AHI, were any of the members of All Hallows Institute's board of trustees also in a position of governance with the canonical entity?

A   Five of the --

MR. DOUGHERTY:  And the canonical entity you are referring to, as a point of clarification, is the North American Province?

MR. KORNFELD:  Correct.

Q   And that's been your understanding when you have said "canonical entity"; correct?

A   Not in 1990, no.

Q   In 1990, it would have been the Eastern American Province; correct?

A   Correct.

Q   Which was succeeded to by the North American Province; correct?

Page 44

K. Griffin

A   The Eastern Province and two other provinces became the North American Province.

Q   Fair enough.

What were the two other provinces?

A   Western American and Canadian.

Q   And by "province," again, since we are clarifying, we are referring to the canonical or religious entity as opposed to the secular entities; correct?

A   Correct.

Q   Now that we have got all those clarifications down, the question was:  In 1990, at the time of the transfer of the high school from CBI to AHI, were any members of AHI's board of trustees also in a position of governance with the canonical entity at that time, the Eastern American Province?

A   Five of the six of them.

Q   Who were those, please?

A   Paul Hennessy -- the same names I gave you:  Paul Hennessy, Donald Dwyer, John Casey, William Stoldt, and James Moffett.

Q   When CBI transferred All Hallows High School to AHI, who were CBI's lawyers?

Page 45

K. Griffin

A   According to the documentation that I read, it would have been John Duffy.

Q   When CBI transferred All Hallows High School to AHI, who were All Hallows Institute's lawyers?

A   I don't know.

(Griffith Exhibit 5, Real Property Transfer Tax Return marked for identification.)

Q   We have put in front of you, Brother Griffith, a document entitled "Real Property Tax Return."  Was this one of the documents you reviewed in connection with your preparation to testify as -- as the designee of CBI?

A   Yes.

Q   And this document is a document which was filed with the New York's Department of Finance; is that correct?

A   It appears so.

Q   And the grantor -- and this document pertains to All Hallows High School; right?

A   The grantor, the Christian Brothers' Institute.  The grantee, All Hallows Institute.

12

Page 46

K. Griffin

Q    And the document is -- and the grant is to All Hallows High School; correct?

A    Yes.

Q    Let's go to the second page of the document, and the very bottom of the second page, do you see the name of the grantor, right by the -- right above the notary legend?

A    William Stoldt, that -- the name of grantor looks like the Christian Brothers' Institute.

Q    Exactly.  And the date of this document is March 9, 1990; correct?

A    Yes.

Q    And William Stoldt signs on behalf of the grantor; correct?

A    Correct.

Q    And John Duffy is the notary for the grantor; correct?

A    Correct.

Q    And then the grantee is All Hallows Institute; is that correct?

A    Yes.

Q    And who signs on behalf of All Hallows Institute?

Page 47

K. Griffin

A    Lawrence T. Murphy.

Q    And again, Mr. Duffy notarizes that document; correct?

A    Yes.

Q    Now, who is Mr. Duffy representing at the time of the transfer?

A    If I read the front page, it says that he is the attorney for the grantor and the grantee.

Q    So, he represented both CBI and he also represented AHI; correct?

A    That would be my read of this, but I have no personal knowledge of that.

Q    Okay.  Do you have any reason to believe that AHI had an attorney other than Mr. Duffy?

A    I have no reason to believe that they did, I have no reason to believe that they didn't.

Q    Let me ask you this then:  Did you see any documents that indicated that in March of 1990, AHI had an attorney other than Mr. Duffy.

A    Not that I recall.

Q    Did anybody tell you that AHI had an attorney other than Mr. Duffy in that March 1990

Page 48

K. Griffin

time period?

A    No.

MR. KORNFELD:  Off the record for one second.

(Discussion held off the record.)

BY MR. KORNFELD:

Q    Mr. Duffy, in 1990, was at the Davidoff & Molito firm; correct?

A    I don't know that, but if the documentation shows that, then --

Q    In 1990, Mr. Dougherty, you testified, was also representing CBI; correct?

A    I -- you could ask Mr. Dougherty that question.

Q    Well --

A    I wasn't --

Q    Well, he's a nice guy, but I get to ask you questions today.

A    Okay.

Q    So --

A    I don't know the year Mr. Dougherty came on board.

Q    Well, let's see if I can maybe refresh your recollection.

Page 49

K. Griffin

(Griffith Exhibit 6, July 30, 1990 Letter to Department of Finance  marked for identification.)

Q    Okay.  This is a document that was provided to us by your counsel on Thursday of last week.  Did you see this document in connection with your preparation for deposition?

A    I believe I did.

Q    And the first page of this document is a letter from Mr. Dougherty to New York's Department of Finance; is that correct?

A    Correct.

Q    And that letter is dated July 30, 1990; right?

A    It is.

Q    It refers to the All Hallows Institute transfer from CBI to AHI; correct?

A    It does.

Q    Does this refresh your recollection as to who Mr. Dougherty was representing in 1990?

MR. DOUGHERTY:  First of all, I will object to the line of questions.  There is no question that -- I think the question that has been posed is whether or not I

Page 50

K. Griffin

represented the Christian Brothers in 1990. I'm not sure how Kevin would be able to answer that, or more likely, my direct boss was John Duffy. I took instructions from John Duffy at the time.

To hold me out as one who is representing the Christian Brothers Institute, for the attorneys in this room realize that after law school, you have a boss, and I am not sure you can describe me as one who is representing Christian Brothers' Institute, when the testimony has already been put on the record that John Duffy represented the Christian Brothers' Institute in 1990.

MR. KORNFELD: The testimony is that he also represented All Hallows Institute in 1990.

We all have bosses when we left law school, to the best of my recollection, which is maybe a little dim now, but we all have bosses when we leave law school, but we also have clients.

So the question was, maybe to you,

Page 51

K. Griffin

Tony, is who was your client in July of 1990, that you were writing this letter for?

MR. DOUGHERTY: First of all, I'm not here being deposed, and you know that. Second of all --

MR. KORNFELD: But you were testifying.

MR. DOUGHERTY: -- I have responded to your line of inquiry of Kevin, okay. And you're framing it in such a fashion that you have presupposed that I, in my capacity as an attorney, was representing the Christian Brothers' Institute, rather than taking instructions of a partner of a firm when I was a first-year law -- well, first-year associate at that time.

MR. KORNFELD: Okay. I understand you have an objection, which has become a speaking objection, with all due respect. I think we have -- you have said your piece on the record. I will ask the witness the questions. If you want to make an objection on legal grounds, feel free.

BY MR. KORNFELD:

Page 52

K. Griffin

Q    In July of 1990, when Mr. Dougherty wrote this letter that is headed "Re: All Hallows Institute," who was Mr. Dougherty representing, to your knowledge?

MR. DOUGHERTY: Objection as to form. You may answer the question if you understand it.

A    I don't know who Mr. Dougherty was representing. I didn't know Mr. Dougherty in 1990.

Q    Let's turn to -- this document, unfortunately, was not number stamped, so I am going to count in -- I'm going to count in six pages, and the heading on that document, which appears to be an attachment to Mr. Dougherty's July 30, 1990 letter we have marked as Exhibit 6, is "Application for Real Property Tax Exemption for Nonprofit Organizations."

Do you see that page?

A    I do.

Q    In item 4A, it has been typed in that "the above-mentioned parcel of Block 2471, Lot 1, has been conveyed from the Christian Brothers' Institute, a nonprofit organization, to All

Page 53

K. Griffin

Hallows Institute, for no consideration."

Do you see that?

A    Yes.

Q    Is it correct that Christian Brothers' Institute conveyed All Hallows High School to All Hallows Institute for no consideration?

A    Yes.

MR. KORNFELD: Let's go to Exhibit 7.

(Griffith Exhibit 7, July 30, 1990 Letter for City of New York, Department of Environmental Protection marked for identification.)

Q    Exhibit 7 is another document that was provided to us in the document production of last Thursday. That document is a letter dated July 30, 1990, to the City of New York. It's also from Mr. Dougherty.

Sir, do you know who Mr. Dougherty's client was for whom he wrote Exhibit 7?

MR. DOUGHERTY: Objection to form. You may answer the question if you understand.

A    Again, I didn't know Mr. Dougherty in

Page 54

K. Griffin

1990.

Q    But this -- this document has an attachment; correct?  The attachment is an application for exemption from water and sewer charges; correct?

A    That's what it reads.

Q    And you saw this document when you were preparing for your deposition; correct?

A    I saw this document, yes.

Q    And the name of the organization for which the application for exemption from water and sewer charges is filed with the City of New York on or about July 30, 1990 is All Hallows Institute; correct?

A    Repeat that, please.

Q    The name of the organization for whom the application for exemption from water and sewer charges that is attached to Exhibit 7 is made on behalf of -- is All Hallows Institute; right?

A    It says "Re: All Hallows Institute," yes.

Q    And the applicant's signature in item 27, it looks like Lawrence something.  Do you see that faded signature there?

Page 55

K. Griffin

A    I do.

Q    Do you recognize whose signature it is?

A    Lawrence T. Murphy.

Q    Who is Mr. Murphy or Brother Murphy at that time?

A    He would have been the chief school administrator of All Hallows High School.

Q    And the document was -- was notarized by Mr. Duffy; correct?

A    Yes.

(Griffith Exhibit 8, Memorandum of the Transfer of Premises from The Christian Brothers' Institute to All Hallows Institute marked for identification.)

Q    Exhibit 8 is a document stamped CBI BANK39 through 44.  This document is entitled "Memorandum of the Transfer of Premises from the Christian Brothers' Institute to All Hallows Institute."  It's dated March 9, 1990.

Brother Griffith, do you know who prepared Exhibit 8?

A    I do not.

Q    Did you see Exhibit 8 in preparation

Page 56

K. Griffin

for your deposition?

A    I did.

Q    Looking at Exhibit 8, is -- did you see anything that you thought was inaccurate in that exhibit?

A    No.

Q    So, to your knowledge, to the best of your knowledge, as the designee of CBI, does Exhibit 8 accurately reflect the transaction by which CBI transferred All Hallows High School to AHI?

A    Yes.

Q    Now, to your knowledge, was there -- with respect to the transfer between CBI and AHI, was there any negotiation that went on between CBI and AHI?

A    Can you say what you mean by "negotiation"?

Q    Yes.  Was -- were any provisions of the transaction negotiated?  We know there was no consideration.  How did it come to be that there was no consideration for the transfer, for example?  But I am going to ask you -- I'm going to ask you about that in a minute.

Page 57

K. Griffin

But I wanted to know, to your knowledge, was -- was there any negotiation?  A give and take, a discussion of terms, where one party says, I am going to give you AHI -- it's a hypothetical, obviously.  I'm going to give you AHI for $100,000, and the other side says, no, I want it for free.

Was there any type of discussion where there was a give and take over any of the terms of the transaction by which the high school was transferred from CBI to AHI?

A    Not to my knowledge.

Q    Who decided to transfer the high school from CBI to AHI?

A    I have no specific knowledge of who decided that.  It would seem that the decision would have been made by the directors of CBI.

Q    Did you speak to any of those directors?

A    I did.

Q    Who did you speak to?

A    James Moffett.

Q    Did you speak to any other directors?

A    I did not.

Page 58

K. Griffin

Q     Did you discuss with Brother Moffett the reason that CBI transferred the high school to AHI in March of 1990?

A     I did.

Q     What did Brother Moffett tell you?

MR. DOUGHERTY: Objection. For the record, that conversation happened in the presence of counsel. For purpose of your inquiry, we will allow it to proceed with the caveat that we have not waived any attorney-client privilege.

Q     Go ahead.

A     Ask the question again.

Q     Yes. I asked you -- just to get you to where we were, I asked you did you discuss with Brother Moffett the reason that CBI transferred the high school to AHI in March of 1990. You answered that you had.

My next question was: What did Brother Moffett tell you during that conversation you just said took place with him about the reason the high school was transferred?

A     There was a history of a lack of vocations from the early to mid to late 1980s. It

Page 59

K. Griffin

was foreseen that in the future, there would not be enough Christian Brothers to maintain the schools that we were presently operating. It was the desire of the brothers at that time to insure that the continua- -- that the schools would continue when no Christian Brothers were available to minster in them.

Q     Did he tell you anything else?

A     At the time, All Hallows had the means to operate itself as a separately incorporated institution. There were a myriad of, you know -- I -- I mentioned earlier the CARA study.

Q     Tell me what Brother Moffett told you.

A     Yeah. Brother Moffett spoke to the Caulkins report. All of these things were kind of in the planning at the same time. We spoke about the -- there was no blueprint, there was no -- that was his word, there was no blueprint for how -- how the school would be -- become independent. There was no blueprint for, this is what we are going to do with the school, but again, because All Hallows had the means to

Page 60

K. Griffin

survive on its own, into the future, at a time when there wouldn't be Christian Brothers, the deed was transferred from Christian Brothers' Institute to All Hallows.

Q     Brother Moffett mentioned the Caulkins report, but the Caulkins report is dated September 1991; correct?

A     Yes.

Q     So, the Caulkins report came after the transfer of All Hallows High School to AHI; correct?

A     The Caulkins report findings came afterwards. The concept of the Caulkins report and the verbalization of it was -- was -- talked about it, that we needed to do something like that in order to -- in order to have a blueprint for the future.

Q     Well, the Caulkins report was a survey; correct?

A     Yes.

Q     The results of that survey were not completed until -- not released until 1991; correct?

A     Correct.

Page 61

K. Griffin

Q     September 1991, to be exact?

A     According to the date that is on the report. My recollection is that the -- my recollection is that the facts were all in front of us, and in order to certify that yes, this is where things are directed -- are heading, a report was needed to be done to show the brothers the reasons why we need to move in the directions that we are moving in, that we need to move in the future.

Q     Now, we said that prior to the transfer of the high school, the board of trustees of the high school was composed of brothers; correct?

A     Correct.

Q     And there was complete overlap of the board of trustees of the high school with the board of directors of CBI; correct?

A     For a time.

Q     Okay. In fact, up until the mid 2000s; correct?

A     Yes.

Q     So, after the transfer of the high school in March of 1990 from CBI to AHI, the

Page 62

K. Griffin

Q management of the high school did not change, did it?

A It did, yes.

Q But the board of trustees remained the same; correct?

A The board of trustees remained the same, but a board of a two-tier system of governance was set up, with many of the powers being given to the board of directors so that the board of trustees had only reserve powers in the operation of the school.

Q But the board of trustees was the highest level of management; correct?

A Yes.

Q So, maybe the better question is: After the transfer in March of 1990 from CBI to AHI, the highest level of management of AHI did not change; correct?

A I would say yes, yes.

Q And in fact, it did not change until the middle of 2005; correct?

A Yes.

Q And in fact, brothers continue to serve on the board of trustees, which is the

Page 63

K. Griffin

highest level of management of AHI; correct?

A Correct.

Q Now, you said that Brother Moffett told you that AHI had the means to operate itself separately in March of 1990. Did you see any financial statements for AHI in preparation for your deposition?

A No.

Q Have you ever seen any financial statements for AHI?

A I taught at All Hallows from 1983 to 1986, and there is a possibility that during that time frame that I may have seen some financial statements.

Q Do you recall what those financial statements --

A I don't.

Q -- back then showed?

A I don't.

Q You don't remember whether the school was in the black or the red, do you?

A I don't. I wasn't -- I was a classroom teacher.

Q And what did you do when two of your

Page 64

K. Griffin

students were whispering in class when they should have been quiet?

MR. DOUGHERTY: Objection to form.

You don't have to answer.

Q You don't have to answer that. I thought that was a good question, but you have been instructed not to answer.

So, did Brother Moffett share with you the reasons he told you that AHI had the means to operate itself independently in March of 1990 -- strike that.

Did Brother Moffett explain in any detail why he said that AHI had the means to operate itself independently in March of 1990?

A He said it in the context of conversation about other schools that didn't have the means and therefore weren't incorporated at that time.

Q When was AHI incorporated?

A It received its absolute charter in 1978.

Q So, from 1978 to 1990, AHI did not own a high school; correct?

A AHI did not own a high school?

Page 65

K. Griffin

Q Yes.

A Christian Brothers' Institute, I guess, would have been the --

Q Exactly.

A -- owner of the property.

Q Despite the fact that there was an AHI --

A Well, AHI has existed since 1909, because the school began in 1909.

Q And the charter was in effect, and correct me if my terminology is wrong, it was licensed to be able to operate a high school. It wasn't an incorporation of a -- of a secular entity type document, was it?

MR. DOUGHERTY: Objection as to form.

You are asking the witness to form a legal opinion, and he's not -- obviously, he's not an attorney.

I'm going to direct him -- perhaps you can rephrase the question now.

Q When you say they received their absolute charter in 1970 --

A '78.

Q -- '8, what is an absolute charter?

Page 66

K. Griffin

A    I don't have full knowledge of what an absolute charter is, but I believe it's what gives it its right to operate as an educational institution.

MR. KORNFELD:  I thought I said that before the objection.

MR. DOUGHERTY:  Not what I am reading here.

MR. KORNFELD:  Okay.

Q    Now, did Brother Moffett tell you when you were having your discussion with him in preparation for your deposition anything about AHI's finances in 1990 other than sort of the general statement that AHI could operate independently in 1990?

A    No.

Q    Does CBI's board of directors receive financial statements at present pertaining to AHI's operations?

A    No.

Q    Have you ever discussed AHI's finances with any of the CBI directors who are also members of AHI's board of trustees?

A    No.  When the directors of CBI meet,

Page 67

K. Griffin

we meet as directors of CBI.  The directors -- the trustees of All Hallows, when they meet, they do so independently of the trustees of CBI, the directors of CBI.

Q    Is the principal of All Hallows Institute a brother at present?

A    The principal, no.

Q    How many brothers teach at All Hallows Institute at present?

A    Approximately five.

Q    At the time of the transfer from CBI to All Hallows Institute in 1990, was the principal a brother?

A    I'm not sure what year All Hallows went to a model of president-principal administration.  When they went to that model, the president would have been a brother.  The principal was not a brother.

I am not sure if what was before or after -- I presume that was after 1990, but I am not 100 percent sure of that.  Lawrence T. Murphy was the chief school administrator.  I am not sure if his title was president or principal in 1990.

Q    And Lawrence T. Murphy, was he a

Page 68

K. Griffin

brother?

A    He is a brother.

Q    How long was he the chief school administrator?

A    I believe nine years.

Q    During what period?

A    I believe he finished in 1997, so, nine years back from 1997.

Q    So, he would have become the chief school administrator in about 1988?

A    Yeah.  Give or take a year.

MR. KORNFELD:  Let's take a ten-minute break, and we will look at that additional document.

(Recess taken.)

MR. KORNFELD:  Ready?  Let's go back on.

MR. DOUGHERTY:  Alan, before we proceed, Kevin Griffith would like to go back and revisit an answer that he gave you, with respect to your inquiry as to what he did in order to prepare for this deposition, specifically looking for certain files.

BY MR. KORNFELD:

Page 69

K. Griffin

Q    Go ahead, Brother Griffith.

A    I understood your question to be, did I look through files myself, which I didn't.  The files that I got and came to me through legal counsel got to legal counsel as a result of two phone calls that I made asking our treasurer's office if they had any files on All Hallows High School.  They did not.

Because it happened over 20 years ago, my presumption was that anything that we had would have been in our archives, so I phoned our archivist and asked him to turn over any files that he had to Mr. Dougherty, and that's how the files came to Mr. Dougherty that I alluded to that I saw.

I did not go into any files myself.  I thought your question was specific to, was I looking through files.  I wasn't looking through files, but I had conversations asking that files be presented.

Q    Did your archivist provide, to your knowledge, all of the documents in the archives pertaining to the transfer from CBI to AHI of All Hallows High School?

Page 70

K. Griffin

A    To my knowledge, yes.

Q    Where is Brother Moffett?  Is he -- is he -- does he reside in New York?

A    Yes.

Q    Where does he reside?

A    He resides in East Harlem.

Q    Does he reside at a residence?

A    Yes.

Q    What residence is that?

A    We call it Christian Brothers East Harlem.  It's on 103rd Street.

Q    Do you recall the address?

A    I want to say 125 East 103rd Street, but I am not 100 percent sure of that.

MR. DOUGHERTY:  We can supply you with the accurate address, Alan.

Q    When did you have the conversation with Brother Moffett that you were discussing with me?

A    Earlier today.

Q    How long did that conversation last?

A    Forty-five minutes to an hour.

Q    That was a conversation that Mr. Dougherty was also a party to?

Page 71

K. Griffin

A    Yes.

Q    Was that a phone conversation or an in-person meeting?

A    Phone.

Q    Were you with Mr. Dougherty when that conversation took place?

A    Yes.

Q    Did Mr. Markowitz also participate in that conversation?

A    No.

Q    Have you told me everything that you can recall about that conversation with Brother Moffett?

A    Well, probably not.  It was a 45-minute conversation.  I don't think I spoke for 45 minutes.  But, you know, one of the things that -- one of the things that he shared was that during the time of the conveyance of the property from Christian Brothers' Institute to All Hallows, that there were three other properties that were owned by Christian Brothers' Institute at the time: Iona Grammar School, Bishop Carney High School, and Rice High School.

None of those three properties were

Page 72

K. Griffin

conveyed by CBI to those schools.  The reasoning for that was those schools could not most likely have survived on their own at the time.

Q    Were there any properties at the time -- and we are talking about the 1990 time; correct?

A    Correct.

Q    Were there any schools in that 1990 time period that were conveyed by Christian Brothers to a stand-alone entity, other than All Hallows Institute?

A    In 1990, no, but prior to that, you know, Iona College was conveyed.

Q    When was that?

A    In 1946, I believe.  To Iona College. Iona Prep -- Iona Prep was not -- Iona Prep was conveyed -- Iona Prep was on the property.  The Iona schools started in 1916.  They started on the property that is presently Iona College's property, so it gets confusing, because the grammar school and the prep predate the college. But the college is on that property now.  The prep and the grammar school moved to other properties.

The prep property that it is

Page 73

K. Griffin

presently on was a tradeoff with Iona College for property that was owned where Iona College presently is, that was used to build the present Iona -- Iona Prep.

Q    When was that?

A    1964.

We have a long history of conveying -- conveying properties.

Q    Between 1964 and 1990, did Christian Brothers convey any property from Christian Brothers' Institute to a stand-alone entity?

A    Not off the top of my head.

Q    After 1990, has Christian Brothers' Institute conveyed any property to a stand-alone entity?

A    Not to my knowledge.  The relationship between the Christian Brothers and Bishop Carney changed in the sense that Bishop Carney is now operated by a lay board of directors independent of Christian Brothers.  There might be one or two Christian Brothers on the lay board of maybe 15 or 20 people, but Christian Brothers' Institute continues to own the property where Bishop Carney High School is located in Rochester,

19

Page 74

K. Griffin

New York.

Q    Since the transfer of All Hallows High School to All Hallows Institute, has Christian Brothers' Institute conveyed any school to a stand-alone entity?

A    No.  We have sold Rice High School.  We are in the process of selling Iona Grammar School, and I just described to you the relationship with Bishop Carney High School.

All Hallows is the only one that was conveyed, because, as I said, it was deemed that the future of All Hallows High School would be strong without Christian Brothers in the future.

Q    In fact --

A    The reason --

Q    I'm sorry.

A    The reason that it was done at -- at no cost is because that's who we are.  You know, we exist for the establish -- we exist in the State of New York to establish schools to work with, you know, young people, so --

Q    In fact, the conveyance of All Hallows High School was the only conveyance that you are aware of from 1964 on of a school by

Page 75

K. Griffin

Christian Brothers' Institute that was done for no consideration; is that correct?

A    It's the only one that was done that happened to be for no consideration, yes.

Q    There weren't any other conveyances that you are aware of since 1964 that were done for no consideration; correct?

A    There were no other schools other than the ones I mentioned except for Power Memorial Academy, which closed in 1984.

Q    That wasn't a conveyance?

A    No.  It closed in 1984.

Q    After the then Lou Alcindor went there; correct?

A    That is correct, long after.

In response to the question you asked earlier, are there other things that Brother Moffett conveyed to me in my conversation with him earlier, yes.  I asked Brother Moffett specifically the question, the relationship between Christian Brothers' Institute and Mount Cashel.  There was no relationship between Christian Brothers' Institute and Mount Cashel.  Christian Brothers' Institute had no

Page 76

K. Griffin

responsibility at -- at Mount Cashel.

I asked Brother Moffett if the conveyance of All Hallows High School was for the purpose of protecting -- of protecting it as an asset in the case that litigation be brought against them, and he said absolutely not, that was not under consideration.

Q    Did you show Brother Moffett Mr. Duffy's December 18, 1990 letter that Mr. Duffy wrote to Claude Thomson regarding protecting Christian Brothers' Institute from liability?

A    I did not.

Q    Did you discuss that letter with Brother Moffett?

A    I don't think -- no, not to my recollection.

Q    Did you tell -- did you tell Brother Moffett that on December 18, 1990, Christian Brothers' Institute's lawyer wrote in a letter, "Within the last few years, in order to make CBI less of a target in any suit for damages, we have been incorporating each school as a separate corporate entity with its own board of trustees or

Page 77

K. Griffin

directors and transferring title to the school from CBI, e.g., to All Hallows Institute"?

A    I did not tell him that, but please recognize that that -- if taken in context, that would mean that we would have conveyed Iona Grammar School, Bishop Carney, and Rice High School as well.  We did not.  We only conveyed All Hallows High School.

Q    So, you didn't tell Brother Moffett anything about what Mr. Duffy wrote in his December 18, 1990 letter, did you?

A    I did not, no.

Q    In 1990, who was the vice president of Christian Brothers' Institute, your counterpart?

A    According to the documents that I read, it's signed by Brother William Stoldt as vice president.

Q    Is Brother Stoldt still alive?

A    No.

Q    What was Brother Moffett's role in 1990, if any, for management?

A    He would have been the president of Christian Brothers' Institute.  That is not

20

Page 78

K. Griffin

correct. I'm sorry. He -- Paul Hennessy would have been the president, I believe, in 1990. Brother Moffett would have become president in 1993.

He would have been a member of the board of directors at the time. I don't know whether he had a role as an officer or not. But he wasn't the president, so I strike that. He became president in 1993.

Q    Did Christian Brothers' Institute provide funds to All Hallows Institute after the March 1990 transfer?

A    There were times where Christian Brothers' Institute provided funds to All Hallows, yes.

Q    When were those times?

A    I couldn't say specifically.

Q    Since 1990, approximately -- since the time of the transfer in 1990 --

A    Right.

Q    -- approximately how much in funds has CBI provided to All Hallows Institute?

A    I couldn't answer that question.

Q    Did CBI provide funds to All Hallows

Page 79

K. Griffin

Institute post transfer when All Hallows Institute was running short of money?

A    On occasion.

Q    So, is it fair to say that on occasion, All Hallows Institute ran short of money after March of 1990?

A    Yes.

Q    Approximately how many occasions?

A    That I couldn't -- I can tell you that from 2005 on, Christian Brothers' Institute has given no money to All Hallows High School. I can't tell you during the times that I wasn't a member of Christian Brothers' Institute, whether or not money was given.

Q    But during the time that you were a member of Christian Brothers' Institute, All Hallows received money from Christian Brothers' Institute?

A    Maybe for the first two years.

Q    What years were those?

A    2003, 2004, possibly. I'm not sure exactly what year they stopped needing money.

Q    Who is responsible for the religious education that is provided to the All Hallows

Page 80

K. Griffin

Institute?

A    Be specific when you say the religious education.

Q    Well, are there classes in the Catholic religion --

A    Yeah.

Q    -- that students who attend All Hallows Institute are required to take?

A    Yes.

Q    Who is responsible for the curriculum of those classes?

A    The curriculum is prepared by the people who are on the scene, the principal primarily, but I believe one of the reserve powers of the trustees, directors -- I call them trustees --

Q    What trustees?

A    The trustees of All Hallows, is to insure the religious nature of the school.

Q    The religious nature of the school --

A    The Catholicity of the school.

Q    Is in keeping with the Catholic educational goals as articulated by the Christian Brothers; correct?

Page 81

K. Griffin

A    As articulated by the Catholic Church.

Q    And --

A    Not by the Christian Brothers, by the Catholic Church.

Q    Do brothers teach those religious education classes at All Hallows Institute?

A    Some do. Most don't.

Q    In the documents that were produced on Thursday, there was not a copy of the CARA study. Is there a reason that that wasn't produced?

A    When I spoke with the archivist, I asked him to provide the Caulkins report and the CARA study. I believe he sent the Caulkins report. This morning, when I met with legal counsel, I had my own copy of the CARA study.

MR. KORNFELD:  Are you claiming any privilege for that study?

MR. DOUGHERTY:  No, not at all.

MR. KORNFELD:  May we get a copy, please?

MR. DOUGHERTY:  We will take it under advisement.

Page 82

K. Griffin

MR. KORNFELD: Okay. I would have appreciated a copy before the deposition, but it didn't happen.

MR. DOUGHERTY: No, it didn't happen. And I believe Kevin gave you quite a good answer why it didn't happen.

A   Mr. Dougherty only learned of the CARA study this morning, when I showed it to him, because it wasn't provided to him by the archivist.

MR. DOUGHERTY: You don't have to continue.

MR. KORNFELD: I actually wasn't blaming anybody. I just said it's a pity I didn't get it provided before the deposition, without any blame meant.

Q   Have you ever seen any newspaper clippings with respect to the All Hallows transfer?

A   Yes. I found them preposterous, the claims that we acted in a criminal way and making us akin to the Mafia, sending money overseas, fabricated with numerous lies.

Q   When were those newspaper clippings

Page 83

K. Griffin

that you are referring to?

A   I believe 2001, 2005. I am not sure of the exact dates.

Q   And in what publications did you see those articles that you are referring to?

A   I would have to look at them again to see what the publication was. They were provided in the documentation that you received, I believe.

Q   Actually, I didn't receive any newspaper clippings. I have gone through every page of what was provided in those four e-mails.

A   Actually, you are correct. You are correct. They were provided for me following the documentation.

Q   Other than those 2001 newspaper clippings that you have just testified to, have you seen any newspaper articles pertaining to the transfer of All Hallows High School from CBI to AHI?

MR. DOUGHERTY: Objection. The testimony was 2001 and 2005.

Q   Let me revise the question. Other than the newspaper articles that you just testified to that had some -- what

Page 84

K. Griffin

you characterized as upsetting and erroneous information, have you seen any newspaper articles pertaining to the transfer of the All Hallows High School from CBI to AHI?

A   I don't remember the year. I recollect it to be either 2005 or 2006, there was an article that was in the New York Times that I read.

Q   What was the subject matter of that article?

A   As you stated. It was about the conveyance of the property from Christian Brothers' Institute to All Hallows. I don't remember the details of the substance of what was in the article. It was something I read at the time that was in the paper. I had no intimate knowledge of what was going on then. I just read it as a person reading.

Q   Did you see in any of the documents that the archivist compiled or any other documents, did you see any other newspaper articles other than the ones that you have just testified to? And those are articles in 2001 and 2005 or '6.

Page 85

K. Griffin

A   No.

Q   Did you see any publicity releases from 1990 in which CBI or AHI announced the conveyance of All Hallows High School from CBI to AHI?

A   In 1990, I was missioned in Miami, Florida, so, no, I did not see anything about that.

Q   In preparing for your deposition, did you see any articles from that time period, any publicity releases from that time period, by which either CBI or AHI announced the conveyance of the high school?

A   I did not see any.

(Griffith Exhibit 9, Official Committee of Unsecured Creditors' First Set of Requests for Production of Documents marked for identification.)

MR. MARKOWITZ: I'm going to send you a website that has the New York Times article in it. I thought you had it. I'm going to send that to you now, okay? Like a realtime deposition document production.

Q   We have marked as Exhibit 9 the

Page 86

K. Griffin

Committee's first set of requests for production of documents propounded to the debtors in connection with the All Hallows transfer.

Q   Have you seen this document before?

A   I have seen so many documents, I can't be certain that I have, I can't be certain that I haven't.

Q   Now, let me call your attention -- to maybe make it a little bit easier, let me call your attention to, starting on page 12 of the document through the end of page 15. There is a list of categories of requested documents by the committee.

Have you ever seen that list of requested documents before?

A   Again, I have seen so many documents, I can't speak specifically to whether I have seen this one or not.

Q   Let me ask you in general, are you confident that CBI has produced all documents in its possession or control, with a couple of exceptions we have discussed today, to counsel for production to the Committee with respect to the All Hallows transfer?

Page 87

K. Griffin

A   I'm confident that the documents that were contained in the archives, which would be where our records are kept for something that happened in 1990, that all of those documents we produced, yes.

Q   So, to your knowledge -- strike that.

Did you attempt to ascertain whether any lawyers for CBI have any documents that are non-privileged related to the transfer that were not contained in the archives?

MR. DOUGHERTY:  Objection as to form. Objection as to, you are asking the deponent whether or not he understands the term, a legal term, as non-privileged in your inquiry, and I don't think he has the ability --

MR. KORNFELD:  I will rephrase.

MR. DOUGHERTY:  Thank you.

Q   Did you attempt to determine whether your lawyers produced all documents that are in their custody and control to Committee counsel?

A   We have instructed our legal counsel to comply fully with any documents that come to us from the Court.

Page 88

K. Griffin

Q   Did you ever review any files that your legal counsel may have maintained with respect to the 1990 transfer?

A   I don't -- the file that I -- the documentation that I referred to earlier, I don't know if those all came from the archives or if some of those came from legal counsel. I don't know.

(Griffith Exhibit 10, Debtor's Objection to the Motion of the Official Committee of Unsecured Creditors for Authority to Assert, Litigate and Settle Claims on Behalf of Bankruptcy Estate Relating to Fraudulent Conveyance to All Hallows Institute marked for identification.)

Q   Exhibit 10 is a copy of the debtor's objection to the Committee's motion for authority to assert, litigate and settle claims on behalf of the bankruptcy estate relating to fraudulent conveyance to All Hallows Institute.

Have you seen this document before?

A   I have seen this before, yes.

Q   Did you see this document before it

Page 89

K. Griffin

was filed with the Court on May 25th, 2012?

A   I suspect I would have seen it before it was filed with the Court, because it would have been sent to me for perusal. But again, there are so many documents that get passed around, that, you know, to know whether this specific one I perused before it was sent to the Court, it is hard to say.

But the general practice has been that I have read documents before they have gone to the Court.

Q   And if you don't approve them, they don't get filed; right?

A   We have discussions about what is filed and what is not filed.

Q   Okay. And if there was something that was incorrect in the document, you wouldn't approve it; correct?

A   I would have a conversation about correcting it.

Q   Okay. Let's turn to paragraph eight of the objection. Why don't you read that paragraph to yourself, and let me know when you are ready to talk about it.

Page 90

K. Griffin

A    Yes.

Q    Okay.  Just so the record is clear, paragraph eight reads: "Over the course of its century-long existence and in its ordinary course of business, CBI has conveyed many parcels of developed and undeveloped real property to schools that it had originally established once they were viable and capable of self-sustained independence."

What -- what parcels are -- is CBI referring to?

A    Iona College, approximately 1946 --

Q    Right.

A    -- would have been conveyed.

Iona Prep, approximately 1964, would have been conveyed.

I explained the relationship with Bishop Carney, how that has changed.  The property wasn't actually conveyed.

Q    Any others?

A    All Hallows would have been conveyed.

Q    In 1990?

A    Correct.  Those are the ones that I am aware of.

Page 91

K. Griffin

Q    There were no others; correct?

A    I can't say there were no others.  I can say I don't recall any others.

Q    So, in the next sentence it talks about these conveyances which happened on numerous occasions in the ordinary course of CBI's business.  "Numerous" means three occasions, one for Iona College, one for Iona Prep, and one for All Hallows; correct?  To your knowledge?

A    "Numerous" means on three occasions out of the possibility of six occasions.  There were only three other properties --

Q    Okay.

A    -- that could be in question.  Iona Grammar School, Rice High School, and Bishop Carney, those are the only other properties that could be in question, so half -- so, yes, half of them have been conveyed.

Q    And the total number of conveyances was three?

A    To my knowledge.

Q    Let's turn to page six of the opposition, paragraph 16.  Why don't you look at that for a moment, and then we will talk about it,

Page 92

K. Griffin

and let me know when you are ready, please.

A    Yes.

Q    There is a reference to ACRIS.  Do you know what that is?

A    I don't.

Q    So, since you don't know what ACRIS is, you don't know what a cursory search on ACRIS would reveal, do you?

A    On the word of my legal counsel, it would reveal -- even a cursory search, which is publicly available, would evidence such transfer.

Q    You are reading what the document says; right?

A    Yes.

Q    Do you have any knowledge of what ACRIS is, other than the sentence in paragraph 16 of the opposition that references it?

A    I don't.

Q    You say that -- CBI says in the last sentence of paragraph 16 that "the All Hallows transfer was made upon ordinary and customary terms for such transfers in New York at that time."

What are the ordinary and customary

Page 93

K. Griffin

terms for such transfers in New York at that time?

A    That is a legal question I am not capable of responding to.

Q    Turn to paragraph 24 of the opposition, which is on page 20 -- I'm sorry, paragraph 24 is on page nine.

A    Yes.

Q    In paragraph 24, there is a sentence that reads as follows: "Because of the well-publicized nature of the All Hallows transfer and the aggressive solicitation and litigation tactics of plaintiffs' counsel, having the benefit of the discovery role is not at all certain and will surely be a heavily litigated topic."

I'm not going to ask you about the legal argument that is contained in that sentence.  I'm going to ask you about the reference to the well-publicized nature of the All Hallows transfer.

I asked you a little bit ago in this deposition about newspaper articles, and you testified to an article in 2001, and then an article in 2005, possibly 2006.  Do you recall that testimony?

24

Page 94

K. Griffin

A    Yes.  There were three articles that I read, that I read recently, and there was the one from the New York Times that I read back in whenever it came out, 2005, 2006, so there would have been a total of four.

MR. MARKOWITZ:  You have that one now.

A    Four articles that appeared that I would have read.  Those are the ones I was referring to earlier, you know, in which we were compared to, you know, criminals sending money overseas and the Mafia and -- and the sort.  As, you know, being criminals.

There was no intent when the property at All Hallows was conveyed from CBI to All Hallows, there was no intent to fraudulently convey anything.  It was -- it was the practices of the brothers, as shown with Iona College and Iona Prep, that we have done that in the past.

Q    I understand your position, sir, but that wasn't exactly my question.

A    Okay, sorry.

Q    My question was simply, I asked you about articles.  You testified now to four

Page 95

K. Griffin

articles that appeared.  How many in 2001?

A    I don't know the dates of all of them, but I believe what I saw was 2001, 2005.  In the three articles, there might have been something from 2002 or 2003, I really don't know.  I didn't look at the date specifically, with the idea of having to remember it.

The article in the New York Times I suspect was either 2005 or 2006, again.

Q    So, it's fair to say that the four articles appeared at some point in time between 2001 to 2006; correct?

A    Correct.

Q    You testified there was an article in the New York Times; correct?

A    Correct.

Q    Where were the other three articles?

A    I would have to look at the -- I would have to look at the documents to see where -- where they appeared.

Q    The reference in paragraph 24 is to the well-publicized nature of the All Hallows transfer.  Do you see that reference?

A    I do.

Page 96

K. Griffin

Q    Other than the one New York Times article and three other articles that appeared somewhere that you don't remember at this time, are you aware of any other articles publicizing the nature of the All Hallows transfer?

A    Those are the four that I am aware of.  That's not to say that there weren't more.

Q    Has anybody told you that there were more?

A    No one has told me.  People have told me that they have seen articles.  I don't know whether they are referring to the same ones I have seen or not.

Q    Who has told you that they have seen articles?

A    The brothers at large.  The students from -- past, you know, students from schools.  Board members from the schools.

Q    You don't -- as you just said, you don't know what articles they are referring to?

A    No.  These are just in-passing conversations that, you know, you are sitting around, you are at a function, and somebody makes reference to, so, did you see that article on such

Page 97

K. Griffin

and such?

Q    As the designee of CBI, the only articles that you can testify to that you have knowledge of are the four articles that appeared between 2001 and 2006; correct?

A    I believe I have said that at least three or four times now.

Q    So, the answer would be yes?

A    I believe that would be correct.

MR. KORNFELD:  Let's mark this letter as Exhibit 11.

(Griffith Exhibit 11, December 12, 1990 letter  marked for identification.)

Q    Okay.  Exhibit 11 is a letter dated December 12, 1990, from Claude R. Thomson, QC, a lawyer at Fasken Campbell Godfrey in Canada to John Duffy.

MR. KORNFELD:  Now, just for the sake of the record, Mr. Dougherty has told me that the debtors are reserving their right to contend that this document is -- is privileged.  We, of course, would reserve the right, if the debtors make such a contention, to argue that for a variety of

Page 98

K. Griffin

reasons, this document is not privileged.

So, everybody has reserved their rights. Ultimately, if the debtors make their motion, it will be for the judge to tell us who is right. Is that fair?

MR. DOUGHERTY: Fair. Fair point.

Q First, sir, have you seen Exhibit 11 before today?

A Before today?

Q Yes, sir.

A Or before right now?

Q Before today. I deliberately asked the question that way.

A I believe I saw it last night.

Q Who -- who were you with when you saw it last night?

A I was with myself.

Q Who sent you this document for your review?

A Legal counsel.

Q Okay. Did they e-mail it to you yesterday at some point in time?

A I was out of town. It was Federal Expressed to me, to my home. When I returned home

Page 99

K. Griffin

yesterday afternoon, it was there waiting for me.

Q Had you had any knowledge of who Claude Thomson was before you saw this letter?

A I have heard the name.

Q Other than hearing the name, did you have any more specific knowledge about who Claude Thomson was before seeing the letter yesterday?

A Not really.

Q To your knowledge, did Claude Thomson ever represent Christian Brothers' Institute?

A No.

Q Did he?

A To my knowledge, no.

Q Fair enough.

Did the law firm of Fasken Campbell Godfrey ever represent Christian Brothers' Institute, to your knowledge?

A To my knowledge, no.

Q Did you know this lawyer existed -- strike that.

Did you know this letter existed prior to yesterday?

A It had been verbalized to me that such a letter existed prior to yesterday.

Page 100

K. Griffin

Q When was it first verbalized to you?

A A short time ago.

Q A week ago, somewhere in that range?

A Maybe a month ago. I'm not 100 percent sure when it was first mentioned to me.

Q Did you discuss this letter with Brother Moffett?

A I did not discuss specifically this letter with Brother Moffett. I believe reference was made to Mr. Duffy.

Q By whom?

A Brother Moffett and myself in our conversation, I don't believe we discussed -- we did not -- Brother Moffett did not read this letter. Brother Moffett did not know the questions that are posed in this letter.

The only question that I asked Brother Moffett was in reference to when the property at All Hallows was conveyed by CBI to All Hallows Institute. To his knowledge, he was a board member of CBI at the time, were there any conversations amongst the board of directors that this was being done to protect assets or as a

Page 101

K. Griffin

result of what was happening in the Canada situation and Mount Cashel, to which he responded, absolutely not, it was not even a consideration.

Q Did Mr. Duffy attend meetings of the board of directors?

A I don't know. Mr. Duffy was before I was a member of the board of directors. I don't know whether he would have attended a -- previous board meetings or not.

MR. DOUGHERTY: Point of clarification. Which board are you talking about, All Hallows board of directors or CBI?

Q Did Mr. Duffy attend -- ever attend meetings of CBI's board of directors?

A Again, I don't know. I wasn't a member of the board of directors of CBI when Mr. Duffy was legal counsel for CBI, so I have no knowledge for that.

Q Has Mr. Dougherty ever attended meetings of the board of directors of CBI?

A He has.

Q Approximately how many times?

A I would say approximately twice a

Page 102

K. Griffin

year.

Q    How often does the board of directors of CBI meet?

A    At present, the board of directors of CBI meets one week each month for ten months. So we meet from September -- in September, we meet from a Monday to a Friday.

Say that again. I'm sorry.

Q    How often does the board of directors of CBI meet, either telephonically or in person?

A    The board of directors of CBI would meet a handful of times during the course of a year. It would depend on business that was relative to it. It's required -- you know, I know we have -- specifically, we have a meeting in October where we discuss finances with the treasurer of CBI, and we have a meeting in June where we discuss approval of budgets for the next fiscal year. In between those meetings, as -- as needed.

Q    Does Mr. Dougherty attend board meetings?

A    Mr. Dougherty has not attended board meetings of CBI. The answer I gave earlier was

Page 103

K. Griffin

incorrect. Mr. Dougherty has not, to my knowledge, been present at board meetings of Christian Brothers' Institute.

Q    Did you know Mr. Duffy?

A    I -- I would have met Mr. Duffy at functions where he would have been present and I was present. Did I know him? No.

Q    Did you know of his reputation as an attorney?

A    Only that he was legal counsel for Christian Brothers' Institute.

Q    Do you know whether Christian Brothers' Institute was happy with his work?

A    Seemed they were.

Q    Did you ever hear anybody say that Mr. Duffy made mistakes when he wrote letters?

A    I would not have been in a position to have had that type of conversation with people.

Q    Did you ever hear anybody say that Mr. Duffy got his facts wrong when he wrote letters?

A    I would not have been in a position to have had a conversation with someone regarding something like that.

Page 104

K. Griffin

Q    Do you have any knowledge of Mr. Duffy getting his facts wrong?

A    I would have not had opportunities to be in a position to have -- to know whether or not Mr. Duffy had his facts wrong or right or somewhere in between.

Q    Christian Brothers' Institute didn't fire Mr. Duffy; correct?

MR. DOUGHERTY:  Objection to form. Do not answer that question.

Q    When did Mr. Duffy stop being Christian Brothers' Institute's counsel?

A    Mr. Duffy stopped being counsel when Mr. Dougherty became counsel. I don't know what year that was.

Q    Mr. Dougherty doesn't get his facts wrong, does he?

MR. DOUGHERTY:  Objection to the form. Where are you going with this line of inquiry, Alan? Because I am directing the client not to answer that question.

Q    Have you ever seen a letter in which Mr. Dougherty got facts wrong?

MR. DOUGHERTY:  Objection.

Page 105

K. Griffin

Q    That was sent -- that was sent to somebody who wasn't a Christian Brother?

MR. DOUGHERTY:  Objection to form. I'm directing him not to answer it. I'm going to ask you again what this line of inquiry is all about, Alan.

MR. KORNFELD:  You have made your objection, and you have given your instruction. That's all you need to do.

This will be Exhibit 12.

(Griffith Exhibit 12, December 18, 1990 letter marked for identification.)

Q    Exhibit 12 is the December 18th, 1990 letter from Mr. Duffy to Mr. Thomson. When was the first time you saw Exhibit 12?

A    Last night.

Q    Have you discussed Exhibit 12 with anybody other than your counsel?

A    No.

Q    Is Brother Paul Hennessy alive?

A    Yes.

Q    Where does Brother Hennessy reside?

A    Venice, Florida.

Q    And where in Venice does he reside?

27

Page 106

K. Griffin

A    He resides in a residence with the Xaverian Brothers. I don't know the address.

Q    Xaverian is X-A-V-I-E-R-I-A-N?

A    E-R-I-A-N.

Q    I was close.

A    X-A-V-E-R-I-A-N.

Q    How is Brother Hennessy's health?

A    He's not well. He's 80, 81 years old. His mind has kind of slipped. Physically he's -- he has difficulties.

Q    But by his mind has kind of slipped, there is degrees of slippage, when people make comments like that. Could you elaborate on that, please?

A    I can only speak to my own personal conversations with him.

Q    Sure.

A    He seems to be very forgetful. He doesn't seem to always have a grasp of the reality of the situation, and other times you can be having a conversation with him, and he can be quite lucid.

Q    To your knowledge, has he been diagnosed with any form of dementia or Alzheimer's

Page 107

K. Griffin

disease?

A    I don't know that I can answer that question because of the medical -- you know, the medical history of the brothers is not something that I am authorized to speak about outside of with that brother.

Q    But you have told me what you have observed.

A    I have told you what I have observed, yes.

Q    And in your layman's view, when it comes to medicine, you observed some degree of dementia; is that fair to say?

A    "Dementia" is a very technical medical term. I would say I have observed some level of memory loss, forgetfulness.

Q    Have you observed confusion?

A    I have observed confusion.

Q    And if I recall your testimony previously, you testified that you did not -- well, you said you didn't discuss Exhibit 12 with anybody other than counsel; correct?

A    I didn't discuss the contents of what's in this exhibit with anyone other than

Page 108

K. Griffin

counsel, correct. I did, as I testified also earlier, have a conversation with Brother Moffett about whether or not, when he was a board of director at Christian Brothers' Institute, whether or not any conversations took place regarding fraudulently conveying any property and whether it was connected in any way to litigation -- there was no litigation against CBI at the time -- or what was happening in Mount Cashel.

And he was adamant, absolutely not, that wasn't even -- that was not a consideration of the board of directors at the time. But I did not reference this letter to him.

Q    You didn't discuss what Mr. Duffy said in Exhibit 12?

A    Correct.

Q    Is Mr. Duffy still alive?

A    I do not think so, but I am not 100 percent sure.

MR. KORNFELD: Can you shed light on that, Tony? Is he alive?

MR. DOUGHERTY: He's dead.

MR. KORNFELD: This will be 13.

(Griffith Exhibit 13, Development of

Page 109

K. Griffin

the Congregation of Christian Brothers in North and South America marked for identification.)

Q    We have marked as Exhibit 13 an excerpt from the archives of the Eastern American Province. Have you seen Exhibit 13 before?

A    No. I have not seen it as an exhibit. It's possible that many years ago, I may have read -- I may have read the document in its entirety that this has been, you know, gleaned from.

Q    Excerpted from?

A    I'm not sure, to be honest, but --

Q    The document -- the legend on the bottom of the first page of the document says "Archives Record Center, Eastern American Province, New Rochelle, New York, 1997."

When you were referring to your archives, what archives did you mean?

A    These ones.

Q    These archives that are kept in New Rochelle, New York?

A    Yes.

Q    So, you went to the province which --

Page 110

K. Griffin

which now is the North American Province? Is the province now Eastern American or --

A     The province is now Edmund Rice Christian Brothers North America.

Q     For the record, when did the name of the province change?

A     2005.

Q     Does --

A     And prior to that, it changed in 1966.

Q     And the 1966 change, just for the record?

A     1966, created three provinces from what had been the American province, to the Eastern American Province, the Western American Province, and the Canadian province.

Q     Does CBI have archives in addition to the archives that are kept by the province?

A     Does CBI have archives in addition?

Q     Yes.

A     I would think -- again, this is very technical. I would think CBI doesn't have archives. The archives are province archives.

Q     Let me try to get to where I was

Page 111

K. Griffin

going to with this. I am trying to understand where the documents pertaining to the 1990 transfer from -- of the high school from CBI to AHI would be. One place would be your attorneys' files; correct?

A     Quite possible.

Q     The second place would be the archives that are kept by the province of which Exhibit 13 is an example of; right?

A     Correct.

Q     Are there any other places there would be documents pertaining to the 1990 transfer of All Hallows High from CBI to AHI?

A     I would presume All Hallows might have its own documents.

Q     Any other places?

A     Not that I'm aware of.

MR. KORNFELD:  Let's take a five- to ten-minute break.

(Recess taken.)

MR. KORNFELD:  On the break, Mr. Markowitz told me that Brother Griffith has a correction.

Q     Would you like to make that

Page 112

K. Griffin

correction, Brother Griffith?

A     Sure. When you asked the question with regards to were there other properties that were conveyed, I had neglected to mention that Brother Rice High School in Chicago was conveyed in the 1970s, from CBI to CBOI, and then in the 1980s, from CBOI to Brother Rice, Incorporated, much in keeping with -- with the practice of the other ones that were mentioned earlier.

Q     So, in the '70s, the conveyance was from Christian Brothers' Institute to Christian Brothers of Ireland; correct?

A     Correct.

Q     And then in the '80s, what was the conveyance?

A     From Christian Brothers' Institute, Inc. to Brother Rice became its own corporation.

Q     So, the transfer of Brother Rice to its own corporation did not take place until the 1980s; correct?

A     I believe it was in the early 1980s.

MR. KORNFELD:  I have no further questions at this time. Do you gentlemen have any questions?

Page 113

K. Griffin

MR. DOUGHERTY:  I do. I do.

EXAMINATION

BY MR. DOUGHERTY:

Q     I would like, Brother Griffith, to revisit Exhibit 12, John Duffy's letter, for the purposes of this inquiry.

Kevin, this obviously is a letter that was purportedly written by John Duffy and addressed to Claude Thomson dated December 18, 1990. Do you see that --

A     Yes.

Q     -- letter in front of you?

I want to focus your attention to the last paragraph on page one, numerated number one. "Yes, but the power to operate the company resides in the board of trustees."

Do you see that?

A     Yes.

Q     Is that an accurate reflection of the corporation known as CBI?

A     No.

Q     Why not?

A     Power would be in the board of directors.

Page 114

K. Griffin

Q    Can you flip the page. I direct your attention to paragraph number two, as styled by John Duffy.

A    Right.

Q    I will read it aloud for the record. "Yes. It was intended that all of the assets and activities of the congregation would be carried on through the limited company."

Do you see that?

A    I do.

Q    Is that an accurate reflection of the corporation?

A    It is not.

Q    Why not?

A    The congregation had no authority to have assets in the limited company. The congregation is a worldwide organization.

Q    So, as you sit here today, your testimony is that is an inaccurate reflection of the Christian Brothers' Institute at the time that Mr. Duffy wrote that letter; correct?

A    Correct.

Q    Continuing on: "Were all assets intended to be transferred to the company,"

Page 115

K. Griffin

parenthetically, "yes, and was the congregation as such intended to cease to exist," parenthetically, "no."

Is that an accurate portrayal of the Christian Brothers' Institute?

A    By company, you mean Christian Brothers' Institute?

Q    I would assume so.

A    No, it's not correct, because in the 1950s schools were established in states outside of New York. Catholic Memorial in Boston, Bergen Catholic in New Jersey. And those properties were never -- never became assets of Christian Brothers' Institute. They were -- they were set up as independent corporations from the start.

Q    And to revisit that one sentence again, I want to highlight the term, the use of the term "congregation." "Were all assets intended to be transferred to the company, and was the congregation as such intended to cease to exist?"

Is that an accurate reflection of CBI with respect to Mr. Duffy's use of the term "congregation"?

Page 116

K. Griffin

A    No. CBI had no -- the congregation has no authority in CBI, and CBI certainly has no authority to have the congregation cease to exist.

Q    Next paragraph. "The relationship between the congregation and the company was that the congregation ran the company and elected its officers and trustees."

Is that accurate.

A    That's inaccurate. The congregation never ran CBI. The congregation never elected officers or directors or trustees or anything else for CBI.

MR. DOUGHERTY:  No further questions, Alan.

MR. KORNFELD:  I have some follow-up questions.

EXAMINATION

BY MR. KORNFELD:

Q    In -- did you talk to anybody who was in management of CBI as of the 1990 time period in preparation for your deposition?

A    Yes.

Q    And was that Brother Moffett?

A    Yes.

Page 117

K. Griffin

Q    Did you ask Brother Moffett what the intent was with respect to whether the activities of the congregation would be carried on through the limited company?

A    I had no such conversation with Brother Moffett.

Q    Did you have any conversation with anybody as to what the intent was as related to -- with -- strike that.

Did you have any conversation with anybody with respect to whether it was intended that in the 1990 time period, all of the assets and activities of the congregation would be carried on through the limited company?

A    I had no such conversations.

Q    Did you have any conversations with Brother Moffett as to whether all assets of the congregation were intended to be transferred to the company in the 1990 time period?

A    I had no such conversation.

Q    Did you have any conversation with anybody as to whether all assets were intended to be transferred to the company in the 1990 time period?

Page 118

K. Griffin

A    I had no prior conversations.

Q    Did you have any conversations with Brother Moffett as to the relationship between the congregation and CBI in the 1990 time period?

A    I did not.

Q    Did you see any documents in preparation for your deposition that indicated to you what the relationship was between the congregation and CBI in the 1990 time period?

A    In preparation for this, I saw no such documents, but I have intimate knowledge of how the congregation operates and how the corporation operates, and so my answers are based on my knowledge of how Christian Brothers' Institute and how the congregation of Christian Brothers operates as a canonical entity.

Q    And what documents do you base your knowledge on as -- as to the 1990 time period?

A    I am not sure what you are asking.

Q    With respect to the relationship between the congregation, the province, and Christian Brothers' Institute in the 1990s, what documents have you looked at that define that relationship?

Page 119

K. Griffin

A    The congregation and the province are two different things now.  The congregation is a worldwide entity.  The province is a member of the congregation, is a part of the congregation.  The congregation is made up of many provinces.

Q    Do you know in Mr. Duffy's -- with respect to Mr. Duffy's letter, whether he was referring to the province and mistakenly using the word "congregation"?

MR. DOUGHERTY:  Objection.  Calls for speculation.

Q    Do you know?

MR. DOUGHERTY:  About Mr. Duffy's intent?  That was your question.  Re-read your question.

MR. KORNFELD:  You may answer.

MR. DOUGHERTY:  You may answer if you understand the question.

A    The question, please?

Q    Do you know whether Mr. Duffy -- strike that.

A    I have no knowledge of Mr. Duffy's intent.

Q    Fair enough.

Page 120

K. Griffin

What is the congregation?

A    The congregation?

Q    Yes.

A    The congregation of Christian Brothers is a canonical entity, a group of men akin to a club, governed by a set of constitutions that each of its members agrees to upon entry.

Q    Did Mr. Duffy represent the congregation at any time, to your knowledge?

A    Not to my knowledge, no.  There is no legal representation for the canonical entity, to my knowledge.

Q    Now, the paragraph in Mr. Duffy's letter, the third paragraph in item number two, that paragraph is correct; right?

MR. DOUGHERTY:  Which one, Alan, are you talking about?

MR. KORNFELD:  Third paragraph in item number two of Mr. Duffy's letter which has been marked as Exhibit 12.

MR. DOUGHERTY:  I would object to that question, that you are asking him to form a legal opinion.

Q    You may answer the question.

Page 121

K. Griffin

MR. DOUGHERTY:  You may answer the question.

A    When it says the company, the corporation, I presume that is CBI, in the Eastern American Province is known as Christian Brothers' Institute, I would make a distinction between Christian Brothers' Institute and the Eastern American Province.

The Eastern American Province is a province of the congregation, which, as I stated a few moments ago, is a group of men who form around constitutions that we agree to when we become members.

Christian Brothers' Institute is a corporation that is -- is, yes, not-for-profit corporation that derives its power both from the statute which provides broad powers to own real and personal property, et cetera, and also from its charter.  I would presume that's correct.

Q    And Christian Brothers' Institute is a corporation that operates within the Eastern American Province; correct?

A    It did when the Eastern American Province existed.  It no longer exists.

Page 122

K. Griffin

Q    It's called the North American Province now?

A    The Eastern American -- what was the Eastern American Province, what was the Western American Province, what was the Canadian Province have become Edmund Rice Christian Brothers North America.

Q    That happened when?

A    2005.

MR. KORNFELD:  I have no further questions at this time.

MR. DOUGHERTY:  Follow-up.

EXAMINATION

BY MR. DOUGHERTY:

Q    Referring back to the same paragraph that the line of inquiry just came to, "the company is in the Eastern American Province," do you see that?

A    Yes.

Q    "Is known as the Christian Brothers' Institute."

Are you familiar with the Christian Brothers' Institute of Massachusetts?

A    I am.

Page 123

K. Griffin

Q    Was that in existence at the time this letter was written?

A    Yes.

Q    Are you familiar with the Christian Brothers' Institute of New Jersey?

A    Yes.

Q    Was that corporation existing in the Eastern American Province at the time of this letter?

A    Yes.

Q    Did the Christian Brothers' Institute of New Jersey have assets --

A    Yes.

Q    -- to your knowledge, in 1990?  Did the Christian Brothers' Institute of Massachusetts have assets, to your knowledge?

A    Yes.

Q    So then if we refer back to paragraph two of Mr. Duffy's letter, specifically the second sentence:  "Were all assets intended to be transferred to the company?  Was the congregation as such intended to cease to exist?"

Do you see that?

A    Yes.

Page 124

K. Griffin

Q    So, Mr. Duffy is not accurate; right?

A    No.

Q    In this --

A    Because those Christian Brothers of Massachusetts and Christian Brothers of New Jersey, with assets, exist and are not part of Christian Brothers' Institute.

Q    Do you -- do you know, Brother, and if you don't know an exact date, that's fine, but approximately when the Christian Brothers' Institute of New Jersey was formed?

A    I would say it was in the mid to late 1950s.

Q    Same question for the Christian Brothers' Institute of Massachusetts.

A    I would say it was in the mid -- again, mid to late 1950s.

MR. DOUGHERTY:  I have no further questions.

MR. KORNFELD:  I have got a couple of follow-up questions.

EXAMINATION

BY MR. KORNFELD:

Q    Did you see any documents that

Page 125

K. Griffin

anybody wrote correcting what you call the mistakes in Mr. Duffy's letter that has been marked as Exhibit 12?

A    No.

Q    To your knowledge, do any such documents exist?

A    Not to my knowledge.

MR. KORNFELD:  I have no further questions at this time.

MR. DOUGHERTY:  Anything?

MR. MARKOWITZ:  I have no questions.

MR. DOUGHERTY:  None here.

MR. KORNFELD:  Okay.  Let's go off the record for a moment.

(Discussion off the record.)

MR. KORNFELD:  While we were off the record, we discussed two stipulations, one pertaining to the deposition, one pertaining to the briefing.

With respect to the deposition, we have agreed that Brother Griffith will have the opportunity to read and correct his deposition.  He will attempt to do so and complete the process tomorrow, on the 31st.

Page 126

K. Griffin

He will advise Mr. Dougherty of any changes. Mr. Dougherty will then, if there are any changes, advise all counsel of any such changes.

Mr. Dougherty, off the record in front of all of us, advised Brother Griffith of the consequences of making changes. Brother Griffith is aware of that.

The original or any certified copy of the deposition can be used for any purpose allowed for by the -- by the rules.

And that is the stipulation with respect to the deposition. Is that acceptable?

MR. DOUGHERTY: Acceptable.

MR. KORNFELD: With respect to briefing, we discussed and reiterated our agreement that we have reached in an e-mail that the parties may, but are not required to, file a supplemental brief with respect to the STN motion. Any such brief must be filed on or before August 2nd.

Is that agreeable?

MR. MARKOWITZ: Whatever you want,

Page 127

K. Griffin

it's okay with me. That's Thursday; right?

MR. KORNFELD: Correct.

MR. MARKOWITZ: Yes.

MR. KORNFELD: Anything else to put on the record?

MR. MARKOWITZ: I don't think so.

MR. KORNFELD: Nor do I. Thank you very much.

oOo

I, BR. KEVIN GRIFFITH, CFC, the witness herein, do hereby certify that the foregoing testimony of the pages of this deposition to be a true and correct transcript, subject to the corrections, if any, shown on the attached page.

_____

Subscribed and sworn to before me this

_____day of _____,_____.

_____

NOTARY PUBLIC

Page 128

STATE OF NEW YORK )      Pg.   of Pgs.
COUNTY OF NEW YORK )

I wish to make the following changes for the following reasons:

PAGE  LINE

____  ____  CHANGE:_____

REASON:_____

____  ____  CHANGE:_____

REASON:_____

____  ____  CHANGE:_____

REASON:_____

____  ____  CHANGE:_____

REASON:_____

____  ____  CHANGE:_____

REASON:_____

____  ____  CHANGE:_____

REASON:_____

____  ____  CHANGE:_____

REASON:_____

____  ____  CHANGE:_____

REASON:_____

____  ____  CHANGE:_____

REASON:_____

_____

Page 129

CERTIFICATE

STATE OF NEW YORK   )
                    : SS.
COUNTY OF NEW YORK   )

I, BONNIE PRUSZYNSKI, a Notary Public with and for the State of New York, do hereby certify:

That BR. KEVIN GRIFFITH, CFC, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 31st of July, 2012.

_____

Bonnie Pruszynski

33

Page 130

INDEX

WITNESS                         PAGE
BR. KEVIN GRIFFITH, CFC                4, 116, 124
BY MR. KORNFELD            113, 122
BY MR. DOUGHERTY


EXHIBITS
Griffith Exhibit 1 Local Rule 1007-2    5
    Affidavit, in re Christian
    Brothers' Institute
Griffith Exhibit 2 Local Rule 1007-2    9
    Affidavit in re the
    Christian Brothers of
    Ireland, Inc. marked
Griffith Exhibit 3 Official        14
    Committee's Second Amended
    30(b)(6) Notice
Griffith Exhibit 4 Community Survey    23
    (Caulkins Report) September
    1991
Griffith Exhibit 5 Real Property       45
    Transfer Tax Return
Griffith Exhibit 6 July 30, 1990       49
    Letter to Department of
    Finance
Griffith Exhibit 7 July 30, 1990       53
    Letter for City of New York,
    Department of Environmental
    Protection
Griffith Exhibit 8 Memorandum of the    55
    Transfer of Premises from
    The Christian Brothers'
    Institute to All Hallows
    Institute
Griffith Exhibit 9 Local Rule 1007-2    85
    Affidavit in re the
    Christian Brothers of
    Ireland, Inc. marked

Page 131

    Objection to the Motion of
    the Official Committee of
    Unsecured Creditors for
    Authority to Assert,
    Litigate and Settle Claims
    on Behalf of Bankruptcy
    Estate Relating to
    Fraudulent Conveyance to All
    Hallows Institute
Griffith Exhibit 11 December 12,       97
    1990 letter
Griffith Exhibit 12 December 18,      105
    1990 letter
Griffith Exhibit 13 Development of     108
    the Congregation of
    Christian Brothers in North
    and South America

**A**

**ability (1)**
87:17
**able (7)**
18:12 21:5 22:4,16
29:16 50:3 65:13
**above-mentioned (1)**
52:23
**absolute (4)**
64:21 65:23,25 66:3
**absolutely (3)**
76:7 101:4 108:11
**Academy (1)**
75:11
**acceptable (2)**
126:15,16
**accurate (7)**
70:17 113:20 114:12
115:5,23 116:9
124:2
**accurately (1)**
56:10
**ACRIS (4)**
92:4,7,8,17
**acted (1)**
82:22
**action (1)**
129:16
**activities (3)**
114:8 117:3,14
**adamant (1)**
108:11
**add (1)**
14:9
**addition (4)**
6:8 31:22 110:18,20
**additional (1)**
68:15
**address (3)**
70:13,17 106:3
**addressed (1)**
113:10
**administer (1)**
21:23
**Administered (1)**
1:9
**administration (1)**
67:17
**administrator (4)**
55:9 67:23 68:5,11
**advise (2)**
126:2,4
**advised (1)**
126:7
**advisement (2)**
25:3 81:25

**affidavit (10)**
5:2,4,6 9:12 11:2,11
11:25 130:10,12,24
**affiliated (1)**
33:11
**afternoon (1)**
99:2
**aggressive (1)**
93:12
**ago (9)**
18:6 27:18 69:11
93:21 100:3,4,5
109:9 121:12
**agree (6)**
8:7 19:12 20:12 21:10
25:7 121:13
**agreeable (1)**
126:24
**agreed (2)**
20:13 125:22
**agreement (1)**
126:19
**agrees (1)**
120:8
**ahead (4)**
13:3 38:20 58:13 69:2
**AHI (67)**
36:5,8,11,12,16,18,23
36:24 37:22,23 38:5
38:8 39:6,8,14,25
40:7,11,15,16,21,23
42:12,16,25 43:8
44:15,25 45:5 47:12
47:16,22,24 49:18
56:12,15,17 57:5,7
57:12,15 58:4,18
60:11 61:25 62:18
62:18 63:2,5,7,11
64:10,14,20,23,25
65:8,9 66:15 69:24
83:20 84:5 85:4,6
85:13 111:5,14
**AHI's (8)**
38:17 39:2 43:2 44:15
66:14,20,22,24
**akin (2)**
82:23 120:7
**al (1)**
1:7
**Alan (10)**
3:11 7:18 17:14 18:11
68:19 70:17 104:21
105:7 116:15
120:17
**Alcindor (1)**
75:14

**alive (4)**
77:20 105:21 108:18
108:22
**allow (3)**
20:9,11 58:10
**allowed (1)**
126:12
**alluded (1)**
69:15
**aloud (1)**
114:6
**Alzheimer's (1)**
106:25
**Amended (3)**
14:16,20 130:14
**America (5)**
33:19 109:3 110:5
122:8 131:10
**American (29)**
34:7,8,11 41:9,14
43:15,22,25 44:3,6
44:18 109:6,17
110:2,3,15,16,16
121:6,9,10,23,24
122:2,4,5,6,18
123:9
**amount (2)**
19:17 30:18
**analysis (1)**
24:3
**and/or (2)**
19:7 32:18
**announced (2)**
85:4,13
**anonymously (1)**
25:7
**answer (29)**
12:25 13:3,10,14,16
14:4 15:23 25:16
29:25 33:13 50:4
52:7 53:23 64:5,6,8
68:21 78:24 82:7
97:9 102:25 104:11
104:22 105:5 107:3
119:17,18 120:25
121:2
**answered (1)**
58:19
**answering (2)**
18:15 38:16
**answers (6)**
8:11,12,15 25:4,6
118:14
**Anthony (4)**
3:17 30:4,8 41:21
**anybody (21)**

5:24 11:21 12:5,14
25:22 26:12,16 27:2
27:6 47:24 82:15
96:9 103:16,20
105:19 107:23
116:20 117:9,12,23
125:2
**anyway (1)**
21:4
**apostolate (3)**
22:12 27:24 28:8
**appeared (6)**
94:9 95:2,12,21 96:3
97:5
**appears (3)**
5:9 45:21 52:16
**applicant's (1)**
54:23
**application (4)**
52:18 54:5,12,18
**Applied (2)**
22:11 27:23
**appreciate (1)**
20:4
**appreciated (1)**
82:3
**appropriate (1)**
28:7
**approval (1)**
102:19
**approve (2)**
89:13,19
**approximately (13)**
6:18 28:13 36:4,6
67:11 78:19,22 79:9
90:13,16 101:24,25
124:11
**April (4)**
36:15 37:20 38:4 39:3
**archives (17)**
69:12,23 87:3,11 88:7
109:6,17,20,20,22
110:18,19,20,24,24
110:24 111:9
**archivist (5)**
69:13,22 81:14 82:11
84:21
**area (2)**
15:23 16:2
**argue (1)**
97:25
**argument (3)**
18:18 19:8 93:17
**article (10)**
84:8,11,16 85:22
93:23,24 95:9,15

96:3,25
**articles (22)**
83:6,18,24 84:3,23,24
85:11 93:22 94:2,9
94:25 95:2,5,12,18
96:3,5,12,16,21
97:4,5
**articulated (2)**
80:24 81:2
**ascertain (1)**
87:8
**asked (16)**
22:6 23:24 26:10
39:10 58:15,16
69:13 75:17,20 76:3
81:15 93:21 94:24
98:13 100:19 112:3
**asking (7)**
8:12 65:17 69:7,20
87:13 118:20
120:23
**assert (4)**
14:24 88:13,20 131:3
**asset (1)**
76:6
**assets (13)**
100:25 114:8,17,24
115:14,19 117:13
117:18,23 123:13
123:17,21 124:7
**associate (1)**
51:17
**assume (2)**
9:7 115:9
**attached (2)**
54:19 127:16
**attachment (3)**
52:16 54:4,4
**attempt (3)**
87:8,20 125:24
**attend (5)**
80:8 101:5,15,15
102:22
**attended (3)**
101:9,21 102:24
**attention (4)**
86:9,11 113:14 114:3
**attorney (8)**
19:10 47:9,16,22,25
51:13 65:19 103:10
**attorneys (11)**
3:5,14 19:10 32:17,22
32:24 33:7,12,12
50:9 111:5
**attorney-client (4)**
17:14 18:22 19:11

58:12
**August (2)**
17:18 126:23
**authority (7)**
14:23 88:13,19
114:16 116:3,4
131:3
**authorized (2)**
26:20 107:6
**available (3)**
22:4 59:7 92:12
**Avenue (2)**
2:11 3:8
**aware (9)**
25:13 26:15 74:25
75:7 90:25 96:5,7
111:18 126:9

**B**

**B (1)**
130:9
**back (10)**
11:10 16:20 21:13
63:19 68:9,17,21
94:4 122:16 123:19
**bankruptcy (8)**
1:2 5:8 14:25 30:9
31:21 88:14,21
131:4
**BANK39 (1)**
55:18
**bar (1)**
32:25
**Barber (2)**
6:11,12
**Barry (3)**
41:22 42:2,3
**base (1)**
118:18
**based (3)**
16:4 37:15 118:14
**basis (1)**
25:17
**began (2)**
21:24 65:10
**behalf (10)**
14:24 15:6,11 35:9
46:15,24 54:20
88:14,20 131:4
**believe (41)**
6:10 16:23 18:15,22
19:5 21:18 23:5,14
24:5 26:24 31:25
33:21 34:2,4 37:15
37:24,25 38:11 40:8
42:22 47:16,18,19

49:9 66:3 68:6,8
72:16 78:3 80:15
81:16 82:6 83:3,9
95:4 97:7,10 98:15
100:11,15 112:22
**benefit (1)**
93:13
**Bergen (1)**
115:12
**best (4)**
13:13 14:3 50:21 56:8
**better (3)**
40:3,23 62:16
**Bishop (8)**
71:23 73:19,19,25
74:10 77:7 90:19
91:16
**bit (2)**
86:10 93:21
**black (1)**
63:22
**blame (1)**
82:17
**blaming (1)**
82:15
**Block (1)**
52:23
**blood (1)**
129:17
**blueprint (4)**
59:20,21,23 60:17
**board (66)**
4:20,22 5:15 11:18,19
11:21 35:4,10 38:10
38:11,13,14,17 39:2
39:6,9 40:14,16,22
41:7,8 42:12,13,17
43:2,9 44:15 48:23
61:13,18,19 62:5,7
62:8,10,11,13,25
66:18,24 73:20,22
76:25 78:7 96:19
100:23,24 101:6,8
101:10,12,13,16,18
101:22 102:3,5,10
102:12,22,24 103:3
108:4,13 113:17,24
**boards (1)**
22:2
**body (3)**
41:10,10,14
**Bonnie (4)**
1:23 2:12 129:7,23
**boss (2)**
50:4,11
**bosses (2)**

50:20,23
**Boston (1)**
115:12
**bottom (2)**
46:6 109:16
**BR (5)**
1:14 2:9 127:12
129:10 130:4
**break (6)**
13:22,23 14:10 68:14
111:20,22
**brief (2)**
126:21,22
**briefing (2)**
125:20 126:18
**briefly (2)**
12:13 17:15
**broad (2)**
9:17 121:18
**Broadway (1)**
3:15
**brother (87)**
4:12 6:4,8,15,16 7:8
10:24 12:8 15:15
23:25 26:18,22 27:3
36:5,7 39:11,11,11
39:12,18,18 41:5
42:10,11 45:12 55:6
55:22 58:2,6,17,21
59:15,17 60:6 63:4
64:9,13 66:11 67:7
67:14,18,19 68:2,3
69:2 70:3,19 71:13
75:18,20 76:3,9,16
76:19 77:10,18,20
77:22 78:4 100:9,11
100:14,16,17,20
105:3,21,23 106:8
107:7 108:3 111:23
112:2,6,8,18,19
113:5 116:24 117:2
117:7,18 118:4
124:9 125:22 126:7
126:9
**brothers (134)**
1:6 3:6,7 4:13,21 5:4
5:7,12,16,20,21,24
5:25 6:17,25 7:11
9:13 14:21 16:18
21:21 22:4,7,14,16
25:11,12 27:25 28:2
33:11,19,23 34:10
35:23,25 36:10
39:25,25 45:24
46:10 50:2,8,13,15
51:14 52:24 53:6

55:15,20 59:3,5,7
60:3,4 61:8,14
62:24 65:3 67:9
70:11 71:20,22
72:11 73:11,12,14
73:18,21,22,23 74:5
74:14 75:2,22,24,25
76:12,21 77:15,25
78:11,15 79:11,14
79:17,18 80:25 81:5
81:7 84:14 94:19
96:17 99:11,17
103:4,12,14 104:8
104:13 106:3 107:5
108:5 109:2 110:5
112:12,13,17
114:21 115:6,8,15
118:15,17,23 120:6
121:6,8,15,21 122:7
122:21,24 123:6,12
123:16 124:5,6,8,11
124:16 130:11,12
130:22,24 131:9
**brought (1)**
76:6
**budgets (1)**
102:19
**build (1)**
73:4
**business (3)**
90:6 91:8 102:14

**C**

**C (3)**
3:3 129:2,2
**call (9)**
15:24 21:2 22:23
24:25 70:11 80:16
86:9,10 125:2
**called (5)**
4:4 16:15 22:10 34:3
122:2
**calls (2)**
69:7 119:11
**Campbell (2)**
97:17 99:16
**Canada (11)**
33:5,8,17 34:13,18,25
35:4,7,13 97:17
101:2
**Canadian (9)**
32:21,25 33:12 34:3
34:12,19 44:6
110:17 122:6
**canonical (12)**
33:20 41:18 42:18

43:3,11,13,19 44:8
44:17 118:17 120:6
120:12
**canonically (1)**
33:24
**capable (2)**
90:9 93:4
**capacities (1)**
8:21
**capacity (7)**
7:12,19 8:5,23 9:8
10:5 51:12
**CARA (12)**
22:10,11 27:21,22,22
28:10,14 59:13
81:11,16,18 82:9
**care (1)**
21:24
**Carney (8)**
71:23 73:19,20,25
74:10 77:7 90:19
91:17
**carried (3)**
114:9 117:4,15
**carry (1)**
18:18
**case (3)**
5:8 11:2 76:6
**Casey (17)**
36:2,5,10 39:11,12,18
39:20 41:2,3,4,5,20
41:24 42:6,11,23
44:23
**Cashel (5)**
75:23,24 76:2 101:3
108:10
**categories (1)**
86:13
**Catholic (6)**
80:6,23 81:2,6 115:12
115:13
**Catholicity (1)**
80:22
**caught (1)**
13:5
**Caulkins (30)**
16:16 21:15,19,20
22:6 23:3,10,13,15
23:19,21 24:2 25:17
25:20,23 26:17 27:4
27:7,10 28:15 59:18
60:7,7,10,13,14,19
81:15,16 130:15
**caveat (1)**
58:11
**CBI (136)**

8:11,14,24 11:11,13
11:16,19,22 15:7,11
18:2 26:25 28:19
30:3,3,17,19 31:9
31:15,18 32:4,9,11
32:17,18,21,24 33:8
33:11,12,17 34:13
34:15,18,25,25 35:4
35:7,8,12,13,16
36:12,16,17,22,24
37:22,23 38:2,6
39:12,13,24 40:7,10
41:12,17 42:12,16
42:25 43:8 44:15,24
45:4,16 47:11 48:13
49:18 55:17 56:9,11
56:15,16 57:12,15
57:18 58:3,17 61:19
61:25 62:17 66:23
66:25 67:2,4,5,12
69:24 72:2 76:22
77:3 78:23,25 83:19
84:5 85:4,5,13
86:21 87:9 90:6,11
92:20 94:16 97:3
100:21,23 101:14
101:18,19,22 102:4
102:6,11,12,18,25
108:9 110:18,20,23
111:4,14 112:7
113:21 115:23
116:2,3,3,11,13,21
118:5,10 121:5

**CBIC (4)**
34:9,11,13,15

**CBI's (8)**
11:21 38:25 41:8
42:17 44:25 66:18
91:7 101:16

**CBOI (17)**
7:16 8:19 9:2,3,6,19
9:22,25 10:9 11:2,5
11:8,24 12:3,4
112:7,8

**cease (4)**
115:3,21 116:4
123:23

**census (1)**
26:9

**Center (4)**
22:11,11 27:23
109:17

**century-long (1)**
90:5

**certain (4)**
68:24 86:7,7 93:14

**certainly (2)**
20:22 116:3

**certified (2)**
2:14 126:10

**certify (4)**
61:6 127:13 129:9,15

**cetera (4)**
10:10 22:9 28:9
121:19

**CFC (6)**
1:14 2:10 4:3 127:12
129:10 130:4

**chair (1)**
41:6

**change (14)**
62:2,19,21 110:7,12
128:7,9,11,13,15,17
128:19,21,23

**changed (3)**
73:19 90:19 110:10

**changes (5)**
126:2,4,5,8 128:4

**Chapter (1)**
1:7

**characterized (1)**
84:2

**charges (3)**
54:6,13,19

**charter (6)**
64:21 65:11,23,25
66:3 121:20

**Chicago (1)**
112:6

**chief (4)**
55:8 67:23 68:4,10

**Christian (110)**
1:6 3:6,6 4:13,21 5:4
5:7,11,20,21,25
6:17,25 7:11 9:12
14:21 16:18 27:25
33:19 34:10 35:22
41:5 45:24 46:10
50:2,8,12,15 51:13
52:24 53:5 55:14,20
59:3,7 60:3,4 65:3
70:11 71:20,22
72:10 73:10,11,14
73:18,21,22,23 74:5
74:14 75:2,22,24,25
76:12,20 77:15,25
78:11,14 79:11,14
79:17,18 80:24 81:5
84:13 99:11,17
103:4,12,13 104:8
104:13 105:3 108:5
109:2 110:5 112:12

112:12,17 114:21
115:6,7,14 118:15
118:16,23 120:5
121:6,8,15,21 122:7
122:21,23 123:5,12
123:16 124:5,6,8,11
124:15 130:10,12
130:22,24 131:9

**Church (2)**
81:3,6

**City (4)**
53:12,18 54:13
130:19

**Civil (1)**
14:22

**claiming (1)**
81:19

**claims (5)**
14:24 82:22 88:14,20
131:4

**clarification (5)**
27:12 35:19,20 43:15
101:12

**clarifications (1)**
44:13

**clarifying (1)**
44:8

**clarity (1)**
39:5

**class (1)**
64:2

**classes (3)**
80:5,12 81:8

**classroom (1)**
63:24

**Claude (11)**
16:21 17:2,4,6 20:10
76:11 97:16 99:4,7
99:10 113:10

**cleaner (1)**
13:17

**clear (4)**
9:20 18:9 38:23 90:3

**client (3)**
51:2 53:21 104:22

**clients (1)**
50:24

**clippings (4)**
82:19,25 83:11,17

**close (1)**
106:6

**closed (2)**
75:11,13

**club (1)**
120:7

**college (9)**

72:14,16,22,23 73:2,3
90:13 91:9 94:19

**College's (1)**
72:20

**come (4)**
26:3,21 56:22 87:24

**comes (1)**
107:13

**comments (2)**
25:11 106:14

**committee (8)**
3:5 14:19 85:17 86:14
86:24 87:22 88:12
131:2

**Committee's (5)**
14:16,23 86:2 88:19
130:14

**common (2)**
17:23 18:15

**community (3)**
22:8 23:9 130:15

**company (15)**
113:16 114:9,17,25
115:7,20 116:6,7
117:5,15,20,24
121:4 122:18
123:22

**compared (1)**
94:12

**compilation (2)**
26:14,17

**compiled (1)**
84:21

**complete (6)**
38:5,25 39:23 40:6
61:17 125:25

**completed (1)**
60:23

**comply (1)**
87:24

**composed (1)**
61:14

**compromise (1)**
20:8

**concept (1)**
60:14

**concluded (1)**
18:19

**confident (4)**
19:18,22 86:21 87:2

**confusing (2)**
38:24 72:21

**confusion (2)**
107:18,19

**congregation (35)**
109:2 114:8,16,18

115:2,19,21,25
116:2,4,6,7,10,11
117:4,14,19 118:5
118:10,13,16,22
119:2,3,5,5,6,10
120:2,3,5,10 121:11
123:22 131:9

**conjunction (1)**
22:13

**connect (1)**
10:12

**connected (3)**
16:17 32:6 108:8

**connection (8)**
22:24 23:21 25:19
27:7 28:17 45:14
49:7 86:4

**consequences (1)**
126:8

**consideration (10)**
53:2,8 56:22,23 75:3
75:5,8 76:8 101:4
108:12

**constitutions (2)**
120:7 121:13

**contact (1)**
33:4

**contained (3)**
87:3,11 93:17

**contend (1)**
97:22

**contention (1)**
97:25

**contents (1)**
107:24

**context (2)**
64:16 77:5

**continua (1)**
59:6

**continue (6)**
21:23 22:5,17 59:7
62:24 82:13

**continues (1)**
73:24

**Continuing (1)**
114:24

**control (2)**
86:22 87:22

**conversation (26)**
15:15,17 16:4 58:8,21
64:17 70:18,22,24
71:3,7,10,13,16
75:19 89:20 100:15
103:19,24 106:22
108:3 117:6,8,11,21
117:22

**conversations (13)**
15:20,22,24 16:3
   69:20 96:23 100:24
   106:17 108:6
   117:16,17 118:2,3
**convey (2)**
73:11 94:18
**conveyance (16)**
9:21 10:14 15:2 71:19
   74:23,24 75:12 76:4
   84:13 85:5,13 88:15
   88:22 112:11,16
   131:5
**conveyances (3)**
75:6 91:6,20
**conveyed (22)**
52:24 53:6 72:2,10,14
   72:18 73:15 74:5,12
   75:19 77:6,8 90:6
   90:15,17,20,22
   91:19 94:16 100:21
   112:5,6
**conveying (3)**
73:9,9 108:7
**convince (2)**
19:19,22
**copies (1)**
27:19
**copy (9)**
18:20 20:18 24:24
   81:11,18,22 82:3
   88:18 126:10
**corporate (3)**
8:4 10:5 76:25
**corporation (11)**
34:9 112:18,20
   113:21 114:13
   118:14 121:5,16,17
   121:22 123:8
**corporations (3)**
35:2,15 115:16
**correct (122)**
5:12,13,17,18,21 6:7
   11:20 12:20 23:16
   23:17 24:7,17,18
   30:12 31:12,13,24
   32:19,20 34:13,14
   34:16,17,20,21,23
   34:24 35:2,3,10,11
   37:18 39:8,9,14,19
   40:7 41:19 42:13
   43:17,19,22,23,25
   44:10,11 45:20 46:3
   46:13,16,17,19,20
   46:22 47:4,12 48:9
   48:13 49:12,13,18

53:5 54:4,6,9,15
55:11 60:8,12,20,24
60:25 61:15,16,19
61:22 62:6,14,19,22
63:2,3 64:24 65:12
72:7,8 75:3,8,15,16
78:2 80:25 83:13,14
89:19 90:24 91:2,10
95:13,14,16,17 97:6
97:10 104:9 107:23
108:2,17 111:6,11
112:13,14,21
114:22,23 115:10
120:16 121:20,23
125:23 127:3,14
**correcting (2)**
89:21 125:2
**correction (2)**
111:24 112:2
**corrections (1)**
127:15
**correctly (2)**
11:14 21:16
**cost (1)**
74:19
**counsel (38)**
12:22 15:14,17,20,25
   16:3,4,8 29:10,13
   29:20 30:2,3,17
   31:9 32:11 49:6
   58:9 69:6,6 81:18
   86:23 87:22,23 88:3
   88:8 92:10 93:13
   98:21 101:19
   103:11 104:13,14
   104:15 105:19
   107:23 108:2 126:4
**count (3)**
42:5 52:14,14
**counterpart (1)**
77:16
**COUNTY (2)**
128:3 129:5
**couple (4)**
12:12 24:21 86:22
   124:21
**course (6)**
21:8 90:4,5 91:7
   97:23 102:13
**court (9)**
1:2 12:15,20 13:7
   87:25 89:2,4,8,12
**courtesy (1)**
18:21
**cover (1)**
12:13

**covered (1)**
35:10
**create (1)**
22:21
**created (1)**
110:14
**creating (1)**
22:21
**Creditors (5)**
3:5 14:20 85:17 88:12
   131:3
**criminal (1)**
82:22
**criminals (2)**
94:12,14
**crossed (1)**
18:25
**curriculum (2)**
80:11,13
**cursory (2)**
92:8,11
**custody (1)**
87:22
**customary (2)**
92:22,25
**C-A-U-L-K-I-N-S (1)**
21:18

_____
            **D**
_____
**D (2)**
3:17 130:2
**damages (1)**
76:23
**Dan (1)**
41:20
**Daniel (3)**
36:2 41:2 42:11
**data (2)**
24:4 26:14
**date (8)**
23:2,4,15 24:14 46:12
   61:3 95:7 124:10
**dated (6)**
49:14 53:17 55:21
   60:7 97:15 113:10
**dates (2)**
83:4 95:3
**Davidoff (5)**
31:3,10 32:2,8 48:9
**day (5)**
5:7 18:18 20:6 22:15
   127:20
**dead (1)**
108:23
**deal (1)**
28:7

**dealing (1)**
24:8
**dealings (3)**
32:11,15 33:3
**deals (2)**
16:2 24:4
**debate (3)**
18:4 19:14,20
**debtor (1)**
5:15
**debtors (6)**
1:9 3:14 86:3 97:21
   97:24 98:4
**debtor's (2)**
88:10,18
**December (10)**
76:10,20 77:12 97:13
   97:16 105:12,14
   113:10 131:6,7
**decided (2)**
57:14,17
**decision (2)**
33:23 57:17
**deed (2)**
16:17 60:4
**deemed (1)**
74:12
**define (1)**
118:24
**definitely (1)**
39:20
**degree (1)**
107:13
**degrees (1)**
106:13
**deliberately (1)**
98:13
**dementia (3)**
106:25 107:14,15
**Department (6)**
45:19 49:3,12 53:12
   130:18,20
**depend (1)**
102:14
**deponent (1)**
87:13
**deposed (2)**
12:9 51:5
**deposing (1)**
7:18
**deposition (26)**
1:14 2:9 13:6 14:20
   37:17 49:8 54:9
   56:2 63:8 66:13
   68:23 82:3,17 85:10
   85:24 93:22 116:22

118:8 125:19,21,24
126:11,14 127:14
129:11,12
**derives (1)**
121:17
**describe (1)**
50:11
**described (1)**
74:9
**designated (1)**
28:18
**designee (3)**
45:15 56:9 97:3
**desire (1)**
59:5
**desires (1)**
13:19
**Despite (1)**
65:7
**detail (1)**
64:14
**details (1)**
84:15
**determination (1)**
17:16
**determine (1)**
87:20
**developed (1)**
90:7
**Development (2)**
108:25 131:8
**diagnosed (1)**
106:25
**different (1)**
119:3
**difficulties (1)**
106:11
**dim (1)**
50:22
**direct (3)**
50:4 65:20 114:2
**directed (1)**
61:7
**directing (2)**
104:21 105:5
**directions (1)**
61:9
**director (18)**
5:20 7:3,5,13 11:7,13
   11:16,22 12:3,6
   30:19 32:18 36:5,8
   39:12,13,25 108:5
**directors (69)**
4:21 5:16 11:18,19,22
   12:4 22:2 35:5,10
   35:16,16,22,23

36:11,12,12,17,18
36:24,24,25 37:3,23
37:25,25 38:2,2,5,8
38:12,13,15,22 39:2
40:6,10 41:8,12
42:13,17 57:18,20
57:24 61:19 62:10
66:18,23,25 67:2,2
67:5 73:20 77:2
78:7 80:16 100:24
101:6,8,13,16,18,22
102:3,5,10,12
108:13 113:25
116:12
**disagreement (1)**
8:17
**discovery (2)**
9:17 93:14
**discuss (10)**
58:2,16 76:15 100:8
100:10 102:17,19
107:22,24 108:15
**discussed (6)**
66:22 86:23 100:15
105:18 125:18
126:18
**discussing (1)**
70:19
**discussion (6)**
21:12 48:6 57:4,9
66:12 125:16
**discussions (1)**
89:15
**disease (1)**
107:2
**distinction (1)**
121:7
**DISTRICT (1)**
1:3
**divide (1)**
33:24
**divided (1)**
33:20
**document (46)**
4:25 14:19 15:18 23:7
23:12,18 26:7 37:5
37:13 45:12,18,18
45:22 46:2,6,13
47:4 49:5,7,10
52:12,15 53:15,16
53:17 54:3,8,10
55:10,17,18 65:15
68:15 85:24 86:5,12
88:23,25 89:18
92:13 97:22 98:2,19
109:10,15,16

**documentation (7)**
15:13 23:5 45:2 48:11
83:9,15 88:6
**documents (40)**
16:8,9,13,14,16 22:10
29:9 37:2,16 45:14
47:21 69:23 77:17
81:10 84:20,22
85:18 86:3,6,13,16
86:17,21 87:2,5,9
87:21,24 89:6,11
95:20 111:3,13,16
118:7,12,18,24
124:25 125:7
**doing (3)**
7:15 8:2 12:11
**Donald (2)**
42:23 44:22
**dots (1)**
10:12
**dotted (1)**
18:25
**Dougherty (108)**
3:17 7:17,23 8:7,25
9:5,9,15 10:2,12,18
10:20 14:9 17:11
18:8 19:10,15,21
20:5,17,22 21:7
24:25 27:11 30:4,5
30:6,8,13,25 31:5,7
31:12,22 32:3,8,12
33:4 35:18 43:13
48:12,14,22 49:11
49:21,22 51:4,9
52:2,4,6,9,10 53:19
53:22,25 58:7 64:4
65:16 66:8 68:19
69:14,15 70:16,25
71:6 81:21,24 82:5
82:8,12 83:21 87:12
87:19 97:20 98:7
101:11,21 102:22
102:24 103:2
104:10,15,17,19,24
104:25 105:4
108:23 113:2,4
116:14 119:11,14
119:18 120:17,22
121:2 122:13,15
124:19 125:11,13
126:2,3,6,16 130:6
**Dougherty's (2)**
52:16 53:20
**Dragin (1)**
30:11
**Drain (4)**

17:18 19:24 20:13
21:9
**Drogin (6)**
3:13 30:13,14,16 31:2
31:10
**drying (1)**
22:19
**due (1)**
51:20
**Duffy (46)**
16:21 17:2,3,6,6
18:24 32:6,8 45:3
46:18 47:3,6,17,22
47:25 48:8 50:5,6
50:15 55:11 76:11
77:11 97:18 100:12
101:5,7,15,19 103:5
103:6,17,21 104:3,6
104:9,12,14 105:15
108:15,18 113:9
114:4,22 119:21
120:9 124:2
**Duffy's (11)**
76:10 113:6 115:24
119:7,8,14,23
120:14,20 123:20
125:3
**duly (2)**
4:5 129:12
**Dwyer (2)**
42:23 44:22
**dying (1)**
22:19

———————————
E
———————————
**E (6)**
3:3,3 129:2,2 130:2,9
**earlier (9)**
59:13 70:21 75:18,20
88:6 94:11 102:25
108:3 112:10
**early (3)**
21:21 58:25 112:22
**easier (1)**
86:10
**East (3)**
70:7,11,14
**Eastern (19)**
34:8,11,20 43:22 44:2
44:17 109:6,17
110:3,16 121:5,8,10
121:22,24 122:4,5
122:18 123:9
**ecclesiastical (2)**
34:22 41:14
**Edmund (2)**

110:4 122:7
**education (3)**
79:25 80:4 81:8
**educational (3)**
22:22 66:4 80:24
**effect (2)**
28:20 65:11
**eight (2)**
89:22 90:4
**either (5)**
17:9 84:7 85:13 95:10
102:11
**elaborate (1)**
106:14
**elect (2)**
11:22 12:5
**elected (4)**
11:16 12:2 116:7,11
**ends (1)**
39:23
**entire (1)**
30:20
**entirety (1)**
109:11
**entities (3)**
33:24 34:16 44:10
**entitled (5)**
4:25 14:19 28:19
45:12 55:18
**entity (20)**
35:8 39:7 41:18 42:18
43:3,11,14,19 44:9
44:17 65:15 72:11
73:12,16 74:6 76:25
118:17 119:4 120:6
120:12
**entry (1)**
120:8
**Environmental (2)**
53:13 130:20
**erroneous (1)**
84:2
**ESQ (4)**
3:10,11,17,18
**establish (2)**
74:20,21
**established (2)**
90:8 115:11
**estate (4)**
14:25 88:14,21 131:5
**et (5)**
1:7 10:10 22:9 28:9
121:19
**event (1)**
16:2
**events (1)**

16:10
**eventually (1)**
22:20
**everybody (1)**
98:3
**evidence (1)**
92:12
**exact (5)**
23:4 30:18 61:2 83:4
124:10
**exactly (5)**
9:5 46:12 65:5 79:23
94:22
**examination (7)**
4:7 9:20 17:13 113:3
116:18 122:14
124:23
**examine (2)**
18:7 21:5
**examined (1)**
4:5
**examining (3)**
7:24 8:2 17:20
**example (2)**
56:24 111:10
**exceptions (1)**
86:23
**excerpt (1)**
109:6
**Excerpted (1)**
109:13
**exemption (5)**
16:24 52:18 54:5,12
54:18
**exhibit (67)**
4:25 5:3 9:11 10:24
11:10 12:2 14:15,18
15:3,8,12 23:7,9,20
25:6,18 45:8 49:2
52:17 53:10,11,15
53:21 54:19 55:13
55:17,23,25 56:4,6
56:10 85:16,25
88:10,18 97:12,13
97:15 98:8 105:11
105:12,14,16,18
107:22,25 108:16
108:25 109:5,7,9
111:10 113:6
120:21 125:4
130:10,11,13,15,16
130:17,19,21,23
131:6,7,8
**exist (8)**
74:20,20 115:3,22
116:4 123:23 124:7

125:7
**existed (5)**
65:9 99:20,22,25
121:25
**existence (3)**
34:4 90:5 123:2
**existing (1)**
123:8
**exists (1)**
121:25
**explain (1)**
64:13
**explained (1)**
90:18
**Expressed (1)**
98:25
**extent (1)**
8:22
**e-mail (3)**
20:20 98:22 126:19
**e-mailed (1)**
21:3
**e-mails (1)**
83:12
**E-R-I-A-N (1)**
106:5
**e.g (1)**
77:3

**F**

**F (1)**
129:2
**fabricated (1)**
82:24
**fact (6)**
61:21 62:21,24 65:7
74:15,23
**facts (6)**
61:5 103:21 104:3,6
104:17,24
**faded (1)**
54:25
**fair (15)**
9:9 10:18 19:15 21:4
31:21 39:22 44:4
79:5 95:11 98:6,7,7
99:15 107:14
119:25
**familiar (3)**
35:6 122:23 123:5
**fashion (1)**
51:11
**Fasken (2)**
97:17 99:16
**Federal (2)**
14:22 98:24

**feel (1)**
51:24
**file (6)**
17:17 20:3 28:19,21
88:5 126:21
**filed (10)**
5:6 18:5 45:19 54:13
89:2,4,14,16,16
126:23
**files (18)**
17:5 28:24 29:2,5,15
29:19 68:24 69:4,5
69:8,13,15,17,19,20
69:20 88:2 111:6
**filing (1)**
18:21
**filled (2)**
26:4,4
**Finance (4)**
45:20 49:3,12 130:18
**finances (3)**
66:14,23 102:17
**financial (5)**
63:7,10,14,16 66:19
**findings (2)**
27:19 60:13
**fine (3)**
6:18 36:4 124:10
**finish (2)**
13:14,15
**finished (2)**
30:7 68:8
**fire (1)**
104:9
**firm (5)**
30:12 32:5 48:9 51:15
99:16
**firms (4)**
31:8,11,11,14
**first (20)**
4:4 5:6,7 7:10 15:3
16:7 23:19 27:9
30:24 49:10,22 51:4
79:20 85:17 86:2
98:8 100:2,6 105:16
109:16
**first-year (2)**
51:16,16
**fiscal (1)**
102:20
**five (9)**
6:19 37:24 40:15 42:5
42:19 43:12 44:19
67:11 111:19
**flip (1)**
114:2

**Florida (2)**
85:8 105:24
**flourishing (1)**
33:22
**focus (1)**
113:14
**following (3)**
83:14 128:4,5
**follows (2)**
4:6 93:10
**follow-up (3)**
116:16 122:13 124:22
**foregoing (1)**
127:13
**foreseen (1)**
59:2
**forgetful (1)**
106:19
**forgetfulness (1)**
107:17
**form (12)**
52:6 53:22 64:4 65:16
65:17 87:12 104:10
104:20 105:4
106:25 120:24
121:12
**formed (2)**
34:7 124:12
**forms (1)**
25:17
**forth (3)**
8:9 16:20 129:11
**Forty-five (1)**
70:23
**found (2)**
18:12 82:21
**four (8)**
83:12 94:6,9,25 95:11
96:7 97:5,8
**frame (1)**
63:14
**framing (1)**
51:11
**fraudulent (4)**
14:25 88:15,21 131:5
**fraudulently (2)**
94:17 108:7
**free (2)**
51:24 57:8
**Friday (1)**
102:8
**front (7)**
10:25 23:12 45:11
47:8 61:5 113:13
126:7
**full (2)**

4:9 66:2
**fully (3)**
19:18,21 87:24
**function (1)**
96:24
**functions (1)**
103:7
**funds (4)**
78:12,15,22,25
**further (6)**
112:23 116:14 122:11
124:19 125:9
129:15
**future (7)**
22:24 59:2 60:2,18
61:11 74:13,14

**G**

**general (3)**
66:15 86:20 89:10
**gentlemen (2)**
39:13 112:24
**getting (3)**
15:23,25 104:3
**give (9)**
13:17,17 19:4 41:22
57:4,5,6,10 68:12
**given (5)**
62:10 79:12,15 105:9
129:13
**gives (1)**
66:4
**gleaned (1)**
109:11
**go (15)**
7:21 11:10 13:2 20:25
21:11,13 38:20 46:5
53:10 58:13 68:17
68:20 69:2,17
125:14
**goals (1)**
80:24
**Godfrey (2)**
97:17 99:17
**goes (1)**
8:25
**going (38)**
7:20 8:3,3,8,19 9:6,10
9:25 10:3,8 12:13
13:13 15:19 17:17
18:4 19:4,4,13,23
20:3 21:3 31:19
52:14,14 56:24,24
57:5,6 59:24 65:20
84:18 85:20,23
93:16,18 104:20

105:6 111:2
**good (9)**
9:16 10:11 12:12,24
14:12 31:5 35:20
64:7 82:6
**governance (9)**
39:6,7 41:10,13 42:18
43:3,10 44:16 62:9
**governed (1)**
120:7
**grammar (6)**
71:23 72:22,24 74:8
77:7 91:16
**grant (1)**
46:2
**grantee (3)**
45:25 46:21 47:10
**grantor (7)**
45:22,24 46:7,10,16
46:19 47:9
**grasp (1)**
106:20
**Griffin (124)**
4:1 5:1 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1

**Griffith (46)**
1:14 2:9 4:3,11,12 5:3
9:11 10:24 12:8
14:15 23:9 42:6
45:8,12 49:2 53:11
55:13,22 68:20 69:2
85:16 88:10 97:13
105:12 108:25
111:23 112:2 113:5
125:22 126:7,9
127:12 129:10
130:4,10,11,13,15
130:16,17,19,21,23
131:6,7,8
**ground (1)**
12:12
**grounds (1)**
51:24
**group (3)**
16:15 120:6 121:12
**guess (1)**
65:4
**guy (1)**
48:18
**guys (1)**
17:10

————————
**H**
**H (1)**
130:9
**half (2)**
91:18,18
**Hallows (100)**
9:21 10:14 15:2 16:11
16:18 28:20,25 29:6
29:8,11,16,21,23
35:17,24 36:23 37:3
38:3 41:7 43:9
44:24 45:4,5,23,25
46:3,21,25 49:17
50:18 52:3 53:2,6,7
54:14,20,21 55:9,15
55:20 56:11 59:10
59:25 60:5,11 63:12
67:3,6,10,13,15
69:8,25 71:20 72:12
74:3,4,11,13,24
76:4 77:3,9 78:12
78:15,23,25 79:2,6
79:12,18,25 80:9,19
81:8 82:19 83:19
84:4,14 85:5 86:4
86:25 88:16,22
90:22 91:10 92:21
93:11,19 94:16,17
95:23 96:6 100:21

100:22 101:13
111:14,15 130:22
131:6
**hand (1)**
129:20
**handful (1)**
102:13
**hands (1)**
29:16
**happen (3)**
82:4,5,7
**happened (6)**
58:8 69:10 75:5 87:5
91:6 122:9
**happening (2)**
101:2 108:10
**happy (1)**
103:14
**hard (1)**
89:9
**Harlem (2)**
70:7,12
**head (3)**
13:8,9 73:13
**headed (1)**
52:3
**heading (2)**
52:15 61:7
**health (1)**
106:8
**hear (4)**
19:3 21:16 103:16,20
**heard (1)**
99:5
**hearing (2)**
17:19 99:6
**heavily (1)**
93:15
**held (3)**
2:10 21:12 48:6
**helped (1)**
26:20
**helping (1)**
22:21
**Hennessy (6)**
42:22 44:21,22 78:2
105:21,23
**Hennessy's (1)**
106:8
**hereinbefore (1)**
129:11
**hereunto (1)**
129:19
**hiding (1)**
18:10
**high (49)**

36:23 37:22 42:16,25
43:8 44:14,24 45:4
45:23 46:3 53:6
55:9 56:11 57:11,14
58:3,18,23 60:11
61:13,14,18,24 62:2
64:24,25 65:13 69:8
69:25 71:23,24
73:25 74:4,7,10,13
74:24 76:4 77:7,9
79:12 83:19 84:4
85:5,14 91:16 111:4
111:14 112:6
**highest (4)**
39:7 62:14,18 63:2
**highlight (1)**
115:18
**hired (2)**
32:24 33:5
**history (3)**
58:24 73:8 107:5
**hold (2)**
26:23 50:7
**holistic (1)**
18:13
**home (2)**
98:25,25
**honest (3)**
31:4 33:2 109:14
**honestly (1)**
10:19
**hour (1)**
70:23
**Hugh (4)**
6:4,6 41:17,20
**hypothetical (1)**
57:6

————————
**I**
**idea (1)**
95:8
**identification (13)**
5:5 9:14 14:17 23:11
45:10 49:4 53:14
55:16 85:19 88:17
97:14 105:13 109:4
**identified (1)**
22:24
**Ilan (3)**
3:10 20:21 21:2
**immediately (1)**
37:19
**implied (1)**
13:25
**inaccurate (3)**
56:5 114:20 116:10

**inadvertently (1)**
15:22
**included (1)**
28:2
**incorporated (5)**
22:22 59:12 64:18,20
112:8
**incorporating (1)**
76:24
**incorporation (1)**
65:14
**incorrect (2)**
89:18 103:2
**independence (1)**
90:10
**independent (4)**
22:2 59:23 73:21
115:16
**independently (4)**
64:11,15 66:16 67:4
**indicate (1)**
5:10
**indicated (2)**
47:21 118:8
**information (3)**
16:10,23 84:3
**informed (1)**
17:25
**inquiry (10)**
9:19,23 51:10 58:10
68:22 87:16 104:21
105:7 113:7 122:17
**Institute (112)**
1:7 3:6 4:13,21 5:5,12
5:20,21,25 6:17,25
7:12 14:21 15:2
16:18 34:10 35:17
35:23,24 45:25,25
46:11,22,25 49:18
50:9,13,16,18 51:14
52:4,25 53:2,6,7
54:15,20,21 55:15
55:15,20,21 60:5
65:3 67:7,10,13
71:20,22 72:12
73:12,15,24 74:4,5
75:2,22,24,25 76:12
77:3,15,25 78:11,12
78:15,23 79:2,2,6
79:11,14,17,19 80:2
80:9 81:8 84:14
88:16,22 99:11,18
100:22 103:4,12,14
104:8 108:5 112:12
112:17 114:21
115:6,8,15 118:16

118:23 121:7,8,15
121:21 122:22,24
123:6,12,16 124:8
124:12,16 130:11
130:22,23 131:6
**Institute's (5)**
5:8 43:9 45:5 76:21
104:13
**institution (2)**
59:12 66:5
**institutions (1)**
22:22
**instructed (2)**
64:8 87:23
**instruction (1)**
105:10
**instructions (2)**
50:5 51:15
**insure (2)**
59:5 80:20
**intended (10)**
114:7,25 115:3,20,21
117:12,19,23
123:21,23
**intent (6)**
94:15,17 117:3,9
119:15,24
**interchangeably (1)**
38:9
**interest (2)**
17:23 18:16
**interested (1)**
129:18
**interminable (1)**
8:6
**intimate (2)**
84:17 118:12
**involved (1)**
31:20
**involvement (1)**
26:17
**in-passing (1)**
96:22
**in-person (1)**
71:4
**Iona (22)**
71:23 72:14,16,17,17
72:17,18,19,20 73:2
73:3,5,5 74:8 77:6
90:13,16 91:9,9,15
94:19,20
**Ireland (5)**
3:7 9:13 112:13
130:13,25
**item (4)**
52:22 54:24 120:15

120:20
**items (1)**
15:17
**I's (1)**
18:25

_____ **J** _____

**J (1)**
3:11
**James (4)**
15:15 42:22 44:23
57:23
**Jersey (5)**
115:13 123:6,13
124:7,12
**Jim (1)**
26:18
**job (2)**
1:24 12:12
**John (25)**
16:21 17:2,3,6,6
18:14,24 41:3,4,5
41:21,25 42:2,3,23
44:22 45:3 46:18
50:5,6,14 97:18
113:6,9 114:4
**joining (1)**
33:23
**Jointly (1)**
1:9
**Jones (2)**
2:11 3:4
**judge (5)**
17:18 19:24 20:13
21:9 98:5
**judges (1)**
19:25
**July (20)**
1:16 2:4 4:19 6:19,19
6:23,24 11:6,9 49:2
49:14 51:2 52:2,17
53:11,18 54:14
129:20 130:17,19
**June (1)**
102:18

_____ **K** _____

**K (124)**
4:1 5:1 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1

38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
**keeping (2)**
80:23 112:9
**keeps (1)**
29:5
**kept (5)**
29:7 87:4 109:22
110:19 111:9
**Kevin (13)**
1:14 2:9 4:3,11 7:18
50:3 51:10 68:20
82:6 113:8 127:12
129:10 130:4
**kind (3)**
59:18 106:10,12
**know (74)**
8:24 23:4 26:20 27:3
27:17 28:16 30:18
30:20 31:4 32:15
33:3,3,13 36:25
37:2,4 45:7 48:10
48:22 51:5 52:9,10
53:20,25 55:22
56:21 57:2 59:13
71:17 72:14 74:19
74:22 78:7 88:7,9
89:7,7,24 92:2,5,7,8
94:11,12,14 95:3,6
96:12,18,21,23
99:20,22 100:17
101:7,9,17 102:15
102:15 103:5,8,9,13

104:5,15 106:3
107:3,4 109:11
119:7,13,21 124:9
124:10
**knowing (1)**
8:10
**knowledge (50)**
8:13,14 11:23 15:16
31:14,16 32:10,16
33:10,14 47:14 52:5
56:8,9,14 57:3,13
57:16 66:2 69:23
70:2 73:17 84:18
87:7 91:10,22 92:16
97:5 99:3,7,10,14
99:18,19 100:22
101:20 103:3 104:2
106:24 118:12,15
118:19 119:23
120:10,11,13
123:15,17 125:6,8
**known (3)**
113:21 121:6 122:21
**KORNFELD (72)**
3:11 4:8,24 7:20,25
8:16 9:3,6,10,24
10:3,15,19,23 14:12
16:25 18:3 19:3,13
19:16 20:2,7,20
21:6,9,13,14 23:6
24:22 31:6 35:20
43:17 48:4,7 50:17
51:7,18,25 53:10
66:6,10 68:13,17,25
81:19,22 82:2,14
87:18 97:11,19
105:8 108:21,24
111:19,22 112:23
116:16,19 119:17
120:19 122:11
124:21,24 125:9,14
125:17 126:17
127:3,5,8 130:5
**Krinsky (7)**
3:13 30:11,16 31:2,10
31:20,24

_____ **L** _____

**lack (2)**
28:4 58:24
**laid (1)**
21:8
**large (1)**
96:17
**larger (1)**
27:24

**late (4)**
21:20 58:25 124:13
124:18
**law (6)**
12:20 50:10,20,23
51:16 99:16
**Lawrence (5)**
47:2 54:24 55:5 67:22
67:25
**lawyer (3)**
76:21 97:17 99:20
**lawyers (9)**
31:17,19,22 32:3,7
44:25 45:6 87:9,21
**lay (4)**
22:2 38:13 73:20,22
**layman's (1)**
107:12
**learned (1)**
82:8
**leave (1)**
50:23
**led (2)**
22:20,23
**left (1)**
50:20
**legal (33)**
15:14,17,20,25 16:3,4
16:8 17:25 29:12,20
30:2,3,17 31:9,15
32:11 51:24 65:17
69:5,6 81:17 87:15
87:23 88:3,8 92:10
93:3,17 98:21
101:19 103:11
120:12,24
**legend (2)**
46:8 109:15
**letter (53)**
17:2,3,5,9,10 18:24
19:6,19 20:9,11,14
49:3,11,14 51:3
52:3,17 53:12,17
76:10,15,21 77:12
97:11,14,15 99:4,8
99:22,25 100:8,11
100:17,18 104:23
105:13,15 108:14
113:6,8,13 114:22
119:8 120:15,20
123:3,10,20 125:3
130:18,19 131:7,8
**letters (4)**
16:20 19:6 103:17,22
**let's (24)**
4:24 5:14 7:15 11:10

21:11,13,15 23:6
30:2 31:17 35:21
36:14 37:19 46:5
48:24 52:12 53:10
68:13,17 89:22
91:23 97:11 111:19
125:14
**level (5)**
39:7 62:14,18 63:2
107:17
**liability (1)**
76:13
**licensed (1)**
65:13
**lies (1)**
82:24
**life (1)**
28:5
**light (1)**
108:21
**limited (6)**
10:4 19:17 114:9,17
117:5,15
**limits (1)**
15:21
**line (11)**
7:16 9:18,22 10:4,7
49:23 51:10 104:20
105:6 122:17 128:6
**list (2)**
86:13,15
**listed (4)**
5:17 15:7,11 25:12
**litigate (4)**
14:24 88:13,20 131:4
**litigated (1)**
93:15
**litigation (4)**
76:6 93:12 108:8,9
**little (4)**
43:4 50:22 86:10
93:21
**LiveNote (1)**
2:14
**LLP (1)**
2:11
**Local (8)**
4:25 5:3 9:11 10:25
11:11,25 130:11,23
**located (2)**
18:9 73:25
**long (11)**
4:17 7:15 30:16 36:4
36:7 38:4,25 68:4
70:22 73:8 75:16
**longer (1)**

121:25
**look (12)**
28:5,17,19,21 29:14
68:14 69:4 83:7
91:24 95:7,19,20
**looked (4)**
17:4,7,8 118:24
**looking (4)**
56:4 68:24 69:19,19
**looks (2)**
46:10 54:24
**loss (1)**
107:17
**Lot (1)**
52:23
**Lou (1)**
75:14
**lucid (1)**
106:23
**Lynch (5)**
41:22,25 42:2,3,7

**M**

**Mafia (2)**
82:23 94:13
**maintain (1)**
59:3
**maintained (1)**
88:3
**making (2)**
82:22 126:8
**Malito (4)**
31:3,11 32:2,9
**managed (1)**
5:15
**management (7)**
7:10 62:2,14,18 63:2
77:23 116:21
**manpower (2)**
21:23 22:18
**March (14)**
36:15 46:13 47:21,25
55:21 58:4,18 61:25
62:17 63:6 64:11,15
78:13 79:7
**mark (3)**
4:24 23:6 97:11
**marked (24)**
5:5 9:13 12:2 14:17
14:18 23:10,20
25:18 45:9 49:3
52:17 53:13 55:16
85:19,25 88:16
97:14 105:13 109:3
109:5 120:21 125:4
130:13,25

**Markowitz (12)**
3:18 10:22 30:10
31:23 71:9 85:20
94:7 111:23 125:12
126:25 127:4,7
**marriage (1)**
129:17
**Massachusetts (4)**
122:24 123:16 124:6
124:16
**matter (2)**
84:10 129:18
**McNally (1)**
6:15
**mean (4)**
56:18 77:6 109:20
115:7
**means (8)**
59:11,25 63:5 64:10
64:14,18 91:8,11
**meant (1)**
82:17
**medical (3)**
107:4,5,16
**medicine (1)**
107:13
**meet (8)**
66:25 67:2,3 102:4,7
102:7,11,13
**meeting (3)**
71:4 102:16,18
**meetings (8)**
101:5,10,16,22
102:20,23,25 103:3
**meets (1)**
102:6
**member (8)**
4:20 78:6 79:14,17
100:23 101:8,18
119:4
**members (13)**
32:25 40:14,22 42:12
42:13,17 43:2,9
44:15 66:24 96:19
120:8 121:14
**Memorandum (3)**
55:13,19 130:21
**Memorial (2)**
75:11 115:12
**memory (1)**
107:17
**men (2)**
120:6 121:12
**mention (1)**
112:5
**mentioned (6)**

42:11 59:13 60:6
75:10 100:6 112:10
**Merit (1)**
2:13
**met (2)**
81:17 103:6
**Miami (1)**
85:7
**Michael (1)**
4:11
**mid (5)**
58:25 61:21 124:13
124:17,18
**middle (2)**
17:12 62:22
**mind (2)**
106:10,12
**mindful (1)**
13:7
**ministries (1)**
28:8
**ministry (2)**
22:8 41:6
**minster (1)**
59:8
**minute (1)**
56:25
**minutes (2)**
70:23 71:17
**missed (1)**
42:8
**missioned (1)**
85:7
**mistakenly (1)**
119:9
**mistakes (2)**
103:17 125:3
**model (2)**
67:16,17
**Moffett (41)**
15:15 26:18,22 27:3
42:23 44:23 57:23
58:2,6,17,21 59:15
59:17 60:6 63:4
64:9,13 66:11 70:3
70:19 71:14 75:19
75:20 76:3,9,16,20
77:10 78:4 100:9,11
100:14,16,17,20
108:3 116:24 117:2
117:7,18 118:4
**Moffett's (1)**
77:22
**Molito (1)**
48:9
**moment (2)**

91:25 125:15
**moments (1)**
121:12
**Monday (1)**
102:8
**money (8)**
79:3,6,12,15,18,23
82:23 94:12
**month (2)**
100:5 102:6
**months (1)**
102:6
**morning (2)**
81:17 82:9
**motion (9)**
14:23 17:17 18:5 20:3
88:11,19 98:5
126:22 131:2
**Mount (5)**
75:22,24 76:2 101:3
108:10
**move (2)**
61:9,10
**moved (1)**
72:24
**moving (1)**
61:10
**Murphy (9)**
41:21,25 42:7 47:2
55:5,6,6 67:22,25
**myriad (4)**
19:5 22:6,24 59:12
**M-O-F-E-T-T (1)**
15:16

**N**

**N (2)**
3:3 130:2
**name (9)**
4:9 25:9 46:7,9 54:11
54:17 99:5,6 110:6
**names (8)**
25:11,12,14 37:10,11
40:24 41:23 44:21
**nature (6)**
80:20,21 93:11,19
95:23 96:6
**need (5)**
13:7,22 61:9,10
105:10
**needed (3)**
60:16 61:8 102:21
**needing (1)**
79:23
**neglected (1)**
112:5

**negotiated (1)**
56:21
**negotiation (3)**
56:16,19 57:3
**never (5)**
19:22 115:14,14
116:11,11
**New (45)**
1:3,15,15 2:11,11,15
3:9,9,16,16 17:21
17:22 41:6 45:19
49:11 53:12,18
54:13 70:4 74:2,21
84:8 85:21 92:23
93:2 94:4 95:9,16
96:2 109:18,18,23
109:23 115:12,13
123:6,13 124:6,12
128:2,3 129:3,5,8
130:19
**newspaper (9)**
82:18,25 83:11,16,18
83:24 84:3,22 93:22
**nice (1)**
48:18
**night (3)**
98:15,17 105:17
**nine (3)**
68:6,9 93:7
**nods (1)**
13:8
**nonprofit (2)**
52:19,25
**non-privileged (2)**
87:10,15
**North (12)**
33:19 41:9,13 43:15
43:24 44:3 109:3
110:2,5 122:2,7
131:9
**notarized (1)**
55:10
**notarizes (1)**
47:3
**notary (5)**
2:14 46:8,18 127:22
129:7
**notes (2)**
11:12,14
**notice (4)**
9:4 14:16,20 130:14
**not-for-profit (1)**
121:16
**number (7)**
22:13 52:13 91:20
113:15 114:3

120:15,20
**numerated (1)**
113:15
**numerous (4)**
82:24 91:6,8,11

_____
**O**
_____

**object (4)**
12:25 13:18 49:23
120:22
**objection (22)**
51:19,20,23 52:6
53:22 58:7 64:4
65:16 66:7 83:21
87:12,13 88:11,19
89:23 104:10,19,25
105:4,9 119:11
131:2
**objections (1)**
12:23
**observed (6)**
107:9,10,13,16,18,19
**obtain (1)**
29:9
**obtained (2)**
29:10,12
**obviously (7)**
8:18 15:19 17:3 20:12
57:6 65:18 113:8
**occasion (2)**
79:4,6
**occasions (5)**
79:9 91:7,8,11,12
**October (1)**
102:17
**office (1)**
69:8
**officer (5)**
6:25 7:2,12 32:18
78:8
**officers (5)**
5:25 6:3,9 116:8,12
**offices (1)**
2:10
**Official (7)**
3:5 14:15,19 85:16
88:11 130:13 131:2
**okay (38)**
10:20,22 13:3,5,20,23
14:5 16:5,7 18:3
19:3,15 21:6 24:24
25:16 37:8,14 38:16
38:23 40:18 47:15
48:20 49:5 51:10,18
61:21 66:10 82:2
85:23 89:17,22 90:3

91:14 94:23 97:15
98:22 125:14 127:2
**old (1)**
106:10
**once (2)**
18:11 90:8
**ones (7)**
75:10 84:23 90:24
94:10 96:13 109:21
112:10
**oOo (1)**
127:10
**open (1)**
14:11
**operate (9)**
22:17 59:11 63:5
64:11,15 65:13 66:4
66:15 113:16
**operated (1)**
73:20
**operates (4)**
118:13,14,17 121:22
**operating (1)**
59:4
**operation (1)**
62:12
**operations (1)**
66:20
**opinion (3)**
17:25 65:18 120:24
**opportunities (1)**
104:4
**opportunity (2)**
13:18 125:23
**opposed (1)**
44:9
**opposition (3)**
91:24 92:18 93:6
**order (7)**
7:21 27:25 60:17,17
61:6 68:23 76:22
**orders (3)**
22:13,14 28:2
**ordinary (4)**
90:5 91:7 92:22,25
**organization (4)**
52:25 54:11,17
114:18
**organizations (2)**
34:23 52:19
**original (1)**
126:10
**originally (1)**
90:8
**Orleans (1)**
41:6

**outcome (1)**
129:18
**outside (3)**
8:14 107:6 115:11
**overlap (8)**
37:7,9,22 38:5,25
39:23 40:6 61:17
**overlaps (1)**
37:15
**overseas (2)**
82:23 94:13
**oversight (1)**
7:11
**owned (2)**
71:22 73:3
**owner (1)**
65:6
**O'Neill (8)**
6:5,6,8,16 41:17,20
41:24 42:6

_____
**P**
_____

**P (2)**
3:3,3
**Pachulski (2)**
2:10 3:4
**page (17)**
46:5,6 47:8 49:10
52:20 83:12 86:11
86:12 91:23 93:6,7
109:16 113:15
114:2 127:16 128:6
130:3
**pages (2)**
52:15 127:14
**paper (1)**
84:17
**paragraph (21)**
5:10,14 89:22,24 90:4
91:24 92:17,21 93:5
93:7,9 95:22 113:15
114:3 116:5 120:14
120:15,16,19
122:16 123:19
**parcel (1)**
52:23
**parcels (2)**
90:6,11
**parenthetically (2)**
115:2,3
**part (3)**
24:10 119:5 124:7
**participate (1)**
71:9
**particularly (1)**
18:11

**parties (2)**
126:20 129:16
**partner (1)**
51:15
**party (2)**
57:5 70:25
**passed (1)**
89:6
**Paul (5)**
42:22 44:21,22 78:2
105:21
**penalty (1)**
12:19
**pending (1)**
14:10
**people (14)**
11:17 26:19 29:23
32:13,15 33:5,22
38:3 73:23 74:22
80:14 96:11 103:19
106:13
**percent (4)**
67:22 70:15 100:6
108:20
**period (12)**
48:2 68:7 72:10 85:11
85:12 116:21
117:13,20,25 118:5
118:10,19
**perjury (1)**
12:19
**person (2)**
84:19 102:11
**personal (6)**
8:13,14 9:7 47:14
106:16 121:19
**personally (2)**
8:3 28:21
**persons (1)**
42:14
**pertaining (9)**
29:20 66:19 69:24
83:18 84:4 111:3,13
125:19,19
**pertains (1)**
45:23
**perusal (1)**
89:5
**perused (1)**
89:8
**Pg (1)**
128:2
**Pgs (1)**
128:2
**phone (5)**
17:15 21:2 69:7 71:3

71:5
**phoned (1)**
69:12
**Physically (1)**
106:10
**piece (1)**
51:21
**pity (1)**
82:15
**place (6)**
58:22 71:7 108:6
111:5,8 112:20
**places (2)**
111:12,17
**plaintiffs (1)**
93:13
**plan (8)**
21:25 22:23 24:9,9,11
24:16,19,23
**planning (1)**
59:19
**please (14)**
4:10 13:23 14:14
21:17 36:20 40:2
43:5 44:20 54:16
77:4 81:23 92:2
106:15 119:20
**point (10)**
9:15,17 14:12 27:11
35:18 43:14 95:12
98:7,23 101:11
**portrayal (1)**
115:5
**posed (2)**
49:25 100:18
**position (18)**
4:13,15 10:9,16 18:13
26:22 32:13 41:9,13
41:16 42:18 43:3,10
44:16 94:21 103:18
103:23 104:5
**possession (1)**
86:22
**possibility (2)**
63:13 91:12
**possible (4)**
20:8 29:19 109:9
111:7
**possibly (3)**
25:6 79:22 93:24
**post (1)**
79:2
**power (4)**
75:10 113:16,24
121:17
**powers (4)**

62:9,11 80:15
121:18
**practice (2)**
89:10 112:9
**practices (1)**
94:18
**predate (1)**
72:22
**predominantly (1)**
38:13
**Premises (3)**
55:14,19 130:21
**prep (11)**
72:17,17,17,18,22,23
72:25 73:5 90:16
91:9 94:20
**preparation (13)**
23:21 25:19 26:13
28:18 37:16 45:15
49:8 55:25 63:7
66:13 116:22 118:8
118:11
**prepare (2)**
15:10 68:23
**prepared (3)**
25:22 55:23 80:13
**preparing (3)**
17:12 54:9 85:10
**preposterous (1)**
82:21
**presence (1)**
58:9
**present (14)**
17:25 35:21 39:24
40:10,21,22 66:19
67:7,10 73:4 102:5
103:3,7,8
**presented (1)**
69:21
**presently (7)**
27:13 31:9 40:17 59:4
72:20 73:2,4
**president (19)**
4:16,18,22 5:11,19
6:4,17,21 11:4
26:25 67:18,24
77:14,19,24 78:3,4
78:9,10
**president-principal...**
67:16
**presume (7)**
27:16 29:7 33:6 67:21
111:15 121:5,20
**presumption (1)**
69:11
**presupposed (1)**

51:12
**prevail (1)**
18:16
**previous (1)**
101:9
**previously (1)**
107:21
**primarily (1)**
80:15
**principal (6)**
67:6,8,14,19,24 80:14
**prior (12)**
31:10 33:18 36:10,16
36:22 37:14 61:12
72:13 99:23,25
110:10 118:2
**privilege (8)**
17:14,21,23 18:23
19:8,11 58:12 81:20
**privileged (5)**
19:6,7,20 97:23 98:2
**probably (7)**
10:7 18:5 38:7 39:4
39:21 40:3 71:15
**problem (1)**
20:23
**Procedure (1)**
14:22
**proceed (2)**
58:10 68:20
**process (2)**
74:8 125:25
**produced (7)**
24:23 27:16 81:10,13
86:21 87:6,21
**production (9)**
17:8,8 24:6 25:2
53:16 85:18,24 86:2
86:24
**professional (2)**
2:13 18:21
**properties (9)**
71:21,25 72:5,24 73:9
91:13,17 112:4
115:13
**property (22)**
45:8,13 52:18 65:6
71:19 72:18,20,21
72:23,25 73:3,11,15
73:24 84:13 90:7,19
94:15 100:21 108:7
121:19 130:16
**propounded (1)**
86:3
**protect (1)**
100:25

**protecting (3)**
76:5,5,12
**Protection (2)**
53:13 130:20
**provide (9)**
16:10 18:20 20:9,10
20:10 69:22 78:12
78:25 81:15
**provided (18)**
15:14 16:8 29:10
31:15,18,23 32:3,9
49:6 53:16 78:15,23
79:25 82:10,16 83:8
83:12,14
**provides (1)**
121:18
**providing (1)**
20:13
**province (48)**
33:20,21 34:5,7,8,11
34:12,19,20 41:9,14
43:16,22,25 44:2,3
44:7,18 109:7,18,25
110:2,3,4,7,15,16
110:17,17,19,24
111:9 118:22 119:2
119:4,9 121:6,9,10
121:11,23,25 122:3
122:5,6,6,18 123:9
**provinces (6)**
34:20,22 44:3,5
110:14 119:6
**provisions (1)**
56:20
**proviso (1)**
21:7
**Pruszynski (4)**
1:23 2:12 129:7,23
**Public (3)**
2:14 127:22 129:8
**publication (1)**
83:8
**publications (1)**
83:5
**publicity (2)**
85:3,12
**publicizing (1)**
96:5
**publicly (1)**
92:12
**purportedly (1)**
113:9
**purpose (5)**
22:15 28:3 58:9 76:5
126:11
**purposes (5)**

7:17,23,25 8:9 113:7
**Pursuant (1)**
14:21
**put (6)**
10:24 21:24 23:12
45:11 50:14 127:5
**p.m (1)**
2:5

_____
**Q**
_____

**QC (1)**
97:16
**question (53)**
5:23 9:18 13:2,15,15
13:18 14:2,4,11
15:24 18:17 29:23
30:7 36:19 40:2,23
44:13 48:15 49:24
49:24 50:25 52:7
53:23 58:14,20
62:16 64:7 65:21
69:3,18 75:17,21
78:24 83:23 91:15
91:18 93:3 94:22,24
98:14 100:19
104:11,22 107:4
112:3 119:15,16,19
119:20 120:23,25
121:3 124:15
**questioning (1)**
7:16
**questions (29)**
8:13,19 10:4,8 12:23
12:24 14:7 20:11,15
22:7 23:23,24 25:5
26:10 28:3 38:17
48:19 49:23 51:23
100:18 112:24,25
116:14,17 122:12
124:20,22 125:10
125:12
**quickly (1)**
7:16
**quiet (1)**
64:3
**quite (3)**
82:6 106:23 111:7

_____
**R**
_____

**R (3)**
3:3 97:16 129:2
**raising (1)**
9:16
**ran (3)**
79:6 116:7,11
**range (1)**

100:4
**Raymond (3)**
36:2 41:2,21
**RDD (1)**
1:8
**reached (1)**
126:19
**read (24)**
13:9 15:13 18:12 27:9
27:15,20 45:3 47:8
47:13 77:18 84:9,16
84:18 89:11,23 94:3
94:3,4,10 100:16
109:10,10 114:6
125:23
**reading (4)**
25:15 66:8 84:19
92:13
**reads (3)**
54:7 90:4 93:10
**ready (3)**
68:17 89:25 92:2
**real (6)**
45:8,12 52:18 90:7
121:18 130:16
**reality (1)**
106:20
**realize (1)**
50:10
**really (3)**
12:24 95:6 99:9
**realtime (1)**
85:24
**reason (20)**
13:22 20:18 47:15,18
47:19 58:3,17,22
74:16,18 81:12
128:8,10,12,14,16
128:18,20,22,24
**reasoning (1)**
72:2
**reasons (5)**
19:5 61:9 64:10 98:2
128:5
**recall (12)**
16:19 23:2 24:4 25:8
26:2 47:23 63:16
70:13 71:13 91:4
93:24 107:20
**receive (2)**
66:18 83:10
**received (5)**
27:19 64:21 65:22
79:18 83:9
**Recess (2)**
68:16 111:21

31:19
**recognize (2)**
55:3 77:5
**recognized (2)**
21:21 34:5
**recognizes (1)**
17:21
**recognizing (1)**
22:15
**recollect (1)**
84:7
**recollection (9)**
7:4 16:9 30:24 48:25
49:20 50:21 61:4,5
76:18
**record (28)**
4:10 7:18 8:10 13:17
18:4 19:14 20:16,25
21:11,12 38:24 48:4
48:6 50:14 51:22
58:8 90:3 97:20
109:17 110:6,13
114:6 125:15,16,18
126:6 127:6 129:13
**recorded (2)**
25:6,7
**records (1)**
87:4
**red (1)**
63:22
**refer (2)**
38:14 123:19
**reference (8)**
92:4 93:18 95:22,24
96:25 100:11,20
108:14
**references (1)**
92:18
**referred (4)**
17:22 23:18 24:12
88:6
**referring (13)**
18:14 38:17 43:14
44:8 83:2,6 90:12
94:11 96:13,21
109:19 119:9
122:16
**refers (1)**
49:17
**reflect (1)**
56:10
**reflected (4)**
11:25 25:5,13,14
**reflection (4)**
113:20 114:12,20
115:23

**refresh (4)**
7:4 16:9 48:25 49:20
**regarding (4)**
15:18 76:11 103:24
108:6
**regards (5)**
22:7,8,8 30:9 112:4
**Registered (2)**
2:12,13
**reiterated (1)**
126:18
**related (5)**
16:10 28:24 87:10
117:9 129:15
**relating (4)**
14:25 88:15,21 131:5
**relationship (12)**
35:12,14 73:18 74:10
75:21,23 90:18
116:5 118:4,9,21,25
**relative (1)**
102:15
**released (1)**
60:23
**releases (2)**
85:3,12
**relevant (2)**
10:13,17
**religion (1)**
80:6
**religious (8)**
22:13 28:5 44:9 79:24
80:4,20,21 81:7
**remained (2)**
62:5,7
**remember (5)**
63:21 84:6,15 95:8
96:4
**remind (1)**
13:13
**repeat (2)**
43:4 54:16
**rephrase (5)**
30:22 36:19 40:3
65:21 87:18
**report (36)**
16:15,16 21:15,19,20
22:6 23:3,10,13,16
23:19,22 24:2 25:17
25:20,23 26:17,20
27:4,7,10,12,14
28:15 59:18 60:7,7
60:10,13,14,19 61:4
61:7 81:15,17
130:15
**Reported (1)**

1:23
**reporter (5)**
2:13,13,14 12:15 13:7
**represent (3)**
99:11,17 120:9
**representation (1)**
120:12
**represented (5)**
47:11,12 50:2,15,18
**representing (8)**
47:6 48:13 49:21 50:8
50:12 51:13 52:4,10
**reputation (1)**
103:9
**request (1)**
18:23
**requested (2)**
86:13,16
**requests (2)**
85:18 86:2
**required (3)**
80:9 102:15 126:20
**Research (2)**
22:12 27:23
**reserve (3)**
62:11 80:15 97:23
**reserved (1)**
98:3
**reserving (1)**
97:21
**reside (5)**
70:4,6,8 105:23,25
**residence (3)**
70:8,10 106:2
**resides (3)**
70:7 106:2 113:16
**respect (28)**
9:19,21,22 11:24
14:23 15:7,11 16:7
16:25 27:4 29:5,11
29:15 51:20 56:15
68:22 82:19 86:24
88:4 115:24 117:3
117:12 118:21
119:8 125:21
126:14,17,21
**respectfully (1)**
18:23
**responded (3)**
23:25 51:9 101:3
**responding (2)**
17:7 93:4
**response (2)**
28:7 75:17
**responsibilities (1)**
10:10

**responsibility (3)**
7:11 27:3 76:2
**responsible (3)**
26:13 79:24 80:11
**result (2)**
69:6 101:2
**results (1)**
60:22
**return (4)**
18:24 45:9,13 130:17
**returned (1)**
98:25
**reveal (2)**
92:9,11
**review (3)**
37:16 88:2 98:20
**reviewed (1)**
45:14
**revise (1)**
83:23
**revisit (3)**
68:21 113:6 115:17
**Re-read (1)**
119:15
**Rice (10)**
71:24 74:7 77:7 91:16
110:4 112:6,8,18,19
122:7
**right (30)**
5:22 12:16 19:12,25
25:7 26:7 29:25
31:6 32:7 40:4
45:23 46:7,8 49:15
54:20 66:4 78:21
89:14 90:14 92:14
97:21,24 98:6,12
104:6 111:10 114:5
120:16 124:2 127:2
**rights (1)**
98:4
**RMR (1)**
1:23
**Rochelle (2)**
109:18,23
**Rochester (1)**
73:25
**role (6)**
23:20 25:19 27:7
77:22 78:8 93:14
**room (2)**
12:14 50:9
**rule (12)**
4:25 5:3 9:11 10:25
11:11,25 13:6,12
14:22 130:10,11,23
**rules (3)**

9:18 12:12 126:12
**running (1)**
79:3

_____

S

**S (2)**
3:3 130:9
**sake (2)**
39:5 97:19
**Sarah (1)**
6:11
**saw (9)**
54:8,10 69:16 95:4
98:15,16 99:4
105:16 118:11
**says (10)**
5:15 12:14 47:8 54:21
57:5,7 92:14,20
109:16 121:4
**scene (1)**
80:14
**SCHARF (1)**
3:10
**school (73)**
36:23 37:22 42:16,25
43:8 44:14,25 45:5
45:23 46:3 50:10,21
50:23 53:7 55:8,9
56:11 57:11,15 58:3
58:18,23 59:22,24
60:11 61:13,14,18
61:25 62:2,12 63:21
64:24,25 65:10,13
67:23 68:4,11 69:9
69:25 71:23,24,24
72:22,24 73:25 74:4
74:5,7,9,10,13,24
74:25 76:4,24 77:2
77:7,8,9 79:12
80:20,21,22 83:19
84:5 85:5,14 91:16
91:16 111:4 112:6
**schools (20)**
21:23,25 22:2,4,17,25
28:8 59:4,6 64:17
72:2,3,9,19 74:21
75:9 90:7 96:18,19
115:11
**Scott (4)**
3:18 9:16 24:22 30:9
**search (2)**
92:8,11
**second (10)**
14:16,20 38:14 46:5,6
48:5 51:6 111:8
123:20 130:14

**secretary (1)**
6:13
**secretary/treasurer...**
6:13
**secular (3)**
34:25 44:9 65:14
**see (40)**
17:5,9 20:17,23,23
21:4 24:8 25:10,12
29:14 37:13 46:7
47:21 48:24 49:7
52:20 53:3 54:25
55:25 56:5 63:6
83:5,8 84:20,22
85:3,8,11,15 88:25
95:20,24 96:25
113:11,18 114:10
118:7 122:19
123:24 124:25
**seeing (2)**
24:4 99:8
**seen (21)**
15:3 63:10,14 82:18
83:18 84:3 86:5,6
86:15,17,18 88:23
88:24 89:3 96:12,14
96:15 98:8 104:23
109:7,8
**sees (1)**
21:9
**self-sustained (1)**
90:9
**selling (1)**
74:8
**send (2)**
85:20,23
**sending (2)**
82:23 94:12
**sense (1)**
73:19
**sent (6)**
81:16 89:5,8 98:19
105:2,2
**sentence (7)**
91:5 92:17,21 93:9,17
115:17 123:21
**separate (4)**
34:15,20 35:15 76:24
**separately (4)**
22:21,22 59:11 63:6
**September (8)**
23:10,16 24:17 60:8
61:2 102:7,7 130:15
**series (2)**
5:16 22:9
**serve (1)**

62:25
**services (5)**
31:15,18,23 32:4,9
**set (7)**
62:9 85:17 86:2
115:15 120:7
129:11,20
**setting (1)**
8:9
**settle (4)**
14:24 88:13,20 131:4
**sewer (3)**
54:5,13,18
**shakes (1)**
13:8
**share (1)**
64:9
**shared (1)**
71:18
**shed (1)**
108:21
**short (3)**
79:3,6 100:3
**show (2)**
61:8 76:9
**showed (2)**
63:19 82:9
**shown (2)**
94:19 127:15
**shows (1)**
48:11
**side (1)**
57:7
**signature (3)**
54:23,25 55:3
**signed (2)**
25:9 77:18
**signs (2)**
46:15,24
**similar (6)**
27:22 28:2,3,3 37:10
37:12
**simply (1)**
94:24
**sir (8)**
5:23 24:13 29:3 40:25
53:20 94:21 98:8,11
**sit (3)**
19:23,25 114:19
**sitting (1)**
96:23
**situation (2)**
101:3 106:21
**six (10)**
18:5 40:20 41:22,22
42:4,19 44:19 52:14

91:12,23
**slippage (1)**
106:13
**slipped (2)**
106:10,12
**slower (1)**
43:5
**sold (1)**
74:7
**solicitation (1)**
93:12
**somebody (3)**
20:20 96:24 105:3
**sooner (1)**
20:4
**sorry (8)**
6:19 30:14 38:20
74:17 78:2 93:6
94:23 102:9
**sort (5)**
7:21 13:25 20:8 66:14
94:13
**South (2)**
109:3 131:10
**SOUTHERN (1)**
1:3
**speak (9)**
27:2,6 32:12 57:19,22
57:24 86:18 106:16
107:6
**speaking (1)**
51:20
**speaks (1)**
37:3
**specific (6)**
32:23 57:16 69:18
80:3 89:7 99:7
**specifically (8)**
68:24 75:21 78:18
86:18 95:7 100:10
102:16 123:20
**speculation (1)**
119:12
**spell (1)**
21:16
**spoke (6)**
17:15 26:18 59:17,19
71:16 81:14
**SS (1)**
129:4
**stamped (2)**
52:13 55:17
**stand-alone (4)**
72:11 73:12,15 74:6
**Stang (2)**
2:10 3:4

**start (4)**
8:4 35:21 36:14
115:16
**started (3)**
30:25 72:19,19
**starting (3)**
39:2 40:9 86:11
**state (6)**
2:15 4:9 74:21 128:2
129:3,8
**stated (2)**
84:12 121:11
**statement (1)**
66:15
**statements (5)**
63:7,11,15,17 66:19
**states (3)**
1:2 28:5 115:11
**status (1)**
16:24
**statute (1)**
121:18
**stip (1)**
20:24
**stipulation (1)**
126:13
**stipulations (1)**
125:18
**STN (1)**
126:22
**Stoldt (6)**
42:23 44:23 46:9,15
77:18,20
**stop (2)**
16:5 104:12
**stopped (2)**
79:23 104:14
**strategic (7)**
22:23 24:9,9,11,16,19
24:23
**Street (2)**
70:12,14
**stricken (1)**
20:15
**strike (7)**
34:18 64:12 78:9 87:7
99:21 117:10
119:22
**strong (1)**
74:14
**structure (1)**
35:6
**students (4)**
64:2 80:8 96:17,18
**study (14)**
22:10,11 27:21,22,23

27:24 28:10,14
59:14 81:12,16,18
81:20 82:9
**styled (1)**
114:3
**subject (4)**
8:11,15 84:10 127:15
**Subscribed (1)**
127:19
**substance (1)**
84:15
**succeeded (1)**
43:24
**sufficient (1)**
17:24
**suit (1)**
76:23
**supplemental (1)**
126:21
**supply (1)**
70:16
**sure (26)**
10:2,16 13:4 20:6
27:18 30:23 32:24
33:2 36:21 37:7
43:6 50:3,11 67:15
67:20,22,23 70:15
79:22 83:3 100:6
106:18 108:20
109:14 112:3
118:20
**surely (1)**
93:15
**survey (15)**
23:9,24 25:5,17 26:3
26:5,6,13,14 27:12
27:14,20 60:20,22
130:15
**survive (1)**
60:2
**survived (1)**
72:4
**suspect (4)**
23:23 27:15 89:3
95:10
**sworn (4)**
4:2,5 127:19 129:12
**system (1)**
62:8

_____
**T**
_____
**T (7)**
47:2 55:5 67:22,25
129:2,2 130:9
**tactics (1)**
93:13

**take (15)**
11:12,14 13:8,23 25:2
36:14 37:19 57:4,10
68:12,13 80:9 81:24
111:19 112:20
**taken (4)**
12:15 68:16 77:5
111:21
**taker (1)**
26:9
**talk (11)**
21:15 25:22 26:12,16
30:2 31:17 33:7,11
89:25 91:25 116:20
**talked (1)**
60:15
**talking (5)**
8:24 37:21 72:6
101:12 120:18
**talks (1)**
91:5
**target (1)**
76:23
**Tarter (7)**
3:13 30:11,16,25 31:9
31:19,23
**taught (1)**
63:12
**tax (5)**
16:24 45:9,13 52:18
130:17
**teach (2)**
67:9 81:7
**teacher (1)**
63:24
**teaching (1)**
22:14
**technical (2)**
107:15 110:23
**telephonically (1)**
102:11
**tell (19)**
9:24 10:6 12:11 13:23
14:2 37:8 47:24
58:6,21 59:9,15
66:11 76:19,19 77:4
77:10 79:10,13 98:6
**tells (1)**
12:25
**ten (2)**
28:5 102:6
**ten-minute (2)**
68:14 111:20
**term (6)**
87:14,15 107:16
115:18,19,24

**terminology (1)**
65:12
**terms (4)**
57:4,11 92:23 93:2
**testified (11)**
4:5 11:12 48:13 83:17
83:25 84:24 93:23
94:25 95:15 107:21
108:2
**testify (3)**
15:10 45:15 97:4
**testifying (5)**
8:23 12:19 15:6 35:9
51:8
**testimony (8)**
50:13,17 83:22 93:25
107:20 114:20
127:13 129:13
**Thank (3)**
7:7 87:19 127:8
**things (7)**
13:16 59:18 61:7
71:17,18 75:18
119:3
**think (16)**
8:5 9:16 12:24 21:4
29:22 30:6 32:5
49:24 51:21 71:16
76:17 87:16 108:19
110:22,23 127:7
**third (4)**
2:11 3:8 120:15,19
**Thomson (12)**
16:21 17:2,4,6 20:10
76:11 97:16 99:4,8
99:10 105:15
113:10
**thought (5)**
56:5 64:7 66:6 69:18
85:22
**three (14)**
40:12,17 71:21,25
91:8,11,13,21 94:2
95:5,18 96:3 97:8
110:14
**Thursday (4)**
49:6 53:17 81:11
127:2
**tier (1)**
38:14
**time (74)**
11:13,18 12:4 17:24
19:17 21:22 22:3
23:25 26:19,23 27:9
28:11 30:19,20
32:17 33:22 34:6

36:14 37:2,24 42:15
42:24 43:7 44:14,17
47:7 48:2 50:6
51:17 55:7 59:5,10
59:19 60:2 61:20
63:14 64:19 67:12
71:19,23 72:4,6,6
72:10 78:7,20 79:16
84:17 85:11,12
92:24 93:2 95:12
96:4 98:23 100:3,23
105:16 108:9,13
112:24 114:21
116:21 117:13,20
117:24 118:5,10,19
120:10 122:12
123:2,9 125:10
**times (15)**
40:12,13 78:14,17
79:13 84:8 85:21
94:4 95:9,16 96:2
97:8 101:24 102:13
106:21
**title (2)**
67:24 77:2
**today (7)**
48:19 70:21 86:23
98:9,10,13 114:19
**told (13)**
29:24 59:15 63:5
64:10 71:12 96:9,11
96:11,15 97:20
107:8,10 111:23
**tomorrow (1)**
125:25
**Tony (4)**
13:18 24:22 51:2
108:22
**top (1)**
73:13
**topic (1)**
93:15
**topics (2)**
15:7,11
**total (2)**
91:20 94:6
**town (1)**
98:24
**tradeoff (1)**
73:2
**transaction (3)**
56:10,21 57:11
**transcript (2)**
13:10 127:15
**transfer (48)**
16:11,17 36:15,16,22

37:14,20,21 42:15
42:24 43:7 44:14
45:9 47:7 49:18
55:14,19 56:15,23
57:14 60:11 61:13
61:24 62:17 67:12
69:24 74:3 78:13,20
79:2 82:20 83:19
84:4 86:4,25 87:10
88:4 92:12,22 93:11
93:20 95:24 96:6
111:4,13 112:19
130:17,21
**transferred (13)**
44:24 45:4 56:11
57:12 58:3,17,23
60:4 114:25 115:20
117:19,24 123:22
**transferring (1)**
77:2
**transfers (2)**
92:23 93:2
**travel (1)**
19:18
**treasurer (2)**
6:14 102:18
**treasurer's (1)**
69:7
**treasurer/secretary...**
6:10
**true (2)**
127:14 129:13
**trust (2)**
10:5,7
**trustee (1)**
39:25
**trustees (41)**
4:23 35:17 38:8,11,18
38:22 39:2,6,9,14
39:15,16 40:6,11,15
40:16,21,22 41:7
42:12 43:2,10 44:16
61:13,18 62:5,7,11
62:13,25 66:24 67:3
67:4 76:25 80:16,17
80:18,19 113:17
116:8,12
**try (6)**
13:10,15 14:3,4 40:3
110:25
**trying (1)**
111:2
**turn (7)**
5:14 21:25 52:12
69:13 89:22 91:23
93:5

**twice (1)**
101:25
**two (20)**
13:16 24:3,10 31:8
35:15,22 39:24
40:13 44:2,5 63:25
69:6 73:22 79:20
114:3 119:3 120:15
120:20 123:20
125:18
**two-tier (1)**
62:8
**two-tiered (1)**
38:10
**type (6)**
28:2,3,3 57:9 65:15
103:19
**typed (1)**
52:22
**typically (1)**
17:22
**T's (1)**
19:2

_____
U
**ultimately (2)**
19:23 98:4
**Um-huhs (1)**
13:9
**understand (13)**
12:16,18 13:2 14:2,3
18:14 19:17 51:18
52:8 53:24 94:21
111:2 119:19
**understandable (1)**
14:5
**understanding (1)**
43:18
**understands (1)**
87:14
**understood (2)**
13:21 69:3
**undeveloped (1)**
90:7
**unfortunately (1)**
52:13
**United (2)**
1:2 28:5
**Unsecured (5)**
3:5 14:19 85:17 88:12
131:3
**unveiled (1)**
24:21
**un-uhs (1)**
13:9
**upsetting (1)**

84:2
**use (2)**
115:18,24

_____
**V**
_____
**variety (1)**
97:25
**Venice (2)**
105:24,25
**verbalization (1)**
60:15
**verbalized (2)**
99:24 100:2
**Vercruysse (12)**
36:2,7,11 39:11,12,19
39:20 41:2,21 42:6
42:8,10
**viable (1)**
90:9
**vice (10)**
4:16,17,22 5:11,19
6:21 11:4 26:24
77:14,19
**Vice-Province (1)**
34:3
**view (2)**
18:13 107:12
**Vincent (1)**
6:15
**vocation (1)**
22:9
**vocations (4)**
22:19 28:4 33:22
58:25
**volume (5)**
24:3,3,8,10,10
**vote (2)**
11:22 12:5
**V-E-R-C-R-U-Y-S-...**
36:3

_____
**W**
_____
**waiting (1)**
99:2
**waive (1)**
19:11
**waived (1)**
58:11
**waiver (3)**
19:9 20:14 21:10
**walk (1)**
10:6
**want (11)**
10:15 15:21 24:20
29:25 40:24 51:23
57:8 70:14 113:14

115:18 126:25
**wanted (1)**
57:2
**wasn't (17)**
18:9 26:9 48:17 63:23
65:14 69:19 75:12
78:9 79:13 81:12
82:10,14 90:20
94:22 101:17 105:3
108:12
**water (3)**
54:5,12,18
**way (7)**
13:9 21:10 22:17
82:22 98:14 108:8
129:17
**website (1)**
85:21
**week (3)**
49:7 100:4 102:6
**weeks (1)**
18:5
**well-publicized (3)**
93:11,19 95:23
**went (5)**
56:16 67:16,17 75:14
109:25
**weren't (3)**
64:18 75:6 96:8
**Western (4)**
34:7 44:6 110:16
122:5
**WHEREOF (1)**
129:19
**whispering (1)**
64:2
**William (5)**
42:23 44:23 46:9,15
77:18
**wish (1)**
128:4
**witness (10)**
4:2,4 28:18 51:22
65:17 127:12
129:10,14,19 130:3
**wondering (1)**
8:8
**word (3)**
59:21 92:10 119:10
**words (1)**
38:9
**work (4)**
8:18 24:20 74:21
103:14
**worldwide (2)**
114:18 119:4

**wouldn't (3)**
22:18 60:3 89:18
**writing (1)**
51:3
**written (3)**
26:6 113:9 123:3
**wrong (6)**
65:12 103:21 104:3,6
104:18,24
**wrote (9)**
52:3 53:21 76:11,21
77:11 103:17,21
114:22 125:2

_____
**X**
_____
**X (4)**
1:4,11 130:2,9
**Xaverian (2)**
106:3,4
**X-A-V-E-R-I-A-N (1)**
106:7
**X-A-V-I-E-R-I-A-...**
106:4

_____
**Y**
_____
**yeah (6)**
13:10 20:2 25:10
59:17 68:12 80:7
**year (9)**
48:22 67:15 68:12
79:23 84:6 102:2,14
102:20 104:16
**years (12)**
24:21 27:18 28:6,6
68:6,9 69:10 76:22
79:20,21 106:9
109:9
**yesterday (5)**
98:23 99:2,8,23,25
**York (35)**
1:3,15,15 2:11,11,15
3:9,9,16,16 17:21
17:22 53:12,18
54:13 70:4 74:2,21
84:8 85:21 92:23
93:2 94:4 95:9,16
96:2 109:18,23
115:12 128:2,3
129:3,5,8 130:19
**York's (2)**
45:19 49:11
**young (1)**
74:22

_____
**Z**
_____
**Ziehl (2)**

2:10 3:4

_____
**$**
_____
**$100,000 (1)**
57:7

_____
**1**
_____
**1 (4)**
4:25 5:3 11:10 52:23
**1Local (1)**
130:10
**10 (2)**
88:10,18
**100 (4)**
67:22 70:15 100:6
108:20
**10018 (1)**
3:16
**1007-2 (9)**
5:2,4 9:12 10:25
11:11,25 130:10,11
130:23
**103rd (2)**
70:12,14
**105 (1)**
131:7
**108 (1)**
131:8
**11 (6)**
1:7 97:12,13,15 98:8
131:6
**11-22820 (1)**
1:8
**113 (1)**
130:5
**116 (1)**
130:4
**12 (16)**
5:14 86:11 97:13,16
105:11,12,14,16,18
107:22 108:16
113:6 120:21 125:4
131:6,7
**122 (1)**
130:5
**124 (1)**
130:4
**125 (1)**
70:14
**13 (6)**
108:24,25 109:5,7
111:10 131:8
**1350 (1)**
3:15
**14 (1)**
130:13

**15 (2)**
73:23 86:12
**16 (3)**
91:24 92:17,21
**18 (6)**
76:10,20 77:12
105:12 113:10
131:7
**18th (1)**
105:14
**1909 (2)**
65:9,10
**1916 (1)**
72:19
**1946 (2)**
72:16 90:13
**1950s (3)**
115:11 124:14,18
**1960s (2)**
33:18,18
**1962 (3)**
33:21,25 34:2
**1964 (5)**
73:7,10 74:25 75:7
90:16
**1966 (5)**
34:4,6 110:11,12,14
**1970 (1)**
65:23
**1970s (1)**
112:7
**1978 (2)**
64:22,23
**1979 (1)**
7:9
**1980s (5)**
21:21 58:25 112:8,21
112:22
**1983 (1)**
63:12
**1984 (2)**
75:11,13
**1986 (1)**
63:13
**1988 (1)**
68:11
**1990 (85)**
16:11 36:14,15,22
37:20 38:4 39:3
42:15,24 43:7,20,21
44:13 46:13 47:22
47:25 48:8,12 49:2
49:15,21 50:2,16,19
51:3 52:2,11,17
53:11,18 54:2,14
55:21 58:4,18 61:25

62:17 63:6 64:12,15
64:23 66:14,16
67:13,21,24 72:6,9
72:13 73:10,14
76:10,20 77:12,14
77:23 78:3,13,19,20
79:7 85:4,7 87:5
88:4 90:23 97:14,16
105:13,14 111:3,13
113:11 116:21
117:13,20,24 118:5
118:10,19 123:15
130:17,19 131:7,8
**1990s (2)**
21:21 118:23
**1991 (12)**
23:10,16 24:17 25:24
25:25 26:24 27:17
28:12 60:8,23 61:2
130:16
**1993 (2)**
78:5,10
**1997 (4)**
24:21 68:8,9 109:18

___

**2**

**2 (5)**
9:10,11 10:24 12:2
130:11
**2nd (1)**
126:23
**2:19 (1)**
2:5
**20 (4)**
28:6 69:10 73:23 93:6
**20-something (1)**
27:18
**2000 (1)**
7:5
**2000s (1)**
61:22
**2001 (9)**
83:3,16,22 84:24
93:23 95:2,4,13
97:6
**2002 (1)**
95:6
**2003 (6)**
6:19 7:14 11:14 30:19
79:22 95:6
**2004 (1)**
79:22
**2005 (20)**
6:20 11:9 38:7 39:4
39:23,24 40:5,18
62:22 79:11 83:3,22

84:7,25 93:24 94:5
95:4,10 110:8
122:10
**2006 (10)**
36:6 39:18,21 40:9
84:7 93:24 94:5
95:10,13 97:6
**2008 (7)**
4:19 6:23,24 11:6
36:9 39:19,20
**2012 (4)**
1:16 2:4 89:2 129:20
**23 (1)**
130:15
**24 (4)**
93:5,7,9 95:22
**2471 (1)**
52:23
**25th (1)**
89:2
**27 (1)**
54:24

___

**3**

**3 (8)**
7:6 14:14,15,18 15:3
15:8,12 130:13
**30 (10)**
1:16 2:4 49:2,14
52:17 53:11,18
54:14 130:17,19
**30(b)(6) (8)**
7:19 8:10,14,23 9:4
14:16,22 130:14
**31st (2)**
125:25 129:20

___

**4**

**4 (7)**
23:7,9,20 25:6,18
130:4,15
**4A (1)**
52:22
**44 (1)**
55:18
**45 (2)**
71:17 130:16
**45-minute (1)**
71:16
**49 (1)**
130:17

___

**5**

**5 (3)**
45:8 130:10,16
**52133 (1)**

1:24
**53 (1)**
130:19
**55 (1)**
130:21

___

**6**

**6 (4)**
49:2 52:17 84:25
130:17
**6th (2)**
17:18 18:18

___

**7**

**7 (6)**
53:10,11,15,21 54:19
130:19
**70s (1)**
112:11
**78 (1)**
65:24
**780 (2)**
2:11 3:8

___

**8**

**8 (8)**
55:13,17,23,25 56:4
56:10 65:25 130:21
**80 (1)**
106:9
**80s (1)**
112:15
**81 (1)**
106:9
**85 (1)**
130:23

___

**9**

**9 (6)**
46:13 55:21 85:16,25
130:11,23
**97 (1)**
131:6

**<u>Exhibit C</u>**

   

ABOUT THE FIRM   PROFESSIONALS   PRACTICE AREAS   NEWS AND EVENTS   PUBLICATIONS   CAREERS   CONTACT US

## PROFESSIONALS

### Anthony D. Dougherty – Partner

Anthony D. Dougherty leads the Not-for-Profit and Education Practice Group at Tarter Krinsky & Drogin LLP. He has practiced law since 1990 with a particular focus in the areas of education, labor and not-for-profit law, including laws pertaining to religious and charitable institutions.

Mr. Dougherty serves as general counsel to Iona College, the Congregation of Christian Brothers and the Eastern Economic Association, an association of economists headquartered in New Rochelle, New York. His clients include several religious orders and not-for-profit foundations as well as private preparatory and post-secondary institutions. He also serves as panel defense counsel for the Chubb Group of Insurance Companies.

Mr. Dougherty has successfully represented his clients before state and federal agencies such as the New York State Division of Human Rights, the Equal Employment Opportunity Commission and the Dormitory Authority of the State of New York. He continually advises his clients on compliance with federal, state and local employment laws as well as the requirements of the Internal Revenue Code for qualification for tax-exempt status. He obtained a dismissal on a motion for summary judgment of a race association discrimination claim on behalf of a college. He also created a publication on mergers, consolidations and restructuring of religious congregations and gave a presentation at the Legal Resource Center for Religious 2005 legal seminar in Atlanta, Georgia, which was attended by superiors and treasurers of religious institutes, attorneys and other professionals serving religious communities.

Mr. Dougherty is a member of the New York State and New York City Bar Associations and a member of the Labor and Employment Law section of the State Bar Association. He is also a member of the National Association of College and University Attorneys.

Prior to joining TKD, Mr. Dougherty was a member of the New York City-based firm, Davidoff & Malito, and gained significant experience in representing not-for-profit, educational and religious institutions under John J. Duffy, Esq.

Phone: 212.216.8099
Fax: 212.216.8001
Email:  adougherty@tarterkrinsky.com
Download vCard



#### Education
- Brooklyn Law School, J.D. 1989

#### Practice
- Labor and Employment
- Litigation
- Not-for-Profit and Education

#### Admissions
- New York
- U.S. District Courts for the Southern and Eastern Districts of New York
- U.S. Court of Appeals for the Second Circuit

#### Related Content
- The TKD Advisor: Ban on Political Activity
- The TKD Advisor: Case Note: Required Insurance Coverage for Contraceptives
- Mergers, Consolidations & Restructuring – A Practical Discussion

## Find a TKD Lawyer

LAST NAME

FIRST NAME

PRACTICE AREAS
-- Choose --

[ SEARCH ]   [ CLEAR ]

A-F | G-L | M-S | T-Z

PRINT THIS PAGE                                   PRIVACY POLICY   DISCLAIMER

**Exhibit D**

Real Property Transfer Tax Return
**Department of Finance**    Pursuant to Chapter 46, Title II,
**Bureau of Tax Operations**   NYC Administrative Code

**For Departmental Use Only**
• Return Number

• Deed Serial Number

N.Y.S. Real Estate Transfer Tax Paid

TYPE OR PRINT LEGIBLY. If the grantor or grantee is a business entity, the name and address of an owner, partner, officer or other individual who will be responsible for responding to any audit inquiries must be provided.

• Grantor: __The Christian Brother's Institute__
Business name, if applicable

• _____
Individual name

• __21 Pryer Terrace, New Rochelle, New York__
Permanent mailing address, after transfer

__13-1740153__
Federal Employer Identification Number   /   Social Security Number

• Grantee: __All Hallows Institute__
Business name, if applicable

• _____
Individual name

• __111 East 164th Street, Bronx, New York__
Permanent mailing address, after transfer

__13-1740431__
Federal Employer Identification Number   /   Social Security Number

Grantor's attorney: __John J. Duffy, Esq.__
Name

__100 East 42nd Street, New York, New York  10017__
Address

Grantee's attorney: __John J. Duffy, Esq.__
Name

__100 East 42nd Street, New York, New York  10017__
Address

**• Property Use (Check One)**
___ 1-3 Family House
___ Residential Condominium
___ Apartment Building
___ Office Building
___ Industrial Building
___ Utility
___ Individual dwelling unit in a 1-3-family house or in an apartment building with 4 or more units
___ Other (Describe) _____

**• LOCATION OF REAL PROPERTY (List each lot separately.)**

| Address | County | Block | Lot | Floors | Square Feet |
|---|---|---|---|---|---|
| 111 East 164th Street | Bronx | 2471 | 1-54 | | |
| | | | | | |
| | | | | | |

Current Assessed Value of Property
$ _____

**• Type of Interest Transferred** (Check one)   __X__ Fee ___ Leasehold Grant ___ Leasehold Assignment or Surrender ___ Easement ___ Development Rights
___ Other (Describe) _____

**• Date of Delivery to Grantee** _____   **• Percentage of Interest Transferred** _____ %
Month   Day   Year

**• CONDITION OF TRANSFER**
Check the condition or conditions which apply and fill out the appropriate schedule on Page 3 or 4 of this return, if required.

a. ___ Arms Length Transfer

b. ___ Transfer in Exercise of Option to Purchase

c. ___ Transfer from Co-op Sponsor to Co-op Corporation

d. ___ Transfer by Referee or Receiver (Complete Schedule A, Page 3)

e. ___ Deed in Lieu of Foreclosure (Complete Schedule B, Page 3)

f. ___ Transfer Pursuant to Marital Settlement Agreement (Complete Schedule C, Page 3)

g. ___ Transfer Pursuant to Corporate Liquidation (Complete Schedule D, Page 3)

h. ___ Transfer to Business Entity Related to Grantor (Complete Schedule E, Page 4)

i. ___ Transfer Without Consideration to or from Agent Dummy or Conduit (Complete Schedule F, Page 4)

j. ___ Transfer Pursuant to Trust Agreement or Will

k. ___ Gift Transfer

l. ___ Transfer to a Governmental Body

m. ___ Correction Deed

n. __X__ Transfer by or to a Tax Exempt Organization (Complete Schedule G, Page 4)

o. ___ Transfer of Property Partly Within and Partly Without New York City

p. ___ Other (Describe) _____

Complete the appropriate tax computation schedule on page 2 of this return. If you are reporting a transfer with a consideration of $25,000 or less, no tax is due; however, you must complete Schedule 1 on Page 2, and file a return.

**THIS RETURN, INCLUDING ALL REQUIRED SCHEDULES, MUST BE COMPLETELY FILLED OUT AND FILED WITH ALL NECESSARY ATTACHMENTS BEFORE THE REPORTED TRANSFER WILL BE RECORDED.**

DEPOSITION EXHIBIT
Griffith 5
7-30-12
PENGAD 800-631-6989

A CERTIFIED COPY OF THE CONTRACT OF SALE MUST BE ATTACHED TO THIS RETURN

## SCHEDULE 1: COMPUTATION OF TAX FOR TRANSFERS TAXED AT 1% RATE

Use this schedule for the following transfers: 1. Conveyances (other than grants, assignments or surrenders of leasehold interests) made on or after July 1, 1982, where: a. The consideration is less than $500,000, or b. The property transferred is a 1-, 2- or 3-family house or an individual residential condominium unit. 2. *Grants, assignments or surrenders, made on or after July 1, 1982, of leasehold interests where: a. The consideration is less than $500,000, or b. The leasehold interest is in a 1-, 2- or 3-family house or an individual dwelling unit in a dwelling which is occupied or is to be occupied as the residence of 4 or more families living independently of each other. 3. *Grants, assignments or surrenders of leasehold interests in real property made on or after February 1, 1982 and before July 1, 1982, where the consideration is $500,000 or more, and where the leasehold interest is not in a 1, 2- or 3-family house or individual dwelling unit. The tax rate is 1% of the consideration with respect to these transfers. Pre-existing mortgages and liens may not be deducted.

| | | | |
|---|---|---|---|
| 1. Consideration paid or required to be paid | ● | $ | |
| 2. Tax due: 1% of Line 1 | ● | | |
| 3. Penalty (See Instructions) | | | |
| 4. Interest (See Instructions) | | | |
| 5. TOTAL DUE: Add Lines 2, 3, and 4 | ● | $ | |

## SCHEDULE 2: COMPUTATION OF TAX FOR TRANSFERS TAXED AT 2% RATE

Use this schedule for the following transfers: 1. Conveyances of real property (other than grants, assignments or surrenders of leasehold interests) made on or after July 1, 1982, for a consideration of $500,000 or more, where the real property transferred is not a 1-, 2- or 3-family house or individual residential condominium unit and where the transfer is not made in performance of a contract executed before February 1, 1982. 2. *Grants, assignments or surrenders of leasehold interests in real property made on or after July 1, 1982, where the consideration is $500,000 or more and where the leasehold interest is not in a 1, 2- or 3-family house or an individual dwelling unit. The tax rate is 2% of the consideration with respect to these transfers. Pre-existing mortgages and liens may not be deducted.

| | | | |
|---|---|---|---|
| 1. Consideration paid or required to be paid | ● | $ | |
| 2. Tax due: 2% of Line 1 | ● | | |
| 3. Penalty (See instructions) | | | |
| 4. Interest (See instructions) | | | |
| 5. TOTAL DUE: Add Lines 2, 3, and 4 | ● | $ | |

### MAKE CERTIFIED CHECK OR MONEY ORDER PAYABLE TO THE ORDER OF THE COMMISSIONER OF FINANCE

*The amount subject to tax in the case of a grant or assignment of a leasehold interest in real property shall be only such amount as is not considered rent for the purposes of the Commercial Rent or Occupancy Tax imposed by Title L, Chapter 46 of the Administrative Code of the City of New York. (See Instructions.)

## SCHEDULE 3: DETAILS OF CONSIDERATION

Complete Schedule 3 for all transfers. Enter zero on Line 15 if the transfer reported was without consideration.

6. Cash ......................................................................... ● $_____

7. Purchase money mortgage ......................................... ● $_____

8. Unpaid principal on pre-existing mortgages .................. ● $_____

9. Accrued interest on pre-existing mortgages .................. ● $_____

10. Accrued real estate taxes .......................................... ● $_____

11. Amounts of other liens on property ............................ ● $_____

12. Value of shares of stock or of partnership interest received ...... ● $_____

13. Value of real property exchanged ............................... ● $_____

14. Amount of Real Property Transfer Tax / or other taxes paid by grantee ...... ● $_____

15. Other (Describe) ...................................................... ● $_____

16. TOTAL CONSIDERATION: Add Lines 6 through 14 (Must equal amount entered on Page 2, Line 1 of Schedule 1 or 2) .................................... $_____

I swear or affirm that this return, including the accompanying schedules, affidavits and attachments, has been examined by me and is, to the best of my knowledge, a true and complete return made in good faith, pursuant to Chapter 46, Title II of the Administrative Code and the regulations issued thereunder.

Sworn to and subscribed to me before this _____ day of _____ The Christian Brothers, Inc. 19____ Name of Grantor

Signature

JOHN J. DUFFY
Notary Public, State of New York
No. 44-6114002
Qualified in Rockland County
Commission Expires December 31, 19____

Sworn to and subscribed to me before this _____ day of _____ All Hallows Institute 19____ Name of Grantee

Laurence T. Murphy
Signature

JOHN J. DUFFY
Notary Public, State of New York
No. 44-6114002
Qualified in Rock____

**Exhibit E**

July 30, 1990

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Department of Finance
Property Division
1932 Arthur Avenue, 7th FL.
Bronx, New York  10457

                              Re:  All Hallows Institute
                                   111 East 164th Street
                                   Bronx, New York  10451
                                   Tax Exemption Application
                                   Our File No.: 1236-009

Gentlemen:

        In accordance with Howard Moy's letter dated June 27,
1990, a copy of which is enclosed herein, I am forwarding to
you an Application for Real Property Tax Exemption for Nonprofit
Organizations I-Organizations Purpose, an Application for Real
Property Tax Exemption for Nonprofit Organizations II-Property
Use and a N.Y.C. Department of Finance additional information
form regarding the above captioned matter.

        If your office requires additional documents or infor-
mation, please contact the undersigned.

                                   Sincerely,


                                   Anthony Dougherty

AD:IMG
Enclosures

cc:  Bro. Spencer Considine
     Mr. Howard Moy


DEPOSITION
EXHIBIT
Griffith 6
7.30.12

**New York City Department of Finance**

## APPLICATION FOR REAL PROPERTY TAX EXEMPTION
### FOR
### NONPROFIT ORGANIZATIONS
### I-ORGANIZATION PURPOSE

(See general information and instructions on back of form)

| | |
|---|---|
| Borough | Bronx |
| Block | 2471 |
| Lot | 1 |

1a. NAME OF ORGANIZATION

All Hallows Institute

1b. MAILING ADDRESS

111 East 164th Street

Bronx, New York  10452

1c. EMPLOYER IDENTIFICATION NUMBER

13-1740431

1d. NAME AND PHONE NO. OF PERSON TO BE CONTACTED

Brother Lawrence T. Murphy

2a. Purpose(s) of the organization

☐ 1. Religious      ☐ 2. Charitable      ☐ 3. Hospital      ☒ 4. Educational

☐ 5. Moral or mental improvement of men, women or children

☐ 6. Cemetery

b. State briefly specific activities related to each purpose checked above:

All Hallows Institute is a high school located at the above parcel and the use of which is solely for educational purposes.

*—ATTACH ADDITIONAL SHEETS WHEREVER NECESSARY—*

EA-420-ORG (7/86) (NYC)                                                                                    Page 2

3a. Is the organization currently exempt from Federal income tax?    ☒ yes    ☐ no

b. Under which section, subsection and paragraph of the Internal Revenue Code?    I.R.C. 501 (c)(3)

c. Did the Internal Revenue Service recognize the exemption on the basis of an application form or a written
request or statement?    ☒ yes    ☐ no
If yes: (1) Was the exemption recognized by a
☒ group exemption letter
☐ separate exemption letter    (check one) .
(2) If exemption was recognized by a group exemption letter, give name and address of organization
receiving group exemption.

United States Catholic Conference

1312 Massachusetts Avenue, N.W.

Washington, D.C.  20005·

(3) If the exemption was recognized by an advance ruling, when does the ruling expire?
Month_____ Day_____ Year_____
*ATTACH COPY OF DETERMINATION OR RULING LETTER

If no: (4) Please explain how the organization is exempt from Federal income tax (attach additional sheets if needed), and attach
Schedule A (obtain Schedule A from Assessor).

_____

_____

_____

_____

d. Is the organization required to file annual returns with the Internal Revenue Service?
☐ yes    ☒ no    If yes, state form number(s): _____
*ATTACH COPY OF EACH RETURN FILED FOR THE ORGANIZATION'S LAST FISCAL YEAR

e. For the last fiscal year, did the organization file an Internal Revenue Form 990-T (Exempt Organization
Business Income Tax Return)?    ☐ yes    ☒ no
*IF YES, ATTACH COPY OF FORM 990-T.

4a. Has the organization applied for recognition of exemption from Federal income tax?    ☐ yes    ☒ no
If yes:

b. Under which section, subsection and paragraph of the Internal Revenue Code?

c. Date of application _____
*ATTACH COPY OF APPLICATION, REQUEST OR STATEMENT AND ATTACHMENTS

*5. If the answer to questions 3a, 3c or 4a was NO, COMPLETE AND ATTACH SCHEDULE A (Obtain Schedule A from assessor.)

EA-420-ORG (7/86) (NYC)

6a. Is the organization incorporated?    ☒
If yes, answer b. through d. If no, answ

b. Date incorporated _____

d. Under which law? Law: _____

*ATTACH COPY OF CURF
sion is not included in th
distributed should the orga

e. Form of organization _____

g. Has the organization applied for incorp
If no, skip to Question 6. If yes:
(1) State/country in which applic
(2) Under which law? Law: ____
(3) Date application filed: ____

7.*ATTACH COPY OF APPLIC

*ATTACH COPY OF CURF
is not included in the artic
should the organization di:

8a. Is the organization under the supervis
If yes, answer b. through d.

b. Which one(s)? Give name and addres

_____

c. Does the organization have an o|
tion issued by a public regulatory boc
*IF YES, ATTACH

d. Does the organization solicit contribu
*If yes and the organization is re|
State, give the organization's re|
REPORT filed with Charities Regist

_____

NOTE: ‹

6a. Is the organization incorporated?   ☒ yes   ☐ no
If yes, answer b. through d. If no, answer e. through g.

b. Date incorporated _____ c. State/country in which incorporated _____

d. Under which law? Law: _____ Article: _____

*ATTACH COPY OF CURRENT ARTICLES OF INCORPORATION (Note: If a dissolution provision is not included in the articles, also attach a statement describing how assets would be distributed should the organization dissolve.) *Also attach current by-laws.

e. Form of organization _____ f. Date formed _____

g. Has the organization applied for incorporation?   ☐ yes   ☐ no

If no, skip to Question 6. If yes:

    (1) State/country in which application has been filed _____ Article: _____

    (2) Under which law? Law: _____

    (3) Date application filed: _____

7. *ATTACH COPY OF APPLICATION AND CONSENTS REQUIRED WITH APPLICATION

*ATTACH COPY OF CURRENT ARTICLES OF ORGANIZATION (Note: If a dissolution provision is not included in the articles, also attach a statement describing how assets would be distributed should the organization dissolve.)

8a. Is the organization under the supervision of any public regulatory body?   ☒ yes   ☐ no
If yes, answer b. through d.

b. Which one(s)? Give name and address ___New York State Department of Education_____

c. Does the organization have an operating certificate, permit, charter, or similar authorization issued by a public regulatory body?   ☐ yes   ☐ no

    *IF YES, ATTACH COPY OF AUTHORIZATION

d. Does the organization solicit contributions from the public?   ☐ yes   ☐ no

*If yes and the organization is registered with Charities Registration in the Department of State, give the organization's registration number, and attach the most recent ANNUAL REPORT filed with Charities Registration.

_____

NOTE: STARRED ITEMS, WHERE APPLICABLE, MUST ACCOMPANY APPLICATION

State of New York )
County of *New York* )ss:

*Lawrence T. Murphy* _____, being duly sworn, says that ____ he is the
*Principal* _____ of the applicant organization, that the statements contained in this
application (including the attached sheets consisting of _____ pages) are true, correct and complete, and that
____ he makes this application for real property tax exemption as provided by law.

Subscribed and sworn to before me
this *26* day of *July* 19 *70*

*Lawrence T. Murphy*
Signature

_____ Notary

JOHN J. DUFFY
Notary Public, State of New York
No. 44-6114002
Qualified in Rockland County
Commission Expires December 31, 19___

## GENERAL INFORMATION AND FILING REQUIREMENTS

**1. Tax Exemption for Nonprofit Organizations under Section 420 of the Real Property Tax Law and New York City Administrative Code.**

Real Property owned by a corporation or association organized or conducted exclusively for religious, charitable, hospital, educational, moral or mental improvement of men, women or children, or cemetery purposes, or for two or more such purposes, and used exclusively for carrying out thereupon one or more such purposes is exempt from taxation.

Under Section J-51 3-0 of the New York City Administrative Code as amended by Local Law No. 76 (1984), the real property owned by a corporation or association organized or conducted exclusively for bible, tract, benevolent, missionary, infirmary, public playground, scientific, literary, library, patriotic or historical purposes, for the development of good sportsmanship for persons under the age of eighteen years through the conduct of supervised athletic games, for the enforcement of laws relating to children or animals, or for two or more such purposes, and used exclusively for carrying out one or more such purposes is also entitled to exemption. Property used for bar association or medical society purposes is taxable in New York City pursuant to Local Law No. 46 (1971).

**2. Application**

A three-part application must be filed with the New York City Department of Finance, Real Property Assessment Bureau: Form RPAB EX SUPP, Form EA-420-ORG (Organization Purpose) and Form EA-420-USE (Property Use). One copy of Form EA-420 ORG must be filed by each nonprofit organization. One copy of Form EA-420-USE must be filed for each separately assessed parcel of property located in New York City for which exemption is sought. One copy of Form RPAB-420-EX SUPP must be filed for each parcel as well. Each year following the year in which exemption is granted on the basis on this application, renewal Forms RPABRNW1 (EA-420-RNW-1) and RPABRNW2 (EA-420-RNWII) must be filed.

If you need more space for any item in the application, attach additional sheets and indicate the question(s) to which you are responding. Please give your name and the employer identification number on all attachments. The Real Property Assessment Bureau may request information in addition to the information contained in the application.

Upon approval or disapproval of the application, the Real Property Assessment Bureau must send one copy of Form EA-420-RPT to the State Board of Equalization and Assessment, Program Analysis and Development, Empire State Plaza, Agency Building No. 4, Albany, New York 12223.

**3. Time and Place of Filing Application**

The application must be filed between January 15th and March 15th in the Borough Office of the Real Property Assessment Bureau in which the property is located: Manhattan: Municipal Building, Room 920, Centre and Chamber Streets, New York, N.Y. 10007; the Bronx: Bergen Building, 7th Floor, 1932 Arthur Avenue, Bronx, N.Y. 10457; Brooklyn: Municipal Building, Room 200, Joralemon and Court Streets, Brooklyn, N.Y. 11201; Queens: 90-27 Sutphin Boulevard, Jamaica, N.Y. 11435; Staten Island: 350 St. Marks Place, Staten Island, N.Y. 10301.

---

### SPACE BELOW FOR USE OF REAL PROPERTY ASSESSMENT BUREAU

APPLICANT CORPORATION

EMPLOYER IDENTIFICATION NUMBER          DATE APPLICATION FILED          PARCEL NUMBER

DOCUMENTARY EVIDENCE PRESENTED:

REAL PROPERTY ASSESSMENT BUREAU

by _____ (SIGNATURE OF REVIEWER)          DATE

EA-420-USE (7/86)
(NYC)    State of New York—State Board of Equalization and Assessment

NEW YORK CITY
DEPARTMENT OF FINANCE

**APPLICATION FOR
REAL PROPERTY TAX EXEMPTION
FOR
NON PROFIT ORGANIZATIONS
II-PROPERTY USE**

(See general information and instructions on back of form)

| Description of parcel as it appears on New York City assessment roll |
|---|
| Borough  Bronx |
| Block  2471 |
| Lot  1 |

1a. NAME OF ORGANIZATION

All Hallows Institute

1b. EMPLOYER IDENTIFICATION NUMBER

13-1740431

2. MAILING ADDRESS

111 East 164th Street

Bronx, New York  10451

3. IF THE ABOVE PARCEL DESCRIPTION IS NOT ACCURATE, PLEASE CORRECT:

4a. Has any part of this property been conveyed to another person or organization?  ☒ yes    ☐ no
 b. Is the property or any part thereof under contract for sale?  ☐ yes    ☒ no
 c. Is the property or any part thereof for sale?  ☐ yes    ☒ no
 d. If the answer to 4a, b or c is yes, give full details (indicate question letter):

(4a)    The above mentioned parcel (Block 2471; Lot 1) has been conveyed from the Christian

Brothers Institute, a non profit organization to All Hallows Institute for no

consideration.

5. Name of grantee as set forth in deed by which property was acquired if different from answer
 to question 1: _____

6. If property was acquired within the last three (3) years, indicate:
 a. Date of acquisition __March 9, 1990_____ b. Deed recording information—Book of Deeds __980__ Page __150__

7a. Was the property acquired from anyone who has had any interest in the owning organization (e.g.,
 officer, director, employee, member, etc.)?  ☐ yes    ☒ no
 b. If yes, explain relationship and circumstances of sale (include purchase price and terms of sale):

N/A

8a. Is the property mortgaged?  ☐ yes    ☒ no
 b. If yes, does the holder of the mortgage presently (or did it formerly) have any interest
 in the owning organization  ☐ yes    ☒ no
 c. If answer to 8b is yes, explain relationship and details of mortgage(s), original principal amount, principal currently outstanding,
 interest rate, original term of mortgage, term remaining:

N/A

—Attach additional sheets wherever necessary—

EA-420-USE (7/86) (NYC)

9a. Does any person or organization have a reversionary interest in this property?  ☐ yes  ☒ no
b. If yes, indicate name and address of such person and state terms of right of reverter:

_____

_____

10. Describe, in detail, use or uses of the property:

All Hallows Institute is a High School and therefore the use of this parcel is

solely for educational purposes.

_____

_____

---

IF THE ORGANIZATION SEEKING EXEMPTION HAS INDICATED ONE OF ITS CORPORATE PURPOSES IS HOSPITAL IN QUESTION 2a. ON FORM EA-420-ORG. ANSWER QUESTION 11. IF NOT, SKIP TO 12.

11a. Are the premises or any portion thereof leased or otherwise occupied as professional offices?  ☐ yes   ☐ no
If yes, answer b through d.

b. State whether the professional offices are leased or otherwise occupied by:  ☐ 1. members of the staff, e.g., doctors
   ☐ 2. professionals not on the staff of the hospital    ☐ 3. a combination of 1 and 2.

c. If lease to members of the staff, are the offices used:  ☐ 1. solely for hospital-related matters
   ☐ 2. for the private practice of the staff members    ☐ 3. a combination of 1 and 2.

d. If not used solely for direct hospital-related purposes, what percentage of time and space are the offices used for direct hospital-related purposes, and what percentage of time and space are they used for the private practice of the staff members?

_____

---

12a. Is the property or any portion thereof regularly occupied by persons or organizations other than applicant?  ☐ yes   ☒ no
If yes, answer b. through e.

b. Name of occupant(s) _____ N/A _____
c. Use by occupant(s) (also indicate specific portion of property so occupied):

N/A

d. Term(s) of occupancy (e.g., one-year lease, month-to-month tenancy):

N/A

e. Amount of rental paid by occupant(s) _____ N/A _____

13a. Is the property or any portion thereof occasionally used by persons or organizations other than applicant?  ☐ yes   ☒ no
b. If yes, state use and indicate specific portion of property used, frequency of use and fee charged or contributions received for use:

N/A

14a. Are there any buildings or other improvements on the property?  ☒ yes  ☐ no
If yes, skip Questions b through f. If no, answer b. through f. and skip Questions 15-16.

b. Use or uses of property if not described in Question 10:

_____ N/A _____

c. Are buildings or other improvements contemplated on this unimproved land?  ☐ yes  ☐ no
If yes, give full details including proposed use(s):

_____ N/A _____


d. Do the minutes of the organization contain a resolution(s) authorizing contemplated building or other improvement?
☐ yes  ☐ no  If yes, attach a copy of resolution(s).

e. State detailed financial resources for contemplated buildings or other improvements. (Include information on building fund.)

_____ N/A _____

_____

_____

f. When will construction begin? ____ N/A _____


15a. Describe the building or improvement; include number and use of all floors and rooms:

_____ The school building consists of three stories and a basement.  There are 21 classrooms,

_____ 4 guidance offices, a gym, bookstore, library and a cafeteria. _____

b. Approximate acreage of land not underlying buildings or other improvements _____

c. Use or uses of land referred to in 15b, if not described in Question 10.

_____

_____

d. Are buildings or other improvements contemplated on this unimproved land?  ☐ yes  ☒ no
If yes, give full details including proposed use(s):

_____

_____

e. Do the minutes of the organization contain a resolution authorizing contemplated buildings or other improvements?
☐ yes  ☒ no  If yes, attach copy of resolution(s)

f. State financial resources for contemplated buildings or other improvements. (Include information on building fund.)

_____ N/A _____

_____

g. When will construction begin? _____ N/A _____

_____

16a. Are there any unoccupied buildings or other improvements on the property?  ☐ yes  ☒ no

b. Date(s) they became unoccupied _____

c. Describe contemplated use(s) of the buildings or other improvements:

_____

_____

EA-420-USE (7/89 NYC)   VERIFICATION

State of New York    )
                     ) ss:
County of _Ner York_ )

_Lawrence T. Murphy_ , being duly sworn, says that ____ he is the _Principal_ of the applicant organization, that the statements contained in this application (including the attached sheets consisting of ____ ____ pages) are true, correct and complete, and that ____ he makes this application for real property tax exemption as provided by law.

_Lawrence T. Murphy_
Signature

Subscribed and sworn to before me this _26_ day of _July_ 19_90_

_John J. Duffy_
Notary

JOHN J. DUFFY
Notary Public, State of New York
No. 44-6114002
Qualified in Rockland County
Commission Expires December 31, 19__

## GENERAL INFORMATION AND FILING REQUIREMENTS

**1. Tax Exemption for Nonprofit Organizations under Section 420 of the Real Property Tax Law and New York City Administrative Code.**

Real Property owned by a corporation or association organized or conducted exclusively for religious, charitable, hospital, educational, moral or mental improvement of men, women or children, or cemetary purposes, or for two or more such purposes, and used exclusively for carrying out thereupon one or more such purposes is exempt from taxation.

Under Section J-51 3-0 of the New York City Administrative Code as amended by Local Law No. 76 (1984), the real property owned by a corporation or association organized or conducted exclusively for bible, tract, benevolent, missionary, infirmary, public playground, scientific, literary, library, patriotic or historical purposes, for the development of good sportsmanship for persons under the age of eighteen years through the conduct of supervised athletic games, for the enforcement of laws relating to children or animals, or for two or more such purposes, and used exclusively for carrying out one or more such purposes is also entitled to exemption. Property used for bar association or medical society purposes is taxable in New York City pursuant to Local Law No. 46 (1971).

**2. Application**

A three-part application must be filed with the New York City Department of Finance, Real Property Assessment Bureau: Form RPAB EX SUPP, Form EA-420-ORG (Organization Purpose) and Form EA-420-USE (Property Use). One copy of Form EA-420 ORG must be filed by each nonprofit organization. One copy of Form EA-420-USE must be filed for each sepa-

rately assessed parcel of property located in New York City for which exemption is sought. One copy of Form RPAB-420-EX SUPP must be filed for each parcel as well. Each year following the year in which exemption is granted on the basis on this application, renewal Forms RPABRNW1 (EA-420-RNW-1) and RPABRNW2 (EA-420-RNWII) must be filed.

If you need more space for any item in the application, attach additional sheets and indicate the question(s) to which you are responding. Please give your name and the employer identification number on all attachments. The Real Property Assessment Bureau may request information in addition to the information contained in the application.

Upon approval or disapproval of the application, the Real Property Assessment Bureau must send one copy of Form EA-420-RPT to the State Board of Equalization and Assessment, Program Analysis and Development, Empire State Plaza, Agency Building No. 4, Albany New York 1222.

**3. Time and Place of Filing Application**

The application must be filed between January 15th and March 15th in the Borough Office of the Real Property Assessment Bureau in which property is located: Manhattan: Municipal Building, Room 920, Centre Chamber Streets, New York, N.Y. 10007; The Bronx: Bergen Building Floor, 1932 Arthur Avenue, Bronx, N.Y. 10457; Brooklyn: Municipal Building, Room 200, Joralemon and Court Streets, Brooklyn, N.Y. 11201; Que 90-27 Sutphin Boulevard, Jamaica, N.Y. 11435; Staten Island: 35 Marks Place, Staten Island, N.Y. 10301.

### SPACE BELOW FOR USE OF REAL PROPERTY ASSESSMENT BUREAU

APPLICANT CORPORATION                                         PARCEL NUM

EMPLOYER IDENTIFICATION NUMBER          DATE APPLICATION FILED

ASSESSED VALUATION

APPLICATION        ☐ APPROVED   ☐ DISAPPROVED   $____ TAXABLE   $____ EXEMPT

DOCUMENTARY EVIDENCE PRESENTED:

REAL PROPERTY ASSESSMENT BUREAU

by _____(SIGNATURE OF REVIEWER)_____                    DATE

**RPAB 420 EXSUPP**

## NEW YORK CITY DEPARTMENT OF FINANCE

### INFORMATION REQUIRED IN ADDITION TO THE FORMAL APPLICATION
### FOR EXEMPTION FROM TAXATION FURNISHED BY THE REAL PROPERTY ASSESSMENT BUREAU

**PROPERTY INFORMATION**

BLOCK **2471**   LOT **1**

BOROUGH (Check one only)

Manhattan (1) ☐   Bronx (2) ☒   Brooklyn (3) ☐   Queens (4) ☐   Staten Island (5) ☐

PROPERTY ADDRESS

Number **111**   Street **East 164th Street**

**APPLICANT**

Name **All Hallows Institute**   Phone **212** **293-4545**

APPLICANT ADDRESS (As Above ☒ or)

Number ___   Street ___   Zip ___

City, Town or Village ___   State ___

**ATTORNEY OR AGENT**

Name **John J. Duffy, Esq.**   Phone **212** **557-7200**

ATTORNEY OR AGENT ADDRESS (As Above ☐ or)

Number **100**   Street **East 42nd Street**   Zip **10017**

City, Town or Village **New York**   State **New York**

1. a. Has this applicant ever previously filed an application for an exemption?   ☐ yes   ☒ no

   If yes, answer b, c, and d.

   b. Year(s) filed: 19 ☐

   c. Action of Tax Commission on application(s)

   ☐ total exemption granted

   ☐ partial exemption granted

   ☐ declared wholly taxable

   ☐ no action taken

   ☐ property was exempt but has subsequently been made taxable in whole or in part

   d. Was there a hearing before the Full Commission on the application?   ☐ yes   ☐ no

   If yes,

   Date of Hearing ___

Page 2

2. a. Does applicant own the property for which exemption is requested?   [X] yes   ☐ no
   b. IF YES, A COPY OF THE DEED TO THE PROPERTY MUST BE ATTACHED HERETO.
3. Has an IN REM FORECLOSURE proceeding been commenced against this property?   ☐ yes   [X] no
4. a. Does this applicant or a interrelated entity own or occupy any other real estate in this State?   ☐ yes   [X] no
   b. If yes, list the address of each parcel and state whether each is exempt and when such exemption was granted. _____

SCHOOLS ARE TO SUBMIT THE FOLLOWING DATA

5. a. Did the school function as a private institution before the present incorporation?   [X] yes   ☐ no
   b. If yes, give reasons for change of corporate structure, also give names of stockholders and officers of the predecessor corpora and what disposition was made of the stock. __The Christian Brothers Institute (a tax exempt__ __(organization) conveyed the property to All Hallows Institute (a tax exempt__ __organization) for no consideration.__

6. State the following:
   a. Number of pupils [ 450 ]
   b. Scale of tuition charges and other fees. __Tuition - $1,700.00 per year__ __Book Fees - $100.00 per year__

   c. Number of free pupils [ 5 ]
   d. Number of free pupils other than those on scholarships supported by endowment or contributions   [ 5 ]

   e. Number of teachers [ 25 ]
   f. Salaries paid __$22,000. to $37,000.__

7. a. As an educational corporation, do you hold yourself out to the public as "non-sectarian"?   ☐ yes   [X] n
   b. If yes, have any of your facilities been denied to any person by reason of his race, creed or color?   ☐ yes   [X]
   c. If the answer to 7b was yes, give full details _____

VERIFICATION

State of New York   } ss:
County of _New York_

_Lawrence T. Murphy_ _____, being duly sworn, says: that ____ _____ of the applicant organization, that the statements c _Principal_
this application (including the attached sheets consisting of _____ pages) are true, correct and complete, and that ____ this application for real property tax exemption as provided by law.

Subscribed and sworn to before me   19 _90_   JOHN J. DUFFY
this _26_ day of _July_   Notary Public, State of New York   _Lawrence T. Murphy_
   No. 44-6114002   Signature of Applicant or Representative
   Qualified in Rockland C.

**Exhibit F**

MEMORANDUM OF THE TRANSFER

OF PREMISES FROM

THE CHRISTIAN BROTHERS INSTITUTE

TO

ALL HALLOWS INSTITUTE
111 EAST 164TH STREET
BRONX, NEW YORK   10452

BLOCK 2471, LOT 1

ON

MARCH 9, 1990

CBIBANK 000039



DEPOSITION
EXHIBIT
Griffith 8
7.30.18

## PREFACE

The Christian Brothers Institute ("CBI"), a New York not-for-profit corporation, having offices at 21 Pryer Terrace, New Rochelle, New York held premises known as 111 East 164th Street, Bronx, New York in fee simple absolute. CBI operates a high school known as All Hallows Institute at said premises, a corporation organized and existing under the Education Law of the State of New York and having offices at 111 East 164th Street, Bronx, New York.

On March 9, 1990 The Christian Brothers Institute, for no consideration, conveyed by deed to All Hallows Institute the premises hereinabove described. All Hallows took same in fee simple absolute.

A number of the following closing documents were deposited with Anita Fleischer of Lawyers Title Insurance Company for the purpose of recordation on April 5, 1990.

The deed was recorded in the office of the County Clerk, Division of Land Records, Bronx County, New York on April 13, 1990 in Reel 980, Page 150.

Due to the fact that there was a change of ownership of the above described premises, it was necessary to file a Real Property Tax Exemption Application with the Department of Finance and an application for exemption from water and sewer charges with the Department of Environmental Protection, Bureau of Water Register on behalf of All Hallows Institute. Failure to do so would cause an interruption of the Tax Exempt Status of said property.

CBIBANK 000040

## DOCUMENT INDEX

The following documents were executed, delivered and/or exhibited to facilitate the conveyance of 111 East 164th Street, Bronx, New York  10452, Block 2471, Lot 1.

* 1) Indenture made the 9th day of March, 1990 by and between The Christian Brothers Institute, a New York not-for-profit corporation, having offices at 21 Pryer Terrace, New Rochelle, New York and All Hallows Institute, a corporation organized and existing under the Education Law of the State of New York and having offices at 111 East 164th Street, Bronx, New York, 10452.

* 2) New York State Combined Real Property Transfer Gains Tax Affidavit; Real Estate Transfer Tax Return; Credit Line Mortgage Certificate dated March 13, 1990.

* 3) Department of Housing Preservation and Development Affidavit in Lieu of Registration Statement dated March 9, 1990.

* 4) New York City Real Property Transfer Tax Return dated March 9, 1990.

5) New York City Department of Environmental Protection - Application for Exemption from Water and Sewer Charges dated July 26, 1990.

6) New York City Department of Finance Application for Real Property Tax Exemption for Non-Profit Organizations I - Organization Purpose dated July 26, 1990.

7) New York City Department of Finance - Application for Real Property Tax Exemption for Non-Profit Organizations II - Property use dated July 26, 1990.

* 8) New York State Exempt Organization Certificate for The Christian Brothers Institute.

* 9) New York State Exempt Organization Certificate for All Hallows Institute.

10) Department of the Treasury Internal Revenue Service letter ruling regarding Section 501(c)(3) of the Internal Revenue 1954 Code as amended as it pertains to the Official Catholic Directory which publishes the names and addresses of all agencies and instrumentalities and all educational, charitable and religious institutions operated by the Roman Catholic Church in the United States.

11) The University of the State of New York Education Department Absolute Charter for All Hallows Institute.

---

\* The originals of these documents were deposited with Lawyers Title Insurance for the purpose of recordation.

**THIS INDENTURE,** made the 9th day of March , nineteen hundred and Liberty

**BETWEEN**   The Christian Brothers' Institute, A New York not-for-

profit corporation, having offices at 21 Pryer Terrace, New Rochelle,

New York,

party of the first part, and All Hallows Institute, a corporation organized and existing under The Education Law of the State of New York and having offices at 111 East 164th Street, Borough of the Bronx, County of Bronx, City and State of New York

party of the second part,

**WITNESSETH,** that the party of the first part, in consideration of

Ten no/xx ($10.00)          dollars,

lawful money of the United States, and other good and valuable consideration paid

by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or

successors and assigns of the party of the second part forever,

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate,

lying and being in the Borough of the Bronx, County of Bronx, City and State of New York, Bounded and Described as follows:

BEGINNING at the corner formed by the intersection of the Northerly side of East 164th Street with the Easterly side of Walton Avenue; running thence EASTERLY along the Northerly side of East 164t Street, One Hundred Fifty-one and Fifty-one one-hundredths (151.51) feet to a point, which point is distant One Hundred Three and Sixty-three one-hundredths (103.63) feet Westerly from the corner formed by the intersection of the Northerly side of 164th Street with the Westerly Side of Grand Boulevard and Concourse; running thence NORTHERLY along a line forming an angle of ninety-seven (97) degrees, seven (7) minutes, ten (10) seconds on its Westerly side with the Northerly side of East 164th Street, Forty and Sixty-four one-hun-dredths (40.64) feet to a point; thence NORTHERLY on a line forming on its Westerly side an angle of One hundred seventy (170) degrees, forty-eight (48) minutes, forty (40) seconds with the last mentioned course, Ninety-six and Eighty-five one-hundredths (96.85) feet to a point; thence NORTHERLY on a line forming on its Westerly side an angle of one hundred seventy-six (176) degrees, six (6) minutes, no (00) seconds with the last mentioned course, Seventy-three and Ninety-six one hundredths (73.96) feet to a point; thence NORTHLY on a line which forms on its westerly side an angle of one hundred seventy-five (175) degrees, ten (10) minutes, twenty (20) seconds with the last course, Forty and Sixty one hundredths (40.60) feet, more or less to a point where said line intersects the dividing line between lots 388 and 389 as shown on the map of West Morrisania etc. made by A. Findlay dated June 1, 1852 and filed in the office of the Register of Westchester County May 16, 1853 as Map No. 15 if said dividing line were extended easterly at right angles to the westerly side of Old Butternut Street; thence WESTERLY at right angles to the westerly side of Old Butternut Street, Twenty and Sixty-four one-hundredths (20.64) feet to the Westerly side of Old Butternut Street at its intersection with the dividing line between lots 388 and 389 aforesaid; thence running WESTERLY at right angles to Walton Avenue and along the said dividing line between Lots 388 and 389 on said map of West Morrisania, One Hundred Seventeen and Fifty one-hundredths (117.50) feet to the Easterly side of Walton Avenue and thence SOUTHERLY along the Easterly side of Walton Avenu Two Hundred Forty-Six and Fifty-nine one-hundredths (246.59) feet t the corner aforesaid the point or place of BEGINNING.        x

roads abutting the above described premises to the center lines thereof,

**TOGETHER** with the appurtenances and all the estate and rights of the party of the first part in and to said premises,

**TO HAVE AND TO HOLD** the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

**AND** the party of the first part covenants that the party of the first part has not done or suffered anything whereby the said premises have been incumbered in any way whatever, except as aforesaid.

**AND** the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

**IN WITNESS WHEREOF,** the party of the first part has duly executed this deed the day and year first above written.

IN PRESENCE OF:

THE CHRISTIAN BROTHERS' INSTITUTE

By ~~Harold M. Delaney, President~~
Vice-President