**Page 1**

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 11-22820-rdd

Adv. Case No. 12-08236-rdd

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of:

THE CHRISTIAN BROTHERS' INSTITUTE,

            Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CORPORATION OF THE CATHOLIC ARCHBISHOP OF SEATTLE,

            Plaintiff,

         v.

CONGREGATION OF THE CHRISTIAN BROTHERS OF IRELAND, ET AL.

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

            U.S. Bankruptcy Court

            300 Quarropas Street

            White Plains, New York

            August 6, 2012

            10:19 AM

B E F O R E :

HON ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

ECR OPERATOR:  LONNIE WEBB

Page 2

Hearing re:  Status Conference

Hearing re:  (Evidentiary Hearing) Motion of the Official Committee of Unsecured Creditors for Authority to Assert, Litigate, and Settle Claims on Behalf of Bankruptcy Estate Relating to Fraudulent Conveyance to All Hallows Institute (related document(s) 302)

Hearing re:  Motion to Intervene filed by Robert W. Muilenburg on behalf of Maryland Casualty Company (related document(s) 41)

Hearing re:  Motion to Intervene filed by John Collen on behalf of Pacific Indemnity Company

Hearing re:  The Christian Brother's Institute of California's Motion to Dismiss Adversary Proceeding (related document(s) 31, 32, 33, 34)

Hearing re:  Christian Brothers' Institute of Michigan's Motion to Dismiss Adversary Proceeding

Transcribed by:  Jamie Gallagher

A P P E A R A N C E S :

TARTER KRINSKY & DROGIN, LLP

Attorneys for the Debtor

1350 Broadway

New York, NY 10018


BY:  SCOTT S. MARKOWITZ, ESQ.

DEBORAH J. PIAZZA, ESQ.


TRESSLER, LLP

Attorney for Pacific Indemnity

233 S. Wacker Drive

22nd Floor

Chicago, IL 60606


BY:  JOHN COLLEN, ESQ.


SCHWABE, WILLIAMSON & WYATT, PC

Attorney for Christian Brothers' Institute of

California

1211 SW 5th Avenue

Suite 1900

Portland, OR 97204


BY:  RICHARD K. HANSEN, ESQ.

**Page 4**

PACHULSKI, STANG, ZIEHL & JONES, LLP

 Attorneys for the Committee

 780 Third Avenue

 36th Floor

 New York, NY 10017


BY:  JAMES J. STANG, ESQ.

 ILAN D. SCHARF, ESQ.

 ALAN J. KORNFELD, ESQ.


COUGHLIN DUFFY, LLP

 Attorney for Maryland Casualty Company

 Wall Street Plaza

 88 Pine Street, 28th Floor

 New York, NY 10005


BY:  DANIEL PASCOE, ESQ.


PATTERSON BUCHANAN FOBES LEITCH & KALZER, INC., P.S.

 Attorney for Archbishop of Seattle

 2112 Third Avenue

 Suite 500

 Seattle, WA 98121


BY:  MICHAEL A. PATTERSON, ESQ.

Page 5

CHARLES J. TAUNT & ASSOCIATES, PLLC

Attorney for Christian Brothers' Institute of Michigan

700 East Maple Road

Second Floor

Birmingham, MI 48009

BY: DEAN R. NELSON, ESQ.

ALSO APPEARING TELEPHONICALLY:

NATHAN THOMAS, ESQ.

Page 6

P R O C E E D I N G S

THE COURT:  Okay.  Christian Brothers' Institute.

MR. STANG:  Good morning, Your Honor.  James Stang for the Committee.

Which matter are we going to start with?  The STN hearing or the motions to dismiss?

THE COURT:  I -- I don't really care.  I'm happy to --

MR. STANG:  I'm just trying to figure out the seating at the table, that's all.

THE COURT:  Why don't we deal with the STN hearing first.

(Pause)

THE COURT:  Okay.  This is the official committee's motion for leave to be granted standing to commence prosecute and potentially sell a -- an intentional fraudulent transfer case or claim on behalf of the debtor against All Hallows Institute.

I've read the parties' pleadings on this, including their stipulation of facts as far as the cost of -- for purposes of this motion -- of pursuing the litigation and the value of the real property.

So, I have a couple of factual questions, myself, but it seems to me that in large measure this is an issue of applying the laud of the facts that are pretty well-

Page 7

established, but I'm happy to hear from the parties as to whether they disagree with that.

Let me tell you the fact that I want to focus on, which I wasn't able to locate in the pleadings. It is clear from the pleadings that a fraudulent transfer action was started in October of 2005 in New York State in respect to this transfer and that it was dismissed without prejudice "with a tolling agreement." I don't know -- the tolling agreement wasn't attached, so I don't know what the status of that is. Did it toll it indefinitely? Did it toll it for one year? I just don't know.

MR. STANG: Your Honor, I don't remember the duration of it.

I'm sorry. James Stang, Pachulski, Stang, Ziehl & Jones for the committee.

I don't recollect the duration of it. I believe Mr. Doggerty (ph) was involved in that aspect of the litigation. It was for a certain period of time and I was unable to ascertain whether, in fact, this STN motion -- or rather the petition was filed before it expired or after it expired for the impact of Section 108, tolling agreement.

I made some inquiries regarding what people knew when and I was unable to ascertain to any certainty, that satisfied me, as to when did it actually expired.

THE COURT: Okay.

Page 8

MR. STANG:  I'm sorry, not when it actually expired, when the statute would have run given the tolling agreement.

THE COURT:  Okay.

MR. MARKOWITZ:  I think we have a copy of it somewhere here, I thought.

Scott Markowitz, Tarter Krinsky & Drogin.

THE COURT:  Okay.

MR. MARKOWITZ:  I think we have a copy of the tolling agreement.

UNIDENTIFIED SPEAKER:  Scott, would you find the 2010.

THE COURT:  April 2011 was the petition.

MR. STANG:  Yeah, Your Honor, I have a feeling it was about six years because I remember thinking it would -- that it was coming close to the petition date, but --

MR. MARKOWITZ:  I have a copy of the tolling agreement.

THE COURT:  Okay, but let -- well, let me see it. If you could just hand it up.  Okay.

(Pause)

THE COURT:  And so it was part of the stipulation discontinuing the lawsuit?

MR. MARKOWITZ:  Yes, I believe that's what it was, Your Honor.

(Pause)

THE COURT:  Okay.  So it says this agreement shall expire on March 6, 2010.  And it preserves the status quo as of March 6, 2006, which was the -- I guess the date that the parties agreed to dismiss the action.  And then the petition date was, I think, April 28, 2011.

MR. MARKOWITZ:  28th, I believe, 2011.

THE COURT:  Yeah, April 28, 2011.

MR. MARKOWITZ: 28th or 26th.

UNIDENTIFIED SPEAKER: 28th, 2011.

THE COURT:  I mean, let me tell you why I think this is relevant and you all can respond.

It seems to me that once a lawsuit was commenced, I think that a defendant could make a pretty good case that there was no more tolling under Section 213 and that other parties would have to bring their actions within two years of that date.  I mean arguably it would be before that, but I'm really focusing on sort of a motion to dismiss type of standard here.

The people who commenced this lawsuit though, I guess it would appear to me would have had on the outside two years from March 6, 2010, to have brought it.  Although, factually one could argue that they knew about the facts months before then because they were preparing their lawsuit.  But even with respect to these plaintiffs who did

bring a lawsuit in 2005, it doesn't seem to me to be cut and

dry that even they would time barred at this point.

MR. STANG:  Would or would not be?

THE COURT:  Would not be, I mean because the

petition was a year and 22 days after the expiree of this

tolling agreement and you get two years under the statute

under Section 213.  And, you know, it is certainly quite

possible that if the litigation were brought again All

Hallows Institute could argue that the plaintiff in this

lawsuit really knew about the facts a year or so beforehand,

but that would seem to me to be more of a factual issue that

would need to be developed as opposed to something that they

could prevail on a motion to dismiss basis.

MR. STANG:  Your Honor, 540 --

THE COURT:  I mean, that's without --

MR. STANG:  Do you want me to respond to it?

THE COURT:  -- I mean that leaves aside all of the

other potential defendants --

MR. STANG:  Well --

THE COURT:  -- I mean, potential plaintiffs

that --

MR. STANG:  Yes.

THE COURT:  -- you say are out there.

MR. STANG:  Also 544(A), Your Honor, which

presumes -- which makes the debtor/trustee the judgment lien

Page 11

creditor or creditor whose executions return unsatisfied

without -- regardless of the debtor's actual knowledge,

so --

THE COURT:  Well, but on -- all right, I'm less moved by that one, though, given that recordation is assumed under this.  Knowledge of the recordation is assumed.

MR. STANG:  Well yes, Your Honor, but 544(A)(1) and (A)(2), at least according to the Matter of Mitten Group, is not affected by the constructive notice that would bind a 544(A)(3) creditor, (A)(1) -- I mean status, a bona fide purchaser status.  (A)(1) and (A)(2), we don't believe are bound or are affected by the constructive notice that was given by the recordation.  We're not alleging bona fide purchaser status as the grounds.

THE COURT:  Okay.

MR. STANG:  Also, Your Honor, by an unofficial count by the debtor, there are approximately 400 claims now filed -- timely filed in the case, and I don't remember how many plaintiffs there were in 2005, but it was maybe a dozen or two dozen.

So, we believe that given the number of claims that have been filed, especially given the scope of notice that was given to get the bar date out, we have 17 states implicated in the proofs of claim and certainly the filing of a lawsuit in New York State Court, you know, would not be

Page 12

constructive notice to creditors in Hawaii, creditors in Washington --

THE COURT: I'm not so sure of that. I mean I think all of those issues are issues that could be raised by All Hallows Institute as part of a statute of limitations defense, but again I'm focusing on a different standard which is it obvious that 213 wouldn't apply here to toll the period, and it appears to me that it's not obvious.

So, I'm not sure what -- I mean, I guess the only remaining factual issue as far as I'm concerned, although the debtors are free to tell me otherwise, is whether in fact there's no economic value to be -- or negligible economic value to be received as part of this, or obtained as part of this lawsuit because the debtors can pay their obligations from other sources.

MR. MARKOWITZ: Judge, Scott Markowitz, Tarter Krinksy & Drogin for the debtors and debtor in possession.

We think there's -- okay, I don't think there's disputed facts that the debtor and not for profit entities whose core mission is to create schools and -- and religious schools consistent with the tenants in the Catholic religion has in the ordinary -- because they're going to rely on the badges of fraud, they're also relying on the John Duffy letter which we believe will be covered by the common interest privilege. We sent a letter regarding that and we

think that letter was written by John Duffy the then counsel

to the deceased to an attorney in Canada representing the

Canadian Christian Brothers entity.

So, they're relying on the badges of fraud and we

think there's very few of those badges.  For example, the

fact that the debtor in the ordinary course of business --

THE COURT:  I'm sorry.  I --

MR. MARKOWITZ:  -- transferred --

THE COURT:  I'll hear the legal arguments.  I'm

just trying to figure out, because this was scheduled as an

evidentiary hearing - -

MR. MARKOWITZ:  Right.

THE COURT:  And I think you all, I appreciate

this, narrowed the factual issues considerably and I think,

perhaps, completely, but I'm trying to figure out if there

are any remaining factual issues before I get to the legal

argument.

MR. MARKOWITZ:  And the factual issue -- I'm

sorry, what did, Your Honor --

THE COURT:  Well, I'd -- the only one I could

think of, and you all are privy to the claims that have been

filed and I'm not, is the issue raised in the debtor's

original objection which is that the debtors may well have

sufficient --

MR. MARKOWITZ:  I see.  I remember.

THE COURT: -- assets to pay their claims and so there's, you know, this is -- this is a waste of time because you don't need this asset to come back into the estate to deal with claims.

MR. MARKOWITZ:  Well, the claims were all by nature -- are all contingent claims, Your Honor, they're all --

THE COURT:  Right.

MR. MARKOWITZ: - - personal injury claims that the bar date just passed.  We think -- the reason the committee will say that we don't is because we amended the schedules to include the debtor -- the debtor's obligation to have retirement for the Brothers.  So -- but -- so that -- we think other than the Brothers' claims for retirement, there may be enough money to pay the claims, but --

THE COURT:  And what is that -- I mean --

MR. MARKOWITZ:  Well --

THE COURT:  How -- how certain are you of that?

(Simultaneous speaking)

MR. MARKOWITZ:  I can't be 100% certain.

THE COURT:  I mean is -- I mean Mr. Stang -- Mr. Stang just told me there's over 400 claims that have been filed, which is --

MR. MARKOWITZ:  But I can't be 100% certain, Your Honor.  I mean, we -- we don't know.  They're all personal

Page 15

injury claims.  Most of them are -- are old claims and --

and they have to be valued either in some sort of procedure

under the plan as any other mass tort case, or have to be

tried in the appropriate court to liquidate them, but

they're --

THE COURT:  Now -- now leaving aside the

retirement claims, or insider claims, and I'm not saying

that those would be disallowed, I'm just --

MR. MARKOWITZ:  I know.

THE COURT:  -- leaving them aside.

MR. MARKOWITZ:  Right.

THE COURT:  What is the debtor's estimate of the

assets and liabilities?

MR. MARKOWITZ:  Well, there's -- there's minimal

liabilities other than -- than abuse claims, okay?

THE COURT:  Right.

MR. MARKOWITZ:  So, and the assets are we know

that we have left over around $6 million from the sale of

the Rice property.  We have a sale -- an auction scheduled

tomorrow that we think will raise at least $7 million on the

Iona Grammar property.  We're -- we still own the Bishop

Kearney school in Rochester, New York, which has widely

different appraisals, but let's assume that's worth $5-6

million.  We still own numerous houses in this area that are

right around Iona College that we have a stalking horse bid

for $5 million for that Iona College has offered to purchase those houses.  That's another $5 million.  There's other pieces of real estate.  There's some cash.

So, I want to say in our estimate of our assets would be $25 million.

THE COURT:  Okay.

MR. MARKOWITZ:  Now the claims, which is a more complicated analysis than that, there were approximately 400 claims filed, Your Honor.  But I would say 75 of them -- 75 of those claims were filed by New York plaintiffs, by personal injury lawyers around the country who signed up New York plaintiffs, that are facially barred by the statute of limitations.  In New York the statute of limitations for sexual abuse, I believe it's three years from when the -- it's tolled while you're a minor, but you have to commence the action within three years.  So, they're facially barred by the statute of limitations.

In the Milwaukee Archdiocese case, the bankruptcy judge there, I believe it's Judge Kelly, did knock those claims out on claim objections.  I know there's issues about what you can decide under 28 U.S.C. 157, I think, (b)(5), but clearly claims that are facially barred by the statute of limitations, we think, go away.  I think the United Airlines cases, there's pendings on that.

So, what do we think the overall claims are?  It's

Page 17

hard to exactly say at this point.  And the bar date just came on August 1st.  We're still going through processing the claims.  We're meeting -- everyone's in town from the committee.  We're having a very substantive meeting with the committee hopefully the day after tomorrow.  And we have the auction tomorrow for Iona Grammar.  We have the meeting with the committee.  We're reviewing the claims.

It's hard for me to stand up now and say somebody did a certain type of sexual act in 1963 in Washington and how much that claim's worth.  We know what we've settled some of those traditionally for.  There's matrixes that are well-established as any other kind of personal injury cases.

But we think there's a -- aside from the injury cases, we think there's a reasonable chance that we'll be able to get creditors paid or get some sort of resolution that makes sense.

THE COURT:  Okay.

MR. STANG:  First of all, Your Honor, we were prepared to bring survivors to testify today about their individual claims to give you a sampling of that.  We were prepared to bring Dr. Jon Conte, who is from the University of Washington, to testify about the impact on adults from childhood sexual abuse, and also Judge Bettinelli, who's retired from the California Superior Court, who has divided up settlement pots around the western United States to

testify about his view of the claims in this case.  At the last hearing, you told us that we didn't need to do that, and so we didn't.

Mr. Markowitz's estimate, even with the New York claims going out, comes to about $65,000 to $70,000 per person, on average, mathematical average.  That is probably less than half of what one defendant has settled these claims for in the west coast against the Christian Brothers and the Seattle Archdiocese.  The average -- from my experience and I think it's been six cases that have been resolved in Chapter 11, not including Portland and not including Tucson, the estimate ranging from Fairbanks, which was a very poor diocese, down to San Diego, which had a lot of property, was probably in the half million dollars per case.

These claims are not hitting cases.  This is not about a Brother slapping a kid.  These proofs of claim were clearly for sexual abuse and I don't know if you have looked at any of these claims, but we're not talking about showing someone some pornography.  We are talking about sodomy, anal rape, masturbation, everything you can think of and the things you don't want to think of are in these proofs of claim.  And the suggestion that these proofs of claim are going to get handled for $60,000 or $65,000 a person is just beyond anything that the record has shown in any of the

other cases.

Secondly, those Brothers, I'm sure they would contend, are not insiders.  They are the ones that amended their schedules to show them as undisputed, non-contingent claims, and I believe those claims total an excess of $100 million.  Now, we may object to those claims.  They may get classified separately, but they put them on their schedules.  Everything they have filed shows they are hopelessly insolvent, far beyond $25 million.

THE COURT:  Okay.  Well, the debtors are not looking to change the treatment of those claims on the schedules, right?

MR. MARKOWITZ:  No, Your Honor.  Not that I know.

THE COURT:  All right, so -- so it seems to me that there is a reasonable likelihood that, in fact, the debtors are insolvent, which I guess then, to my mind, really narrows the issues to legal issues as far as the law is applied to the facts here.  And I'm prepared to hear oral argument on that.

But as far as the facts are concerned, it appears to me that if the committee on behalf of the estate were to be successful in the litigation it wants to bring, there'd be a substantial net recovery to the estate, a little under $8 million.  There would be an issue as to how that recovery would be achieved --

Page 20

MR. MARKOWITZ:  Right, I was --

THE COURT:  -- and -- and we can discuss that, but just based on the factual stipulation -- that's, you know -- that's -- there's a value that's been given to the property and a cost that's been given to the litigation.  I don't know whether that value was present valued or whether it was the value as, you know -- as of today, assuming of some recovery.

It also appears to me as I've just said that it's reasonable to assume that the debtors are insolvent and not insolvent by, you know, an amount of $600,000, which was the stipulated cost of the litigation, but substantially more than that, certainly more than $7.9 million given the schedules, which lists retirement claims as well as contingent or liquidated personal injury claims, as well as other claims.

And it appears to me that while All Hallows Institute is by no means precluded from pursuing on a factual basis the statute of limitations defense, it would appear to me that it's unlikely that they would be able to prevail on that defense on a motion to dismiss basis for one or more reasons.  But I guess the most obvious one would be the tolling agreement that was entered into, leaving aside the other issues about what it would be reasonable for other parties to know and when.  I could certainly see the

Page 21

argument being made that as of October of 2005, it would be reasonable to assume under all the circumstances that the litigation should have been commenced then or at least within two years thereafter, and of course this leaves open also the issue of 544(B)(1).

So, it appears to me that on the merits, perhaps with one exception that is a -- I think more of an issue for legal argument which is the Religious Freedom Restoration Act point that the facts do not support the objection.  But I'm happy to hear legal argument and maybe there are other facts you can point out to me that suggests that this isn't a coverable claim that, if pursued, is likely to benefit the debtors' estate.

MR. STANG:  Your Honor, do you want to hear legal argument on the RFRA issue, or general discussion of it, or --

THE COURT:  Well, I -- why don't I hear from the debtors, generally, on this because I mean, maybe I -- you know, I --

MR. MARKOWITZ:  On RFRA or the other --

THE COURT:  -- it's quite possible I missed something, so I'd like to --

MR. MARKOWITZ:  On the other issue or the religious freedom?

THE COURT:  No, on -- on everything.

Page 22

MR. MARKOWITZ:  Oh, all right, well --

THE COURT:  If you want -- if you want to make your argument.

MR. MARKOWITZ:  Yeah.  Well, I --

Judge, Scott Markowitz, Tarter Krinsky & Drogin.

I think our argument -- I mean, our argument is that under STN as modified by Adelphia and Smart World, debtor possession has the rights to pursue these actions and we have the right to -- to smartly manage, I think this is debtor's duty to wisely manage and Adelphia says that after -- after Smart World.  And in STN, the Court has to assure itself that there's sufficient likelihood of success.  It says there's no mini-trial, but it still has to -- the Court still has to assure itself there's a likelihood of success.

We think this case is somewhat unique.  It's not a commercial case.  And we have a situation where we have a religious order and a corporate entity that through -- where the religious order operates through.  The ordinary course of its business over years, and we -- we can stipulate to that, they -- they agree to that, Your Honor.

We have a situation where CBI in 1946 transferred four pieces of property for no consideration, which is where Iona College is today.  We have a situation where Brother Rice High School in Chicago was transferred in 1977 from CBI and CBOI to Brother Rice High School, Inc.

Their business model, which we have -- we can have testimony to, is to create these schools that are in the -- in the -- the religious tenants of the Catholic religion, specifically more, you know, Brother Rice, who is an Irish -- I believe he was a saint, right?

UNIDENTIFIED SPEAKER:  Blessed?

MR. MARKOWITZ:  Blessed.  So, this is what our business model was and in order for them to prevail, they have to show intent, intent to defraud, and it has to be clear and convincing evidence.  We don't think it's there.  And we think that as a debtor in possession, under Adelphi, and obviously 650,000 they say is a modest sum, I say to them if you think it's such a great case, then why don't you limit your fees to only getting paid out of the recovery.

We don't think it's a good case for a variety of reasons.  Under the badges of fraud, the debtor, when it transferred its assets, retained most of its assets.  The debtor still had, as of the transfer, the Rice High School property in New York City.  They didn't transfer that asset.  The Iona Grammar property which we're going to have the sale tomorrow which is at least $7 million, many other properties, Bishop Kearney in Rochester.  So they did not go into a wholesale transfer of their assets, it was completely consistent with their business plan from the beginning of time, 1906, where they, as schools became viable, Brother

Page 24

Griffith who -- who prepared to testify, we are going to proffer testimony, that as schools became viable and became self-sufficient, then they would be transferred.  They would set up a charter.

We have the documents here that are stipulated to go into evidence, the various charters of the schools of Iona Prep, of Brother Rice High School in Chicago, of Bishop Kearney, of All Hallows, and there was no intent to transfer and we think that -- that sentencing clear and convincing standard and if you look at the badges of fraud, few of them exist.

I mean, in -- Judge Shannon in the Lipa case and the Keane (ph) case specifically said that transferring the subsidiary is not per se fraudulent, there's -- there's no question that the debtor continued to pay its bills as they come due for 22 years since the transfer.

There was no law -- as Brother Griffith is here to testify to, there was no lawsuits pending against CBI at the time.  There wasn't even any lawsuits threatened against CBI at the time that we know of for sexual abuse at the time of the transfer.

THE COURT:  Well --

MR. MARKOWITZ:  There was, I believe, lawsuits in Canada against CBIC, but there was no lawsuits pending against CBI, the debtor --

THE COURT:  Okay.

MR. MARKOWITZ: -- when the -- when the assets were transferred.

We've touched on the statutes of limitations issue.  I understand it's a lower standard because it's an STN motion and it's -- it's more akin to a motion to dismiss, but we think all those factored in together justify the debtor's business judgment in not pursuing the litigation in view of -- of what the bankruptcy -- what the Second Circuit said in Adelphia.  And in Adelphia, the Second Circuit said -- Second Circuit said "although STN, Commodore, and Housecraft expanded the scope of derivative standing, our precedent did not undermine either the debtor's central role in handling the estate's legal affairs or the Court's responsibility to monitor for abuses by the parties.  It remains 'the debtor's duty to wisely manage the estate's legal claim and its duty is implicit in the debtor's role as the estate's only fiduciary.'"  Citing Smart World.

So, we think that since it's an intentional fraud on conveyance case, and it's clear and convincing evidence, and you're going to have -- you have a letter from a lawyer who's deceased to another lawyer who's deceased, you have maybe some of the incidents of badges of fraud, you have few, if any, of the witnesses around at the time 22 years

ago that the transfer was made.  You have an entity that is engaged in the business of creating schools, owning fee at some point and then transferring them for no consideration.

The debtor never received any consideration for any of those transfers in any of these schools.  It transferred it -- the whole property where Iona College is, a few miles from here.  It transferred in downtown Chicago, Brother Rice High School, in the 1970's, and the debtor continued on to meet all of its obligations as they came due.  And we think that that coupled with the fact that the debtor in possession retains a great deference from the Court in these kind of situations, we think that the --

THE COURT:  Well, normally it does but what I have here is a situation where the debtor's basically saying its -- its mission in life is to make these types of transfers. So, you know, even if it were viewed as an -- a voidable transfer, I -- I get the distinct impression that the debtor wouldn't bring it because it would be in opposition to its mission -- you know, it's very reason for existence.

This isn't a case where, you know, one group of creditors or insiders is being preferred over another, which is usually why courts -- you know, courts weigh that in determining whether to not defer to the debtor or not.  But this is a case where the debtor's basically saying, look, for the greater good we're not going to bring this because

Page 27

we believe in keeping the high school in existence because it's a great high school.

MR. MARKOWITZ: I think that's a fair statement. I mean, it's hard to argue against that. But also going to Your Honor's point, you know, you have a school in a poor, congressional district. We stipulated as the value of the property based on appraisals, and they say in their papers they don't want to close down the school, but how else are they going to get the -- get the money. If the debtor doesn't have the money, Your Honor, the school doesn't have the money. It's a -- it's a relatively poor school in the Bronx.

So, in essence, it would lead potentially to -- if they were successful, obviously you're making no findings on that and that's not what this hearing's about today, but there would ultimately be substantial legal fees incurred, the estate has to pay because they're not willing to limit it to, you know, taking on a contingency. The Second Circuit specifically said that in STN. In STN, the Second Circuit said --

THE COURT: No, that's a -- that's a factor, obviously.

MR. MARKOWITZ: Right.

THE COURT: It's a factor for bringing the litigation if it's being done a contingency basis, I

Page 28

understand that.

MR. MARKOWITZ:  Right, it says, of course if the creditors' committee represents its fee agreement with his attorneys will in no event impose a net burden on the bankruptcy estate because the committee will pay the fee and seek reimbursement out of -- out of only any recovery.

THE COURT:  But it's not a dispositive factor by any means.

MR. MARKOWITZ:  No, it's not.  It's not.  But we're weighing all these factors and -- and they weigh towards our business judgment of -- of not pursuing the case and we think that -- Your Honor raised the issue, how are they going to recover the money?  If they -- if they're successful after this litigation which is going to cost the estate at least 650,000, which we've stipulated to.  It comes out of the general coffers of the estate, okay?  And delays things, and then they get a judgment so they own -- so then the debtor, CBI, owns the building and the (indiscernible - 00:44:33) concords where All Hallows is -- operates its school.  There's only a -- there's no way they can get the money other than to sell the school and close the school down.  So I think those are factors --

THE COURT:  And that raises the Religious Freedom --

MR. MARKOWITZ:  Right. Right.

THE COURT:  - Restoration Act issue.

MR. MARKOWITZ:  And that raises that issue. Again, not necessarily for today to be dispositive, but we -- we factored all those factors in when we determined whether or not we -- when they made the demand upon us to sue, and I understand what Your Honor says.  It's our mission and we created the high school in 1906, right?  And the high school's created in 1909 by the Christian Brothers. So, I get what you're saying.

But we still think under Smart World and Adelphia that the Court, under these circumstances, has the discretion to -- to deny standing for the committee under these circumstances to go forward.

THE COURT:  Okay.

MR. STANG:  Your Honor, I would just like to address the RFRA issue and then Mr. Kornfeld can address the other aspects of what Mr. Markowitz has talked about.

First of all, Your Honor, RFRA is not even applicable to this litigation.  RFRA is unconstitutional as it applies to state law.  This is, in essence, a state law cause of action under New York law for intentional fraud. And the Supreme Court ruled in, I believe it was, the Boerne case that RFRA was unconstitutional as applied to the states.

THE COURT:  Well, but it's incorporated through

Page 30

the Bankruptcy Code.  It would be a Bankruptcy Court order.

I mean, Judge Perris seemed to feel that it -- that that

wasn't an issue because she cited a number of cases that --

MR. STANG:  Well --

THE COURT:  -- that dealt with fraudulent transfer

issues or 544 --

(Simultaneous speaking)

MR. STANG:  I'm not sure that --

THE COURT:  -- well she -- she applies it -- she

basically says under 544, it is an issue.

MR. STANG:  Well, I guess the question is, is

using 544 as a portal, if you will, to get to the state law

cause of action, does that make this cause of action -- does

that make RFRA applicable because it does apply at least, so

far, to federal law, or is it really applying it to state

law.  So, that's one argument.

THE COURT:  Okay.

MR. STANG:  The second argument is that there's no

government action here.  RFRA applies to government action.

The committee is not a government entity.

THE COURT:  But you're going to get an order

from --

MR. STANG:  We, well --

THE COURT:  -- the Bankruptcy Court.

MR. STANG:  -- yes, we are getting an order from

Page 31

the Bankruptcy Court but the action that's -- the Court sua sponte isn't acting to bring this asset into the estate, it's an action by the creditors' committee, and we are not a government actor.  RFRA only applies to government action.  And we don't think it applies to this case at all.

But taking RFRA on its terms, they have to show --

THE COURT:  But, but wait -- I --

MR. STANG:  Okay.

THE COURT:  -- but I mean the tithe cases, you know, that's a Chapter 7 trustee and that's still government action.

MR. STANG:  Well, the tithing cases were not -- I do not believe the initial -- in re Young was a RFRA case, and then the Bankruptcy Code was amended to limit the tithing.  And I believe Young was a 548 cause of action.

But -- and it is our position in this case and, frankly, in one of the other Chapter 11 church cases that's going on right now, that the government -- there is no government action here as it applies to -- as it applies into RFRA context.

THE COURT:  Okay.

MR. STANG:  The third thing is just take RFRA on its own.  Is there a substantial burden by virtue of not to sell the school, because I'm not sure how this school -- how we will get value of this school, but is bringing this high

school into the bankruptcy estate, which is all we are asking for in this complaint, or the value of the school, but bring the property in, how is that a substantial burden on the high school?  It doesn't stop operating simply because --

THE COURT:  Well, but it --

MR. STANG:  -- the Christian Brothers' Institute --

THE COURT:  -- but how do --

MR. STANG:  -- now owns the property.

THE COURT:  -- how would you get value other than selling it?

MR. STANG:  Well, it is -- you might sell it, but as Judge Perris pointed out, that is putting a little bit of the cart before the horse.

We have to see once it's in the estate what is proposed to be done with it to then see if there's a substantial burden.  But, for example, the stalking horse bidder -- using horses in today's argument a lot -- for Iona Grammar is Iona Prep.  Is -- is selling a Christian Brothers' Grammar School to a Christian Brothers' -- Christian Brothers' affiliated high school a substantial burden on someone's exercise of faith?  They certainly don't think so.

Maybe the Archdiocese of New York will offer to

Page 33

buy All Hallows Institute.  Maybe another religious order will offer to buy All Hallows Institute.  I -- I really don't know standing here today how we're going to get the value out of that property, but it is not beyond imagination that a school, which has been operating since 1909 in the Archdiocese of New York, wouldn't be "saved" by another Catholic entity.  But we don't have to make that decision today.

If you decide that the relief that will be granted under the complaint is bringing the high school into the estate, the high school doesn't shut down.  The high school doesn't close.  It simply operates much like Iona Grammar's been operating, or any of their other operations operate.

If someone came and said tear it down and we're going to build housing because it's a block and a half from new -- the new New York Yankee stadium, well then you might say I'd need to think about RFRA, but we're not proposing that.  That is for another day.

Right now, we're just trying to figure out how to get this asset back into the estate where it belongs.  And so there might be a RFRA issue someday, but not because the high school becomes part of this bankruptcy estate.

THE COURT:  But in the meantime, you are spending a fair amount of money with sort of a question mark at the end as to what happens even if you win.

Page 34

MR. STANG:  We are spending a lot of money to get the high school back into -- back into the estate without an exit strategy for the -- well, there may be an exit for the high school, I'm not sure that it's even a substantial burden.

If the school were closed and it was put to another purpose, non-Catholic purpose, I'm not sure that's a substantial burden.  How many other Catholic High Schools are there in the area?  How many parishes provide religious education to high school students?

THE COURT:  I don't know.

MR. STANG:  That's an alternative use.  Now I don't know either.

THE COURT:  I know I don't know.

MR. STANG:  I don't know, Your Honor, but they have to show a substantial burden, not just a burden, but a substantial burden.  And if there are other means to -- and if the standard is how do we educate Catholic youth with Catholic education, they have to demonstrate that there's a substantial burden.

It's first on them and, you know, we could do at some point, if we are successful with litigation, a survey of how Catholic youth and I don't even know how many Catholic people go to that school.  I mean a lot of Catholic schools have non-Catholic students, but if their mission is

Page 35

to educate Catholic youth in the Catholic education, you know, they're going to have to demonstrate there was a substantial burden by closing this school.

THE COURT:  What's the enrollment of the school?

BR. GRIFFITH:  Approximately 675.

MR. STANG:  Your Honor, we're not --

THE COURT:  And it's -- and it's what 9th through 12th grades?

BR. GRIFFITH:  It's grades 9 through 12, primarily a Latino population, most of them are Catholic.  They live in the poorest congressional district in the United States. It would be extreme hardship to them if the school were to close.

MR. STANG:  Your Honor --

THE COURT:  Well, I'm just getting the numbers.

MR. STANG:  Mr. Griffith's is -- Brother Griffith is going to take the stand and he has personal knowledge.

THE COURT:  I'm just getting the numbers, that's all I'm focusing on.

MR. STANG:  So, Your Honor, we're not talking in this litigation about closing the school.  We're not closing Iona Grammar, under their stalking horse bid was not going to be closed.

So, transferring a school or bring a school into a bankruptcy estate does not impose a substantial burden.

Page 36

What -- and that's what Judge Perris talked about with the parish litigation in Portland.  Bringing the parishes into that estate did not impose a substantial burden.  She said depending on what you then do with it, how many you're going to sell, how many might be closed by virtue of bringing them into the bankruptcy estate, that might be a substantial burden, but that wasn't what was before her and frankly that's not what's before you.

THE COURT:  Well, it was -- I mean, the procedural posture was different but it was also different in the sense that there were a lot of properties that she was dealing with as opposed to just one.

MR. STANG:  There were a lot of properties she was dealing with.

THE COURT:  And there wasn't basically a -- I mean she was assuming that some of these might be sold and that's not what I'm not assuming here, I guess.

MR. STANG:  I -- I honestly don't know what's going to happen to this school if it's brought into the estate.

Maybe they will do a fundraising drive, finally, to pay survivors and tell people, you want to maintain your high school, you want to maintain this level of Catholic education in the Archdiocese of New York, you need to buy it out of bankruptcy.  Maybe they'll go to Cardinal Dolan and

Page 37

say to him, you want to maintain a school for Latino children in the Bronx?  Spend some money and buy -- and make this an Archdiocesan school.

THE COURT:  Okay.  Let me -- I know you wanted to respond generally to the debtor's objection.  Let me just ask you, though, as far as the timing of this is concerned, very often these motions are brought and decided right before the limitations period expires.  That's not the case here.

We're still several months away from that, it would be April 2013.  Why now?  And is -- you know, is this -- why isn't this something that might well be put off as one of the -- a threat overhanging the debtors and perhaps the diocese, generally, than something where the estate's actually spending the money now?

MR. STANG:  A couple of factors, Your Honor.

First is plan exclusivity is soon upon us and we expect that they will -- termination of -- or the statutory end of the plan exclusivity is soon upon us and we expect the debtor will file a plan and there have been very little -- next to no substantive plan discussions to date.  There has been term sheets submitted by the debtor.  I submitted a number of factual questions in response to that term sheet, and there was no response to date to my factual questions.

We are having a preliminary plan meeting on

Page 38

Wednesday. It is not attended by the clients. It will be attended by counsel. We've thought about putting this off and the feeling was that running this kind of motion up to the deadline is a bad idea because you might deny it, and we needed to understand what our rights were going to be vis a vis this substantial asset.

At the last hearing when this question came up, I said if we have plan negotiations, I want to have this cause of action in the committee's pocket and not in their pocket because it just changes the dynamic of the negotiation.

The most important factor, though, is the age of the survivors. Based on my committee membership, most of these survivors are in their 60's. Mr. Markowitz, I don't quite know why he keeps on harping on it, but talks about how these claims are so old. All that means to me is these people have been living with the effects of having been raped for -- for their entire adult lives and that certainly isn't something that, I think, diminishes their claim, it probably magnifies their claim.

But I've got people - I don't know that any have died in this case yet, but in my other cases, they're dying regularly. Sometimes by their own hand, but usually just by old age, and I really don't want to have to hear about a person dying and not getting compensation of any sorts because I waited an extra eight months to bring litigation

that's probably going to take six months itself, if not longer.  These people have been waiting a long time to have -- to be fairly compensated for what happened to them and this asset is going to be part of that fair compensation, and it's really just time to move along.

If we're right, the asset comes in, we'll see whether we -- how we can monetize it, but asking these men and some -- you know, probably mostly men, you know, to wait even longer simply isn't right.  And that's why we're bringing it now.

THE COURT:  Okay.  Then one of your colleagues was going to respond to the rest?

MR. STANG:  Mr. Kornfeld was.

MR. KORNFELD:  Good morning, Your Honor.  Alan Kornfeld, Pachulski Stang for the committee.

A couple of points in response to issues that Mr. Markowitz raised.

First of all, his request that the debtor's business judgment be respected.  At the time of the transfer, there was complete overlap between the board of directors of CBI and the board of trustees of AHI.  That complete overlap continued until 2005.  There was no independent negotiation.  In fact, there was no negotiation whatsoever.

At present, Your Honor, two out of three of the --

Page 40

of the trustees -- of the board of trustees, the highest management body of AHI are Christian Brothers who are also members of the board of directors of CBI. The third member of the board of trustees of AHI is a Christian Brother who is in ministry in New Orleans. So, there is no real difference between the management of these entities.

And under those circumstances, there is no independence, which is a prerequisite of the business judgment deference that Mr. Markowitz is talking about. So, there -- there is no business judgment that -- that deserves deference.

With respect to ordinary course, this transfer was not ordinary course. Prior to this transfer, there were only three transfers for no consideration: one in 1946 to Iona College, one in 1964 to Iona Prep, and this transfer in 1990. The transfer that Mr. Markowitz was talking about, about Bishop Rice, was a transfer from CBI to CBOI, to another debtor.

The debtors have made much in their papers about ordinary course means these transfers took place at times when the schools could stand on their own. As we pointed out in our papers, Your Honor, that was not the case with this school.

AHI continued to be supported by CBI until approximately 2005. AHI, as Brother Griffith testified last

money -- last Monday occasionally needed money, occasionally ran out of money.  AHI could not stand on their on.  So, there was no ordinary course.  This entity was not -- was not self-sufficient.

And -- and then with respect to awareness of the lawsuits, we -- we go to the December 18, 1990, Duffy letter where Mr. Duffy, who was -- who was Mr. Doggerty's colleague at the time at the Davidoff Malito firm, said that the transfer was done in order to make CBI less of a target for damages when a transfer takes place, e.g. from CBI to AHI, that it's done to give some protection for viability and is also useful for fundraising.

So, in this case in contrast to most of the fraudulent transfer cases where we do have to rely on circumstantial evidence to badge the fraud, we have direct evidence that this transfer was a transfer that was done to avoid liability from creditors.  The (indiscernible - 01:01:33) on records which we put in front of you from the archives show that the -- that CBI was well-aware based on the congregation's archives of lawsuits in Canada starting as early as 1989.

And, frankly, what we're talking about, Your Honor, gets us back to sort of the standard that the Court started with.  This standard is a motion to dismiss standard.  What the debtors have done is raise various

factual challenges and factual explanations to

(indiscernible - 01:02:09) that is on the face of the

complaint.

And the Court has said -- in Adelphia said, we

don't need to reach the factual challenges and the factual

explanations, we don't need to resolve one side's position

on disputed issues of fact.

And, frankly, that brings us to the badges of

fraud of which we have almost all of them, there was, as we

just discussed, as we pointed out in the papers, a close

relationship, in fact complete overlap between the

management of both entities at the time of the transfer.

That close relationship continues until this day.  The

transfer as we pointed out was not in the ordinary course.

There was inadequacy of consideration.  The debtors admit

that --

THE COURT:  Well -- even though that is normally

the largest badge of fraud in this instance, with this not

for profit debtor, it seems to me that that one is kind of

by the boards.

MR. KORNFELD:  Well, it only happened two times

prior in their existence.

THE COURT:  No, no, but I -- no, that goes to your

other badges, but the inadequacy of consideration is, I mean

-- that wasn't their business.

MR. KORNFELD:  Well, moving -- moving past that one and as -- as Your Honor knows that's -- that's -- we would -- we would attempt to show factually that in fact that the -- the lack of consideration wasn't something that happened in the ordinary course, so that would be an issue for trial also.  But -- but putting that one aside --

THE COURT:  But it's a not for profit entity.

MR. KORNFELD:  I understand, but they -- there's not a not for profit exception to 544.

THE COURT:  No, what I -- but what I'm saying is that in weighing the badges of fraud, that one is kind of an inverse world when you have a not for profit entity, I think.

MR. KORNFELD:  I understand, Your Honor.  Moving to other badges of fraud, I don't think it's disputed that there was knowledge of creditors' claim at that time.  We've put evidence in front of the Court that shows that.

And then -- then the last one, the retention of control, it's not disputed that CBI retained control through the overlapping management of AHI and, in fact, still has that control to this day.  So we have virtually every badge of fraud.

Again, back to the standard, the standard here is a 12(b)(6) standard.  The complaint that we provided in draft form to the Court more than exceeds that standard.  In

fact, given what we've provided to the Court with very limited discovery, we've well exceeded the standard. We've provided the Court with -- with testimony and with documents that show that this -- this complaint exceeds a motion to dismiss standard.

THE COURT: Okay. Well, all right. You can go ahead, that's fine.

MR. MARKOWITZ: I was just going to say -- Scott Markowitz, Tarter Krinsky & Drogin -- on the badges of fraud, and I know Your Honor's familiar with them, and they're slightly different depending upon which Court, but in citing from the Lippy (ph) versus Baron Co., the Keane case citing the BFP, the KC U.S. Supreme Court case, among these badges are gross, inadequate -- gross inadequacy of consideration, which we've talked -- as Your Honor knows that our position is it's a not for profit corporation and that should not be a factor that's heavily weighed; a close relationship; the transferor's insolvency, there's no insolvency as a result of the transfer, perhaps we may be insolvent 22 years later, but there was no insolvency at the time; the questionable transfer not in the ordinary course of business, he says there's two, no there was three.

CBOI transferred to Brother Rice High School, Inc. That's a very valuable piece of property in Chicago. There's no doubt about that. It's no doubt about it's

Page 45

consistent with their prior practice.  There's no secrecy in the transfer.  It was fully recorded.  There was no retention of control.  It's a two-tiered board.  The debtor has no control over that property.  It was unquestionably a full transfer and gives All Hallow Institute full control over that property.  They've had it full control for 22 years.  They have their own set of creditors.  They have their own operations.

So, again, I know it's a -- it's a lower standard, but -- but coupled with the fact that they have to show clear and convincing evidence, coupled with the fact that we're a not for profit institution in this business, in our business judgment and Adelphia, we think the Court could deny the motion and we ask that they do.

Thank you, Judge.

THE COURT:  Okay.  Well, I think the Court in these situations has a fair amount of discretion in deciding whether to confer standing or not.

And that discretion is -- is really a couple of levels, but it ultimately comes down, I think, to a sense weighing the merits of the claim and the ultimate benefit of bringing litigation to whether it simply makes sense as a matter of litigation and business judgment to pursue the litigation.

I know there's quite a bit of talk about deferring

**Page 46**

to the debtor's business judgment, including in the Adelphia case from 544 F.3d 420, Second Circuit (2008).  But, ultimately, I think the Courts, including the Second Circuit, put the onus in these types of situations, whether it's an STN standing situation, or approval of a settlement, or approval of a transaction out of the ordinary course, all of which come down to a decision on how to allocate the debtor's resources in light of the legal and business risks and issues.

To the Court's sense of whether a particular course of action makes sense, it appears to me that there is, in fact, a colorable claim here.  Courts have in the past analogized this analysis, particularly as to the colorable claim part of the two-prong analysis set forth in STN, to a 12(b)(6) analysis.  And as far as the first prong is concerned, I think that's appropriate.

I don't see a -- a 12(b)(6) type of defense here. I wasn't entirely sure until I saw the tolling agreement, but -- and even without the tolling agreement, I think there are good arguments that might be dealt with on a summary judgment basis for tolling, but not -- not on a – on a basis of permitting this lawsuit from getting out of the -- out of the starting gate.

Similarly, it appears to me that while there would be many defenses that could be asserted by All Hallows

Institute, including to the merits of this intentional

fraudulent transfer claim, which Mr. Markowitz has

summarized, and they would include the fact that the debtor

continued to pay its debts for decades after this transfer,

that the debtor did not transfer all of its property, that

this wasn't part of a overall or concerted scheme, that the

debtor is not in the business of making money, in fact just

the opposite, and therefore, the fact that it was a transfer

for $10 or $0 is less relevant as a badge of fraud than it

would normally be the case.

The debtor's argument that this wasn't the first

time it transferred isolated pieces of property like this,

the debtor's argument that really All Hallows is -- is and

has been, except for a legacy of involvement -- a separate

institution starting in 1990, and the difficulty of proof

given the witnesses - lack of witnesses at this point, so

there would have to be a lot of inferential argument made.

Finally, I'm not discounting the potential for a

successful motion in limine, which I agree with the

committee, it's not appropriate to decide now.

So, it is clear to me that this would not be an

easy case for the committee to win, but I don't see it as

being a case that would die in a motion to dismiss, and

frankly it may well be a case that would survive a motion

for summary judgment also.

That brings me to the second prong of the STN test which is -- is the action unlikely to benefit the debtor's estate.  I haven't cited STN yet, so I guess I should which is 779 F.2d 901, Second Circuit (1985).  And frankly, I don't really see much evolution in the committee context since then, notwithstanding that there have been four more Second Circuit level opinions dealing with standing.  So, I'm -- I'm guided by the STN analysis here.

The issue of benefit to the estate is a closer call for me.  The committee has been candid in saying that it doesn't see an outcome here where the high school would be sold, I'm sorry, where the high school would be closed, i.e. sold for some other purpose if it prevailed, although it's not waiving the right to do that or to seek that remedy.

To my mind that limits to some extent, and that extent has a big question mark on it, the value of this litigation.  It presumes that there would be a buyer for the high school as a school and/or a funder as part of, perhaps, a comprehensive settlement such as Mr. Stang said the New York Archdiocese or some other group that would want to preserve this school as it is.

Going beyond that, if one were actually to close the school and sell it, you know, as a condo for example, I think it would raise the prospect of another serious defense

**Page 49**

which would be the RFRA issue.  But I agree with the committee that again as far as an STN analysis concerned -- is concerned, it is premature to close out this lawsuit based on the Religious Freedom Restoration Act because there are alternatives, potentially.

The issue I have, though, is whether those alternatives are realistic enough to see value here for the estate in excess of the cost that it would take to prosecute this litigation to get to a victory.

Committee counsel, and I appreciate his candor on this, is telling me that the very prospect of pursuing the lawsuit would show, not only to the debtor but to those people and institutions who care about this school and the debtor's mission, that that mission is in some jeopardy and therefore that it is a cold dose of reality if I granted this motion.  I guess I tend to agree with that ultimately.

I also think that because standing would be conferred here on a creditors' committee that is, I think, responsibly represented and is in fact a fiduciary for all the unsecured creditors that the committee would not act irresponsibly in this litigation and would pursue it as I have just described it.  In other words, I take the committee at its word that it is not looking, necessarily, to close down the high school.  In fact that would be its least preferred option other than having it as an option.

I raise this type of issue early in this case when I was told that Rice High School, which is a famous and well-regarded school for decades, was closing and it raised my concern that was this happening because of this case or is it happening for some other reason.

I think this case is different if there is something of real value, societal value, to be saved, I would hope that people in other institutions would step up, if necessary, to help save it.  Certainly the school, to my mind, fills that bill.

So, weighing at this time the potential value of this litigation, it seems to me that if properly and wisely pursued, there would be a benefit to the estate, clearly worth more than the cost of wisely pursuing it.

I don't believe that it is viewed as $8 million of cash in the creditors' hands, it just isn't that type of litigation, but it is litigation that may lead to, I would hope, a consensual resolution of this case as a whole, of the Chapter 11 case.

So, although it is not a -- an easy decision by any means, I will grant the committee's motion and give it standing to pursue this intentional fraudulent transfer claim.

I think the committee fully understands my view that their pathway in this litigation is not an easy one,

and my hope that it is something that would instead be a --
an element in negotiating a final plan here, which the
parties should focus on first, particularly given the fact
that you have several months to go before the limitations
period expired.

MR. MARKOWITZ:  Judge, I understand your decision.
Would you be willing as part of this, since we are coming on
these plan negotiations and there is a statute of
limitations issue is many months away to give them that
authority but say that they have to wait a certain period of
time, or at least get into the plan negotiation so that --

THE COURT:  Well, I think the plan negotiations
should go forward.  I mean, the fact that the lawsuit it
commenced, I mean that's, you know -- I manage the lawsuit
in large measure.

The parties should be focusing on -- on
negotiating the plan, but I think the fact that this is out
there is important and I wouldn't want to send the message
by putting conditions on bringing the litigation that maybe
it isn't that important, I think it is important and if it
can be resolved, great, and I think it should be.  You've
seen the complaint.  Everyone's seen the complaint.

MR. MARKOWITZ:  Right.

THE COURT:  It's been filed as an exhibit, so --
and it's been thought about carefully, at least the merits

Page 52

and defenses have been thought about carefully, I'm not so sure about the outcome if one wins has been thought about that carefully, but that's something that, you know, the lawyers and the clients should talk about.

MR. MARKOWITZ:  Okay.

THE COURT:  So, I -- I certainly wouldn't be disappointed if this wasn't filed for a few months, but I'm not -- I'm not going to put a condition like that on -- on the relief.

I also think given the observation I made earlier which is that this is not a fact pattern where a debtor is preferring insiders or management or a friendly group of creditors where Courts have, you know, quite eager to say, well yeah, it should be in a disinterested parties' hands, this litigation, the debtor's whole mission here is to create and preserve schools like this.

So, while I'm granting the motion, including the committee's ability to settle the litigation, it would seem to me, just as any plan can also settle litigation, that if the debtors propose a plan that is a reasonable resolution of this issue, they're certainly free to do that and I'm free to confirm it if it satisfies the confirmation standards.

So, a fair resolution of this issue will get approved whether it's submitted by the committee or

Page 53

submitted by the debtors.  Although, the debtor's resolution

of it really should be, I think, as part of a plan as a

practical matter.

MR. MARKOWITZ:  So, you're not permanently taking

away the debtor's ability to --

THE COURT:  No.

MR. MARKOWITZ:  -- to settle it.

THE COURT:  You know, if -- if some other

constituent in the case came up with a way to settle that,

I'd listen to them too.

MR. MARKOWITZ:  Okay.

THE COURT:  On the other hand, unlike in, I guess,

it's the child law case, the Juno case, the committee will

have the authority to settle if it, you know -- if it can.

MR. MARKOWITZ:  On Smart World, yeah.

THE COURT:  Smart World, yes.  Smart World.  Thank

you.  And they'll have full standing on that -- on that

basis, subject to 9019 of course.

MR. STANG:  Right, and subject to the debtor's

rights to be heard.

THE COURT:  Right and my discretion to decide

whether it's a fair and reasonable settlement.

MR. KORNFELD:  Your Honor, we'll submit an order

to you --

THE COURT:  Fine.  If you --

Page 54

MR. KORNFELD: -- and show it through, we're going to pass it around first, obviously.

THE COURT: -- yeah, you can circulate to -- to the debtor's counsel. You don't need to settle it on them, but just email it.

MR. KORNFELD: Okay.

THE COURT: Okay?

MR. KORNFELD: Thank you.

THE COURT: Thanks.

We went through this with Iona, we should -- I should say this on the record I guess here too, I think it's been clear from what the committee has said, it's frankly clearer here than it was in Iona because there's no sale in prospect. The committee would have to win and then pursue all the options before one would even consider that, but that just, I think, highlights how remote the closing of this school is.

People who are going to this school should not be freaking out thinking that it's going to be closing, you know, next September or next April or whenever. That's just not going to happen. So, that message should be very clear.

MR. STANG: Your Honor -- Your Honor, there is an auction tomorrow of the Iona Grammar property.

THE COURT: Right.

MR. MARKOWITZ: In our -- at our office.

Page 55

MR. STANG:  At their offices -- there is going to be an auction -- there is an auction dynamic.

MR. MARKOWITZ:  Just one qualified bidder besides from Iona, just so Your Honor knows from Iona Prep.

THE COURT:  Okay.

MR. STANG:  Are you a -- there may be some issues about how that auction proceeds, are you --

THE COURT:  Yeah, I'll be around.

MR. STANG:  -- generally available tomorrow?

THE COURT:  Well, I'm in -- I have a hearing in the morning, but I'll be around.

MR. STANG:  Okay.

THE COURT:  And you -- you have a court reporter there, you're going to (indiscernible – 1:28:06) on the record?

MR. MARKOWITZ:  Yes, we have a court reporter.

THE COURT:  Okay.

MR. MARKOWITZ:  And then we have a hearing August 15th, a sale hearing if --

TH COURT:  Okay.

THE COURT:  -- if necessary.

MR. STANG:  Okay, thank you, Your Honor.

THE COURT:  Okay, thank you.

MR. MARKOWITZ:  Your Honor, isn't -- oh, okay, yeah, yeah.

Page 56

THE COURT:  All right, so then let me take the motions to dismiss in Corporation of the Catholic Archbishop of Seattle versus Congregation of Christian Brothers of Ireland, et al.

MR. COLLEN:  Your Honor, may it please the Court, John Collen on behalf of Pacific Indemnity.  We have an unopposed motion to intervene which you may want to consider at the outset of the hearing.

THE COURT:  Okay.  I -- there is no opposition to that motion, correct?

MR. COLLEN:  There is no opposition, Your Honor.  I think under Caldor (ph), it's pretty clear that we have skin in the game and therefore a right to intervene.

The only thing I want to make clear on the record is that nothing involved in either the motion or the actual intervention constitutes an admission or evidence of coverage (indiscernible – 1:29:26) of rights and remedies with respect to defenses or denials of coverage are reserved.

THE COURT:  Right.

MR. COLLEN:  As a quick reminder, we -- there's an insurance certificate, not a policy, in existence which may cover, if anything, only events of the Briscoe School $250,000 per occurrence.  The skin in the game with the consolidation motion is that it could lead someone arguably

Page 57

to claim standing as an insured now that's been substantively consolidated.

THE COURT:  Because the assets would be merged and that's --

MR. COLLEN:  That's -- that's right, and -- and therefore expand a universe of coverage beyond what was originally contracted for.  So that's the skin in the game that motivates the intervention.

And if Your Honor sees fit to grant this motion, I would ask to be heard in connection with supporting the dismissal motions, which I believe we could be heard on independently under 1109(b), but I think we'd prefer to be a party for the reasons stated.

THE COURT:  Okay.  Does anyone have anything to say on this motion to intervene?

MR. MARKOWITZ:  The debtor didn't file -- the debtor doesn't object, Your Honor.

THE COURT:  Okay.

MR. MARKOWITZ:  The debtor didn't file any papers.

MR. COLLEN:  Your Honor, if I may, chambers informed us not to file a -- a draft order.  I have one here that's been looked at by committee counsel, Mr. Patterson, if I may approach Your Honor, or should I do that in chambers?

THE COURT:  Well, let me just -- I mean the -- I

Page 58

am prepared to grant the motion to intervene consistent with the -- Judge Gerber's ruling in Adelphia.  I don't view the insurer here as, in essence, a full-fledged party entitled to take discovery on its own, or all that sort of stuff at this point without being convinced later about the need for that, but I'm certainly prepared to let it be heard on this issue, the motion to dismiss issue, as well as other issues in the case.  And if there is specific discovery that it wants to take or, you know, other aspects under the Part 7 rules, then I'll consider that at the time.

MR. COLLEN:  Your Honor, that's fine.  We can submit an order with pro viso that we would reproach the Court for permission to engage in any discovery.  There is, however, a proposed answer to the complaint which was attached to the motion to intervene and we would ask --

THE COURT:  That's fine.

MR. COLLON:  -- to be allowed to filed that.

THE COURT:  It's really just the -- it's just the -- pre-trial activity that I want to keep a handle on.

MR. COLLON:  That's fine, Your Honor.  We'll circulate an order among the parties and email it to chambers, we hope, within 48 hours.

THE COURT:  Okay.

MR. COLLON:  Thank you so much.

THE COURT:  Thank you.

Page 59

MR. PASCOE:  Your Honor, Dan Pascoe from Coughlin Duffy.  We represent Maryland Casualty Company and we filed a very similar motion to specific indemnity for the same reason.

THE COURT:  Right.  I -- I'll grant it on the same basis.

MR. PASCOE:  Thank you, Your Honor.

THE COURT:  So, I -- hopefully you can -- you can use the same type of wording.  You should work together on the order to make sure it's -- there's no reason not to --

MR. PASCOE:  Will do, thank you, Your Honor.

THE COURT:  -- model them on each other.

Okay, so there are two motions to dismiss by Christian Brothers' Institute of Michigan and Christian Brothers' Institute of California.  They raise very similar issues and I'm happy to hear them all together.  I mean, there's no reason, I think, to have the plaintiff go through oral argument twice on this.  I think they're -- they're very similar allegations.

MR. NELSON:  Thank you, Your Honor.  Dean Nelson, I'm speaking on behalf of the Christian Brother Institute of Michigan and I think the issues have been presented fairly well in both our brief and the brief of the California Institute.

I mean, at the end of the day what this motion

comes down to is what facts are there that are alleged against Christian Brother Institute of Michigan and are they sufficient for substantive consolidation. We went through numerous provisions of the complaint and there just simply aren't any. Under the applicable standard, you need evidence that creditors treated both the entity to be consolidated, in this case CBIM and the debtors, or perceived by the creditors and treated by the creditors of those entities as a single, economic unit.

There's not a single fact allegation in this entire complaint that goes to that allegation other than a simple statement that that element is true, which as the Iqbal and Twombly indicates is inappropriate.

There's similar situation with the second element or means of providing for substantive consolidation and there's just simply no facts to show that there is a -- any sort of a entanglement of assets and certainly no evidence that untangling this will benefit all credits. And I think that that's where, at least from our purposes, this complaint is so -- it's just -- hit us the wrong way.

When we have our own creditors, we have our own assets, and then we get this complaint that says, oh, but you need to be come -- come into Bankruptcy Court because somebody you may or may not have dealt with in the past has filed for bankruptcy. And there's just simply no evidence

Page 61

that -- or allegations that it is appropriate and therefore should be dismissed, just without regard to the standing arguments which, I think, in this particular case were first raised by the -- the debtors in their answer and affirmative defenses, and then picked up in some of the briefs.

But at the end of the day, the issue the Seattle Archdiocese just doesn't have standing because they're seeking a relief that, in effect, benefits all creditors and any cause of action that would benefit all creditors would be property of the estate, and anything that is property of the estate is given to the debtors or the debtors in possession subject to a derivative standing motion. And that's not the case here.

And I think at -- we just can't emphasis -- emphasize enough, there just simply aren't any facts alleged against CBIM and we went through what facts were alleged and why they don't pertain to the cause of action for substantive consolidation and I think this motion is just that simple. And it should be dismissed with prejudice as to CBIM.

We're not asking for dismissal as against the NAP or consolidation of the two debtors, we just -- CBIM wants to be dismissed and go home. And there's no allegations in that -- this complaint that would dictate any other result.

THE COURT: Okay.

Page 62

MR. HANSEN:  Your Honor, Richard Hansen for CBI California.

I would reiterate what Mr. Nelson has -- has stated as well turn to the briefs, but one thing I'd like to point out is this entanglement issue that is so -- so necessary for a substantive consolidation matter proceeding, there is no fact alleged in the Seattle Archdiocese's complaint against CBI California that it ever did business with CBI California, that it ever knew we even existed until a lawsuit was filed in King County Circuit Court in the State of Washington by one of the -- by a lawyer for one of the -- the claimants in this case that alleged that we were a landlord.

Now, I'm not sure what that -- I mean, we have issues on that complaint, but in this particular complaint there's no issue of entanglement of assets.  The Seattle Archdiocese never did business with us, never thought they were doing business with us, and in fact has alleged that the provincial headquarters, which were supposedly located upon our premises, that's what the complaint says, that they were the agents of CBI, one of the debtors.  Where does that put CBI California?  We're nowhere to be found.

And the debtors -- excuse me, the creditors of my client are now being dragged clear across the country into this court because why?  Nobody can explain why.  The bottom

Page 63

line is that Seattle Archdiocese is looking for -- to spread their problem on as many people as they can and that's not an appropriate use of this particular cause of action and in this particular proceeding.  And we'd rely upon our briefing, Your Honor.

THE COURT:  Okay.

MR. COLLEN:  Mr. Patterson, would you mind if I?

UNIDENTIFIED SPEAKER:  (Indiscernible)

MR. COLLEN:  That will give you a better chance to refute to what I'm about to say.

Thank you, Your Honor, John Collen for Pacific Indemnity.

Let me start with the following overview.  We would not be concerned with this substantive consolidation complaint if it were insurance neutral.  That is to say if the consolidation were not to take place solely for insurance purposes so that it would not risk the asserted expansions of coverage that I spoke about earlier with the understanding, of course, that we're not conceding that it's a necessary result, but certainly would be an asserted position.

I mentioned to Mr. Patterson and I'll mention it to the Court and all parties present that with an insurance neutral substantive consolidation, that is where it is -- there is no consolidation for coverage purposes, we probably

would be willing to sit on the sidelines for the rest of

this.  But unless and until that happens, I have two

observations.

The first is to support what's already been said

without repetition by Christian Brothers of Michigan and

California.  And the second is to expand a little bit upon

the issue of standing, which is interesting because it comes

on the heels of the STN motion with respect to the

fraudulent conveyance.

Substantive consolidation is generally considered

to be sort of a bankruptcy equivalent of veil piercing.  And

the only distinction in the New York case law that we were

able to find that makes those doctrines not quite identical

is that veil piercing could be based on fraud.  Substantive

consolidation can be based on general equitable principals.

And I would question at the outset, by the way,

how anything could operate equitably with respect to my

client which creates potential universes of insurance beyond

the people we originally contracted with.

Given that rough equivalent, it's important that

-- it's really not a rough equivalent, it's an essential

equivalent with -- with slightly -- slight differences only.

It is worth quoting, and I seldom do this in oral argument,

verbatim from Jackson versus CorporateGear, LLC, 2005 U.S.

District, Lexis 35579, Southern District of New York,

**Page 65**

(2005), "when New York law applies, a bankruptcy trustee has standing to assert claims based on piercing the corporate veil or alter ego liability and creditors are precluded from pursuing those claims unless have been abandoned."  That has not happened here.

The Archdiocese brings before this Court a complaint for which necessary pre-conditions are absent. Now, it could have potentially brought a derivative standing motion, in which case, I think, Your Honor would have to conduct a hearing roughly analogous to what we just went through with respect to the fraudulent conveyance actions sought to be asserted by the committee.

But, instead, what's happened is a party, not the committee, not a fiduciary for all creditors, and not the debtor, without seeking derivative standing, has sought to assert under the guise of substantive consolidation what is nothing more than a veil piercing cause of action which is specifically legally reserved only to the debtor unless and until something else happens.  So --

THE COURT:  Well, this -- this issue in the substantive consolidation context, leaving aside the issue of substantively consolidating a debtor with a non-debtor, hasn't really been addressed by the courts, right?

MR. COLLEN:  I'm sorry, Your Honor?

THE COURT:  Had this -- this standing issue has

Page 66

not been addressed by the courts, has it, in the substantive

consolidation area?  There's no holding that says that a

non-debtor cannot seek substantive consolidation?  I mean a

third party, for example, a creditor.

MR. COLLEN:  Well, I think the import of a

quotation from Jackson/CorporateGear case, Your Honor, is --

THE COURT:  Well, but that's a -- that's a veil

piercing case.

MR. COLLEN:  Right, but it's the functional

equivalent --

THE COURT:  But it isn't.  It's not veil piercing.

I mean, look, there -- there are many cases that deal with

at the equity of the circuit court level standing to bring

veil piercing.

MR. COLLEN:  Right.

THE COURT:  And it -- it depends on, to some

measure, what state's law you're applying.  New York, I

agree with you.  It's a corporation specific cause of

action, unless they're very unusual facts.

But, you know, that -- the number of times that

substantive consolidation has been litigated and raised, I

haven't been able to locate a case that says that only the

debtor can bring a substantive consolidation, or -- it's a

state cause of action.

MR. MARKOWITZ:  You mean a circuit court case?  Or

Page 67

there's -- there's definitely Bankruptcy Court opinions on it.

THE COURT:  Only the debtor --

MR. MARKOWITZ:  Yes.

THE COURT:  -- can bring substantive consolidation?

MR. MARKOWITZ:  Yes.  I -- I review those cases. That's why we put in our answer an affirmative defense, we didn't (indiscernible).

THE COURT:  Well, I haven't seen them cited.

MR. MARKOWITZ:  All right, I will -- I believe they were cited by --

THE COURT:  I don't think so.

MR. MARKOWITZ:  Okay, well I -- I can --

MR. COLLEN:  Well, I cited one in -- in argument just a moment ago, Your Honor, but --

THE COURT:  That's a veil piercing case, though.

MR. COLLEN:  Right.

THE COURT:  That's different.

MR. COLLEN:  I think the point is whether it's substantive consolidation or veil piercing, some kind of derivative standing needs to be obtained.  The -- there's also, to my knowledge, not a -- a body of case law which independently holds the other way that any creditor --

THE COURT:  No, I agree with that.  I agree with

you.

MR. COLLEN:  -- that any creditor can come in and say pierce the veil or substantively consolidate.

So, what I'm suggesting, Your Honor, is that at least in its current procedural posture, the complaint ought to be dismissed and if Mr. Patterson wishes to seek some kind of derivative standing, either through the debtor in possession or somehow on behalf of all creditors, because after all this is a remedy that's going to impact the assets of the estate available to everybody, not just to Mr. Patterson's client, then he can bring that before the Court and we can go through the kind of analysis that Your Honor, I think very patiently indulged in earlier with respect to the STN motion on fraudulent conveyance.

And those are the only remarks that I wish to submit to amplify what's already been said by the movants who are here before the Court to dismiss this action.  I understand Mr. Markowitz may have some further comments on authorities with regard to substantive consolidation standing.

THE COURT:  Okay.

MR. COLLEN:  All right.  Thank you, Your Honor.

THE COURT:  Okay.

MR. PATTERSON:  Mike Patterson, Patterson Buchanan, on behalf of the Archbishop of Seattle, Your

Honor.

And I think preliminarily context for this is extremely important.  The Court will recall that the very first hearing that was held in this particular case, the issues of all of these other Christian Brother entities being named in various lawsuits in the State of Washington.  We have raised that, I think, in every hearing that we've had before this Court.  And this Court indicated that definitively this needs to be sorted out because we have lawsuits filed in the State of Washington, some which are already back here in New York, but I understand may be remanded back at some point in time.

But the issue is there are a myriad of Christian Brother entities named in those lawsuits, in addition to the debtors that have filed for bankruptcy here.  We continue to get those, we understand there's another 20 claims, so we have about 35 claims now pending against the Archdiocese and various Christian Brothers' entities.

The Court, in indicating that you specifically wanted to definitively address this issue and find out whether or not any of these organizations were predecessors, successors in interest, those sorts of issues.  We understand canon law insofar as some juridic [sic] institutions are here and with regard to civil law and some of those issues, but we brought this motion or this

complaint for substantive consolidation to ferret out exactly what entities we are now being faced as co-defendants on with the subject of potential joint and several liability in the State of Washington, which entities are connected with the debtors and which were not.  And that was the whole purpose of the substantive consolidation.  And this whole issue with regard to standing has been raised.

We have filed a proof of claim.  We are a creditor.  The number of these lawsuits are back here where we are named as a co-defendant.  We have insurance policies where an additional named insured is the Congregation of the Christian Brothers.  And so we believe that it was certainly prudent for us to pursue this motion for substantive consolidation for three basic reasons.

One is the Court wanted a definitive resolution as to these other entities as to whether or not they were indeed predecessors, successors, or otherwise involved.  And the context of that is, is that we are dealing with an unusual piece of litigation here, especially in the State of Washington, where the statute of limitations is extended under the discovery rule and some of these cases go back to 1935.

And, as a result of that, it's easy for, you know, people to stand up and say what happened historically for five years, but we've had negotiations ongoing with regard

-- for instance, Briscoe School since 1914.  We referenced that contract in there.  We've had ongoing relationship with O'Dea High School and that's been an ongoing process with signed agreements as late as 1973.

And so all that we want to see happen here, and certainly the burden here is this is a 12(b)(6) motion and they're saying well, there isn't enough plead here that would allow this case to go forward.  I submit to you that they are picking and choosing which portions of that complaint they want to pick and choose with only the name Michigan, or only the name California there.  But there are many other allegations and many other complaint allegations that -- that relate here.

In fact, not even the Christian Brothers are sure about the entities and which existed at any particular point in time, all that we know --

THE COURT:  But -- could -- could I -- could I interrupt you?

MR. PATTERSON:  Yes.

THE COURT:  It's true that it makes sense in this case, as the committee's identified, to see the relationships among various entities that have the name Christian Brothers in the name, or they're affiliated.  But it seems to me that to use a complaint as the vehicle for doing that, you need to have more in the complaint than

what's alleged here.

I mean you have Rule 2004.  You can take that discovery.  You don't need to bring a complaint to get to the bottom of -- of these issues.  In fact, bringing the complaint makes it harder to get to the bottom of these issues because then you can't take as broad discovery as you can under Rule 2004.  And when you bring the complaint after having taken the discovery, you'll have more facts.

I -- I really -- I tend to agree with the movants here.  I don't really see, other than non-conclusory allegations, anything justifying substantive consolidation of the debtors with these two movants.

I mean, there's a -- there is, I guess, a fair amount in here suggesting that some Christian Brothers' entities may be, sort of, inextricably tied to these debtors.  But I don't see facts suggesting that these two Christian Brothers' entities fall under that category.

I mean one was a landlord and one employed a wrongdoer and it has alleged, you know, sent him back out into the world again to another Christian Brothers' entity.  But I don't -- I mean, I've been through the complaint a few times and I just don't see more than that.

MR. PATTERSON:  Well, Your Honor, I mean certainly with regard to Michigan, California, I mean there's paragraphs 4, 12, 13, 14, 16, 20, 24, 28, 29 that refer to

Page 73

the defendants generally, not specifically.  And I --

THE COURT:  Right.

MR. PATTERSON:  And here's the reason why.  I mean, how do we get to the issue here?

We are now faced with lawsuits in the State of Washington naming all of these other Christian Brothers' entities.

My position, the Archdiocese position, has always been clear, that when the dust clears on this bankruptcy, we want to be in a position where we can say that we will not have a Christian Brother entity as a co-defendant exposing us to joint and several liability.

This Court has indicated that you want to ferret out those individuals so that we're not faced with that -- that proposal.  And certainly the complaint for substantive consolidation at least brings these entities in here so that we can ferret those out.

THE COURT:  But it sounds to me then that basically the -- the only basis for substantive consolidation is that they're co-defendants in a lawsuit.  I mean --

MR. PATTERSON:  Well, they're --

THE COURT:  -- you know, I mean, that would mean -- if you follow that approach that means that basically any corporation that used his (indiscernible - 1:53:50) should

be substantively consolidated with the, you know, the 40,000 corporations that used his (indiscernible - 1:53:56).

MR. PATTERSON:  No, and not -- and not necessarily --

THE COURT:  I mean, they knowingly sent his (indiscernible - 1:54:00) into the world.  I mean, why isn't Brother Courtney like his (indiscernible - 1:54:04)?

MR. PATTERSON:  But -- but they are saying that they are linked, and I'm talking about -- it's not we saying that, it is the plaintiffs who are saying that they are linked insofar as their decisions as it relates to moving around these abusers and in particular Briscoe and O'Dea, and going back to 1914 and the agreements that posted them.

THE COURT:  But on that score, let -- I mean let's look at the complaint then.

On the -- on the linkage point, I think it's easiest with Christian Brothers' Institute of California. Paragraph 13 says "upon information and belief, the defendants have their provincial headquarters in California from '69 to early '76.  On information and belief, those headquarters were owned by defendant Christian Brothers' Institute of California."  And then it says, "and the provincial leaders were the agents of defendant CBI."  But provincial leaders isn't tied to Christian Brothers' Institute of California, right?  I mean, they're just -- and

Page 75

then it says "upon information and belief, during that timeframe the provincial leaders transferred Courtney from school to school, including O'Dea High School."  But, again, it's not -- I don't see a tie there other than real estate with Christian Brothers' Institute of California.

MR. PATTERSON:  But, Your Honor, I think we -- we did in fact allege that there was more than a tie there that the -- you have to remember that the western province here, aka western province, was also as we were told -- I mean, the point being here is that we don't know specifically whether or not these were predecessors or successors, but the allegations in the complaints against us are saying that.

What I want and when the dust clears here --

THE COURT:  Well, but you don't say that.  But you don't say that in your complaint.

MR. PATTERSON:  I believe I do, Your Honor.

THE COURT:  You don't say that Christian Brothers' Institute of California was a successor or a predecessor.  It's just -- it's the landlord.

MR. PATTERSON:  Well, and we put forward and we referenced our contracts.  We reference --

THE COURT:  But those don't have -- they're not a party to those contracts.

MR. PATTERSON:  Well, but the -- I think the case

law indicates that if we reference those contracts and what we did in the -- in the diagrams that we put forward in the opposition is simply outlying what the factual allegations were as it relates to that.

THE COURT:  I -- I understand that.  I could -- I can -- you know, I can -- I believe I can consider your client's agreements that are referenced in the complaint or that are central to the complaint, but none of those agreements is with Christian Brothers' Institute of California.

MR. PATTERSON:  Well --

THE COURT:  And there's no allegation that Christian Brothers' Institute of California was another name for or party to those agreements, or did business on -- you know, they did business under this name too.  I mean, it's just -- it doesn't -- it doesn't --

MR. PATTERSON:  Well, certainly --

THE COURT:  I mean I'm assuming there are other -- I mean isn't there a Christian Brothers that makes wine.  I mean they -- they, you know -- they have the name Christian Brothers too.

MR. PATTERSON:  But they're not -- they're not named here --

THE COURT:  They're not named in the complaint.

MR. PATTERSON:  And they're not named as being

Page 77

alleged to have been involved in any of this sexual abuse

conduct.  I agree that under --

THE COURT:  All right, but I -- but I don't see --

I mean even if that is enough for substantive consolidation,

which I don't think it is, but I don't even see that as far

as Christian Brothers' Institute of California.

On Michigan, it does say that "upon information

and belief, despite having knowledge of Courtney's prior

misconduct at Brother Rice High School, he Christian

Brothers," I guess that means Michigan, "transferred him to

another school and eventually to O'Dea High School,"

although it doesn't really say Christian Brothers of

Michigan did.

So, again, I don't -- but so, I mean that's it as

far as Christian Brothers of Michigan is concerned.  And,

you know, maybe you meant to say Christian Brothers of

Michigan transferred him there, although it doesn't say it,

and --

MR. PATTERSON:  Well, I think that you need to --

there are certainly paragraphs that zero in on Michigan,

zero in on California --

THE COURT:  Just in terms of making --

MR. PATTERSON:  -- mention those specifically,

okay.

THE COURT:  Well, that's where you define them as

the defendants.

MR. PATTERSON:  And then we define them as defendants.

THE COURT:  Right, I mean that's the only other --

MR. PATTERSON:  And -- and I --

THE COURT:  I don't think there's anything else --

MR. PATTERSON:  Well --

THE COURT: -- except lumping them in as the defined term defendants.

MR. PATTERSON:  Well, in paragraph 13, I agree that we make the allegation that CBI California owned the property where other defendants had their provincial offices.

THE COURT:  Right.

MR. PATTERSON:  But then we go on and mention them in the context of defendants in paragraphs 4, 12, 13, 14, 16 --

THE COURT:  But that's just a defined term.  I mean you've defined them that way.  That doesn't mean anything.

MR. PATTERSON:  Well, because --

THE COURT:  You know, you could -- you could have listed, I don't know, let's say -- let's do a hypothetical, that in addition to the defendants in the King County action who were there, another defendant who was named, and, you

know, since -- since we're dealing with this subject, let's say they name Jerry Sandusky, okay?  Would just the fact that he's named in there and then you can define them all as the defendants, you would substantively consolidate Jerry Sandusky, you know, with the debtors.

MR. PATTERSON:  But -- and I would agree with that, but I'd suspect what's going to happen in the Jerry Sandusky case, I mean as a result of -- there's going to be a lot of civil litigation and there's going to be a lot of connection not only insurance policies, but connection with Penn State with regard to whether or not he acted for and on behalf of them, et cetera, et cetera.

THE COURT:  That's fine, but what I'm saying is when you -- in this complaint, where you -- where you define the term defendants as including all the defendants in the lawsuit --

MR. PATTERSON:  Right.

THE COURT:  -- and then other than in these specific paragraphs 12 and 13 where you're talking about CBI of Michigan and CBI of California, you're just referring to the defendants?  That doesn't say anything.  I mean it doesn't -- it doesn't say who -- what these people did.

MR. PATTERSON:  Well, they're part of that Christian Brother entity group, and here's the whole point is that is there a plausible, it doesn't have to be

probable, is there a plausible claim here that indeed there were a number of Christian Brothers' organizations from 1914 forward that could be linked to and were linked to CBI --

THE COURT:  Okay, but -- but --

MR. PATTERSON:  -- the debtors, and Congregation of the Christian Brothers for which we have an insurance policy --

THE COURT:  But you're not --

MR. PATTERSON:  -- name and is additional insured.

THE COURT:  But you're not naming all of the Christian Brothers' entities in this -- in this complaint, right?  There are other Christian Brothers' entities out there?

MR. PATTERSON:  No, we are only naming those Christian Brothers' entities that plaintiffs have named in the lawsuits in the State of Washington as being implicated as a result of sexual abuse in both Briscoe Boys School and O'Dea.

THE COURT:  So, why -- so, I mean I think your answer tells me, then, that the allegations that these named entities are so entangled as to merit substantive consolidation is not really based on their managerial and financial entanglement, but simply based on the fact that they were named in a complaint.

MR. PATTERSON:  Well, here's --

**Page 81**

THE COURT:  So all of these allegations about them being entangled, other than being inclusory [sic], aren't really about entanglement.

MR. PATTERSON:  Okay, but the bottom line is this. Is that we are faced with allegations that they are entangled --

THE COURT:  I don't -- I don't see that.  I mean not in the complaint.

MR. PATTERSON:  And, you know, I would love --

THE COURT:  They're entangled -- well, are you saying that the allegations that they're entangled -- are those allegations that they sent Brother Courtney from place to place?

MR. PATTERSON:  That's one of them.  That's correct.

THE COURT:  Why?  Is there anything else?

MR. PATTERSON:  Yes, insofar as --

THE COURT:  What?

MR. PATTERSON:  -- their management and their governanceship, the signing of the 1914 contract, the signing of the 1973 contract with O'Dea.  Your Honor --

THE COURT:  But there's no allegation that Christian Brothers' Institute or -- of California or Michigan have the same management, have the same -- or signed these documents.

Page 82

MR. PATTERSON:  I think there is, Your Honor, but here's the --

THE COURT:  You should show me because I couldn't find it.

MR. PATTERSON:  Okay.  Here's the bottom line --

THE COURT:  Well, so you can't show me, right, because it's not there?

MR. PATTERSON:  Yes.  Okay, here we go.

(Pause)

MR. PATTERSON:  Well, I'm looking at -- and here's the paragraphs that I'm looking at, Your Honor, and once again these are 4, 12 --

THE COURT:  Well, let's -- let's go through them.

MR. PATTERSON:  Okay.

THE COURT:  4 just says they're defendants.  They're defendants in the King County --

MR. PATTERSON:  Okay and 12 says were agents of defendant Christian Brothers' Institute of Michigan and Michigan Corporation.

THE COURT:  Wait, let me --

(Pause)

THE COURT:  Okay.

MR. PATTERSON:  13, talking about the provincial headquarters in California.  Agents of defendant CBI, that's the allegation in there.

THE COURT:  Well, it just -- actually it just says that and the provincial leaders were the agents of defendant CBI, it doesn't --

MR. PATTERSON:  Right.

THE COURT:  -- say that California was.

MR. PATTERSON:  Well, it -- I believe it says that in conjunction with their agency as referred to up in paragraph 12.

THE COURT:  It doesn't.  I mean, I don't know who the provincial leaders are.  Christian Brothers' Institute of California is not a province, right?

MR. PATTERSON:  No.

UNIDENTIFIED SPEAKER:  It's a high school.

THE COURT:  Okay.  Look, you may, or the debtors may, or the committee may be able to accumulate enough facts to allege in a complaint that substantive consolidation is justified for either of these two entities, I just don't see it here.

MR. PATTERSON:  Well, and once again, if you take a look at paragraph 16, upon information and belief --

THE COURT:  Okay, 16?

MR. PATTERSON:  Yes.  The defendants contend that there are separate entities affiliated with the debtors.

THE COURT:  Okay.  Right.

MR. PATTERSON:  That's a plausible allegation

based upon --

THE COURT:  But that -- but that just means they're affiliates.  That means -- that actually means that they're separate.  They contend they're separate.  That's -- that doesn't really -- I thought you -- you asserted that for the case or controversy point.

MR. PATTERSON:  Well, that's part of it.

THE COURT:  Okay.  So, it's not a -- it doesn't support substantive consolidation.

MR. PATTERSON:  Well, if -- if in fact the Court, once again, is feeling as though we need some more definitive allegations in here, I would ask for leave to amend the complaint.  And here's the -- here's the purpose for -- and I'm -- trust me, if in fact CBI of Michigan and CBI of California get out of here, I would like a definitive order from this Court saying that there is no showing that they are connected or were ever connected in any way --

THE COURT:  Well, you can't get that --

MR. PATTERSON:   -- with the debtors.

THE COURT:   -- because it's just a motion to dismiss.

MR. PATTERSON:  Okay.

THE COURT:  It's just based on the complaint.  It's not a decision on the merits.

MR. PATTERSON:  But my point is, is that we don't

Page 85

have any discovery that indicates that.

THE COURT:  But you have Rule 2004.  You know, maybe -- and if it was my fault, I apologize for this.  I do remember saying, I think, based on both you and Mr. Stang's discussion about the King litigation and the insurance and, you know, my questioning whether people have gotten to the bottom of the insurance yet, the -- my suggesting that the parties do look into all these entities.  But my view was that a way to do that was through either informal discovery or Bankruptcy Rule 2004 discovery.

And this kind of puts the cart before the horse, I mean, the whole point of -- even before Twombly and Iqbal, but Papasan v. Allain is that you don't use a conclusory complaint as a doorway into discovery and particularly in this context where you don't need it.  In fact, you get better discovery under Rule 2004.

So, if that's your purpose behind this, I would say, you know, take a 2004 exam, figure out who -- what these relationships are, and then -- and then move to file it, you know, file an amended complaint.

MR. PATTERSON:  Okay, I think that's a -- that's appropriate.

THE COURT:  One other point on this, I did think that one element of this complaint might be to, in effect, extend the insurance coverage by substantively consolidating

Page 86

the assets as well as the liabilities, of course, which is

what substantive consolidation is all about.

And it would seem to me that if a party has

entered into a contract like a contract for insurance, it

isn't the same as getting a lien, but it's close.  And I

just -- I don't really see that working, that approach

working.

Now the contract itself may be vague or ambiguous

and may, you know, require analysis as to who the insured

was supposed to be, but just doing it by substantive

consolidation, I think, is pretty -- that would be a

stretch.  I'm not ruling on that, but I think that just as

liens survive substantive consolidation, generally, it would

seem to me that an insurance contract where insured number 1

was the insured, it would be hard to find that substantive

consolidation would also make insureds number 2, 3, and 4

the insured. That's separate --

MR. PATTERSON:  And that would --

THE COURT:  -- from saying that the definition of

the insured is vague and we need to decide what that means.

That's a separate issue.

MR. PATTERSON:  And that was not the purpose of

bringing this, Your Honor.  I fully understand who the

insured is or the insureds under the contracts --

THE COURT:  Well, I --

MR. PATTERSON:  -- of the Maryland Casualty --

THE COURT:  Good because I'm not sure other people do, but --

MR. PATTERSON:  But -- but one of the -- one of the entities, though, that's named in here and is subject to this complaint for substantive consolidation is a named insured and that's the Congregation of Christian Brothers and -- and I would assume that both Maryland and Pacific Indemnity will, you know, meet their obligations as it relates to that, but that was not the purpose in bringing this to expand the insurance coverage.  And I know Mr. Collen is very much concerned about that.

THE COURT:  I know, I mean that -- that might well be the effect of it, though, I mean --

MR. COLLEN:  That's the -- thank you, Your Honor, that's exactly right, it's that --

THE COURT:  I mean that would be an open issue.

MR. COLLEN:  -- consequence that concerns us.

THE COURT:  It's the second level of the substantive consolidation analysis is, you know -- who's ox is being gourde by this and is if fair to have it be gourde.

MR. PATTERSON:  But, Your Honor, I guess getting back to, you know -- getting back to your suggestion about doing the 2004 discovery and then seeking an amended complaint at this particular point in time, once again I

would seek guidance from the Court because once again the bottom line here is that when the dust clears and we finally resolve this case, the Archdiocese of Seattle does not want to find itself in litigation with Christian Brothers' entities where there are allegations that they were connected with the debtors and that somehow --

THE COURT:  Well, but -- but you might.  I mean if substantive consolidation doesn't lie, that's the only other consequence is that you might.  I mean, it is quite possible that if the mere -- if the only meaningful connection among these entities is that they each employed a bad actor, I don't think that gives rise to substantive consolidation. So you might well be in that situation.

You know, the -- the other employers of the bad actor may not be brought into this bankruptcy case.  You may have -- you know, there may be contribution claims and things like that, but it's not a bankruptcy issue.

I mean, again, going back to the asbestos analogy, there was lots of evidence that at least the main asbestos producing corporations shared information, knew about the harms of asbestos, at a minimum didn't tell each other or they did tell each other, they kept producing it, but that's not enough to substantively consolidate, you know, John's Danville with Armstrong or, you know, any of the other asbestos companies, W.R. Grace.  I mean, they're all

separate entities.

MR. PATTERSON:   Okay.

THE COURT:   Just the fact that they did -- they did wrongdoing together isn't enough.

MR. PATTERSON:   Right.  And I understand the motion to dismiss here is made by CBI of Michigan, CBI of California.

THE COURT:   Right.

MR. PATTERSON:   We do not have the congregation of Christian Brothers --

THE COURT:   No, that's true.

MR. PATTERSON:   -- and the other Christian Brothers' entities.

THE COURT:   I'm just ruling on these two motions.  Nothing else.

MR. PATTERSON:   Correct.  I wanted to make sure that's clarified.

THE COURT:   Right.  Okay.

MR. PATTERSON:   Thank you.

MR. HANSEN:   They will submit an order then?

THE COURT:   Yes, well let me just -- does the debtor have anything to say on this?

MR. MARKOWITZ:   Judge, we think the Court should grant the motion to dismiss.  We put in our answer and will hope to deal with this as part of plan negotiations, as Your

Honor knows and I've been speaking to Mr. Patterson since the case started, there is cases Metro Media, there's ways to resolve these claims that -- these contribution claims or the fact that he's a co-defendant with the debtor in State Court for various tort claims.

There's a way to resolve that is part of our plan negotiation and we think that that's the most prudent way, and if he'd participate with us in the plan, make contributions, he could hopefully end up out of this bankruptcy and not having to worry about the problems he's worrying about.

THE COURT:  Well that -- that's fair.  All right. Well, I -- I have two motions to dismiss in this adversary proceeding, one brought by Christian Brothers' Institute of California and the other by Christian Brothers' Institute of Michigan, both of them under Bankruptcy Rule 7012 incorporating Federal Rule of Civil Procedure 12(b)(6).

The underlying complaint seeks a declaratory judgment that the two movants, as well as certain other non-debtor entities affiliated with the debtors or at least sharing some of the same name as the debtors, should be substantively consolidated with the debtors in this case. The motions are supported by the two intervener insurance companies and assert various grounds for dismissal.

First it is asserted that the plaintiff, which is

Page 91

the Corporation of the Catholic Archbishop of Seattle lacks standing to seek substantive consolidation without at least first having obtained permission to do so in the debtor's place.

Second, it is asserted that because the substantive consolidation of non-debtor entities with the debtors is sought, that either the Court lacks the power to grant the relief because, in effect, it would be tantamount to an involuntary bankruptcy of the two non-debtor movants under Section 303 of the Bankruptcy Code without the protections of a Section 303 motion or proceeding.

And secondly, that even if the Court does have the power to substantively consolidate non-debtor entities with debtors, that power should be used even more sparingly than the extraordinary remedy of the substantive consolidation of debtor entities with each other, and that even as plead on a conclusory basis, the complaint does not set forth that super extraordinary set of circumstances.

And then, finally, it is asserted that the complaint fails, except on a conclusory basis, in essence repeating the elements of the cause of action without any underlying facts to support that conclusory assertion fails under the relevant case law to survive a motion to dismiss.

It is clear that substantive consolidation is a different remedy than veil piercing.  Substantive

**Page 92**

consolidation is a remedy or doctrine unique to Federal Bankruptcy Law, under which Bankruptcy Courts may, in the exercise of their general equitable powers and arguably under Sections 541 or 1123 of the Bankruptcy Code, consolidate the assets and liabilities of different entities and treat them as one for purposes of the bankruptcy case. See, for example, In re Owens Corning, 419 F.3d 195-205, Third Circuit (2005), cert. denied 126, Supreme Court 1910 (2006).

On the other hand, veil piercing is a state law cause of action, which the debtor possesses under Section 541 of the Bankruptcy Code.  Depending on the applicable state law, it is true that only a debtor in possession may bring a veil piercing case if in fact the cause of action under state law belongs to the corporation, even if it may be derivatively brought by the corporation's creditors or shareholders.  However, veil piercing involves a different analysis than substantive consolidation growing out of the two doctrines' independent origins.

I'm reluctant to grant these motions simply on the basis of a lack of standing because, at least as far as the case law that's been cited to me, I do not find any cases that so limit the standing of a third party to bring a substantive consolidation proceeding.  Although, it is possible that they are out there and simply haven't been

**Page 93**

cited to me.

I'm partly of the view that I won't rule on this basis because there's a perfectly good alternative basis to grant the motion, and I don't believe, therefore, that I need to consider this grounds for purposes of these two motions, although it may come up in the future.

Similarly, I will not grant the motions on the basis that I'm precluded from substantively consolidating the estates of the debtors with non-debtors.  This is an issue that has divided the courts.  There are courts that believe that there is no such remedy under the Bankruptcy Code and that it -- it improperly circumvents Section 303 of the Code.  However, in New York and in particular in the Second Circuit, I believe that is not the law provided that the motion is on sufficient notice to all of the creditors of the non-debtor entities.

I've reviewed the certificate of service of this motion -- I'm sorry, of this complaint and it appears to me that the plaintiff has attempted to serve the known creditors of the two movants, but under Second Circuit case law, I believe that the Court does have the power to substantively consolidate non-debtors with debtors.  See Soviero v. Franklin National Bank, 328 F.2d 446, Second Circuit (1964).  See also, In re Verestar, 343 BR 444,463, Bankruptcy SDNY (2006).  See generally, 2 Collier on

Page 94

Bankruptcy, Paragraph 105.09(c), 16th edition (2011).

It is clear that even where substantive consolidation is sought of debtors, as opposed to debtors and non-debtors, it is an extraordinary remedy that must be exercised sparingly.  See for example, FDIC v. Colonial Realty Co., 966 F.2d 57, Second Circuit (1992); and In re Augie/Restivo Baking Company, 860 F.2d 515, Second Circuit (1988); and Chemical Bank v. Kheel, 369 F.2d 845-847, Second Circuit (1966).

The test enunciated in Augie/Restivo still pertains in the Second Circuit, although the Colonial Realty case makes it clear that it is ultimately a facts-based context dependent determination.  The Court ultimately needs to decide, in order to substantively consolidate corporate entities: one, whether the creditor has dealt with the entities as a single, economic unit and did not rely on their separate identities in extending credit; or two, whether the entities' affairs are so entangled and confused that substantive consolidation will benefit all creditors.

Since it is a fundamentally equitable analysis, there's often a third element of the analysis that comes in once the Court determines to substantively consolidate the entities and that is whether there is any particular entity who should fall out of the substantive consolidation because they clearly did rely on the separate credit of the -- of

the corporate entities and therefore should not be subject to the leavening of substantive consolidation.

Here, since this is a motion to dismiss, the Court must assess the legal feasibility of the complaint, not weigh the evidence that might be offered in its support. Koppel v. 4987 Corp., 167 F.3d 125-133, Second Circuit (1999). The Court's consideration is "limited to facts stated on the face of the complaint and in the documents appended to the complaint or incorporated in the complaint by reference, as well as to matters of which judicial notice may be taken." Hertz Corp. v. City of New York, 1 F.3d 121-125, Second Circuit (1993), cert. denied 510 U.S. 1111 (1994); see also DiFolco v. MSNBC Cable LLC, 62 F.3d 104-111, Second Circuit (2010). "Where a document is not incorporated by reference, the Court may nevertheless consider it where the complaint relies heavily upon its terms and effect."

The Court accepts the complaint's factual allegations as true even if they are doubtful, in fact, and must draw all reasonable inferences in favor of the plaintiff. Tellabs Inc. v. Makor Issues & Rights Limited, 551 U.S. 308, 321, 323 (2007); and LaFaro v. New York Cardiothoracic Group, 570 F.3d at 475, Second Circuit.

However, if a complaint's allegations are clearly contradicted by documents incorporated in the pleadings by

Page 96

reference, the Court need not accept them.  Labajo v. Best Buy Stores LP, 478 F.2d, F Supp. 2d, excuse me, 523-528, SDNY (2007).

Moreover, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265-286 (1986).  Instead, the complaint must state more than "labels and conclusions and a formulaic recitation of the elements of a cause of action will not do."  Bell Atlantic Court v. Twombly, 550 U.S. 544-555 (2007).

In addition, the Supreme Court has -- while the Supreme Court has confirmed that in light of the notice pleading standard of Federal Rule of Civil Procedure 8(a), that a complaint does not need detail of factual allegations to survive a motion under Rule 12(b)(6).  See Twombly, 550 U.S. at 555.  Its "factual allegations must be enough to raise the right to relief before the speculative level." Id. Otherwise, the defendant should not be subjected to the burdens of continued discovery and the worry of over-hanging litigation.  Id at 556.

In sum, therefore, the Court applies a two-step approach under Rule 12(b)(6).  Harris v. Mills, 572 F.3d 66-72, Second Circuit (2009).

After identifying the elements of the applicable causes of action, Ashcroft v. Iqbal, 129 Supreme Court 1937-

1947 (2009), the Court must first note the allegations not entitled to the assumption of truth because they are only legal conclusions.  Id at 1951.  And, second, it must assess the factual allegations in context to determine whether plausibly suggested entitlement to relief.

I've reviewed the complaint and the documents referred to in the complaint or arguably central to the complaint, which have been attached to the plaintiff's response to the two motions to dismiss, and I have concluded that the complaint as to both movants fails the first part of the two-prong test.

It asserts only on a conclusory basis, i.e. reciting the elements of a cause of action for substantive consolidation in the Second Circuit, the allegations with respect to the two movants.  It does not set forth any facts other than, again, reciting the elements of the cause of action that would support substantive consolidation of these two non-debtor entities with the debtors.

In essence, the complaint states that the two movants have been named along with other entities, including the debtors and the plaintiff, in litigation in Washington State related to the conduct of the O'Dea High School and the Briscoe Memorial School in Washington State.

It has been alleged in that litigation and is also alleged in paragraph 12 of the complaint that movant,

Page 98

Christian Brothers' Institute of Michigan, at one time employed a Christian Brother, Edward Courtney, who eventually was transferred to the O'Dea High School, notwithstanding prior knowledge of Courtney's misconduct at another high school operated by Christian Brothers' Institute of Michigan.

It is also alleged that Christian Brothers' Institute of Michigan was affiliated with the debtors and that the debtors arguably, given the full benefit of the doubt to the plaintiff, supervised Courtney while he was at the high school in Birmingham, Michigan, run by Christian Brothers' Institute of Michigan.

With respect to the Christian Brothers' Institute of California, it is alleged that between 1969 and early 1976, the provincial headquarters of "the defendants", which would include the debtors as well as Christian Brothers' Institute of Michigan and Christian Brothers' Institute of California, as well as other parties, and a building owned by defendant, Christian Brothers' Institute of California.

It is also alleged in paragraph 13 that provincial leaders of some entity, but apparently not Christian Brothers' Institute of California, caused Courtney to be transferred from school to school, including the O'Dea High School, despite knowing of his prior misconduct.

It is then alleged in a conclusory fashion in

Page 99

paragraphs 34, 35, 36, 37, and 38 that the plaintiffs in the

Washington State action and the plaintiff in the present

adversary proceeding before me "dealt with the debtors and

the Christian Brothers' entities," which include the two

movants, as a single institution, that the Christian

Brothers are mere instrumentalities of one another with no

separate existence apart from the debtors, and that the

debtors' affairs are so entangled with those of the

Christian Brothers' entities that substantive consolidation

of the debtors and the Christian Brothers' entities will

benefit all of the debtor's creditors including, but not

limited to, the plaintiff.

It's also alleged in paragraph 36 that the timely

expense necessary to attempt to unscramble the entanglement

of the debtor's affairs with that of the Christian Brothers'

entities is so substantial that no accurate identification

and allocation of assets is possible in the absence of

substantive consolidation.

Paragraph 37 alleges that no harm will come to the

debtors or the Christian Brothers' entities should this

Court enter an order of substantive consolidation because

these entities are already so entirely entangled.

Paragraph 38 alleges that substantive

consolidation will allow a truly equitable distribution of

assets among the debtor's creditors by treating the

Page 100

Christian Brothers' entities as a single economic unit, along with plaintiff.

Each of those paragraphs clearly merely parrots the general standard for substantive consolidation under Augie/Restivo, and more specifically the second alternative prong of that standard. This was confirmed to some extent in oral argument when counsel for the plaintiff acknowledged that discovery needed to occur to determine the degree of entanglement. But as the Supreme Court has noted in Twombly and Iqbal, as well as Papasan v. Allain, a complaint that merely recites the elements of the cause of action should not serve as the platform for discovery to determine whether those elements actually exist in fact.

Consequently, I'm not -- I'm sorry, I'm of the mind that the complaint should be dismissed and that the two motions should be granted on the basis that the complaint as drafted does not set forth, other than in a conclusory fashion, the elements of a cause of action for substantive consolidation. That view is heightened by the fact that the complaint seeks to substantively consolidate non-debtor entities with debtor entities, which to my mind would require even more extraordinary degree of entanglement than is contemplated by Augie-Restivo and its progeny.

I would also note that it appears to me that there's a way to get to the understanding of the

Page 101

entanglement of these parties, if in fact they were entangled, without pursuing this litigation at this time, which would be through Bankruptcy Rule 2004 examinations or consensual discovery.  But, the two movants should not be put to the burden of litigating this matter in this form at this time.

So, I'm going to ask each of you to submit a separate order granting the motion to dismiss.  You don't need to settle that order formally on counsel for the plaintiff, but you should email it to him before you email it to chambers, and you should also send a copy to counsel for the debtor and counsel for the committee.

(Simultaneous speaking)

THE COURT:  My -- my normal --

UNIDENTIFIED SPEAKER:  Your Honor --

UNIDENTIFIED SPEAKER:  Should the insure have a copy too?

THE COURT:  I'm sorry.

UNIDENTIFIED SPEAKER:  Can the intervener have a copy?

THE COURT:  Oh, yes.  I'm sorry.  Yes.  Certainly.

UNIDENTIFIED SPEAKER:  Thank you.

THE COURT:  My normal practice is not to grant motions for leave to amend from the bench, but when people want to make a motion to amend, they can do it under Rule

Page 102

15.

Do you have a motion to dismiss on?

MR. MARKOWITZ:  I don't, Your Honor.  We just put in an answer --

THE COURT:  Okay.

MR. MARKOWITZ:  -- and affirmative defenses and we --

THE COURT:  I mean, I'm not -- I'm not looking to create more litigation in this -- in this substantive consolidation case, so I'm reluctant to impose a deadline on you for making that type of motion.

MR. MARKOWITZ:  Yeah, we -- and we were going to have some discussions, I mean there's a possible scenario that some of the debtors -- well, two of them are debtors so that -- they would possibly -- as a plan negation, that could be something that could be --

THE COURT:  They might be substantively consolidated.

MR. MARKOWITZ:  Right.  I don't want to say that --

THE COURT:  Well, so I -- I guess I'll impose a -- well, does anyone have any thoughts on imposing a deadline here?

MR. NELSON:  Your Honor, I -- again, Dean Nelson.

I would propose as opposed to setting a deadline,

Page 103

just -- if Your Honor's inclined to do that is just

dismissing it without prejudice --

THE COURT:  That's fine.  I -- I'll do that --

MR. NELSON:  -- and then have the discovery --

THE COURT:  -- unless someone else has anything to

say about that.  I'm inclined to dismiss it without

prejudice.

MR. PATTERSON:  Your Honor, we do have, as I

understand it, a discovery conference on August 15th as it

relates to the substantive consolidation complaint.

THE COURT:  Well, you could confer on that but in

the context of Rule 2004.

MR. PATTERSON:  Okay, thank you, Your Honor.

THE COURT:  Okay.

MR. MARKOWITZ:  Thank you, Your Honor.

THE COURT:  All right, so you can -- you can both

submit that order without dismissing the complaint as to

your clients without prejudice.  Okay.

MR. MARKOWITZ:  Thank you, Your Honor.

THE COURT:  Thank you.

(Whereupon these proceedings were concluded at 12:52

P.M.)

Page 104

**I N D E X**

**RULINGS**

| | Page | Line |
|---|---|---|
| Motion of the Official Committee of | 50 | 21 |
| Unsecured Creditors for Authority to Assert, | | |
| Litigate, and Settle Claims on Behalf of | | |
| Bankruptcy Estate Relating to Fraudulent | | |
| Conveyance to All Hallows Institute | | |
| Motion to Intervene filed by John Collen | 58 | 1 |
| on behalf of Pacific Indemnity Company | | |
| Motion to Intervene filed by Robert W. | 59 | 5 |
| Muilenburg on behalf of Maryland Casualty | | |
| Company | | |
| The Christian Brother's Institute of | 100 | 17 |
| California's Motion to Dismiss Adversary | | |
| Proceeding | | |
| Christian Brothers' Institute of | 100 | 17 |
| Michigan's Motion to Dismiss Adversary | | |
| Proceeding | | |

C E R T I F I C A T I O N

I, Jamie Gallagher, certify that the foregoing transcript is

a true and accurate record of the proceedings.

Jamie Gallagher

Digitally signed by Jamie Gallagher
DN: cn=Jamie Gallagher, o, ou, email=digital1@veritext.com, c=US
Date: 2012.08.13 16:53:48 -04'00'

Veritext

200 Old Country Road

Suite 580

Mineola, NY 11501

Date:  August 13, 2012