UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

In re:                                            :    Chapter 11
                                                  :
THE CHRISTIAN BROTHERS' INSTITUTE, *et al*.       :    Case No.: 11-22820 (RDD)
                                                  :
                                                  :    (Jointly Administered)
              Debtors.                            x

-----------------------------------------------------------------

# FIRST AMENDED DISCLOSURE STATEMENT TO JOINT CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE CHRISTIAN BROTHERS' INSTITUTE AND THE CHRISTIAN BROTHERS OF IRELAND, INC. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

TARTER KRINSKY & DROGIN LLP
Anthony Dougherty, Esq.
Scott S. Markowitz, Esq.
1350 Broadway, 11th Floor
New York, New York 10018
Telephone: 212/216-8000
Facsimile: 212/216-8001

*Attorneys for the Debtors and Debtors In Possession*

PACHULSKI STANG ZIEHL & JONES LLP          PACHULSKI STANG ZIEHL & JONES LLP
James I. Stang, Esq.                        Ilan D. Scharf, Esq.
10100 Santa Monica Blvd., 13th Floor        780 Third Avenue, 36th Floor
Los Angeles, CA  90067-4100                 New York, NY  10017-2024
Telephone: 310/277-6910                      Telephone: 212/561-7700
Facsimile: 310/201-0760                      Facsimile: 212/561-7777

*Attorneys for Official Committee of Unsecured Creditors*

-and-

LAW OFFICES OF PAUL A. RICHLER
Paul A. Richler, Esq.
15332 Antioch St. Suite 305
Pacific Palisades, CA 90272
Telephone: 310/862-0045
Facsimile: 310/612-2501

*Special Insurance Counsel to the Official Committee of Unsecured Creditors*

Dated: New York, New York
       December 6, 2013

# Table of Contents

DISCLOSURE STATEMENT ................................................................................................1

I. INTRODUCTION .............................................................................................................1

II. NOTICE TO HOLDERS OF CLAIMS..........................................................................2

III. EXPLANATION OF CHAPTER 11 ..............................................................................5
   A.   OVERVIEW OF CHAPTER 11 ........................................................................................5
   B.   CHAPTER 11 PLAN .....................................................................................................5
   C.   CONFIRMATION OF A CHAPTER 11 PLAN ....................................................................6
   D.   SUMMARY OF CLASSIFICATION AND TREATMENT .......................................................7
IV. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN .....10

V. VOTING INSTRUCTIONS AND CONFIRMATION OF PLAN...............................12
   A.   MANNER OF VOTING ON PLAN ..................................................................................12
   B.   CLAIM HOLDERS ENTITLED TO VOTE........................................................................13
   C.   CLASSES IMPAIRED UNDER THE PLAN .......................................................................13
   D.   VOTE REQUIRED FOR CLASS ACCEPTANCE ................................................................14
VI. THE DEBTORS AND THEIR OPERATIONS ...........................................................14
   A.   GENERAL BACKGROUND ...........................................................................................14
      1.  Pre-Petition ....................................................................................................14
      2.  Sexual Abuse Litigation .................................................................................15
VII. THE CHAPTER 11 CASE ...........................................................................................16
      1.  The Chapter 11 Filing ....................................................................................16
      2.  Retention of Counsel ......................................................................................16
      3.  Appointment of Creditors' Committee ...........................................................16
      4.  Asset Sales ......................................................................................................17
      5.  Bar Dates and Objections to Claims ..............................................................19
      6.  Motion to Extend Exclusivity .........................................................................20
      7.  All Hallows Litigation ....................................................................................20
      8.  Post-Petition Operations and Select Financial Information ...........................21
      9.  Plan Mediation ..............................................................................................22
      10. Community Support Corporation ...................................................................22
      11. Maintenance Claims ......................................................................................23
      12. Seattle Archdiocese .......................................................................................23
      13. Removed Cases ...............................................................................................25
      14. Motions for Relief From the Automatic Stay .................................................28
      15. Insurance .......................................................................................................28
VIII. SUMMARY OF THE PLAN .......................................................................................30
   A.   GENERAL .................................................................................................................30
      1.  Brief Explanation of Chapter 11 ...................................................................30
      2.  Acceptance of the Plan ...................................................................................31
      3.  Classification of Claims Generally ................................................................31
   B.   CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN ...............................32
      1.  <u>Unclassified Claims</u> .....................................................................................32
         (a)   United States Trustee Fees ....................................................................32
         (b)   Administrative Claims .........................................................................32
      2.  <u>Priority Tax Claims</u> .....................................................................................34

      3.  *Class 1 – Other Priority Claims* ..................................................................34
      4.  *Class 2 – Secured Claims* .........................................................................34
      5.  *Class 3 – General Unsecured Convenience Claims* ..............................34
      6.  *Class 4 – Sexual Abuse Claims* ...............................................................35
      7.  *Class 5 – Fraud Claims* ............................................................................37
      8.  *Class 6 – Physical Abuse Claims* ............................................................38
      9.  *Class 7 – Maintenance Claims* ................................................................38
      10. *Class 8 – General Unsecured Claims* ......................................................38
      11. *Class 9 – Penalty Claims* .........................................................................39
      12. *Class 10 – Abuse Related Contingent Contribution / Reimbursement / Indemnity Claims* ......39
  C.  **MEANS FOR EXECUTION OF THE PLAN**...................................................................**39**
      1.  *The Trust*....................................................................................................39
      2.  *Creation and Funding of Trust* ...............................................................40
      3.  *Establishment of Reserve Accounts* ........................................................40
      4.  *Prosecution of Tort Actions* ....................................................................41
      5.  *Liquidation and Payment of Abuse Claims* ............................................41
      6.  *Insurance Matters* ....................................................................................43
      7.  *Treatment of Executory Contracts and Unexpired Leases* ....................46
  D.  **PROCEDURE FOR DETERMINATION OF CLAIMS OTHER THAN ABUSE CLAIMS, FRAUD CLAIMS, AND
      PHYSICAL ABUSE CLAIMS** .................................................................................**46**
      1.  *Objection to Claims* ..................................................................................46
      2.  *Disputed Claims* ........................................................................................47
      3.  *Treatment of Contingent Claims* .............................................................47
  E.  **PROVISIONS GOVERNING DISTRIBUTIONS**.............................................................**47**
      1.  *Distribution Only to Holders of Allowed Claims* ...................................47
      2.  *Transmittal of Distributions* ...................................................................47
      3.  *Timing of Distributions* ............................................................................48
      4.  *Form of Distributions* ...............................................................................48
      5.  *No Professional Fees or Expenses* ..........................................................48
      6.  *Claim Estimation*......................................................................................48
      7.  *No Interest on Claims* ...............................................................................49
      8.  *Withholding Taxes* ....................................................................................49
      9.  *No De Minimis Distributions* ...................................................................49
      10. *Manner of Cash Payments*.......................................................................49

**IX.  CONDITIONS TO EFFECTIVE DATE** ..........................................................**50**

  A.  **CONDITIONS TO OCCURRENCE OF EFFECTIVE DATE** ............................................**50**
  B.  **WAIVER OF CONDITIONS**......................................................................................**50**
  C.  **FAILURE OF PLAN TO GO EFFECTIVE** ..................................................................**50**

**X.  EFFECT OF PLAN CONFIRMATION** ...........................................................**50**

  A.  **DISCHARGE** ........................................................................................................**50**
  B.  **VESTING OF ASSETS** ...........................................................................................**53**
  C.  **EXCULPATION AND LIMITATION OF LIABILITY**....................................................**53**
  D.  **PERMANENT INJUNCTION AGAINST PROSECUTION OF RELEASED CLAIMS AND CHANNELED CLAIMS
      AGAINST PARTICIPATING PARTIES AND SETTLING INSURERS** ..............................**54**
  E.  **RELEASE OF CLAIMS AGAINST PARTICIPATING PARTIES** .....................................**56**
  F.  **SETTLING INSURER INJUNCTION** .........................................................................**56**

**XI.  NON-MONETARY COMMITMENTS** ............................................................**56**

**XII.  CERTAIN OTHER GENERAL PROVISIONS OF THE PLAN**.........................**59**

      1.  *Causes of Action/Avoidance Actions* ......................................................59
      2.  *Retention of Jurisdiction* ..........................................................................60
      3.  *Remand of Removed Actions* ...................................................................60
      4.  *Modification of the Plan* ..........................................................................60

     *5. Severability* ........................................................................................................................... *61*

     *6. Section 1146 Exemption* ....................................................................................................... *61*

     *7. Management of the Reorganized Debtors* ........................................................................ *61*

**XIII.    CONFIRMATION PROCEDURES** ......................................................................... **61**

    A.    SOLICITATION OF VOTES; ACCEPTANCE ................................................................. **62**

    B.    CONFIRMATION HEARING ......................................................................................... **62**

    C.    BEST INTERESTS TEST ................................................................................................. **63**

    D.    FEASIBILITY ................................................................................................................. **65**

    E.    CRAM DOWN ................................................................................................................. **65**

**XIV.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** .......................... **66**

    A.    LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE ............................... **66**

    B.    ALTERNATIVE CHAPTER 11 PLANS ............................................................................ **66**

**XV.    CERTAIN FEDERAL INCOME TAX CONSIDERATIONS** ............................................ **67**

    A.    THE TRUST ................................................................................................................... **67**

    B.    FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS .......................... **68**

**XVI.    VOTING INSTRUCTIONS** ................................................................................... **69**

**XVII.    CONCLUSION** .................................................................................................. **70**

## EXHIBITS

Exhibit A:    Joint Chapter 11 Plan of Reorganization Proposed by The Christian Brothers' Institute and The Christian Brothers of Ireland, Inc. and The Official Committee of Unsecured Creditors

Exhibit B:    Order Approving the Disclosure Statement

Exhibit C:    Liquidation Analysis

Exhibit D:    Memorandum of Understanding Regarding Treatment of Community Support Corporation Under Plan of Reorganization for The Christian Brothers' Institute and The Christian Brothers of Ireland, Inc.

## DISCLOSURE STATEMENT

On April 28, 2011 (the "**Petition Date**"), The Christian Brothers' Institute ("**CBI**") and The Christian Brothers of Ireland, Inc. ("**CBOI**" and, collectively with CBI, the "**Debtors**") filed voluntary Chapter 11 petitions with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").  Since the Petition Date, the Debtors have remained in possession of their assets and have continued to own, operate and manage their affairs pending the approval of a plan of reorganization in accordance with the provisions of Title 11 of the United States Code (as amended, the "**Bankruptcy Code**").  The Debtors and The Official Committee of Unsecured Creditors of The Christian Brothers' Institute and The Christian Brothers of Ireland, Inc. (the "**Committee**") seek confirmation of their *First Amended Joint Chapter 11 Plan of Reorganization Proposed by The Christian Brothers' Institute and The Christian Brothers of Ireland, Inc. and The Official Committee of Unsecured Creditors* (as it may hereafter be amended or modified, the "**Plan**").  The Committee and the Debtors are referred to herein collectively as the "**Plan Proponents**."

Pursuant to §1125 of the Bankruptcy Code, the Plan Proponents now submit this disclosure statement (the "**Disclosure Statement**") in connection with the Plan.

## I.

## INTRODUCTION

The Plan Proponents provide this Disclosure Statement to all of the Debtors' known creditors and other parties in interest in order to provide adequate information to enable them to make an informed decision on whether to accept or reject the Plan.   All holders of Claims are hereby advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan.

The Plan summary and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan (a copy of which accompanies this Disclosure Statement as **Exhibit A**).[1]

BY ORDER DATED _____ __, 2013 (THE "**DISCLOSURE STATEMENT ORDER**"), THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT, WHICH INCLUDES AND DESCRIBES THE PLAN, AS CONTAINING ADEQUATE INFORMATION OF A KIND AND IN SUFFICIENT DETAIL TO ENABLE CREDITORS OF THE DEBTORS TO MAKE AN INFORMED DECISION ABOUT THE PLAN.  A COPY OF THE DISCLOSURE STATEMENT ORDER IS ATTACHED HERETO AS **EXHIBIT B**.  ONLY HOLDERS OF ALLOWED CLAIMS IN CLASS 4 (SEXUAL ABUSE CLAIMS), CLASS 5 (FRAUD CLAIMS), CLASS 6 (PHYSICAL ABUSE CLAIMS) AND CLASS 8 (GENERAL UNSECURED CLAIMS) ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.  ACCORDINGLY, EXCEPT FOR THE DEEMED UNIMPAIRED CLASS 1, CLASS 2, CLASS 3 AND CLASS 7 CLAIMS AND DEEMED IMPAIRED CLASS 9 AND CLASS 10 CLAIMS, THE PLAN PROPONENTS ARE SOLICITING ACCEPTANCES OF THE PLAN FROM ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS.

---

[1] Capitalized terms not otherwise defined in this Disclosure Statement have the meanings and definitions assigned to them in the Plan.

THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALL CLAIMS AGAINST THE DEBTORS. ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN.

VOTING INSTRUCTIONS ARE CONTAINED IN THE ATTACHED DISCLOSURE STATEMENT ORDER. IN ADDITION, THE SOLICITATION PACKAGE ACCOMPANYING EACH OF THE BALLOTS CONTAINS APPLICABLE VOTING INSTRUCTIONS. **TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED, EXECUTED AND ACTUALLY RECEIVED BY OMNI MANAGEMENT GROUP/RUST CONSULTING (THE "VOTING AGENT") BY 5:00 P.M. (PREVAILING EASTERN TIME), ON JANUARY 3, 2014 (THE "VOTING DEADLINE").**

The Court's approval of the Disclosure Statement does not constitute a recommendation by the Court either for or against the Plan. No statements or information concerning the Plan and the transactions contemplated thereby have been authorized, other than the statements and information set forth in this Disclosure Statement. All other statements regarding the Plan and the transactions contemplated, whether written or oral, are unauthorized.

The Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for January 9, 2014 at 10:00 A.M.(the "Confirmation Hearing") at the United States Bankruptcy Court for the Southern District of New York located at 300 Quarropas Street, White Plains, New York. This hearing may be adjourned from time to time, including without further notice other than by announcement in the Bankruptcy Court on the scheduled date of such hearing. At that hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code. The Bankruptcy Court will then also receive and consider a ballot report prepared by the Voting Agent concerning the votes for acceptance or rejection of the Plan by the parties entitled to vote.

## II.

## NOTICE TO HOLDERS OF CLAIMS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT AND ALL EXHIBITS THERETO WITH CARE.**

**PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. UNLESS OTHERWISE SPECIFIED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED**

HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN OR ANY OTHER APPLICABLE DOCUMENT, THE TERMS OF THE PLAN OR ANY SUCH APPLICABLE DOCUMENT SHALL GOVERN.

NO REPRESENTATIONS CONCERNING THE DEBTORS, THE ESTIMATED VALUE OF THE DEBTORS' PROPERTY AND/OR THE ESTIMATED ASSETS TO BE GENERATED FROM THE LIQUIDATION OF THE DEBTORS' ASSETS, ARE AUTHORIZED BY THE PLAN PROPONENTS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY YOU IN CASTING YOUR VOTE WITH RESPECT TO THE PROPOSED PLAN.

THIS DISCLOSURE STATEMENT IS BASED UPON INFORMATION AVAILABLE TO THE PLAN PROPONENTS AS OF THE DATE HEREOF AND DOES NOT REFLECT EVENTS THAT MAY OCCUR SUBSEQUENT TO THAT DATE, WHICH MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE PLAN PROPONENTS FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE PLAN PROPONENTS' KNOWLEDGE, INFORMATION AND BELIEF.  HOWEVER, THE PLAN PROPONENTS AND THEIR ADVISORS DO NOT REPRESENT OR WARRANT THAT THIS DISCLOSURE STATEMENT IS COMPLETE OR THAT THE INFORMATION CONTAINED HEREIN IS FREE FROM ANY INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE, AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW.

NOTHING IN THIS DISCLOSURE STATEMENT IS OR SHALL BE DEEMED TO BE AN ADMISSION OR A DECLARATION AGAINST INTEREST BY THE PLAN PROPONENTS FOR PURPOSES OF ANY EXISTING OR FUTURE LITIGATION.  AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTORS AND DEBTORS IN POSSESSION IN THESE CASES.

**ALTHOUGH THE PLAN PROPONENTS' PROFESSIONAL ADVISORS HAVE ASSISTED IN THE PREPARATION OF THIS DISCLOSURE STATEMENT BASED UPON THE FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING THE FINANCIAL, BUSINESS AND ACCOUNTING DATA PROVIDED BY THE DEBTORS, THE PLAN PROPONENTS' PROFESSIONAL ADVISORS HAVE NOT INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND MAKE NO REPRESENTATIONS OR WARRANTIES AS TO SUCH INFORMATION. SUCH PROFESSIONAL ADVISORS DO NOT REPRESENT OR WARRANT THAT THIS DISCLOSURE STATEMENT IS COMPLETE OR IS FREE FROM ANY INACCURACY OR OMISSION.**

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan (including all exhibits and schedules to the Plan and Disclosure Statement) in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code. Except for the Plan Proponents (in their capacity as such) and certain of the professionals each has retained, no person has been authorized to use or promulgate any information concerning the Debtors, their business, or the Plan other than the information contained in this Disclosure Statement and if given or made, such information may not be relied upon as having been authorized by the Plan Proponents. You should not rely on any information relating to the Debtors, their business or the Plan other than that contained in this Disclosure Statement and the Exhibits hereto.

After carefully reviewing this Disclosure Statement, including the attached Exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot and return the same to the address set forth on the ballot, in the enclosed, postage prepaid, return envelope so that it is actually received by the Voting Agent no later than the Voting Deadline. All votes to accept or reject the Plan must be cast by using the appropriate ballot. Votes which are cast in any other manner will not be counted. **All ballots must be actually received by the Voting Agent no later than December __, 2013 at 5:00 p.m., Prevailing Eastern Time. For detailed voting instructions and the name, address and phone number of the person you may contact if you have questions regarding the voting procedures,** *see* **the Disclosure Statement Order.**

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

You will be bound by the Plan if it is confirmed by the Bankruptcy Court, even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim.

**THE PLAN PROPONENTS URGE ALL HOLDERS OF
IMPAIRED CLAIMS TO ACCEPT THE PLAN.**

## III.

## EXPLANATION OF CHAPTER 11

### A.    Overview of Chapter 11

Chapter 11 is the principal chapter of the Bankruptcy Code pursuant to which a debtor in possession may reorganize its business in an orderly fashion for the benefit of its creditors, stockholders, and other parties in interest.

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor in possession as of the date the petition is filed.  Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee.  In the Debtors' Cases, the Debtors remain as debtors in possession.

The filing of a petition under the Bankruptcy Code triggers the automatic stay provisions of the Bankruptcy Code.  Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts by creditors or other third parties to collect on prepetition claims against a debtor or otherwise interfere with its property or business.  Exempted from the automatic stay are governmental authorities seeking to exercise regulatory or policing powers.  Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed chapter 11 plan.

### B.    Chapter 11 Plan

The formulation of a chapter 11 plan is the principal purpose of a chapter 11 case.  The plan sets forth the means for satisfying the holders of claims against and interests in a debtor's estate.  A chapter 11 plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of the debtor's assets.  In either event, upon confirmation of the plan, it becomes binding on the debtor and all of its creditors, and the prior obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan.  The Plan incorporates a compromise reached among the Debtors and the Committee which the Plan Proponents believe provides a fair and equitable allocation of the Debtors' assets that will be distributed to creditors and treatment of all Claims against the Debtors.

After a chapter 11 plan has been filed, the holders of impaired claims against and equity interests in a debtor are permitted to vote to accept or reject the plan.  Before soliciting acceptances of a proposed plan, Section 1125 of the Bankruptcy Code requires the plan proponent(s) to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.  **This Disclosure Statement is presented to holders of Claims against the Debtors to satisfy the requirements of Section 1125 of the Bankruptcy Code in connection with the Plan Proponents' solicitation of votes on the Plan.**

### C.    Confirmation of a Chapter 11 Plan

If all classes of claims and, where applicable, equity interests accept a plan of reorganization, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of Section 1129(a) of the Bankruptcy Code have been satisfied. **The Plan Proponents believe that the Plan satisfies all the applicable requirements of Section 1129(a) of the Bankruptcy Code.**

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or, where applicable, interest in a particular class vote in favor of a chapter 11 plan for the bankruptcy court to determine that the class has accepted the plan. Rather, a class of claims or interests will be deemed to have accepted the plan if the court determines that the plan has been accepted by more than a majority in number and at least two-thirds in amount of those claims actually voting in such class. **Only the holders of Allowed Claims and Abuse Claims who actually vote will be counted as either accepting or rejecting the Plan.**

In addition, classes of claims or equity interests that are not "impaired" under a chapter 11 plan are conclusively presumed to have accepted the plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under a plan are conclusively deemed to have rejected the plan. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class.

**Classes 4 (Sexual Abuse Claims), 5 (Fraud Claims), 6 (Physical Abuse Claims) and 8 (General Unsecured Claims) are impaired under the Plan and entitled to vote on the Plan.**

**Holders of Class 4 Claims (Sexual Abuse Claims) shall have the option of being treated in one of two ways: (i) payment from the Trust utilizing the Allocation Plan or (ii) commencing or continuing litigation against the Debtors in a court of appropriate jurisdiction. If a Class 4 Claimant elects to commence or continue litigation against the Reorganized Debtor in a court of appropriate jurisdiction, such Sexual Abuse Claimant's recovery shall be subject to the Channeling Injunction and limited to recovery from insurance, and/or the Trust (to the extent any judgment is not satisfied from insurance and/or a joint tortfeasor, and subject to the amount such Claimant would have received under the Allocation Plan) and/or joint tortfeasors and not from the Reorganized Debtors' assets. Holders of Class 4 Claims must make an election of their treatment after notice of the final determination of the award under the Allocation Plan. Any Holder of a Class 4 Claim who does not elect treatment shall be treated as though he or she elected to receive payment from the Trust using the Allocation Plan.**

**If a Sexual Abuse Claimant elects to continue litigation against the Debtors and/or any third party and is unsuccessful in pursuing or settling such claim, then such Sexual Abuse Claimant will receive no distribution under the Plan.**

**Classes 1 (Other Priority Claims), 2 (Secured Claims), 3 (General Unsecured Convenience Claims), and 7 (Maintenance Claims) are deemed unimpaired under the Plan and are deemed to accept the Plan.**

**Classes 9 (Penalty Claims) and 10 (Abuse Related Contingent Contribution/Reimbursement/Indemnity Claims) are impaired and deemed to reject the Plan.**

In general, a bankruptcy court also may confirm a chapter 11 plan even though fewer than all the classes of impaired claims against and equity interests in a debtor accept such plan. For a chapter 11 plan to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent(s) of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan.

Under Section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a rejecting class of claims or equity interests if, among other things, the plan provides:  (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, in an amount equal to the allowed amount of such claim or such other treatment as accepted by the holder of such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive on account of such junior claim or equity interest any property at all unless the senior class is paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims or equity interests if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims or equity interests, and (b) no senior class of claims or equity interests is to receive more than 100% of the amount of the claims or equity interests in such class.  **The Plan Proponents believe that the Plan will satisfy the foregoing requirements as to any rejecting class of Claims, and can therefore be confirmed despite any such a rejection by any Class.**

**D.**     **Summary of Classification and Treatment**

Detailed elsewhere in this Disclosure Statement is a description of the technical aspects of the classification of Claims, the relative allocations of property to holders of such Claims, the methodology as to how such property is to be distributed, the risks inherent in the proposed Plan, and the applicable bankruptcy and tax consequences of the Plan.  However, the Plan Proponents believe that a broad overview of what, in the opinion of the Debtors and Creditors are likely to receive under the Plan, will be helpful for your consideration of whether you wish to accept or reject the Plan.

The following is a summary of the classification of all Claims under the Plan and the proposed treatment of each such Class under the Plan.  This summary is qualified in its entirety by reference to provisions set forth in the Plan.

| CLASS | DESCRIPTION | KIND OF PROPERTY DISTRIBUTED TO CLASS | PROJECTED ULTIMATE DISTRIBUTION AS PERCENTAGE OF ALLOWED CLAIM |
|---|---|---|---|
| Administrative (unclassified) | a. Professional Fees and Expenses | Cash | 100% as allowed by Court or as agreed between the holder of such claim and the Reorganized Debtors. |
| | b. Accounts payable and other obligations which arose post-petition | Cash | 100% on the Effective Date or as may be paid in the ordinary course of business. |
| Priority Tax Claims (unclassified) | Tax Claims | Cash | 100% of Allowed Claim paid in cash on the Effective Date or such other treatment agreed to by the holder of such Allowed Priority Tax Claim and the Reorganized Debtors. |
| Class 1 | Other Priority Claims | Cash | 100% of Allowed Claim paid in cash on the Effective Date or such other treatment agreed to by the holder of such Allowed Other Priority Claim and the Reorganized Debtors. |
| Class 2 | Secured Claims | Cash or a surrender of collateral | 100% of Allowed Claim plus contract interest upon the sale of the collateral securing such Secured Claim or a surrender of the collateral in full satisfaction of such Secured Claim. |
| Class 3 | General Unsecured Convenience Claims | Cash | $500 in cash on the Effective Date or upon such terms as may be agreed in writing by the holder of an Allowed Convenience Claim and the Reorganized Debtors. |
| Class 4 | Sexual Abuse Claims | Cash | Holders of Class 4 Claims (Sexual Abuse Claims) shall have the option of being treated in one of two ways: (i) treatment under the Allocation Plan, wherein the holder will receive payment from the Trust utilizing the Allocation Plan; or (ii) treatment as a Sexual Abuse Litigation Claim, wherein the holder may commence or continue litigation against the Debtors in a court of appropriate jurisdiction with recovery subject to the Channeling Injunction and limited to amounts payable by insurance and/or joint tortfeasors and not the Reorganized Debtors' assets. Holders of Class 4 Claims must make an election of their treatment. Any Holder of a Class 4 Claim who does not elect treatment shall be treated as though he or she selected to receive payment from the Trust using the Allocation Plan. If a holder of a Class 4 Claim elects to be treated as a Sexual Abuse Litigation Claim and loses his or her litigation against the Debtors and/or any joint tortfeasor, then such holder will receive no recovery from the Trust. If a holder of a Class 4 Claim elects to be treated as a Sexual Abuse Litigation Claim and is successful in his or her |

| CLASS | DESCRIPTION | KIND OF PROPERTY DISTRIBUTED TO CLASS | PROJECTED ULTIMATE DISTRIBUTION AS PERCENTAGE OF ALLOWED CLAIM |
|---|---|---|---|
| | | | claim against the Debtors and/or any joint tortfeasor, such holder may recover from the Trust only to the extent such holder is not paid in full from insurance and/or any joint tortfeasor and only up to the amount such holder would otherwise have received under the Allocation Plan. |
| Class 5 | Fraud Claims | Cash | Allowed Fraud Claims shall receive $10,000.00 from the Trust to be paid on the later of thirty (30) days after the Effective Date or entry of a Final Order with respect to an objection of such Fraud Claim. |
| Class 6 | Physical Abuse Claims | Cash | Allowed Physical Abuse Claims shall receive $500.00 from the Trust to be paid on the later of thirty (30) days after the Effective Date or entry of a Final Order with respect to an objection of such Physical Abuse Claim. |
| Class 7 | Maintenance Claims | Cash | Maintenance Claims held by Brothers of the North American Province of the Christian Brothers shall be paid in the ordinary course by the Community Support Corporation which shall assume the obligation to support the individual Christian Brothers. |
| Class 8 | General Unsecured Claims | Cash | Holders of Allowed General Unsecured Claims shall receive their Pro Rata share of $50,000.00 to be paid as soon as reasonably practicable after all General Unsecured Claims have been either Allowed or Disallowed. |
| Class 9 | Penalty Claims | None | Allowed Penalty Claims, if any, will receive no distribution under the Plan. |
| Class 10 | Abuse Related Contingent Contribution/ Reimbursement/ Indemnity Claims | None | Abuse Related Contingent Contribution/Reimbursement/Indemnity Claims shall receive no distribution under the Plan and be Disallowed pursuant to Section 502(e)(1) of the Bankruptcy Code |

As discussed in the Liquidation Analysis attached hereto as **Exhibit C**, the Plan Proponents estimate that recoveries for Holders of Class 4, Class 5, Class 6 and Class 8 Claims will be greater than in a liquidation under chapter 7 of the Bankruptcy Code because (a) the total amount of property available for distribution is greater under the Plan than in a liquidation under chapter 7 and (b) Class 7 Maintenance Claims are being assumed by Community Support Corporation ("**CSC**") and, therefore, (i) will not dilute the amount available to distribute to other creditors and (ii) will remain unimpaired the Plan. In addition, the Plan Proponents believe that distributions under a chapter 7 case would likely be delayed due to the time it will take a chapter 7 trustee to assess the Debtors' assets, review and analyze claims, and evaluate and litigate claims against third parties. Holders of Allowed Claims entitled to vote to accept or reject the

Plan should review the Liquidation Analysis (including all footnotes thereto) in assessing whether to vote to accept or reject the Plan.

## IV.

## QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

**Why are the Plan Proponents sending me this Disclosure Statement?**

The Plan Proponents are seeking to obtain Bankruptcy Court approval of the Plan. Prior to soliciting acceptances of the Plan, Section 1125 of the Bankruptcy Code requires the preparation and approval of a Disclosure Statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with such requirements.

**What happens to my recovery if the Plan is not confirmed, or does not go effective?**

If the Plan is not confirmed, the Plan Proponents believe it is unlikely that the Debtors will be able to reorganize. The Plan memorializes a comprehensive settlement between the Debtors and the Committee, which allocates the bulk of the Debtors' assets to the Trust which will be established for the benefit of Abuse Claimants. The Plan also provides for payment for other Claims from the assets of the Debtors or the Reorganized Debtors, as well as assumption of Class 7 Maintenance Claims by CSC. If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated in the Plan could be implemented and what holders of Claims would ultimately receive on account of their Claims. It is possible that any alternative may provide holders of Claims with less than they would have received pursuant to the Plan on account of, among other things, the cost of negotiating, drafting and potentially litigating an alternative plan, as well as complex litigation regarding Abuse Claims. Moreover, non-confirmation of the Plan will likely result in either the voluntary conversion of the Cases to cases under chapter 7 of the Bankruptcy Code or dismissal of the Cases in their entirety. For a more detailed description of the consequences of this or of a liquidation scenario, *see* "Best Interests of Creditors Test," which begins on page 63 hereof, and the Liquidation Analysis attached as **Exhibit C** to this Disclosure Statement.

**If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "Consummation?"[2]**

"Confirmation" of the Plan refers to the approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution contemplated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and become effective.

---

[2] The description capitalized terms in response to this question are qualified in their entirety by reference to the definitions in the Plan.

References to the "Effective Date" mean the date that all conditions to the Plan have been satisfied or waived and the Plan has been fully consummated. Distributions will only be made on the Effective Date or as soon as practicable thereafter, based on, among other things, the amount of cash available to satisfy Claims, the time which the Abuse Claims Reviewer requires to complete his analysis of Sexual Abuse Claims, the amount of Claims outstanding against the Debtors, and the Trustee's business judgment.

**Where is the cash required to fund the Plan coming from?**

The cash required to fund the Trust, which will pay holders of Class 4, 5 and 6 Claims, will come from (i) $13.442 million of cash from the Debtors (ii) $3.2 million of cash from Providence Washington Insurance Co., (iii) sales of real property owned by the Debtors, (iv) the prosecution and settlement of lawsuits which are property of the Debtors' Estates, and (v) certain funds that may be received from Non-Settling Insurers and Participating Parties. The cash required to fund payments for Professional Fees and Classes 3 and 8 Claims will come from the Debtors and/or the Reorganized Debtors.

**Will there be any releases granted to parties other than the Debtors as part of the Plan?**

Yes. *See* "Exculpation and Limitation of Liability," which begins on page 49.

**How do I vote for or against the Plan?**

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the holders of Claims entitled to vote on the Plan. If you are a holder of a Claim in Classes 4, 5, 6 or 8 (collectively, the "**Voting Classes**"), you may vote for or against the Plan by completing the ballot and returning it in the envelope provided. *See* "Voting Instructions and Confirmation of Plan," which begins on page 12.

**What is the deadline to vote on the Plan?**

All ballots must be actually received by the Voting Agent no later than 5:00 p.m. (prevailing Eastern Time) on January 3, 2014 (the "**Voting Deadline**").

**Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

**When is the Confirmation Hearing scheduled to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for January 9, 2014 to take place at 10:00 a.m. (prevailing Eastern Time) before the Honorable Judge Robert D. Drain, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street White Plains, New York 10601-4140. The Confirmation Hearing

may be adjourned from time to time, including without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof. Objections to Confirmation of the Plan must be filed and served on the Plan Proponents and certain other parties, by no later than December 26, 2013 at 5:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement. Unless objections to Confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, which is attached to this Disclosure Statement as **Exhibit B**, they might not be considered by the Bankruptcy Court.

**What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization is the principal objective of a chapter 11 case. The confirmation of a plan of reorganization by the Bankruptcy Court binds the debtor, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.

**What role does the Bankruptcy Court play after the Confirmation Hearing?**

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising out of, or related to, the Cases and the Plan. A detailed description of the Bankruptcy Court's post-confirmation jurisdiction is provided in Section 18.1.1 of the Plan.

**Do the Debtors and the Committee recommend voting in favor of the Plan?**

Yes. The Debtors and the Committee recommend voting for the Plan because the Plan provides for a larger distribution to the Debtors' unsecured creditors, including holders of Abuse Claims, than would otherwise result from a liquidation or any other reasonably available alternative. Accordingly, the Debtors and the Committee recommend that holders of Claims in Voting Classes support Confirmation of the Plan and vote to accept the Plan.

**V.**

**VOTING INSTRUCTIONS AND CONFIRMATION OF PLAN**

A.    **Manner of Voting on Plan**

Before voting, this Disclosure Statement as well as the Plan should be read in its entirety. You should only use the ballot sent to you with this Disclosure Statement to cast your vote for or against the Plan.

**If you hold a Claim in Classes 4, 5, 6 and/or 8, included in the package of materials forwarded to you along with the Disclosure Statement and Plan is the enclosed Ballot for your acceptance or rejection of the Plan. You should complete, date and sign your Ballot and return it to the Voting Agent. All Ballots must be received by 5:00 P.M. (prevailing Eastern Time) on January 3, 2014. Any Ballot which is properly executed but does not indicate acceptance or rejection of the Plan shall be deemed to be an acceptance of the**

**Plan.  A Class 4 Sexual Abuse Claimant will receive separate notice of the opportunity to select from one of the two (2) options available with respect to the treatment of their Class 4 Claim.  If such Claimant fails to make an election, such Claimant shall be treated as though he or she selected the option of participating in the Allocation Plan.**

### B.    Claim Holders Entitled to Vote

Under the Bankruptcy Code, any holders of Claims in Classes that are "impaired" under the Plan are entitled to vote to accept or reject the Plan, unless such Class of Claims neither receives nor retains any property under the Plan (in which case such Class is deemed to have rejected the Plan).  Bankruptcy Code §1124 provides generally that a Claim is impaired if the legal, equitable or contractual rights of the Claim are altered.

Subject to the exceptions provided below, any holder whose Claim is impaired under the Plan is entitled to vote if either (i) its Claim has been scheduled by the Debtors and such Claim is not scheduled as disputed, contingent or unliquidated, or (ii) such Claim holder has filed a proof of Claim with respect to a Disputed Claim.  Pursuant to Federal Rule of Bankruptcy Procedure 3018(a), Class 4 Sexual Abuse Claims shall be estimated at $1.00 for voting purposes only.  The actual amount payable on account of Class 4 Sexual Abuse Claims will be determined pursuant to the Allocation Plan.

A holder of a Disputed Claim is not entitled to vote on the Plan unless such Claim is temporarily allowed by the Plan Proponents or by an order of the Bankruptcy Court in an estimated amount which it deems proper for the purpose of voting to accept or reject the Plan.  In other words, only holders of Allowed Claims, Class 4 Sexual Abuse Claims (estimated for voting purposes only at $1.00 for each Claim), Class 5 Fraud Claims, Class 6 Physical Abuse and Class 8 General Unsecured Claims that are not Disputed Claims may vote to accept or reject the Plan.  A Claim to which an objection has been filed by the Debtors or any other party-in-interest no later than December 23, 2013, or a Claim (i) which is listed on the Debtors' schedules as disputed, unliquidated or contingent, and (ii) with respect to which a superseding proof of claim has not been filed is not an Allowed Claim for voting purposes, unless the Claim is settled by agreement or the Bankruptcy Court allows the Claim (in whole or in part) by Final Order.  Upon request of a party-in-interest, the Bankruptcy Court may temporarily allow or estimate a Disputed Claim for purpose of voting on the Plan.  Ballots cast in respect of Claims other than Allowed Claims and Abuse Claims will not be counted.  In addition, a vote may be disregarded if the Bankruptcy Court determines that the acceptance or rejection of the Plan by the Claimant is not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

### C.    Classes Impaired Under the Plan

Claim holders in Classes 4, 5, 6 and 8 are impaired under the Plan and are eligible, subject to the limitations set forth above, to vote to accept or reject the Plan.  Any controversy as to whether any Claim or Class of Claims is impaired under the Plan shall, after notice of any hearing, be determined by the Bankruptcy Court.

D.    **Vote Required for Class Acceptance**

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a Class of impaired Claims as acceptance by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of holders of Allowed Claims in that Class who cast ballots.[3]    Class 4 Sexual Abuse Claims shall be estimated at $1.00 each for voting purposes only.  As such, if more than half of the number of Class 4 Abuse Claimants who vote cast Ballots in favor of the Plan, Class 4 will be deemed to have accepted the Plan.

**VI.**

**THE DEBTORS AND THEIR OPERATIONS**

A.    **General Background**

1.    **Pre-Petition**

CBI is a New York not-for-profit corporation which was formed to establish, conduct, and support Catholic elementary and secondary schools principally throughout New York State.  However, CBI also conducted business outside of New York State.  CBOI is an Illinois not-for-profit corporation which was formed to establish, conduct, and support Catholic elementary and secondary schools principally throughout the State of Illinois.  However, CBOI also conducted business outside of Illinois.  Both of the Debtors also support spiritual and temporal affairs of the Edmund Rice Christian Brothers North American Province (the "**Province**") of the Congregation of Christian Brothers (the "**Congregation**").  Members of the Province are referred to herein as "**Christian Brothers**" or "**Brothers**").

The Congregation is a Roman Catholic religious order which was started in Ireland by Edmund Rice in 1802.  Christian Brothers are not ordained priests, but take vows of poverty, chastity, and obedience.  The Congregation's religious mission is focused on youth education.  Edmund Rice founded the Congregation's first school in Ireland in 1802.  The primary purpose of Edmund Rice's first school was to educate underprivileged boys with an emphasis on the tenets of the Roman Catholic Church.  The Congregation has various geographic provinces throughout the world including the Province in North America.  The Christian Brothers have had a continuous presence in North American since the early twentieth century.  Since the early 1900s, the Christian Brothers of the Province have either established or been involved as teachers, principals, trustees, and leaders at numerous schools throughout the United States and Canada.  In 1906, the Christian Brothers established a school in New York City.  In 1940, Iona College, was founded by the Christian Brothers in New Rochelle, New York as a post-secondary institution of higher learning.  Currently, the Christian Brothers operate nine schools, including Iona Grammar School, Iona Preparatory School, Brother Rice High School (Illinois), Brother Rice High School (Michigan), Bergen Catholic High School, Palma High School, Damien Memorial School, Saint Laurence High School, and Catholic Memorial High School.  The Christian Brothers also founded and remain involved in Iona College.

---

[3]  In the case of Abuse Claims, such claims will be deemed allowed in the amount of $1.00 claims for voting purposes only.

Prior to the 1960s, the Christian Brothers had one North American Province operating in the United States and Canada, which was called the "**North American Province**".  In the mid-1960s, the Christian Brothers divided their North American Province into three (3) provinces: the Eastern American Province; the Western American Province; and the Canadian Province.  Under Canon Law, a province is a *juridic person*.  However, under state and federal laws in the U.S., a *juridic person*, may not be recognized as a legal entity.  As of 2005, the Eastern American Province, the Western American Province, and the Canadian Province merged into a single province known as the Edmund Rice Christian Brothers North American Province (as defined earlier, the "**Province**").  There are currently approximately 220 Christian Brothers in the Province.  The Province is headed by a Provincial Team Leader, who is a Christian Brother, and a Provincial Leadership Team (the "**PLT**") comprised of six (6) Christian Brothers.  Currently, all Christian Brothers on the PLT are also directors or trustees of both of the Debtors.

Each of the Debtors is managed through a board of trustees/directors.  The Debtors' trustees/directors do not receive a salary in their capacity as trustees or directors.  The Debtors generally operate through a procedure known as centralized funding, through which the Debtors' receive funds (called a "pro rata") from the schools or institutions where the Christian Brothers teach or work, and the Debtors provide a stipend to the various Christian Brother Communities where the Christian Brothers reside to pay for the Brothers' basic living expenses.  Historically, the Debtors also depended upon grants and donations to fund a portion of their operating expenses, including grants and donations from third parties as well as entities established to support Christian Brothers and their mission such as the Christian Brothers Foundation ("**CBF**") and CSC.  Both CBF and CSC were established to provide for the maintenance of the Province's Christian Brothers and to support the Province's mission.  Since commencement of these Cases, the Debtors report that donations from third parties to the Debtors have virtually come to a halt.  CBF has made substantial grants to CBI for maintenance and support of the Brothers and thereby depleted substantially all of its funds.

## 2.    Sexual Abuse Litigation

From time to time, the Debtors, the Province and/or the Congregation were sued by sexual abuse survivors on account of sexual abuse by a Christian Brother or others for whom the Debtors were allegedly responsible.  Such lawsuits increased over time and, by the late 1990s, the Debtors as well as the Province, through the former Canadian, Eastern American and Western American Provinces, were sued by numerous plaintiffs primarily in Washington State and Canada.

In Washington State, the former Western American Province and the Debtors operated O'Dea High School ("**O'Dea**"), a Catholic high school owned by the Corporation of the Catholic Archbishop of Seattle (the "**Seattle AD**"), and Briscoe Memorial School ("**Briscoe**"), an orphanage/school which closed in 1969 and was owned by the Seattle AD.  Numerous individuals who were students or, in the case of Briscoe, residents at these schools commenced lawsuits in Washington State court because they were sexually abused by Christian Brothers or others for whom the Debtors were allegedly responsible.

In addition, numerous lawsuits were filed in St. John's, Newfoundland, Canada, stemming from sexual abuse at Mount Cashel, an orphanage operated by the Christian Brothers.

The Debtors spent a substantial portion of their funds in defending litigation and paying settlements arising from sexual abuse claims. A substantial portion of the funds utilized to settle abuse litigation came from CBF and/or CSC, which had earmarked such funds to pay the costs of Brothers' support and/or retirement. In addition, in the 1980's, CBI sold the building which housed the former Power Memorial school which was located in the Lincoln Center area of Manhattan. The Debtors represent that these proceeds were also utilized and ultimately exhausted to pay litigation costs and settlements. Shortly prior to the Petition Date, CBI, as well as the Seattle AD (a co-defendant in sexual abuse litigation pending in Washington State), agreed to participate in mediation to attempt to resolve several sexual abuse litigation cases which were close to trial ready. Unfortunately, the mediation was unsuccessful, and as a result, rather than incur the cost and disruption of defending numerous lawsuits in Washington State and in other jurisdictions, the Debtors filed their chapter 11 cases in an effort to resolve all sexual abuse claims through a bankruptcy reorganization plan in a fair way considering the Debtors' limited resources. Based upon the number of claims outstanding, the sexual abuse survivors' chances for success on the merits, the cost of litigating claims for which the Debtors may ultimately be found liable, and the possibility that additional sexual abuse survivors would assert claims against the Debtors, the Debtors decided to commence these Cases in order to manage the litigation process, preserve their assets for the benefit of unsecured creditors, and, end the prospect of additional liability for sexual abuse claims.

## VII.

## THE CHAPTER 11 CASE

### 1.    The Chapter 11 Filing

The Debtors commenced their cases on the Petition Date. The Debtors' Cases were assigned to the Honorable Robert D. Drain, United States Bankruptcy Judge. The Bankruptcy Court entered an order directing that these Cases be procedurally consolidated and jointly administered for procedural purposes only under Case No. 11-22820. The Bankruptcy Court has entered several orders in these Chapter 11 Cases, each of which is available from the clerk of the Bankruptcy Court or may be viewed at the Bankruptcy Court's website: **www.nysb.uscourts.gov.**

### 2.    Retention of Counsel

Subsequent to the Petition Date, the Debtors remained in possession of their assets and property and continued to operate their businesses as debtors in possession pursuant to §§1107 and 1108 of the Bankruptcy Code. By order of the Court, dated May 18, 2011, Tarter Krinsky & Drogin LLP was authorized to act as bankruptcy counsel for the Debtors for these Cases.

### 3.    Appointment of Creditors' Committee

Pursuant to §§1102(a) and 1102(b) of the Bankruptcy Code, the United States Trustee appointed an Official Committee of Unsecured Creditors (as defined above, the "**Committee**") to serve in the Debtors' Cases. The Committee consists of seven (7) individuals who hold Sexual Abuse Claims or Fraud Claims against the Debtors and/or other Entities, including Entities associated or affiliated with the Debtors in some way. Three (3) members of the

Committee assert Sexual Abuse Claims against the Debtors that occurred in the United States, three (3) members of the Committee assert Sexual Abuse Claims against the Debtors based on abuse that occurred in Canada, and one (1) member of the Committee asserts a Fraud Claim against the Debtors.

The Committee retained the law firm of Pachulski Stang Ziehl & Jones LLP to represent it throughout these Cases. The Committee also retained (a) the Law Offices of Paul A. Richler as special counsel for insurance matters, (b) Stewart McKelvy as special Canadian counsel, (c) Berkeley Research Group as financial advisor and (d) Patrick Wall as consultant. Since its appointment, the Committee has taken an active role in the Debtors' Cases and been involved in virtually every major event which transpired during the Chapter 11 process, including taking an active role in asset sales to maximize the value for the Estates, asserting derivative claims on behalf of the Estates, mediating and memorializing the terms of the Plan with the Debtors and one of their insurers, and negotiating internally and with other similarly situated Claimants over the terms of the Plan and a plan to allocate funds to Abuse Claimants.

The Committee has also performed its investigatory function by subpoenaing information from the Debtors and third parties, reviewing information supplied by the Debtors and third parties, as well as conducting its own investigation to determine if any other assets (such as insurance proceeds) could be made available to pay Claims of Abuse Claimants or other creditors. The Committee has also negotiated the terms of the Plan with the Debtors; and the Committee is a co-proponent of the Plan.

### 4.     Asset Sales

As detailed on Schedule A of the Debtors' Schedules, as of the Petition Date, the Debtors owned approximately twenty (20) parcels of real estate. The Debtors sold a substantial portion, by value, of the real property they owned, as follows:

### (a)  74 West 124th Street, New York, NY

The most valuable parcel of real estate owned by CBI was a building located at 74 West 124th Street in Manhattan (the "**124th Street Property**"). The 124th Street Property was formerly utilized as Rice High School, a Catholic school operated by the Christian Brothers. For a variety of reasons, not related to CBI's Chapter 11 filing, Rice High School ceased operations at the end of the 2010-2011 school year. As such, the 124th Street Property was no longer being utilized as a school. In order to raise funds needed to support CBI's continued mission and to fund a reorganization plan, CBI decided to sell the 124th Street Property. In order to maximize the value of the sale, CBI retained Newmark & Company Real Estate, Inc. ("**Newmark**") as the broker to market and sell the 124th Street Property. After marketing the property, CBI signed a contract to sell the 124th Street Property to Harlem Village Academies (an operator of charter schools) ("**HVA**") for $13 million. CBI obtained Bankruptcy Court approval of certain bidding procedures, which afforded other potential purchasers the opportunity to purchase the 124th Street Property. No competing bids were received by the bid deadline established by the bidding procedures and the Bankruptcy Court authorized CBI to sell the 124th Street Property to HVA for $13 million. From the sale proceeds, CBI satisfied the first mortgage held by Country Bank in the amount of approximately $5 million. The balance of the sale proceeds, less customary closing costs, have been retained by CBI and

utilized for a variety of ordinary course expenditures as well as to fund the Chapter 11 process and the Plan.

### (b) 173 Stratton Road, New Rochelle, New York and Vacant Land Across Therefrom

As of the Petition Date, CBI owned the property located at 173 Stratton Road, New Rochelle, NY (the "**173 Premises**") as well as a vacant parcel of land across the street from the 173 Premises (the "**Vacant Land**"). Since the 1950s, Iona Grammar School ("**Iona Grammar**") has operated a school on the 173 Premises and utilized the Vacant Land as recreational facilities. Iona Preparatory School ("**Iona Prep**") approached CBI and expressed an interest in purchasing the 173 Premises and the Vacant Land which would enable Iona Grammar to continue to operate a school at the 173 Premises. Christian Brothers operate both Iona Grammar and Iona Prep. CBI entered into a contract to sell the 173 Premises and the Vacant Land to Iona Prep for $8.5 million. The purchase price was to be paid with $5 million in cash at closing and CBI would take back a mortgage for $3.5 million payable over 300 months. CBI filed a motion to approve the sale to Iona Prep and establish bidding procedures so that other interested parties could submit competing bids. The Committee filed and prosecuted an objection to the sale. The Committee asserted, among other things, that CBI had not adequately marketed the 173 Premises and the Vacant Land and that the purchase money mortgage portion of the consideration was unfavorable to creditors. The Committee also asserted that the bid procedures were inadequate. The Debtors also sought to retain a broker for the sale and the Committee objected to retention of the broker on the basis that the Debtors had not demonstrated that the broker was qualified to sell the 173 Premises and the Vacant Land. The Committee also agreed to delay any closing to a third party purchaser so that Iona Grammar could complete another full school year. After a hearing on the Debtors' proposed sale procedures and retention of the broker, the Court noted that it agreed with many of the Committee's objections regarding the sale procedures and directed the parties to jointly interview brokers and revise the bid procedures. After the hearing and based upon the Court's instructions, CBI and the Committee agreed to revised sale procedures and interview brokers. The Committee also consented to the retention of Newmark as a broker to market the 173 Premises and the Vacant Land.

Based on the Committee's and the Debtors' efforts, CBI received one other qualified bid. Therefore, on August 7, 2012 the Debtors, with the Committee, held an auction for 173 Premises and the Vacant Land between Iona Prep and that bidder. At the conclusion of the auction, CBI selected Iona Prep's modified all cash bid for $8.1 million. The Committee supported Iona Prep's modified bid on condition that the closing take place when the sixty (60) days from entry of the Bankruptcy Court's approval of the sale. The competing bidder filed an objection to the sale which the Bankruptcy Court overruled. CBI closed the sale to Iona Prep. Since the 173 Premises and the Vacant Land were not encumbered by a mortgage substantially all of the sale proceeds, less customary closing costs, were made available to CBI's Estate.

### (c) Sale of Single-Family Houses located in New Rochelle, New York

As of the Petition Date, CBI owned eight (8) single-family houses located in Westchester County, New York. In or about July 2012, Iona College (the "**College**") made an offer to purchase six (6) of the houses located in New Rochelle, New York for a total purchase price of $5 million. The six (6) houses are adjacent to the College's campus. Individual Christian Brothers resided in

some of the houses prior to the sale. CBI filed a motion to sell the six (6) houses to the College for $5 million. The Bankruptcy Court approved sale procedures that included terms proposed by the Committee. No competing bids for the six (6) houses in bulk or for any of the houses on an individual basis were received. As such, the Bankruptcy Court approved the College's $5 million bulk bid for the six (6) houses and CBI closed the sale. Since the six (6) houses were not encumbered by mortgages, CBI's Estate retained all of the net sale proceeds less customary closing costs.

### (d) **Sale of 9757 South Seeley Avenue, Chicago, IL**

As of the Petition Date, CBOI owned a residential house located at 9757 South Seeley Avenue, Chicago IL (the "**Seeley House**"). The Seeley House was formerly utilized to house a community of Christian Brothers residing in Chicago. The community of Christian Brothers located at the Seeley House relocated and the Seeley House was not being utilized. CBOI retained a local residential real estate broker and obtained an offer to purchase the Seeley House for $250,000. CBOI filed a motion with the Bankruptcy Court to approve a private sale rather than conducting an auction due to the relatively modest value of the Seeley House. The Committee consented to the sale and the Bankruptcy Court authorized the sale. CBOI closed the sale in February 2012. Since the Seeley House was unencumbered by a mortgage, CBOI's bankruptcy estate retained all of the net sale proceeds less the customary closing costs.

### (e) **Sale of 8554 S. Lavergne Ave., Burbank, IL**

As of the Petition Date, CBOI owned a residential house located at 8554 S. Lavergne Ave., Burbank, IL (the "**Lavergne House**"). CBOI retained a local residential real estate broker and obtained an offer to purchase the Seeley House for $160,000. The Bankruptcy Court approved the transaction as a private sale and further authorized any other sale of the Lavergne House subject to the Committee's consent. Escrow did not close and CBOI successfully remarketed the Lavergne House for $155,000. This sale closed (with the Committee's consent) and the net proceeds of $142,362 are on deposit for funding the Trust on the Effective Date.

### 5. **Bar Dates and Objections to Claims**

By order dated February 10, 2012 (the "**Bar Order**"), the Bankruptcy Court established two separate deadlines for creditors to file a proof of claim for events arising prior to the Petition Date. The Bar Order established May 11, 2012 as the last day for creditors other than sexual abuse victims to file a proof of claim with Omni Management Group ("**Omni**"), the Debtors' claims agent. The Bar Order established August 1, 2012 for individuals asserting claims based upon sexual abuse as the last day for filing sexual abuse claims with Omni. In accordance with the Bar Order, the Debtors' bankruptcy counsel arranged through Omni to serve a notice of the General Bar Date and the Sexual Abuse Bar Date upon all known creditors and other parties-in-interest. The Debtors and Omni made great efforts to disseminate to known and potentially known sexual abuse victims. Specifically, the Debtors' bankruptcy counsel made a motion to the Bankruptcy Court to compel numerous schools to produce alumni directories so that a notice of the Sexual Abuse Bar Date could be sent to all alumni of schools where individual Christian Brothers taught or performed ministry over the last several decades. A notice of the Sexual Abuse Bar Date was sent to approximately 300,000 individuals. In addition, publication notice of the Sexual Abuse Bar Date was made in

approximately 45 national and local newspapers on two (2) separate occasions. The Debtors and the Committee's professionals have reviewed the Claims filed by creditors. A total of 426 Sexual Abuse Claims have been timely filed in the Debtors' Chapter 11 Cases.[4] The Sexual Abuse Claims identify thirty-one schools and two orphanages where the abuser came into contact with the survivor. The Sexual Abuse Claims identify seventeen states and Canada as locations where abuse occurred. With the exception of five claimants, the claimants were all minors between five and seventeen years of age when the abuse began. In excess of 100 Christian Brothers are identified as abusers, including 19 who are identified by more than ten claimants and more than 50 who are identified by at least two claimants.

In addition, a total of 59 non-Sexual Abuse Claims such as General Unsecured Claims to Trade Vendors Contribution Claims from joint tortfeasors and Secured Claims from banks have been timely filed.

To the extent the Debtors have the right to object to Claims (only the Trust has the right to object to Abuse Claims) and deems it prudent and/or cost effective to object to Claims, the Plan provides that the Debtors have sixty (60) days from the Effective Date to file objections to filed Claims. If the Debtors or the Committee fail to object to a properly filed Claim on or before sixty (60) days from the Effective Date, then such Claim will be deemed allowed if such Claim is a non-Sexual Abuse Claim and will be entitled to the Distribution under the Plan applicable to the particular class in which such Claim is classified. The Plan provides that Sexual Abuse Claims will not be Allowed Claims, but treated as provided in the Plan.

### 6.     Motion to Extend Exclusivity

Pursuant to §1121 of the Bankruptcy Code, a debtor in possession is granted a 120-day exclusive period from the Chapter 11 filing date to file a plan of reorganization. During such time, only the debtor can file a plan of reorganization. However, the Bankruptcy Code provides that the court can increase a debtor's exclusive period to file and confirm a plan of reorganization for cause shown up to eighteen (18) months after commencement of the case. From time to time, the Bankruptcy Court extended the Debtors' exclusive period to file a plan of reorganization in these Cases. As of July 10, 2012, the Debtors' exclusive right to file a Plan terminated. Notwithstanding the termination, the Debtors and the Committee agreed that neither the Debtors nor the Committee would file a Plan with the Bankruptcy Court while Plan negotiations were proceeding in earnest.

### 7.     All Hallows Litigation

In the course of investigating the Debtors' financial condition, the Committee discovered that in or around 1990, CBI conveyed (the "**Transfer**") a building located at 111 East 164th Street, Bronx, NY 10452 (the "**Bronx Property**") to All Hallows Institute ("**AHI**"). Prior to the Transfer, CBI owned the Bronx Property upon which a school called All Hallows High School operated. CBI did not receive any consideration for the Transfer. AHI is an Entity that was created by and is controlled by Christian Brothers, including Brothers who are directors or trustees of the Debtors. The Committee believes that the current value of the Bronx Property is approximately $8.5 million. AHI continues to operate the school on the Bronx Property.

---

[4] Approximately five (5) additional Sexual Abuse Claims were filed after the Sexual Abuse Bar Date.

The Committee believes there is substantial evidence of fraudulent intent with respect to the Transfer. As such, the Committee made a demand upon the Debtors to commence an action under Section 544 of the Bankruptcy Code, thereby utilizing the New York Debtor/Creditor Law to avoid the Transfer as intentionally fraudulent. The Debtors declined to commence an action to avoid the Transfer, disagreeing with the Committee's belief that the Transfer was fraudulent. Thereafter, the Committee filed a motion seeking standing to avoid the Transfer on behalf of and for the benefit of the Debtors' Estates. The Debtors opposed the Committee's motion for standing. After a contested hearing, the Bankruptcy Court granted the Committee's motion and authorized the Committee to commence an action against All Hallows to recover the Bronx Property or the value thereof for the benefit of CBI's Estate. The Committee commenced an adversary proceeding (the "**AHI Proceeding**") entitled *The Official Committee of Unsecured Creditors of The Christian Brothers' Institute and The Christian Brothers of Ireland, Inc., v. All Hallows Institute*, Adv. No. 13-08229-rdd in order to avoid the Transfer. That proceeding is currently pending before the Bankruptcy Court. The Plan provides that the Trustee will administer the AHI Proceeding for the benefit of the Settlement Fund. AHI filed a motion to dismiss the AHI Proceeding, which the Committee opposed. After a contested hearing, the Bankruptcy Court denied AHI's motion to dismiss.

### 8. Post-Petition Operations and Select Financial Information

Since the Petition Date, the Debtors have continued to operate their business. During a typical month, CBI spends approximately $400,000, the bulk of which is for support of the individual Christian Brothers. CBOI spends approximately $200,000 per month, the bulk of which is for the support of individual Christian Brothers. CBI also funds approximately $90,000 per month to St. Joseph's, a nursing home operated by the Christian Brothers and located in New Rochelle, New York. St. Joseph's houses approximately 25 elderly and infirm Christian Brothers.

Set forth below is a summary of the Debtors' remaining assets:

(a) **Cash in Citibank Investment Account.** As of November 20, 2013, CBI has $14.444 million on deposit with Citibank, which is the net amount remaining from the asset sales described above.

(b) **Operating Cash.** As of October 31, 2013, CBOI maintained approximately $600,000 in various bank accounts. The Debtors believe that some of this cash is restricted and only available for certain use as per instructions from donors. As of September 30, 2013, CBI maintained approximately $300,000 in cash in its operating account.

(c) **Real Estate.** CBI currently owns (a) a single-family house located at 117 N. 10th Avenue, Mt. Vernon, New York (the "**Mount Vernon Property**"); (b) a single-family house located at 260 Wilmot Road, New Rochelle, New York (the "**Wilmot Road Property**"), utilized as CBI's office headquarters; (c) a house located at 30 Montgomery Circle, New Rochelle, New York (the "**Montgomery Circle Property**"), which houses the St. Joseph's nursing home; (d) a property located at 125 Kings Highway South, Rochester, New York, which is currently utilized by a Catholic school known as Bishop Kearney High School (the

"**Rochester Property**"); and (e) a property located at 1850 South Broadway Route 9, Esopus, New York (the "**Esopus Property**"). The Rochester Property and the lower portion of the Esopus Property or the sales proceeds thereof will be transferred to the Settlement Fund. The other real estate will revest in CBI free of claims of any creditors other than mortgage holders. CBI received an offer from Bishop Kearney High School to purchase the Rochester Property for $3 million subject to certain closing contingencies, including financing. The Rochester Property is subject to secured claims of approximately $1.2 million. The Committee requested that the Debtor decline to accept that offer. Also at the Committee's request, CBI has retained Caliber Commercial Brokerage, LLC as the broker to market the Rochester Property. CBI's Schedules state that the fair market value of the lower portion of the Esopus Property is $935,000.00. This value is based on an appraisal which assumes that the lower portion will be subdivided from the "upper parcel" of the property. The Esopus Property is not subdivided and CBI is processing an application to do so which CBI expects will be approved by the end of 2013. CBOI owns a single family residence located at 46201 Royal Ave, Grand Beach, MI which is utilized as a Christian Brothers' residence.

### 9. Plan Mediation

During these Cases, the Debtors and the Committee met to discuss and negotiate the terms of a consensual plan of reorganization. Both the Debtors and the Committee recognized that a consensual plan resolving the Debtors' liability with respect to Abuse Claims was the preferred outcome to litigation due to the cost and uncertainty of litigation. Due to the expiration of the Debtors' exclusive period to file a plan, the Committee and the Debtors could each file their own plan. However, the Plan Proponents recognized that the cost of litigation could materially impair recoveries even for a party that succeeded in confirming a contested plan. As such, the Debtors and the Committee agreed to mediate the terms of a plan. The Debtors and the Committee jointly selected as Plan mediator the Honorable Elizabeth S. Stong, a United States Bankruptcy Judge in the United States Bankruptcy Court for the Eastern District of New York. By stipulation and order dated February 19, 2013, Judge Drain appointed Judge Stong as a mediator. Over a period of approximately two (2) months, including at least five (5) comprehensive mediation sessions before Judge Stong and numerous additional conferences between the parties, the Debtors and the Committee were able to reach an agreement with respect to the terms of a joint plan for the Debtors, the terms of which are memorialized in the Plan. Providence Washington Insurance Co. ("**PWIC**"), one of the Debtors' general liability insurers, participated in the mediation and is contributing $3.2 million which would be made available to the Trust in exchange for policy releases and other protections more detailed below and in the Plan. CBI filed a motion to approve the settlement with PWIC, including PWIC's buyback of insurance policies. By order, dated October 24, 2013, the Bankruptcy Court approved the settlement.

### 10. Community Support Corporation

Community Support Corporation (as defined above, "**CSC**") is an Illinois not-for-profit corporation that was formed with the purpose of furthering the spiritual and temporal interests of the

Province, including, but not limited to, the care and sustenance of elderly and infirm Christian Brothers of the Province.

CSC has approximately $19.5 million in assets, including a $3.6 million unsecured note to CBOI.  CSC has asserted a claim of $3.6 million against CBOI on account of the note.

## 11. **Maintenance Claims**

On May 11, 2012, CBI amended Schedule F of its Schedules of Assets and Liabilities to include support claims for 152 Brothers in the amount of $124,331,700 [Docket No. 324].  Also on May 11, 2012, CBOI amended Schedule F of its Schedules of Assets and Liabilities to include support claims for 50 Brothers in the amount of $30,615,230 [Docket No. 325].  The Debtors assert that they are obligated for the lifetime support of the Province's Christian Brothers as they retire. The Debtors estimate that it costs between $30,000 and $42,000 per year to support each retired Christian Brother.  The Debtors calculated the amount of the support claims by estimating the number of years that each Christian Brother is expected to live and multiplying by the estimated cost of care.  Certain Christian Brothers also filed claims for support on behalf of all Christian Brothers of the Province, which duplicate the claims in the Debtors' respective amended Schedules.

The Committee asserts that the support claims should be disallowed because, among other things, (a) the support obligations are based on Canon (Catholic religious) law and are not an obligation under civil law and (b) to the extent the Debtors are obligated to support the Christian Brothers, the claims are overstated.

Under the Plan, the support claims will be assumed by CSC and will not be satisfied from the Debtors' assets or the Trust Assets.

## 12. **Seattle Archdiocese**

The Seattle AD owns O'Dea, and owned Briscoe before it was closed in 1969.  The Seattle AD is a co-defendant with the Debtors and other Entities in lawsuits that were commenced in Washington State court by sexual abuse survivors prior to the Petition Date.  The Seattle AD is also a co-defendant with non-Debtor Entities in lawsuits that were commenced in Washington State court by sexual abuse survivors after the Petition Date.  The lawsuits assert claims based on sexual abuse by Christian Brothers or others for whom the Debtors or the Seattle AD were allegedly responsible at O'Dea and Briscoe.

The Seattle AD or the Debtors have removed all pending cases against them and other defendants asserting claims stemming from sexual abuse by a Christian Brother that were pending in Washington State court as of the date hereof.  The removed cases were transferred to the Bankruptcy Court and are currently pending in the Bankruptcy Court.  Substantially all discovery and pretrial matters have been stayed in the removed cases pending the outcome of the Debtors' Cases.

The Seattle AD has asserted a liquidated claim against the Debtors in the amount of at least $1,639,703.  The Seattle AD's liquidated claim stems from lawsuits against the Archdiocese based on sexual abuse at O'Dea and Briscoe.  The Seattle AD's liquidated claim is based upon its

assertion that it paid in excess of its obligated amount to settle certain claims.  The Seattle AD also asserts that the Debtors are liable to the Seattle AD for contribution, indemnification and other common law and civil law claims and filed an unliquidated contingent reimbursement claim.  The Debtors intend to object to the Seattle AD's contingent reimbursement claim pursuant to § 502(e)(1) of the Bankruptcy Code.  The Debtors may also object to the Seattle AD's liquidated claim.

The Seattle AD has also commenced two actions against the Debtors and other parties, as follows:

a.      *Corporation of the Catholic Archbishop of Seattle v. Congregation of Christian Brothers of Ireland, et al.*, Adv. No. 11-08332 (RDD).  The Seattle AD is the primary insured under certain insurance policies, including, a policy (the "**Maryland Policy**") issued by Maryland Casualty Company ("**Maryland Casualty**") and a policy (the "**Pacific Policy**") issued by Pacific Indemnity Company ("**Pacific Indemnity**").  The Maryland Policy identifies "named insureds" as, among others, the Seattle AD and the "Congregation of Christian Brothers, but only with respect to the operation of O'Dea High School."  The Maryland Policy provides comprehensive general liability coverage with a limit of $300,000 per occurrence.  Similarly, the Pacific Policy identifies "named insureds" as the Seattle AD and "Congregation of Christian Brothers."  The Pacific Policy provides comprehensive liability coverage with a limit of $250,000 for each occurrence.  Prior to the Petition Date, the Debtors and Seattle AD each shared coverage within the respective policy limits under the Maryland Policy and Pacific Policy.  On August 16, 2011, the Seattle AD commenced an adversary proceeding seeking declaratory relief regarding the extent of the Debtors and the Seattle AD's interest in the policies.  On October 12, 2011, Maryland Casualty filed an answer to the complaint.  On October 13, 2011, the Debtors filed a response to the complaint and asserted cross-claims against Maryland Casualty and Pacific Indemnity seeking declaratory judgment regarding the Debtors' rights under the policies.  On October 14, 2011, Pacific Indemnity filed an answer to the complaint.  On October 28, 2011, Pacific Indemnity filed an answer to the cross-claim.  On November 4, 2013, Maryland Casualty filed an answer to the cross claim.  On December 13, 1011, the parties to the action entered into a stipulation staying all matters in the proceeding until June 7, 2012.  On October 12, 2012, the parties entered into a stipulation further staying all matters in the proceeding until January 16, 2013.  Although virtually no discovery has been conducted in the litigation, the parties have been in discussions regarding a resolution contingent upon confirmation of the Plan.  Section XI of the Plan provides that the Trust will step into the Debtors' shoes with regard to insurance matters, including defending the Debtors in this adversary proceeding.

b.      *Corporation of the Catholic Archbishop of Seattle v. Congregation of Christian Brothers, et al.*, Adv. No. 12-08336 (RDD).  On April 27, 2012, the Seattle AD commenced an adversary proceeding against various defendants, including the Debtors, seeking to substantively consolidate the Debtors with the following entities: (i) Congregation of Christian Brothers; (ii) Congregation of the Christian Schools of Ireland; (iii) Congregation of Christian Brothers-North American Province a/k/a Western Province; (iv) Congregation of Christian Brothers-North American Province a/k/a Western Province a/k/a Eastern Province a/k/a American Province; (v) Christian Brothers Institute of California; and (vi) Christian Brothers Institute of Michigan.  On June 13, 2012, Christian Brothers Institute of Michigan ("**CBI Michigan**") moved to dismiss the complaint as to CBI Michigan.  On June 27, 2012, the Debtors answered the complaint.  On June 29, 2012, Christian Brothers Institute of California ("**CBI California**") moved to dismiss the

complaint as to CBI California. CBI Michigan operates the Brother Rice High School in Bloomfield Michigan. Upon information and belief, CBI California operates Palma Junior and Senior High School in Salinas California. Neither is a debtor in these Cases; and neither is a Participating Party under the Plan (and as such is not receiving the benefit of any discharge, release or exculpation under the Plan). After a contested hearing, the Bankruptcy Court dismissed the complaint as to CBI California and CBI Michigan. The Plan Proponents believe that the Seattle AD is seeking substantive consolidation of certain non-Debtor entities for its own parochial reasons in order to limit its exposure based upon joint and several liability under Washington State law. The Debtors dispute the Seattle AD's standing to seek such substantive consolidation and filed a motion for a judgment on the pleadings dismissing this adversary proceeding. The motion to dismiss has been adjourned to January 9, 2014. Additionally, the Plan Proponents believe that confirmation of the Plan will moot this litigation and that it is virtually impossible for the Court to analyze the effect of substantively consolidating the Debtors with the Congregation which is a *juridic person* under Canon law.

### 13.    Removed Cases

The Debtors and\or the Seattle AD have removed the following cases pending in Washington State court and transferred them to the Bankruptcy Court.

a.    *L.W., et al. v. Corporation of the Catholic Archbishop of Seattle, et al.*, Adv. No. 11-08317 (RDD). On May 27, 2011, the Debtors removed this proceeding to the United States Bankruptcy Court for the Western District of Washington. On or about July 25, 2011, the Honorable Timothy W. Dore, United States Bankruptcy Judge in the United States Bankruptcy Court for the Western District of Washington, entered an order transferring the proceeding to the Bankruptcy Court. The claims in this case arise out of sexual abuse by Christian Brothers at Briscoe. The Seattle AD had entered into prepetition settlements with certain plaintiffs in the proceeding. On October 12, 2011, the Seattle AD filed its *Motion for Approval and Enforcement of Settlement Agreement Between Plaintiffs and the Archdiocese and Dismissal as to the Archdiocese Only*. Both the Debtors and the Committee objected to the scope of relief sought by the Seattle AD in the motion, largely seeking to preserve the Debtors insurance rights with respect to certain insurance policies. After a hearing on the matter, on December 20, 2011, the Bankruptcy Court entered an order dismissing the proceeding as to the Seattle AD only and, among other things, preserving the Debtors' insurance rights. This proceeding is still pending as to the other defendants therein. The claims of plaintiffs in this proceeding who also filed proofs of claims against the Debtors are classified as Sexual Abuse Claims under the Plan.

b.    *R.P. v. Congregation of Christian Brothers – Brother Rice Province, et al.*, Adv. No. 11-08319 (RDD). On May 27, 2011, the Debtors removed this proceeding to the United States Bankruptcy Court for the Western District of Washington. On or about July 25, 2011, the Honorable Timothy W. Dore, United States Bankruptcy Judge in the United States Bankruptcy Court for the Western District of Washington, entered an order transferring the proceeding to the Bankruptcy Court. This proceeding is still pending. The claims of plaintiffs in this proceeding who also filed proofs of claims against the Debtors are classified as Sexual Abuse Claims under the Plan.

c.    *G.W., et al. v. Congregation of Christian Brothers – Brother Rice Province, et al.*, Adv. No. 11-08320 (RDD). On May 27, 2011, the Debtors removed this proceeding to the United

States Bankruptcy Court for the Western District of Washington. On or about July 25, 2011, the Honorable Timothy W. Dore, United States Bankruptcy Judge in the United States Bankruptcy Court for the Western District of Washington, entered an order transferring the proceeding to the Bankruptcy Court. The claims in this proceeding arise from misrepresentations by the Debtors to sexual abuse survivors during earlier litigation that caused such plaintiffs to accept settlement offers that were lower than they would have been absent such misrepresentations. This proceeding is still pending. The claims of plaintiffs in this proceeding who also filed proofs of claims against the Debtors are classified as Fraud Claims under the Plan.

d.      *K.A., et al. v. Corporation of the Catholic Archbishop of Seattle, et al.*, Adv. No. 11-08321 (RDD). On May 27, 2011, the Debtors removed this proceeding to the United States Bankruptcy Court for the Western District of Washington. On or about July 25, 2011, the Honorable Timothy W. Dore, United States Bankruptcy Judge in the United States Bankruptcy Court for the Western District of Washington, entered an order transferring the proceeding to the Bankruptcy Court. The claims in this case arise out if sexual abuse by a Christian Brother at O'Dea. This proceeding is still pending. The claims of plaintiffs in this proceeding who also filed proofs of claims against the Debtors are classified as Sexual Abuse Claims under the Plan.

e.      *W.D. v. Corporation of the Catholic Archbishop of Seattle, et al.*, Adv. No. 12-08238 (RDD). The plaintiff commenced this action in Washington State court after the Petition Date against the Seattle AD and other entities based on sexual abuse by a Christian Brother at O'Dea. On February 1, 2012, the Seattle AD removed the action to the United States Bankruptcy Court for the Western District of Washington. On or about May 3, 2012, the Honorable Timothy W. Dore, United States Bankruptcy Judge in the United States Bankruptcy Court for the Western District of Washington, entered an order transferring the proceeding to the Bankruptcy Court. This proceeding is still pending. The claims of plaintiff in this proceeding are classified as Sexual Abuse Claims under the Plan if the plaintiff filed a claim against the Debtors in these Cases.

f.      *F.C., et al. v. Corporation of the Catholic Archbishop of Seattle, et al.*, Adv. No. 12-08239 (RDD). The plaintiffs commenced this action in Washington State court after the Petition Date against the Seattle AD and other entities based on sexual abuse by Christian Brothers at Briscoe and O'Dea. On February 1, 2012, the Seattle AD removed the action to the United States Bankruptcy Court for the Western District of Washington. On or about May 4, 2012, the Honorable Timothy W. Dore, United States Bankruptcy Judge in the United States Bankruptcy Court for the Western District of Washington, entered an order transferring the proceeding to the Bankruptcy Court. This proceeding is still pending. The claims of plaintiffs in this proceeding are classified as Sexual Abuse Claims under the Plan if the plaintiffs filed claims against the Debtors in these Cases.

g.      *B.L., et al. v. Corporation of the Catholic Archbishop of Seattle, et al.*, Adv. No. 12-08302 (RDD). The plaintiffs commenced this action in Washington State court after the Petition Date against the Seattle AD and other entities based on sexual abuse by a Christian Brother at O'Dea. On June 12, 2012, the Seattle AD removed the action to the United States Bankruptcy Court for the Western District of Washington. On or about October 5, 2012, the Honorable Karen A. Overstreet, United States Bankruptcy Judge in the United States Bankruptcy Court for the Western District of Washington, entered an order transferring the proceeding to the Bankruptcy Court. This proceeding is still pending. The claims of plaintiffs in this proceeding are classified as Sexual Abuse Claims under the Plan if the plaintiffs filed claims against the Debtors in these Cases.

h.        *R.A., et al. v. Corporation of the Catholic Archbishop of Seattle, et al.*, Adv. No. 12-08305 (RDD).  The plaintiffs commenced this action in Washington State court after the Petition Date against the Seattle AD and other entities based on sexual abuse by a Christian Brother at Briscoe.  On June 12, 2012, the Seattle AD removed the action to the United States Bankruptcy Court for the Western District of Washington.  On or about October 10, 2012, the Honorable Karen A. Overstreet, United States Bankruptcy Judge in the United States Bankruptcy Court for the Western District of Washington, entered an order transferring the proceeding to the Bankruptcy Court.  This proceeding is still pending.  The claims of plaintiffs in this proceeding are classified as Sexual Abuse Claims under the Plan if the plaintiffs filed claims against the Debtors in these Cases.

i.        *T.P., et al. v. Corporation of the Catholic Archbishop of Seattle, et al.*, Adv. No. 12-08318 (RDD).  The plaintiff commenced this action in Washington State court after the Petition Date against the Seattle AD and other entities based on sexual abuse by a Christian Brother at O'Dea.  On November 14, 2012, the Seattle AD removed the action to the United States Bankruptcy Court for the Western District of Washington.  On or about December 10, 2012, the Honorable Karen A. Overstreet, United States Bankruptcy Judge in the United States Bankruptcy Court for the Western District of Washington, entered an order transferring the proceeding to the Bankruptcy Court.  This proceeding is still pending.  The claims of plaintiff in this proceeding are classified as Sexual Abuse Claims under the Plan if the plaintiffs filed claims against the Debtors in these Cases.

j.        *J.H., et al. v. Corporation of the Catholic Archbishop of Seattle, et al.*, Adv. No. 12-08321 (RDD).  The plaintiffs commenced this action in Washington State prior to the Petition Date against the Debtors, the Seattle AD and other entities based on sexual abuse by Christian Brothers at Briscoe.  On October 30, 2012, the Seattle AD removed the action to the United States Bankruptcy Court for the Western District of Washington.  On or about October 30, 2012, the proceeding was transferred from the United States Bankruptcy Court for the Western District of Washington to the Bankruptcy Court.  On January 7, 2013, the Bankruptcy Court entered an order dismissing this proceeding as to the Seattle AD only with respect to claims asserted between a single plaintiff in the action against the Seattle AD based on a settlement between such plaintiff and the Seattle AD.  This proceeding is still pending against the Debtors.  The claims of plaintiffs in this proceeding are classified as Sexual Abuse Claims under the Plan if the plaintiffs filed claims against the Debtors in these Cases.

k.        *W.D. v. Corporation of the Catholic Archbishop of Seattle, et al.*, Adv. No. 12-08238 (RDD).  The plaintiff commenced this action in Washington State court after the Petition Date against the Seattle AD and other entities based on sexual abuse by a Christian Brother at O'Dea.  On March 27, 2013, the Seattle AD removed the action to the United States Bankruptcy Court for the Western District of Washington.  On or about May 9, 2013, the Honorable Timothy W. Dore, United States Bankruptcy Judge in the United States Bankruptcy Court for the Western District of Washington, entered an order transferring the proceeding to the Bankruptcy Court.  This proceeding is still pending.  The claims of plaintiff in this proceeding are classified as Sexual Abuse Claims under the Plan if the plaintiff filed a claim against the Debtors in these Cases.  The Plan provides that all actions removed to the Bankruptcy Court shall be remanded to the State Courts where the actions were originally commenced, unless a plaintiff objects to the remand.  The Bankruptcy Court will resolve any objections.

14. **Motions for Relief From the Automatic Stay**

On August 15, 2011, the Seattle AD filed its *Motion of Corporation of the Catholic Archbishop of Seattle to Seek Determination of the Extent of 11 U.S.C. § 362 Stay With Regard to Edmund Rice Congregation of Christian Brothers-North American Province* [Docket No. 69] (the "Seattle AD Stay Relief Motion"), seeking a determination that the Province has no separate legal existence from the Debtors. The Committee objected to the Seattle AD Stay Relief Motion [Docket 119] on the bases that, among other things, determination of the relationship between the Debtors and the Province requires and adversary proceeding and that substantial discovery would be required regarding the facts necessary to address this issue and that the motion, in fact, sought to substantively consolidate the Debtors and the Province under the guise of a stay relief motion. The Debtors also objected to the Seattle AD Stay Relief Motion [Docket No. 121] because (a) the motion was procedurally improper and (b) the "Debtors disagree with the Archdiocese's characterization of the [Province] and its *relationship vis-à-vis* the Debtors." The Bankruptcy Court did not grant the relief requested by the Seattle AD Stay Relief Motion.

On June 27, 2012, Vincenzo Grillo, sought relief from the automatic stay to pursue personal injury claims against Debtor CBI only to the extent such claims are covered by insurance [Docket No. 359]. Mr. Grillo alleges that he was injured due to hazardous conditions on CBI's premises. On August 16, 2012, the Bankruptcy Court entered an order granting Mr. Grillo relief from the automatic stay to commence an action in New York State court on account of his alleged injuries, provided that Mr. Grillo's damages would be limited to the amount recovered from any applicable insurance policy [Docket No. 405].

15. **Insurance**

The Debtors originally scheduled two insurance policies on their Schedules of Assets and Liabilities: ~~the~~ Maryland Policy and the Pacific Policy described above.

Providence Washington Insurance Co.: The Committee undertook an investigation of the Debtors' prepetition assets and, based on that investigation and efforts by counsel to certain of the Sexual Abuse Claimants prior to the Petition Date, uncovered a policy issued by PWIC that provided coverage for claims from 1982 and 1983. The Committee undertook a review of the Province's archives located in New Rochelle, New York. Based on that review, the Debtors were able to identify additional policies issued by PWIC for 1984 through 1988. As discussed above, PWIC participated in mediation with the Debtors and the Committee and agreed to fund a $3.2 million settlement in exchange for certain policy releases and a channeling injunction.

Royal Globe Insurance Company and Royal Indemnity Company: Based on the Committee's review of the Province's archives located in New Rochelle, New York, the Debtors located insurance policies issued by Royal Globe Insurance Company and Royal Indemnity Company (collectively, "**Royal**") that may provide coverage for approximately 52 Sexual Abuse Claims that arose between July 3, 1976 and July 3, 1978. On April 26, 2013, the Debtors tendered the claims to Arrowood Indemnity Company, the successor to Royal. On May 3, 2013 and July 24, 2013, Arrowood Indemnity Company, acting on behalf of Royal, rejected the tender of the claims raising a number of coverage defenses, including denial based on the assertion that the Debtors gave late notice of the tendered claims. Subsequently, the Debtors, Arrowood Indemnity Company and

the Committee engaged in settlement discussions and have agreed that Arrowood Indemnity Company would pay $350,000 to the Trust in exchange for policy releases and a channeling injunction. The Debtors and the Committee intend to seek Bankruptcy Court approval of the settlement.

Hanover Insurance Company: The Committee reviewed the Province's archives located in Chicago, Illinois. Based on the Committee's review of the Chicago archives, the Debtors located an insurance policy issued by Hanover Insurance Company ("**Hanover**") that may provide coverage for 42 Sexual Abuse Claims that arose between January 8, 1982 and January 8, 1985. On May 30, 2013, the Debtors tendered claims to Hanover under this policy. Hanover has disclaimed coverage of such claims and asserts that it received late notice of the claims and that Hanover suffered prejudice as a result. In claiming late notice, Hanover asserts that the Debtors had knowledge of these claims long before they provided notice. Among other things, Hanover asserted that the Debtors had notice of the claims pre-dating the bankruptcy.

Hanover also identified additional primary and umbrella insurance policies, including policies that may provide coverage for approximately 28 additional Sexual Abuse Claims that occurred between January 8, 1979 and December 1, 1986. Hanover has disclaimed any liability under these policies as well.

On July 10, 2013, Hanover commenced an adversary proceeding before the Bankruptcy Court seeking a declaratory judgment that it is not liable to the Debtors under its policies. That proceeding is captioned *The Hanover Insurance Company, et al. v. The Christian Brothers' Institute, et al.*, Adv. Pro. No. 13-08318 (RDD). The parties may mediate this dispute prior to the date scheduled for the Confirmation Hearing. The Debtors and the Committee have agreed to mediate the dispute. However, no mediation has been scheduled to date.

Great American: The Debtors have located insurance policies or evidence of insurance policies issued by Great American Insurance Company for the period covering January 8, 1973 to January 8, 1979. The Debtors also have correspondence dated July 6, 1967 indicating that Great American insured two Christian Brothers schools (Brother Rice High School (Chicago) and St. Laurence High School) but the correspondence does not indicate whether the Debtors are insureds. The Debtors have tendered certain Sexual Abuse Claims to Great American Insurance Company.

National Union (AIG): The Debtors have located an umbrella insurance policy issued by National Union Fire Insurance Company of Pittsburgh for the period covering October 23, 1974 to October 1, 1977. The Debtors have tendered certain Sexual Abuse Claims to National Union.

Interstate Fire and Casualty Company (Allianz): The Debtors have located an umbrella insurance policy issued by Interstate Fire and Casualty for the period covering February 21, 1978 to February 21, 1979. The Debtors have tendered certain Sexual Abuse Claims to Interstate Fire and Casualty

Under Section XI of the Plan, the Debtors' rights under insurance policies are assigned to the Trust and the Trustee will be appointed as the representative of the Debtors' estates to enforce the Debtors' rights under any insurance policies. If there is a determination by a court of competent

jurisdiction that the assignment of insurance rights to the Trust and/or the Trustee's appointment are invalid, then the Reorganized Debtors will assert any such insurance rights in cooperation with and to the extent requested by the Trust.  To the extent provided in the Plan, the Trust will reimburse the Reorganized Debtors for reasonable counsel fees and expenses.

Nothing contained in the Plan, including the assignment of the Debtor's rights under the Insurance Policies or the appointment of the Trustee as a representative of the Debtors' estates to enforce the Debtors' rights under any Insurance Policies, is intended to affect the rights and remedies of a Person or Entity who is not a Participating Party but who asserts rights under an Insurance Policy.  Brother Rice High School, Inc. contends that payments under the Plan to Abuse Claimants may be credited against any liability of Brother Rice High School, Inc. for Sexual Abuse to extent that Brother Rice High School, Inc. was a co-insured or had rights to coverage under an Insurance Policy issued by Providence Washington.  Brother Rice High School, Inc. also contends that rights to coverage under certain Insurance Policies were transferred to it by CBOI during 1984 and that CBOI is without the ability to assign any rights to the Trust that were previously transferred to Brother Rice  High School, Inc.  The Committee and other parties dispute both that Brother Rice High School, Inc. was a co-insured or possessed rights to coverage under an Insurance Policy issued by Providence Washington and the foregoing contentions.

## VIII.

## SUMMARY OF THE PLAN

The Debtors and the Committee submit that the treatment of Creditors under the Plan is more favorable than the treatment Creditors would receive if the Cases were converted to Chapter 7.[5]  Therefore, the Debtors and the Committee submit that the Plan is in the best interests of the Creditors and the Debtors and the Committee recommend acceptance of the Plan by holders of Claims in Classes 4, 5, 6, and 8.

**THE SUMMARY OF THE PLAN SET FORTH BELOW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PROVISIONS SET FORTH IN THE PLAN, THE TERMS OF WHICH CONTROL.**

### A.   General

#### 1.   Brief Explanation of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself and its Creditors.  Upon the filing of a petition for reorganization under chapter 11 and during the pendency of the case, the Bankruptcy Code imposes an automatic stay of all attempts to collect claims or enforce liens against the debtor, including the commencement of any sexual abuse litigation.

Confirmation and consummation of a plan of reorganization is the principal objective of a chapter 11 case.  In general, a plan divides the claims against, a debtor into separate

---

[5] Since the Debtors are not-for-profit entities, the Bankruptcy Court can only convert these cases to a chapter 7 if the Debtors consent.

classes and allocates plan distributions among those classes. If the legal, equitable and contractual rights of a class are unaffected by the plan, such class is considered "unimpaired". All unimpaired classes are deemed to have <u>accepted</u> the plan and therefore are not entitled to vote thereon. Bankruptcy Code §1126(g), on the other hand, provides that all classes of claims that do not receive or retain any property under the plan on account of such claims are deemed to have <u>rejected</u> the plan. All classes of claims that are considered "impaired" and are entitled to vote on the plan.

Under the Bankruptcy Code, acceptance of the plan is determined by class; therefore, it is not required that each holder of a claim in an impaired class vote in favor of the plan in order for the bankruptcy court to confirm the plan. Generally, each impaired class must vote to accept the plan; however, the Bankruptcy Court may confirm the plan in certain circumstances without the acceptance of all impaired classes if at least one (1) impaired class votes to accept the plan and certain other statutory tests are satisfied. Many of these tests are designed to protect the interests of creditors who either do not vote or vote to reject the plan but who will nonetheless be bound by the plan if it is confirmed by the Bankruptcy Court.

**2.**     <u>**Acceptance of the Plan**</u>

As a condition to confirmation, Bankruptcy Code §1129(a) requires that: (a) each impaired class of claims votes to accept the plan; and (b) the plan meets the other requirements of §1129(a). As explained above, classes that are unimpaired are deemed to have accepted the plan and therefore are not entitled to vote thereon, and classes that do not receive or retain any property under the plan are deemed to have rejected the plan and likewise are not entitled to vote thereon. Accordingly, acceptances of the plan are being solicited only from those parties who hold claims classified in impaired classes that are to receive distributions under the plan.

An impaired class of claims will be deemed to have accepted the plan if holders of at least two-thirds in dollar amount and a majority in number of claims in such class who cast timely ballots vote to accept the plan.

**3.**     <u>**Classification of Claims Generally**</u>

Bankruptcy Code Section 101(5) defines a claim as: (a) a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured"; or (b) a "right to an equitable remedy for breach or performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured."

Bankruptcy Code Section 1123 provides that a plan of reorganization shall designate classes of claims against a debtor. Bankruptcy Code Section 1122 further requires that each class of claims contain only claims that are "substantially similar" to each other. The Debtors believe that they have classified all Claims in compliance with the requirements of Sections 1122 and 1123. However, it is possible that a holder of a Claim may challenge such classification and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Debtors would, to the extent permitted by the Bankruptcy Court, modify the classifications in the Plan as required and use the acceptances

received in this solicitation for the purpose of obtaining the approval of a Class or Classes of which the accepting holder is ultimately deemed to be a member.  Any such reclassification could adversely affect the Class of which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.  Furthermore, a reclassification of Claims could necessitate a re-solicitation.

**B.    Classification and Treatment of Claims Under the Plan**

The following describes the classification of Claims under the Plan and the treatment that holders of Claims, whether Sexual Abuse or otherwise, are to receive if the Plan is confirmed and becomes effective.  A Claim is classified in a particular Class only to the extent that the Claim fits within the description of that Class and is classified in a different Class to the extent that any remainder of the Claim fits within the description of such different Class.

**1.    Unclassified Claims**

The Plan does not classify Administrative Claims, statutory fees due to the United States Trustee, or Priority Tax Claims, but does provide for the following treatment of such Claims.

**(a)    United States Trustee Fees.**  All  fees payable by the Debtors under Section 1930 of Title 28 of the United States Code that have not been paid prior to the Effective Date shall be paid by the Debtors on or before the Effective Date.  In addition, the Debtors, or any successor thereto by merger, consolidation or otherwise, on or after the Effective Date, shall be liable for and shall pay such fees until the entry of a final decree in this case or until the case is converted or dismissed.  The Reorganized Debtors shall file post-confirmation operating reports with the Bankruptcy Court and the United States Trustee until a final decree is entered.

**(b)    Administrative Claims.**  An "Administrative Claim" is a Claim for payment of an administrative expense of a kind specified in Bankruptcy Code Section 503(b) and referred to in Bankruptcy Code Section 507(a)(2), including the actual and necessary costs and expenses of preserving the estate or operating the Debtors' businesses after the commencement of a Chapter 11 case, loans and advances made to the Debtors after the Petition Date, compensation for legal and other services and reimbursement of expenses awarded or allowed under Bankruptcy Code Sections 330(a), 331 or 503, certain retiree benefits, certain reclamation Claims, and all fees and charges against the estate pursuant to Chapter 123 of Title 28 of the United States Code.

The Plan provides that each holder of an Allowed Administrative Claim (including, without limitation, the professionals' fees and expenses incurred by the Professional Persons and allowed in a Final Order of the Bankruptcy Court) shall be paid in full, in Cash, by the Reorganized Debtors (i) on the later to occur of the Effective Date or the date the order allowing such Administrative Claim becomes a Final Order, or (ii) upon such other terms as may exist in the ordinary course of business of the Debtors; or (iii) upon such terms as may exist pursuant to Order of the Bankruptcy Court or an agreement between such holder of an Allowed Administrative Claim and the Debtors.

The Debtors estimate that the aggregate amounts due to professionals shall total approximately $2,000,000.00.  This includes the professional fees of Tarter Krinsky & Drogin LLP, bankruptcy counsel for the Debtors, and Pachulski, Stang, Ziehl & Jones LLP, counsel for the Creditors' Committee.  It also includes the fees of Gordon Tilden Thomas & Cordell LLP, special litigation counsel to the Debtors, McInnes Cooper, special Canadian counsel to the Debtors, Sperduto Spector & Company, accountants for CBI, Omni Management Group, claims and noticing agent for the Debtors, Berkeley Research Group, financial advisors to the Creditors' Committee, and the Law Offices of Paul Richler, special insurance counsel to the Creditors' Committee.  During the pendancy of these Chapter 11 cases pursuant to a monthly compensation order, most professionals have received 80% of their fees and 100% of their disbursements through March 2013.  The $2 million in professional fees represents the Debtors best estimate of the unpaid portion of fees due under the monthly compensation order as well as the fees due from January 2013 through confirmation.

With respect to the trade Claims arising after the Petition Date representing obligations incurred by the Debtors in the ordinary course of their businesses consistent with past practice, such trade Claims shall be paid in the ordinary course of business.  The Debtors estimate that post-petition ordinary course payables as of the Effective Date will be approximately $100,000.  As to other Allowed Administrative Claims, except as otherwise provided in the Plan, the Plan provides that each holder of an Allowed Administrative Claim: (i) shall be paid by the Reorganized Debtors on the later to occur of the Effective Date or the date the order allowing such Administrative Claim becomes a Final Order; and (ii) shall receive, on account of and in full satisfaction of such Allowed Administrative Claim, Cash equal to the amount thereof, unless the holder agrees to less favorable treatment of such Allowed Administrative Claim.

The Plan further provides that Professional Persons with Claims for services rendered during these Chapter 11 cases, must file requests for payment within forty-five (45) days after notice of the Effective Date is filed with the Bankruptcy Court.

Administrative Claims representing obligations incurred by the Debtors after the date and time of the entry of the Confirmation Order (including, without limitation, Claims for professionals' fees and expenses) shall not be subject to application to the Bankruptcy Court and may be paid by the Reorganized Debtors in the ordinary course of business and without Bankruptcy Court approval.  After the Confirmation Date, the Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Court, pay the reasonable fees and expenses of the Professional Persons employed by the Debtors in connection with the implementation and consummation of the Plan, the claims reconciliation process and any other matters as to which such Professionals may be engaged.

Administrative Claims representing fees and expenses of Professional Persons that are employed by the Committee that are incurred prior to the Effective Date of the Plan in connection with the implementation and consummation of the Plan may be paid by the Trust in the Trustee's sole discretion and after notice and a hearing.

Administrative Claims representing fees and expenses of Professional Persons that are employed by the Debtors prior to the Effective Date of the Plan shall not be paid by the Trust.

2.      **Priority Tax Claims**

A "Priority Tax Claim" is an Unsecured Claim of a governmental unit entitled to priority in payment pursuant to any provision of the Bankruptcy Code §507(a)(8). The New York State Department of Labor filed a claim in the amount of $106.14 on account of unemployment insurance. The Department of Labor's claim shall paid in full on the Effective Date.

3.      **Class 1 – Other Priority Claims**

Class 1 consists of Other Priority Claims. These are claims entitled to priority under Section 507(a)(3) – (a)(7) and 507(a)(9) – (a)(10). These are claims for unpaid wages, employee benefit plan contributions and the like. The Debtors do not believe that any such Claims exist. However, in the event a Claim is allowed as an Other Priority Claims, such Claims shall receive either (a) payment form the Reorganized Debtors in the full amount of their Allowed Claims in cash, on later of the Effective Date or when such Claim becomes an Allowed Claim or (b) payment upon such terms as may be agreed in writing between the holder of such Other Priority Claim and the Reorganized Debtors.

4.      **Class 2 – Secured Claims**

Class 2 consists of holders of Secured Claims. Based upon the Debtors' Schedules and the proofs of claim filed in these Chapter 11 cases, the Debtors believe there are only two (2) holders of Secured Claims. Canandaigua National Bank (the "**CNB**") filed two (2) proofs of claims based upon a loan in the amount of $1,500,000.00, which is secured by the Rochester Property. The Debtors believe that the amount due to CNB is approximately $1,200,000.00. In addition to CNB, American Honda Finance Corporation is a holder of a Secured Claim against a 2009 Honda Civic. As of the Petition Date, the payoff amount under the closed-end vehicle lease is approximately $13,000.00.

With respect to American Honda Finance Corporation's Claim, the Plan provides that the Reorganized Debtors will either continue to make all payments under the vehicle lease or surrender the vehicle in full satisfaction of American Honda Finance Corporation's Secured Claim. With respect to CNB's Secured Claim, the Plan provides for certain alternative treatments. Since the property securing the CNB claim will be either sold or transferred to the Trust, the Trust can elect to either direct the Debtors to surrender the property to CNB in exchange for a full satisfaction of CNB's Secured Claim (this is unlikely as it appears the property has a value substantially in excess of CNB's Secured Claim) or the Trust may direct the Debtors to pay CNB's Allowed Secured Claim the full amount of its Secured Claim plus applicable postpetition contract interest upon the sale of the property. CNB may not look to the Trust's assets (other than the Trust's rights with respect to proceeds of the sale of the Rochester Property) for payment of its claim. Class 2 is unimpaired and not entitled to vote on the Plan.

5.      **Class 3 - General Unsecured Convenience Claims**

Class 3 consists of the holders of General Unsecured Convenience Claims against the Debtors or holders of Unsecured Claims who elect to be treated as a General Unsecured Convenience Claim. These Claims are unsecured creditors of Claims of $500.00 or less or who

voluntarily reduce their Unsecured Claim to $500.00.  The Plan provides that all holders of Allowed Class 3 Claims will receive either (a) payment from the Reorganized Debtors in the amount of $500.00 in cash on the Effective Date or when such Claim becomes an Allowed Class 3 Claim or payment of the Allowed Class 3 Claim upon such terms as may be agreed in writing by the holder of such Allowed Class 3 Claim and the Reorganized Debtors.  Class 3 is unimpaired under the Plan and holders of Class 3 Claims are not entitled to vote under the Plan.

6. **Class 4 – Sexual Abuse Claims**

Class 4 consists of holders of Sexual Abuse Claims.  The Plan provides that holders of Class 4 Claims may elect to have their Class 4 Claim treated in one of two alternative ways:

**Option 1 (Allocation Plan).**  Sexual Abuse Claimants who elect to have their Claim treated pursuant to the Allocation Plan shall have their Claims against the Debtors reviewed by the Abuse Claims Reviewer.  Under this alternative, the Class 4 Claim holder may proceed to liquidate his/her Claim against any entity other than the Debtors that may also be liable with the Debtors, such as a joint tortfeasor in a court of appropriate jurisdiction other than the Bankruptcy Court. The Honorable William L. Bettinelli has been retained as the Abuse Claims Reviewer pursuant to an order of the Bankruptcy Court.  The Abuse Claims Reviewer will review such proofs of claim filed by the Class 4 Claimants and any other information which the Abuse Claim Reviewer requests from such Claimants.  The Abuse Claim Reviewer will then assign a certain number of points to the Class 4 Claimants Sexual Abuse Claims based upon various factors such as the nature of the abuse and the effect of the abuse on the survivor.  The Abuse Claims Reviewer will also consider additional factors, such as whether a Sexual Abuse Claimant commenced prepetition litigation against the Debtors.  The points awarded by the Abuse Claims Reviewer will be automatically adjusted based on any awards previously paid to the Claimant by the Debtors or CBIC, the applicable statute of limitations, or the length of time since 1962 in the case of claims arising in Canada. Notwithstanding the amount of points awarded or any applicable reductions, holders of Allowed Sexual Abuse Claims who elect the Allocation Plan alternative will be paid no less than $5,000. Upon completion of the Abuse Claim Reviewer's review of each Class 4 Claimant's Claim who elects the Allocation Plan alternative, the Abuse Claim Reviewer shall provide written notification to the Trustee of the Trust of the points awarded to each Class 4 Claimant.  The Trustee shall calculate the average value of each awarded point based upon the net funds in the Trust available for distribution to the Sexual Abuse Claimants.  Under the Allocation Protocol, distributions will be made by the Trust to all Sexual Abuse Allocation Claimants simultaneously, except that the Trust will hold any claims subject to an objection in reserve until such time and the objection is resolved with respect to a claim.  Upon making such determination the Trustee shall distribute the monetary award to the Class 4 Claimant in accordance with the Plan and the Trust documents.  The Trust will initially be funded with $16.64 million.  $13.44 million shall come from the Debtors' cash and $3.2 million shall be contributed by Providence Washington Insurance Company in exchange for full policy releases and other protections afforded in the Plan, such as permanent injunctive relief and the like.  Under no circumstance shall the monetary award to a Sexual Abuse Claimant pursuant to the Allocation Plan have any effect of the rights of a Non-Settling Insurer.  A copy of the Allocation Plan is attached as **Exhibit 2.8** to the Plan.

**Option 2 (Sexual Abuse Litigation Claim)**.  Holders of Class 4 Claims may elect not to participate in the Allocation Plan and may elect to be treated as a Sexual Abuse Litigation

Claimant.  Under this alternative, the Class 4 Claim holder may proceed to liquidate his/her Claim against the Debtors as well as any other entity that may also be liable with the Debtors, such as a joint tortfeasor in a court of appropriate jurisdiction other than the Bankruptcy Court.  Unless required and or funded by insurance, the Reorganized Debtors may elect not to defend such litigation as the Debtors discharge will prevent any person or entity from enforcing a judgment against the Reorganized Debtors' assets.

If an Abuse Claimant elects to be a Sexual Abuse Litigation Claimant (regardless of whether that election is subsequently rescinded per the Plan) and thereafter receives an Insurance Recovery based on a Debtors' Insurance Policy or a recovery from a defendant who is jointly and severally liable with the Debtors, such recoveries shall be divided as follows:

(a)    Prior to Effective Date of Plan:  100% to Trust;

(b)    After Effective Date of Plan, 50% to Trust and 50% to Claimant (payments net of contingency fee and reimbursable costs);

(c)    After post-confirmation commencement of plaintiff's deposition, commencement of independent medical examination of plaintiff or plaintiff's production of documents. 25% to Trust and 75% to Claimant (payments net of contingency fee and reimbursable costs) and

(d)    Within 90 days of trial date assigned by Court: 5% to Trust and 95% to Claimant (all payments net of contingency fee and reimbursable costs).

If an Abuse Claimant elects to be a Sexual Abuse Litigation Claimant and thereafter receives an Insurance Recovery based on a Site Insurance Policy or a recovery from a defendant who is jointly and severally liable with the Debtors, such recoveries shall be divided as follows:

(a)    5% to the Trust and 95% to the Claimant, regardless of when paid.

The Trustee will establish a reserve from the Settlement Fund for the Abuse Claim of the Sexual Abuse Litigation Claimant utilizing the Allocation Plan.  If the Sexual Abuse Litigation Claimant cannot obtain a final judgment or settlement of the Claim or a final judgment is entered against the Sexual Abuse Litigation Claimant finding that the Debtors do not have any liability to such Claimant on account of his Sexual Abuse Claim, the Reserve shall revert to the non-reserved assets of the Trust and the Sexual Abuse Litigation Claimant shall have no recourse against the Trustee, the Trust or the Settlement Fund.  If the Sexual Abuse Litigation Claimant settles its claim against a Co-Defendant who is alleged to be jointly and severally liable, upon payment of the settlement amount the reserve shall be released to the non-reserved assets of the Trust for distribution to such Claimant pursuant to the Plan and Allocation Plan.  If the Sexual Abuse Litigation Claimant obtains a final judgment (other than through settlement) against a Co-Defendant alleged to be jointly and severally liable and, after exhausting all remedies to collect such final judgment receives less than the amount thereof, the difference shall be paid to the Sexual Abuse Litigation Claimant from its reserve not to exceed the amount of the reserve.  Any amount remaining in the Sexual Abuse Claimant's reserve after payment

pursuant to the foregoing sentence shall be released to the non-reserved assets of the Trust for distribution pursuant to the Plan and the Allocation Plan.

On the Effective Date, the Trust shall assume all liability for and will pay all Sexual Abuse Claims pursuant to the provisions of the Plan and the Trust documents. The assumption of liability and the payment of the Sexual Abuse Claims by the Trust shall not be deemed to release the Debtors' liability on account of the Sexual Abuse Claims except that the Debtors will receive a discharge as set forth in Section XV of the Plan.

The Plan provides that the Trustee may seek Bankruptcy Court approval to add any Person or Entity to the lists of Participating Parties and Settling Insurers. As a Claimant or other interested party, you will receive notice of any motion to add a Person or Entity to such lists and/or the terms of a Participating Party Agreement. If you do not object to such a motion and it is granted by the Bankruptcy Court, the release and injunctive provisions identified and contained in your Ballot shall be deemed to include such new Participating Party or Settling Insurer and claims against the new Participating Party shall be subject to the Channeling Injunction.

The Plan provides that the Bankruptcy Court, subject to the approval of the Trustee, may appoint a future claims representative for creditors, including creditors with Sexual Abuse Claims. A future claims representative is in essence a court-appointed agent named to represent certain future claimants alleging that they were sexually abused prior to the Petition Date, but for one reason or another, did not file a proof of claim. The future claims representative will be responsible for negotiating with third parties such as any joint tortfeasors and/or Non-Settling Insurers for a reserve of monies to be set aside to be paid to holders of future claims. The Plan will provide that in exchange for the funding of any future claims reserve, holders of future claims will be channeled to the future claims reserve fund and will not be entitled to pursue claims against those Persons or Entities that fund the reserve. Bankruptcy courts in this District, as well as appellate courts have approved channeling injunctions in favor of non-debtor third parties under "unusual circumstances." The Court may also approve a motion brought by the Trustee seeking approval of an agreement between and among the Trustee, a future claims representative and a Person or Entity seeking to become a Participating Party or Settling Insurer. Under no circumstances shall the Trustee seek approval of an agreement with the future claims representative that uses any property of the Trust to fund a distribution for the benefit of future claimants. Similarly, the Reorganized Debtors shall not be required to fund any future claims reserve and the Reorganized Debtors intend to take the position that any future claim is a claim as defined under the broad definition contained in the Bankruptcy Code and the Debtors' discharge will bar such claim.

7.    **Class 5 - Fraud Claims**

Class 5 consists of holders of Fraud Claims. These are Claims by individuals who previously settled an Abuse Claim against the Debtors prior to the Petition Date and assert that they were fraudulently induced by the Debtors to accept an amount less than the true value of their Claim. The Debtors dispute the validity of Fraud Claims. The Plan provides that each holder of a Class 5 Fraud Claim will receive $10,000.00 from the Trust to be paid on the later of thirty (30)

days after the (a) Effective Date or (b) entry of a Final Order resolving an objection to such holder's Fraud Claim.

### 8.      Class 6 – Physical Abuse Claims

Class 6 consists of holders of Physical Abuse Claims.  These are Claims not involving Sexual Abuse but more in the nature of tort Claims based upon excessive corporal punishment or the like.  The Debtors dispute the validity of such Claims and believe any such Claims even if meritorious are barred by applicable state statutes of limitations.  The Plan provides that each holder of a Class 6 Physical Abuse Claim will receive $500.00 from the Trust to be paid on the later of thirty (30) days after the (a) Effective Date or (b) entry of a Final Order resolving an objection to such holder's Physical Abuse Claim.

### 9.      Class 7 – Maintenance Claims

Class 7 consists of Claims held by individual Christian Brothers against the Debtors for support, maintenance, sustenance, and/or care.  The Debtors calculate that such Maintenance Claims total in excess of $150 million.  For a description of the Maintenance Claims *see* "Maintenance Claims" on p. 23 above.

The Plan provides that CSC will assume and be responsible for all Class 7 Claims, which will be payable in the ordinary course of business.  CSC does not have sufficient assets to pay in full all such Class 7 Claims on the Effective Date.  However the Debtors expect that the Reorganized Debtors will continue to receive funds from Brothers who are capable of teaching and providing ministry, which funds shall be used to pay the Debtors' ongoing operating costs (including Maintenance Claims) as well as fund their ongoing Maintenance Claim obligations.  In addition, the Reorganized Debtors believe that they will be able to resume fund raising after emerging from Chapter 11.  The Debtors estimate that between their expected revenues and CSC's current assets, they have sufficient funds to pay ongoing Maintenance Claims for at least 5 years.

The Plan provides that CSC will be a Participating Party and entitled to certain injunctive relief and other protections which will prevent any Sexual Abuse Claimants from seeking recovery from CSC on account of Sexual Abuse caused by individual Christian Brothers. In consideration for the third-party release granted to CSC under the Plan will be the assumption of all Class 7 Claims.  The Committee investigated CSC's assets and its relationship to the Province and the Debtors and supports the third-party release granted to CSC under the Plan.

### 10.      Class 8 – General Unsecured Claims

Class 8 consists of holders of General Unsecured Claims.  These are Claims not secured by any interest in the Debtors' property and consist of any Claim against the Debtors that is not an Abuse Claim, Fraud Claim, Physical Abuse Claim, Administrative Claim, Maintenance Claim or Priority Tax Claim.  Based upon a review of the Debtors' Schedules as well as filed proofs of claim, the Debtors estimate that Class 8 Unsecured Claims total approximately $7 million including (a)  a Claim in the amount of at least $1,639,703.00 filed by the Seattle AD; (b) a claim of $1.8 million by CBF on account of loans to CBI (the "**CBF Claim**"); and (c) a $3.6 million Claim by CSC on account of loans made to CBOI (the "**CSC Claim**").  The Plan

provides that all holders of Allowed Class 8 Claims will receive their Pro Rata share of $50,000 to be paid as soon as reasonably practicable after all Class 8 Claims have either been Allowed or Disallowed.  The Debtors dispute any liability regarding the Claims asserted by the Seattle AD, including the $1,639,703.00 liquidated claim.  The forecasted recovery for holders of Allowed Class 8 Claims depends heavily upon whether and to what extent the Seattle AD's Claim is Allowed.  If the Seattle AD's liquidated Claim is Allowed, then the Debtors estimate that the total amount of Allowed Unsecured Claims will be approximately $2 million.  This would equate to a 2.5% recovery for holders of Allowed Class 8 Claims.  On the other hand, if the Seattle AD's Class 8 Claim is Disallowed, then the Debtors estimate that the total amount of Allowed Unsecured Claims will be approximately $200,000 and holders of Allowed Class 8 Claims will receive an approximate 25% recovery on account of Allowed Class 8 Claims.

### 11.   Class 9 – Penalty Claims

Class 9 consists of Penalty Claims.  These Claims are Claims based upon a fine, penalty, forfeiture, punitive damages, or the like not meant to compensate the Claimant for actual pecuniary loss.  The Debtors are unaware of any such Penalty Claims.  It is possible that Class 4 Sexual Abuse Claimants may have included some type of Penalty Claim in their proof of claim.  The Plan provides that Penalty Claims will be subordinated to all other Allowed Claims and receive no distribution under the Plan.

### 12.   Class 10 – Abuse Related Contingent Contribution / Reimbursement / Indemnity Claims

Class 10 consists of Abuse Related Contingent Contribution / Reimbursement / Indemnity Claims.  These are Claims by an entity against the Debtors for contribution, indemnity, or reimbursement arising as a result of such entity having paid or defended against any Abuse Claim, including, but not limited to, a joint tortfeasor or the like.  The Seattle AD filed an unliquidated Claim asserting contribution and indemnification Claims based upon being named as co-defendant with the Debtors in various Sexual Abuse Litigations.  In addition, Pacific Indemnity, an entity that issued liability policies to the Seattle AD and named the Congregation of Christian Brothers as an additional insured, filed unliquidated indemnification Claims against the Debtors.  Consistent with Section 502(e)(1) of the Bankruptcy Code, holders of Class 10 Claims held by any Person or Entity shall be Disallowed and receive no distribution under the Plan.

### C.   Means for Execution of the Plan

### 1.   The Trust

On the Effective Date, the Trust will be created. Omni Management Acquisition Corp. ("Omni") will be the Trustee. Omni has served as trustee of trusts created for the benefit of sexual abuse claimants in the chapter 11 cases of Diocese of Davenport, Society of Jesus, Oregon Province and Catholic Bishop of Northern Alaska.

2.    **Creation and Funding of Trust**

On the Effective Date, the Reorganized Debtors will, in full release and satisfaction and discharge of all Class 4 Sexual Abuse Claims, cause the following to occur:

a.  The execution and delivery of the Trust Agreement which will establish the Trust;

b.  The delivery of $13.442 million necessary for the Debtors to meet its obligations under the Plan as of the Effective Date;

c.  PWIC shall wire $3.2 million to the Trust;

d.  The Debtors and or the Reorganized Debtors will pay or deliver to the Trustee of the Trust such sums received by them from any settlements of Insurance Claims since the Petition Date other than the $3.2 million paid by PWIC, including the $350,000 settlement with Arrowood;

e.  The Debtors and the Creditors' Committee will be deemed to assign to the Trustee of the Trust all Avoidance Rights (not otherwise released, time barred, enjoined, or discharged under the Plan) and Third Party Derivative Claims against Entities other than Participating Parties. This specifically includes the adversary proceeding entitled, *The Official Committee of Unsecured Creditors of The Christian Brothers' Institute and the The Christian Brothers of Ireland, Inc. v. All Hallows Institute, Adv. No. 13-08229-dd*, filed in the Bankruptcy Court;

f.  The Debtors will be deemed to assign to the Trust any rights the Debtors may have with respect to Insurance Coverage, including Insurance Policies described herein and any claims against third parties on account of defenses to or denials of insurance coverage;

g.  At the Trustee's election, on the Effective Date the Reorganized Debtors will either (i) execute and deliver quit claim deeds to the Trust for the real property located at: (a) 125 Kings Highway S, Rochester, New York and (b) 1850 Broadway/Route 9W, Esopus, New York (Lower Parcel) (collectively, the "Properties") or (ii) the Reorganized Debtors shall (1) market and sell the properties in accordance with the Trustee's sole and exclusive discretion and (2) shall deliver net proceeds from the sale of the Properties to the Trustee; and

h.  The Debtors or the Reorganized Debtors shall execute any and all documents necessary to assign the Insurance Claims and any rights under any of the Debtors' liability insurance policies to the Trust.

3.    **Establishment of Reserve Accounts**

As set forth in the Trust Agreement and Article XII of the Plan, the Trustee shall establish Reserves for various purposes.

4.    **Prosecution of Tort Actions**

An action may be prosecuted against the Reorganized Debtors only as follows:

(a)    The Debtors intend to change their names in order to avoid any confusion surrounding the continued prosecution of tort actions permitted by the Plan.  The Debtors intend to utilize a name such as Religion Liquidation Corp. or the like.

(b)    Following the Effective Date of the Plan, a Class 4 Claimant electing to be a Sexual Abuse Litigation Claimant may commence an action against the Debtors and/or the Province.  The Debtors may elect not to defend such actions or expend any funds with respect thereto.  Any such action shall be deemed by operation of law to be an action against the Debtors.  Consistent with the discharge provided for in the Plan, any judgment obtained in such action may not be enforced against the Debtors, the Reorganized Debtors, the Province and/or any of their assets, including, but not limited to, any assets retained by the Debtors under the Plan, revested assets or assets acquired by the Reorganized Debtors after the Effective Date, and shall be paid in accordance with the Plan and shall be fully enforceable solely against and paid by any Non-Settling Insurer under the terms of that Non-Settling Insurer's Insurance Policy.  For the avoidance of any doubt, nothing contained in the Plan is intended to impair or diminish the joint and several liability of any third party for Abuse, except if that third party is a Participating Party.

5.    **Liquidation and Payment of Abuse Claims**

(a)    The Trust shall pay Abuse Claims in accordance with the terms of the Plan, Confirmation Order and Trust Documents and without regard to whether the Claim is asserted against the Christian Brothers' Institute or the Christian Brothers of Ireland, Inc.  The amount of the Trust's distributions on account of Abuse Claims shall not be binding upon any Non-Settling Insurer.  Absent such consent, Non-Settling Insurers shall only be bound by judgments obtained against the Debtors and/or the Participating Parties prior to the Petition Date and by judgments obtained in litigation which is authorized to continue under the Plan.

(b)    Nothing in the Trust Documents shall (i) impose any costs, directly or indirectly, upon the Estates or any Participating Party relating to the treatment of Abuse Claims or (ii) otherwise modify the rights or obligations of the Estates or any Participating Party as otherwise set forth in the Plan.

(c)    Effect of No Award On Abuse Claims.  If a Sexual Abuse Allocation Claimant is denied payment pursuant to the Allocation Plan or a court of competent jurisdiction determines that a Sexual Abuse Litigation Claimant cannot obtain a judgment against the Debtors, Released Parties, Participating Parties, or the Trust, the holder of such Abuse Claim will have no further rights against the Debtors, Reorganized Debtors, Released Parties, Participating Parties, the Settling Insurers, the Trust or Trustee relating to such Abuse Claim.

(d)    Treatment of Attorneys' Fees and Costs of Abuse Claimants.  Subject to the treatment of Qualified Counsel Fees and Qualified Counsel Costs pursuant to the Plan, the fees and expenses of attorneys representing Abuse Claimants who receive payment from the Trust will be borne by such Abuse Claimants based on applicable state law and individual

arrangements made between such Abuse Claimants and their respective attorneys. In no event will the Debtors, the Reorganized Debtors, the Participating Parties, the Released Parties, the Settling Insurers, the Trust, or the Trustee have any liability for any fees and expenses of attorneys representing any of the Abuse Claimants except for the provisions relating to Qualified Counsel Fees and Qualified Counsel Costs, and any such Claims for fees and/or expenses, if any, will be Disallowed.

(e)     Treatment of Punitive Damages.   Claims for punitive or exemplary damages in connection with any of the Claims will be treated as Penalty Claims and will receive no distribution under the Plan.

(f)     Withdrawal of Abuse Claims.   An Abuse Claimant may withdraw an Abuse Claim at any time on written notice to the Trustee.  If withdrawn, the Claim will be withdrawn with prejudice and may not be reasserted.

(g)     Before the Trustee will first pay an Abuse Claim to any Abuse Claimant who is a citizen or resident of the United States and whose Proof of Claim indicates that he or she was abused, in whole or in part, after December 5, 1980, counsel for that Claimant must provide the Trustee with a letter stating  that:

(i) if the Abuse Claimant is not a Medicare Beneficiary, counsel or an Approved Vendor has obtained documentation received within 120-days from the Social Security Administration confirming that the Abuse Claimant is not a Medicare Beneficiary, or

(ii) if the Abuse Claimant is a Medicare Beneficiary, counsel or an Approved Vendor has obtained a letter from MSPRC received within 120-days: (a) setting forth the Conditional Payment estimate made to or on behalf of the Medicare Beneficiary that is subject to reimbursement by a "primary plan," as the phrase is defined in Section 1395y(b)(2) of the MSPA, and verifying that the Abuse Claimant's counsel has held back in his or her trust account a sum from payment equal to the Conditional Payment estimate for the purpose of reimbursing Medicare, to be held until the MSPRC acknowledges that that terms for reimbursement of Medicare have been agreed, or (b) stating that no such Conditional Payment has been made to or on behalf of the Medicare Beneficiary or (b); and

(iii) regardless of whether the Abuse Claimant is currently a Medicare Beneficiary, counsel has evaluated whether to set aside a sum in the Abuse Claimant counsel's trust account for future medical expenses received after the date of payment hereunder that counsel anticipates may be covered by Medicare and that would be subject to reimbursement from payment hereunder, and if counsel has determined that a sum should be set aside, set aside that sum.

(h)     The failure by one or more Medicare Beneficiaries or other Abuse Claimants to comply with these provisions shall not delay or impair the payment by the Trustee to any other Medicare Beneficiary or other Abuse Claimant complying with these provisions.

(i)     If the Abuse Claimant is the estate of an Abuse Claimant, then the letters or documentation required pursuant to Section 10.6 of the Plan (as described in Section VIII(C)(4)(g) of the Disclosure Statement) need not be dated within 120 days of the date of payment by the Trustee to such Claimant.

### 6.     <u>Insurance Matters</u>

(a)     <u>Transfer of Insurance Rights</u>.    On the Effective Date, and without any further action by any party, but subject to the provisions of Sections 7.1.13 and 7.1.14 of the Plan, the Debtors, the Reorganized Debtors, and each of the Participating Parties will be deemed to have assigned to the Trust the Debtors', the Reorganized Debtors', and the Participating Parties' rights to all Insurance Claims and Insurance Recoveries against the Non-Settling Insurers.  The foregoing transfer shall be effective to the maximum extent permissible under applicable law and the terms of the Insurance Policies and shall not be construed:  (a) as an assignment of the Insurance Policies or (b) to entitle any person or entity to Insurance Coverage other than those persons or entities entitled to such coverage under the terms of the Insurance Policies.  The Debtors intend to request the Bankruptcy Court find that the assignment of Insurance Claims as provided in the Plan is valid, and does not defeat or impair the Insurance Coverage.  If a party in interest fails to timely file an objection to the proposed assignment by the deadline for filing objections to confirmation of this Plan, that party in interest shall be deemed to have irrevocably consented to the assignment and will be forever barred from asserting that the assignment in any way affects the ability of the Trust to pursue Insurance Claims and Insurance Recoveries, or either of them, from the Non-Settling Insurers, and each of them, or Insurance Coverage.  In the event that the Bankruptcy Court determines that the assignment of the Insurance Claims and Insurance Recoveries is valid and does not defeat or impair the Insurance Coverage, following the Effective Date, the Trust shall assume responsibility for, and be bound by, all of the obligations of the Debtors and Participating Parties under the Insurance Policies; provided, however, that the Trust's assumption of such responsibility shall not relieve the Debtors, the Reorganized Debtors or the Participating Parties from any obligation that such entities may have under the Insurance Policies.

(b)     <u>Appointment of Trustee as Estate Representative to Enforce Insurance Rights and Obtain Insurance Recoveries</u>.  Pursuant to the provisions of Section 1123(b)(3)(B) of the Bankruptcy Code, the Trust is hereby appointed as the representative of the Debtors' estate for the purpose of retaining and enforcing the Debtors' and the Debtors' Estates' Insurance Coverage and for Insurance Claims with respect to the Abuse Claims against the Debtors.  The determination of whether the appointment of the Trust as the Debtors' and the Debtors' Estates' representative provided for in the Plan is valid and does not defeat or impair the Insurance Coverage, shall be made by the Bankruptcy Court at the Confirmation Hearing.  If a party in interest fails to timely file an objection to the proposed appointment by the deadline for filing objections to confirmation of this Plan, that party in interest shall be deemed to have irrevocably consented to the appointment and will be forever barred from asserting that the appointment in any way affects the ability of the Trust to pursue Insurance Claims and Insurance Recoveries, or

either of them, from the Non-Settling Insurers, and each of them, or Insurance Coverage.  In the event that the Bankruptcy Court determines that the appointment is valid and does not defeat or impair the Insurance Coverage, following the Effective Date, the Trust shall assume responsibility for, and be bound by, all of the obligations of the Debtors and Participating Parties under the Insurance Policies; provided, however, that the Trust's appointment shall not relieve the Debtors, the Reorganized Debtors or the Participating Parties from any obligation that such entities may have under the Insurance Policies.

(c)    Consequences of Determination that Assignment or Appointment is Invalid.  The determination of whether the assignment of Insurance Claims provided for in the Plan is valid, and does not defeat or impair the Insurance Coverage or that the appointment of the Trust as the Debtors' and the Debtors' Estates' representative provided for in the Plan, is valid and does not defeat or impair the Insurance Coverage, shall be made by the Bankruptcy Court at the Confirmation Hearing.   In the event that a Final Order is entered holding that the assignment of Insurance Claims provided for in the Plan, or that the appointment of the Trust as the Debtors' and the Debtors' Estates' representative provided for in the Plan, is invalid or would defeat or impair the Insurance Coverage with respect to an Insurance Policy, as to such Insurance Policy, the assignment and/or appointment, as the case may be, will be deemed not to have been made. If the assignment and/or appointment is not deemed to have been made, the Debtors, the Reorganized Debtors, and each of the Participating Parties will retain the Insurance Claims under such Insurance Policy, and:

(d)    At the request of the Trust, the Reorganized Debtors and the Participating Parties will assert their Insurance Claims to the extent requested by the Trust against any Non-Settling Insurer.  All Insurance Recoveries by the Reorganized Debtors and the Participating Parties will be paid to the Trust.  The Reorganized Debtors and Participating Parties will select and retain counsel to pursue their Insurance Claims, subject to the Trustee's approval, which approval shall not be unreasonably withheld,

(e)    The Reorganized Debtors agree to cooperate with the Trust with respect to the Insurance Coverage Claims.  The Reorganized Debtors will provide the Trustee and its counsel with all discovery requests, pleadings, moving documents and other papers which the Reorganized Debtors intend to make or file with respect to the Insurance Coverage Claims and any related counterclaims against the Non-Settling Insurers prior to making such requests or filing.   The Reorganized Debtors agrees to keep the Trustee advised of any settlement discussions regarding any litigation against a Non-Settling Insurer and will involve the Trust's counsel in all settlement discussions where offers or counter-offers are presented.

(f)    The Trust shall pay the reasonable attorneys' fees, costs and expenses that are incurred by the Reorganized Debtors in pursuing their Insurance Claims.

(g)    The Trust shall, in addition to reasonable attorneys' fees, costs and expenses, reimburse the Reorganized Debtors for any reasonable out of pocket costs and expenses they incur as a direct consequence of pursuing such Insurance Claims, but will not compensate the Reorganized Debtors for any time any of their employees expend. Upon receipt by the Reorganized Debtors, all Insurance Recoveries received by the Reorganized Debtors on account of such Insurance Claims shall be deemed to be held in trust for the benefit of the Trust

and shall be remitted by the Reorganized Debtors to the Trust as soon as practicable following the Reorganized Debtors' receipt of such Insurance Recoveries.

(h)     If the Trust advances legal fees and costs to enforce any rights and remedies under an Insurance Policy of a Non-Settling Insurer, such legal fees and costs shall be prorated between the Trust and the Claimant alleging coverage under such Insurance Policy based on the foregoing percentages; provided that the Trust and the Claimant may agree to a proration more favorable to the Trust.  Claimant is responsible for his share of the legal fees and costs regardless of whether any amount is paid by the Non Settling Insurer.  Counsel of record for the Claimant in connection with such Claimant's Sexual Abuse Claims shall be liable to the Trust for the Claimant's share of the legal fees and costs.   The allocation of legal fees and costs among the Trust and Sexual Abuse Claimants in connection with the enforcement of any rights or remedies under an Insurance Policy of a Non-Settling Insurer shall be determined by further order of the Bankruptcy Court.  Notwithstanding anything to the contrary in sections 7.1.13 and 7.1.14 of the Plan, the proceeds of an Insurance recovery on account of any Sexual Abuse Claimant that is represented by counsel in connection with such Claimant's Sexual Abuse Claim that, upon request of the Trustee, does not advance legal fees in accordance with this Section 7.1.16 shall be split 75% to the Trust and 25% to the Claimant.

(i)     Preservation of Insurance Rights.  Nothing in the Plan shall be construed to impair or diminish in any way any Non-Settling Insurers obligations under any Insurance Policy.  No provision of this Plan shall impair or diminish any Non-Settling Insurer's legal, equitable, or contractual obligations relating to the Insurance Policies issued by the Non-Settling Insurers or the Insurance Claims against the Non-Settling Insurers in any respect.  In the event that any court determines that any provision of this Plan impairs or diminishes any Non-Settling Insurer's obligations with respect to the Insurance Claims or Insurance Recoveries, such provision of this Plan shall be given effect only to the extent that it shall not cause such impairment or diminishment.

(j)     Post-Judgment Actions Against Non-Settling Insurers.  In the event that any Abuse Claimant obtains a judgment against the Reorganized Debtors as permitted by the Plan, the Reorganized Debtors will cooperate with the Trust or Abuse Claimant in the pursuit of any action brought by the Trust or Abuse Claimant against a Non-Settling Insurer that the Trust contends provides Insurance Coverage for such judgment.  Reorganized Debtors agree that they will provide the Trust or Abuse Claimant with any non-privileged and relevant documents and information reasonably requested by the Trust or Abuse Claimant in pursuit of such an action. The Trust agrees that it will reimburse the Reorganized Debtors for any reasonable out of pocket costs they incur, including attorneys' fees, as a direct consequence of such cooperation, but will not compensate the Reorganized Debtors for any time any of their employees expend.

(k)     Settlement with Non-Settling Insurers.  Following the Effective Date, the Reorganized Debtors shall not enter into a settlement agreement affecting any Insurance Policy or Insurance Recoveries with any Non-Settling Insurer without the express written consent of the Trust, which consent may be granted or withheld at the Trust's sole and absolute discretion. Following the Effective Date, the Reorganized Debtors authorize the Trust to exclusively act on their behalf to negotiate a settlement with any Non-Settling Insurer on account of such Insurance Claims.

(l)  <u>Cooperation with Non-Settling Insurer in Defense of Claims</u>.  In the event that any Abuse Claimant prosecutes an action against the Reorganized Debtor as permitted by the Plan, the Reorganized Debtors will cooperate, in accordance with the terms of any applicable Insurance Policy, with a Non-Settling Insurer that is providing a defense to such a Claim.  The Trust agrees that it will reimburse the Reorganized Debtors for any reasonable out of pocket costs, including attorneys' fees, they incur as a direct consequence of such cooperation, but will not compensate the Reorganized Debtors for any time any of their employees expend.

(m)  <u>Insurance Neutrality</u>.  Except as described herein, no provision of the Plan shall diminish or impair the right of any Insurer to assert any defense to any Insurance Claim.  Neither the assumption by the Trust of the Abuse Claims nor the fact that the Trust is liquidating and paying monies on account of the Abuse Claims shall be construed in any way to diminish any obligation of any Insurer under any Insurance Policy to provide Insurance Coverage to the Debtors, the Debtors' Estates or the Reorganized Debtors for Abuse Claims.  The duties and obligations, if any, of the Non-Settling Insurers under each Non-Settling Insurer's Insurance Policy shall not be impaired, altered, reduced or diminished by:  (a) the discharge granted to the Debtors under the Plan pursuant to Section 1141(d) of the Bankruptcy Code, (b) the exonerations, exculpations and releases contained in the Plan or (c) the Channeling Injunction.

### 7.      Treatment of Executory Contracts and Unexpired Leases

Subject to the requirements of Section 365, all executory contracts and unexpired leases of the Debtors that have not been rejected by order of the Bankruptcy Court or are not the subject of a motion to reject pending on the Confirmation Date will be deemed assumed by the Reorganized Debtors on the Effective Date. If any party to an executory contract or unexpired lease that is being assumed objects to such assumption, the Bankruptcy Court may conduct a hearing on such objection on any date that is either mutually agreeable to the parties or fixed by the Bankruptcy Court.  All payments to cure defaults that may be required under Section 365(b)(1) of the Bankruptcy Code will be made by the Reorganized Debtors.  In the event of a dispute regarding the amount of any such payments, or the ability of the Debtors to provide adequate assurance of future performance, the Reorganized Debtors will make any payments required by Section 365(b)(1) of the Bankruptcy Code after the entry of the Final Order resolving such dispute.

### D.      Procedure for Determination of Claims Other than Abuse Claims, Fraud Claims, and Physical Abuse Claims

### 1.      Objection to Claims.

Notwithstanding the occurrence of the Effective Date and except as to any Claim that has been Allowed prior to the Effective Date or any Abuse Claim, Fraud Claim, or Physical Abuse Claim, the Reorganized Debtors may object to the Allowance of any Claim against the Debtors or seek estimation thereof on any grounds permitted by the Bankruptcy Code by filing an objection within sixty (60) days after the Effective Date.

2. **Disputed Claims.**

Except as to any Abuse Claim, Fraud Claim or Physical Abuse Claim, payments or other distributions will be made to holders of Claims until such Claims are Allowed Claims pursuant to Final Order.

3. **Treatment of Contingent Claims.**

Until such time as a Contingent Claim or a Contingent portion of an Allowed Claim becomes fixed or absolute or is Disallowed, such Claim will be treated as a Disputed Claim for all purposes related to distributions under the Plan.

E. **Provisions Governing Distributions**

1. **Distribution Only to Holders of Allowed Claims.**

Except as otherwise provided in the Plan, distributions under this Plan and the Plan Documents will be made only to the holders of Allowed Claims and in the case of Abuse Claims, only pursuant to the Plan and the Trust Documents.  Until a Disputed Claim becomes an Allowed Claim, the holder of that Disputed Claim will not receive any distribution otherwise provided to the Claimants under the Plan or the Plan Documents. If necessary in determining the amount of a Pro Rata distribution due to the holders of Allowed Claims in any class, the Reorganized Debtors or the Trustee, as applicable, will make the Pro Rata calculation as if all Unresolved Claims were Allowed Claims in the full amount Claimed or in the Estimated Amount.  When an Unresolved Claim in any class becomes an Allowed Claim, the Reorganized Debtors or the Trustee, as applicable, will make full or partial distributions, as applicable, with respect to such Allowed Claim, net of any setoff contemplated by the order, if any, allowing such Claim and/or any required withholding of applicable federal and state taxes.

2. **Transmittal of Distributions.**

Except as otherwise provided in the Plan, in the Plan Documents, or in an order of the Bankruptcy Court, distributions to be made under the Plan, Confirmation Order or Trust Documents to Abuse Claimants will be made by the Trustee and distributions to all other Claimants will be made by the Reorganized Debtors.  Distributions to Abuse Claimants will be made (a) to the client trust account for attorneys of record of Abuse Claimants, (b) if the Abuse Claimant does not have an attorney of record, to the latest mailing address set forth in a proof of claim filed with the Claims Agent or the Bankruptcy Court by or on behalf of such Claimant, or to such other address as may be provided to the Reorganized Debtors or Trustee, as applicable, by such Claimant in writing, or (c) if no such proof of claim has been filed and no written notice setting forth a mailing address is provided by or on behalf of such Claimant to the Reorganized Debtors or Trustee, as applicable, to the mailing address set forth in the schedules filed by the Debtors in these Cases.  Distributions to other Claimants will be made by wire or first class United States mail, postage prepaid, (a) to the client trust account for attorneys of record of the Claimant, (b) if the Claimant does not have an attorney of record, to the latest mailing address set forth in a proof of claim filed with the Claims Agent or the Bankruptcy Court by or on behalf of such Claimant, or to such other address as may be provided to the Reorganized Debtors, as applicable, by such Claimant in writing, or (c) if no such proof of claim has been filed and no

written notice setting forth a mailing address is provided by or on behalf of such Claimant to the Reorganized Debtors, to the mailing address set forth in the schedules filed by the Debtors in these Cases. If a Claimant's distribution is not mailed or is returned to the Reorganized Debtors or Trustee because of the absence of a proper mailing address, the Reorganized Debtors or Trustee, as the case may be, shall make a reasonable effort to locate or ascertain the correct mailing address for such Claimant from information generally available to the public and from such party's own records, but shall not be liable to such Claimant for having failed to find a correct mailing address.  The Trustee shall have no liability to an Abuse Claimant on account of distributions made to the client trust account of an Abuse Claimant's attorney.

3.      **Timing of Distributions.**

Unless otherwise agreed by the Reorganized Debtors or Trustee, as applicable, and the recipient of a distribution under this Plan or the Plan Documents, whenever any payment to be made is due on a day other than a Business Day, such payment will instead be made on the next Business Day, with interest to the extent expressly contemplated by this Plan or any applicable agreement or instrument.   Any Claimant that is otherwise entitled to an undeliverable Distribution and that does not, within thirty (30) days after a Distribution is returned to the Trustee as undeliverable or is deemed to be an undeliverable Distribution, provide the Trustee with a written notice asserting its claim to that undeliverable Distribution and setting forth a current, deliverable address will be deemed to waive any claim to such undeliverable Distribution and will be forever barred from receiving such undeliverable Distribution or asserting any Claim against the Reorganized Debtors, the Trust, the Trustee or their property. Any undeliverable Distributions that are not claimed under this Section will become available to distribute to other Claimants or be retained by the Reorganized Debtors in accordance with the Plan.  Nothing in the Plan requires the Reorganized Debtors, the Trust or the Trustee to attempt to locate any Claimant whose Distribution is undeliverable.  If an instrument delivered as a Distribution to a Claimant is not negotiated within one hundred and twenty (120) days after such instrument was sent to the Claimant, then the instrument shall be null and void, the Claimant shall be deemed to have waived such Distribution, and it shall become Available Cash.

4.      **Form of Distributions.**

Unless otherwise agreed by the Reorganized Debtors or Trustee, as applicable, and the recipient of a distribution under this Plan or the Plan Documents, all distributions will be made, at the option of the Reorganized Debtors or Trustee, by a check by first class mail, postage prepaid or wire transfer.

5.      **No Professional Fees or Expenses.**

No professional fees or expenses incurred by a Claimant will be paid by the Debtors, the Reorganized Debtors, or the Trustee with respect to any Claim except as specified in this Plan or the Trust Documents.

6.      **Claim Estimation.**

In order to effectuate distributions pursuant to the Plan and avoid undue delay in the administration of the Chapter 11 Cases, the Debtors (if prior to the Effective Date) and the

Reorganized Debtors (on and after the Effective Date), after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), shall have the right to seek an Order of the Bankruptcy Court or the District Court, pursuant to § 502(c) of the Bankruptcy Code, estimating or limiting, on account of a Disputed Claim, the amount of (i) property that must be withheld from or reserved for distribution purposes on account of such Disputed Claim(s), (ii) such Claim for allowance or disallowance purposes, or (iii) such Claim for any other purpose permitted under the Bankruptcy Code; provided, however, that the Bankruptcy Court or the District Court, as applicable, shall determine (i) whether such Claims are subject to estimation pursuant to § 502(c) of the Bankruptcy Code and (ii) the timing and procedures for such estimation proceedings, if any, such matters being beyond the scope of the Plan.  Notwithstanding the foregoing, no party in interest except the Trustee may seek to estimate an Abuse Claim.

### 7.      No Interest on Claims.

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a postpetition agreement in writing between the Debtor and a holder of a Claim and approved by an Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claim, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any other provision of the Plan, Confirmation Order or Plan Trust Agreement, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

### 8.      Withholding Taxes.

The Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. As a condition to making any distribution under the Plan, the Reorganized Debtors may require that the holder of an Allowed Claim provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

### 9.      No De Minimis Distributions.

No cash payment of less than $100 will be made by the Reorganized Debtors or the Trustee to any Holder of an Allowed Claim.  No consideration will be provided in lieu of the de minimis distributions that are not made under this Article.  Allowed Claims that are entitled to a Pro Rata distribution of less than $100 shall continue to accrue until such time as the Pro Rata distribution on account of such Claim will be $100 or more.

### 10.      Manner of Cash Payments.

Cash payments to domestic Claimants will be denominated in U.S. dollars and will be made by checks drawn on a domestic bank selected by the Trustee or, at the Trustee's option, by wire transfer from a domestic bank.  Cash payments to foreign Claimants may be paid, at the Trustee's option, either in the same manner as payments to domestic entities or in any funds and by any means that are necessary or customary in the particular foreign jurisdiction.

# IX.

## CONDITIONS TO EFFECTIVE DATE

### A.    Conditions to Occurrence of Effective Date

Each of the following are conditions to the Effective Date, which conditions must be satisfied or waived by the Plan Proponents.

1)    The Bankruptcy Court shall have entered a Final Order or Final Orders approving all settlement agreements involving the Participating Parties and any appropriate judgments consistent therewith, in form and substance reasonably acceptable to each of those parties, and no stay of such Orders shall be in effect;

2)    The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Reorganized Debtors, the Committee, the Participating Parties, and no stay of such Order shall be in effect;

3)    The Trustee and Reorganized Debtors have signed the Trust Agreement; and

4)    The Debtors and Participating Parties have made the transfers to the Trust as required by the Plan.

### B.    Waiver of Conditions

The Debtors, the Plan Proponents, the Participating Parties, and the Settling Insurers may waive any of the conditions to the occurrence of the Effective Date, including waiver of the Final Order Condition at any time from and after the Confirmation Date.

### C.    Failure of Plan to Go Effective

Subject to further order of the Bankruptcy Court, in the event that the Effective Date does not occur within ninety (90) days of entry of a Final Order confirming the Plan, the Plan shall become null and void.

# X.

## EFFECT OF PLAN CONFIRMATION

### A.    Discharge

Subject only to Sections 15.1, 15.1.1, 15.2, 15.3, and 15.4 of the Plan, on the Effective Date, pursuant to Section 1141(d) of the Bankruptcy Code, the Debtors and the Reorganized Debtors will be discharged from all liability for any and all Claims and Debts, known or unknown, whether or not giving rise to a right to payment or an equitable remedy, that arose, directly or indirectly, from any action, inaction, event, conduct, circumstance, happening, occurrence, agreement, or obligation of the Debtors, or the Debtors' Representatives before the Confirmation Date, or that otherwise arose before the Confirmation Date, including all interest, if any, on any such Claims and Debts,

whether such interest accrued before or after the date of commencement of these Cases, and including all Claims and Debts based upon or arising out of Sexual Abuse, Physical Abuse, Fraud Claims and General Unsecured Claims and from any liability of the kind specified in Sections 502(g), 502(h), and 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim is filed or is deemed filed under Section 501 of the Bankruptcy Code; (b) such Claim is Allowed under this Plan; or (c) the holder of such Claim has accepted this Plan.

The Plan provides that the Debtors will receive a discharge with certain limited exceptions, including: (a) the Debtors' indemnification obligations under the Providence Washington Settlement Agreement (*see* Section 15.1 of the Plan); (b) no release of the Debtors or certain related parties for any act or acts of abuse resulting in a claim against the Debtors (*see* section 15.1.1 of the Plan); (c) limiting the scope of the discharge so that it does apply to obligations of certain non-debtor Persons or Entities (*see* Section 15.2 of the Plan); (d) limiting recovery for judgments obtained against the Province, Christian Brothers Communities within the Province, or the Provincial Leadership Team to insurance proceeds from a Non-Settling Insurer and not from the assets of the Reorganized Debtors after the Effective Date (*See* Section 15.3 of the Plan); and (f) no discharge for any Abuse Claims that arose or occurred after the Petition Date (*See* Section 15.4 of the Plan).

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN OR THE DISCLOSURE STATEMENT, NOTHING CONTAINED IN THIS PLAN SHALL CONSTITUTE A RELEASE OF ANY ABUSE CLAIM AGAINST (A) THE DEBTORS; (B) PERSON OR PERSONS HAVING PERSONALLY COMMITTED AN ACT OR ACTS OF ABUSE; (C) THE CONGREGATION OF CHRISTIAN BROTHERS OR ANY OF ITS PREDECESSORS; (D) THE CONGREGATIONAL OR PROVINCIAL LEADERSHIP TEAMS (AND ANY MEMBER THEREOF) OF THE CONGREGATION OF CHRISTIAN BROTHERS OR ANY OF THEIR (I.E. THE CONGREGATIONAL OR PROVINCIAL LEADERSHIP TEAMS) PREDECESSORS: (E) A SUCCESSOR OR PREDECESSOR OF THE DEBTORS TO THE EXTENT OF SUCH SUCCESSOR'S OR PREDECESSOR'S INDEPENDENT LIABILITY FOR AN ACT OR ACTS OF ABUSE; (F) THE CHRISTIAN BROTHERS SCHOOLS; AND  (G) THE HOLY SEE. .  FOR AVOIDANCE OF DOUBT, EXCEPT AS REQUIRED BY THE INSURANCE POLICIES OF NON SETTLING INSURERS, THE DEBTORS MAY ELECT NOT TO DEFEND ANY SEXUAL ABUSE LITIGATION WHICH IS AUTHORIZED TO BE PROSECUTED AGAINST THE DEBTORS PURSUANT TO THIS PLAN AND NO JUDGMENT OBTAINED AGAINST THE DEBTORS IN SUCH SEXUAL ABUSE LITIGATION CAN BE EXECUTED AGAINST THE REVESTED ASSETS OR FROM ANY ASSETS ACQUIRED BY THE REORGANIZED DEBTORS SUBSEQUENT TO THE EFFECTIVE DATE.    NOTHING CONTAINED IN THIS PLAN SHALL CONSTITUTE AN INJUNCTION AGAINST PROSECUTION OF A SEXUAL ABUSE CLAIM AGAINST THE DEBTORS PROVIDED THAT NO JUDGMENT OBTAINED AGAINST THE DEBTORS FOR A SEXUAL ABUSE CLAIM  CAN BE EXECUTED AGAINST THE REVESTED ASSETS OR FROM ANY ASSETS ACQUIRED BY THE REORGANIZED DEBTORS SUBSEQUENT TO THE EFFECTIVE DATE.**

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN OR THE DISCLOSURE STATEMENT, NOTHING CONTAINED IN THE PLAN SHALL**

**CONSTITUTE AN INJUNCTION AGAINST PROSECUTION OF A SEXUAL ABUSE CLAIM AGAINST (A) THE DEBTORS; (B) PERSON OR PERSONS HAVING PERSONALLY COMMITTED AN ACT OR ACTS OF ABUSE; (C) THE CONGREGATION OF CHRISTIAN BROTHERS OR ANY OF ITS PREDECESSORS; (D) THE CONGREGATIONAL OR PROVINCIAL LEADERSHIP TEAMS (AND ANY MEMBER THEREOF) OF THE CONGREGATION OF CHRISTIAN BROTHERS OR ANY OF THEIR (I.E. THE CONGREGATIONAL OR PROVINCIAL LEADERSHIP TEAMS) PREDECESSORS: (E) A SUCCESSOR OR PREDECESSOR OF THE DEBTORS TO THE EXTENT OF SUCH SUCCESSOR'S OR PREDECESSOR'S INDEPENDENT LIABILITY FOR AN ACT OR ACTS OF ABUSE; (F) THE CHRISTIAN BROTHERS SCHOOLS; AND (G) THE HOLY SEE. FOR AVOIDANCE OF DOUBT, EXCEPT AS REQUIRED BY THE INSURANCE POLICIES OF NON SETTLING INSURERS, THE DEBTORS MAY ELECT NOT TO DEFEND ANY SEXUAL ABUSE LITIGATION WHICH IS AUTHORIZED TO BE PROSECUTED AGAINST THE DEBTORS PURSUANT TO THE PLAN AND NO JUDGMENT OBTAINED AGAINST THE DEBTORS IN SUCH SEXUAL ABUSE LITIGATION CAN BE EXECUTED AGAINST THE REVESTED ASSETS OR FROM ANY ASSETS ACQUIRED BY THE REORGANIZED DEBTORS SUBSEQUENT TO THE EFFECTIVE DATE**.

The discharge and injunction provisions of the Plan do not apply to (a) the obligations of any Non-Settling Insurers for any Claims; (b) the obligations arising under any settlement agreement between the Debtors and any Settling Insurer approved by the Bankruptcy Court, which are not and will not be discharged; (c) the performance by the Reorganized Debtors of any and all obligations due to the Non-Settling Insurers under their Insurance Policies with respect to any Abuse Claim; (d) a Person or Persons having personally committed an act or acts of Abuse resulting in a Claim against the Debtors or a Participating Party; (e) the Congregational Leadership Teams (and any member thereof) of the Congregation of Christian Brothers or any of its predecessors or successors; (f) a successor or predecessor of the Debtors to the extent of such successor's or predecessor's independent liability for an act or acts of Abuse; (g) the Christian Brothers Schools and (h) the Holy See.

On the Effective Date, none of the Abuse Claims against the Province, Christian Brothers Communities within the Province or the Provincial Leadership Team (or any of its predecessors or successors) shall be affected by the Plan, the Confirmation Order or the Trust Documents; except that any Abuse Claimant obtaining a judgment against the Province, Christian Brothers Communities within the Province or the Provincial Leadership Team (or any of its predecessors or successors) may recover only from Insurance Policies of a Non-Settling Insurer and not from the Revested Assets or any assets acquired by the Reorganized Debtors after the Effective Date. For the avoidance of any doubt, nothing contained in the Plan is intended to impair or diminish an Abuse Claimant's rights against any other third party for joint and several liability on account of Abuse, unless such party is a Participating Party.

Abuse Claims arising or occurring after the Petition Date will not be discharged, released or impaired, with the exception of any Abuse Claim against a Settling Insurer.

B.    **Vesting of Assets**

In accordance with §§ 1141 and 1123(a)(5) of the Bankruptcy Code, and except as otherwise provided in the Plan or the Confirmation Order, the Revested Assets shall revest in the respective Reorganized Debtors on the Effective Date free and clear of all liens, Claims, and interests of Creditors, including successor liability Claims.  On and after the Effective Date, the Reorganized Debtors may operate and manage their affairs and may use, acquire and dispose of property without notice to any Person, and without supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

C.    **Exculpation and Limitation of Liability**

**EXCEPT AS EXPRESSLY PROVIDED IN THIS PLAN, NONE OF THE EXCULPATED PARTIES WILL HAVE OR INCUR ANY LIABILITY TO, OR BE SUBJECT TO ANY RIGHT OF ACTION BY, ANY HOLDER OF A CLAIM, ANY OTHER PARTY IN INTEREST, OR ANY OF THEIR RESPECTIVE AGENTS, EMPLOYEES, REPRESENTATIVES, FINANCIAL ADVISORS, ATTORNEYS, OR AFFILIATES, OR ANY OF THEIR SUCCESSORS OR ASSIGNS, FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF THE CASE, INCLUDING THE EXERCISE OF THEIR RESPECTIVE BUSINESS JUDGMENT AND THE PERFORMANCE OF THEIR RESPECTIVE FIDUCIARY OBLIGATIONS, THE PURSUIT OF CONFIRMATION OF THE PLAN, OR THE ADMINISTRATION OF THE PLAN OR THE TRUST, EXCEPT LIABILITY FOR THEIR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE (PROVIDED HOWEVER THE DEBTORS AND REORGANIZED DEBTORS WILL BE DISCHARGED FROM ANY SUCH LIABILITY FOR SUCH ACTS OR OMISSIONS OCCURRING PRIOR TO THE CONFIRMATION DATE) OR ANY CAUSES OF ACTION ARISING FROM OR RELATED TO DENIALS OF COVERAGE OR COVERAGE DEFENSES RAISED BY NON SETTLING INSURERS, AND IN ALL RESPECTS, SUCH PARTIES WILL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN OR IN THE CONTEXT OF THE CASE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE DEBTORS AND ITS TRUSTEES, OFFICERS, MEMBERS, EMPLOYEES, ATTORNEYS, FINANCIAL ADVISORS, AND OTHER PROFESSIONALS SHALL BE ENTITLED TO AND GRANTED THE BENEFITS OF § 1125(E) OF THE BANKRUPTCY CODE. FOR THE AVOIDANCE OF DOUBT, THIS SECTION AND THE DEFINITION OF "EXCULPATED PARTIES" SHALL NOT, DIRECTLY OR INDIRECTLY, INURE TO OR FOR THE BENEFIT OF (I) A PERSON OR PERSONS HAVING PERSONALLY COMMITTED AN ACT OR ACTS OF ABUSE RESULTING IN A CLAIM AGAINST THE DEBTORS, A PARTICIPATING PARTY OR A SETTLING INSURER, (II), THE CONGREGATION OF CHRISTIAN BROTHERS OR ANY OF ITS PREDECESSORS; (III) THE CONGREGATIONAL LEADERSHIP TEAMS (AND ANY MEMBER THEREOF) OF THE CONGREGATION OF CHRISTIAN BROTHERS OR ANY OF ITS (I.E. THE CONGREGATIONAL LEADERSHIP TEAM'S) PREDECESSORS, (IV) A SUCCESSOR OR PREDECESSOR OF THE DEBTORS TO THE EXTENT OF SUCH SUCCESSOR'S  OR PREDECESSOR'S INDEPENDENT LIABILITY FOR AN ACT OR**

**ACTS OF ABUSE, (V) THE CHRISTIAN BROTHERS SCHOOLS AND (VI) THE HOLY SEE.**

**PARTICIPATING PARTIES, SETTLING INSURERS, THE REORGANIZED DEBTORS, THE TRUST, THE TRUSTEE AND PROFESSIONALS EMPLOYED BY THE FOREGOING SHALL NOT HAVE ANY LIABILITY TO ANY GOVERNMENTAL ENTITY OR INSURER ON ACCOUNT OF PAYMENTS MADE TO AN ABUSE CLAIMANT, INCLUDING BUT NOT LIMITED TO LIABILITY UNDER THE MEDICARE SECONDARY PAYER ACT.**

**D.    Permanent Injunction Against Prosecution of Released Claims and Channeled Claims Against Participating Parties and Settling Insurers**

Except as otherwise expressly provided in the Plan, for the consideration described in the Plan, on the Effective Date, pursuant to Sections 105(a) and 363 of the Bankruptcy Code, any and all persons and entities who now hold or who may in the future hold claims of any kind or nature (including all debt holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, abuse claimants, other insurers, and all others holding claims of any kind or nature whatsoever) against the Debtors, the Reorganized Debtors, the Province, the Participating Parties, the Settling Insurers, the Settling Insurer Other Releasing Parties, or the Settling Insurer Policies, arising out of, relating to, or in connection with the Settling Insurer Policies or abuse claims are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, to enforce or to attempt to assert or enforce any such claim and interest against the Settling Insurers, the Settling Insurer Released Parties, and/or the Settling Insurer Policies. Any Insurer that becomes a Settling Insurer and signs a settlement agreement with the Debtors shall be entitled to the benefits, including all injunctions, as set forth in the form of settlement agreement signed by such Insurer.

In consideration of the undertakings of the Channeling Injunction Beneficiaries, pursuant to their respective settlements with the Debtors and/or a Participating Party, the funding of the Trust, other consideration, and to further preserve and promote the agreements between and among the Channeling Injunction Beneficiaries, and the protections afforded the Channeling Injunction Beneficiaries, and pursuant to Section 105 of the Bankruptcy Code:

(a)    any and all Channeled Claims are channeled into the Trust; and

(b)    all Persons or Entities that have held or asserted, hold or assert, or may in the future hold or assert, any Channeled Claim are hereby permanently stayed, enjoined, barred and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim, including:

(c)    commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any Channeling Injunction Beneficiaries, their respective predecessors, successors, and assigns, or their respective employees, officers, and directors, or against the property of any Channeling Injunction Beneficiaries, their respective predecessors, successors, and assigns, or their respective employees, officers, and directors;

(d)     enforcing, attaching, collecting or recovering, by any manner or means, from any Channeling Injunction Beneficiaries, their respective predecessors, successors, and assigns, or their respective employees, officers, and directors, or from the property of any Channeling Injunction Beneficiaries, their respective predecessors, successors, and assigns, or their respective employees, officers, and directors, with respect to any such Channeled Claim, any judgment, award, decree, or order against any Channeling Injunction Beneficiaries, or other Person or Entity;

(e)     creating, perfecting or enforcing any lien of any kind against any Channeling Injunction Beneficiaries, their respective predecessors, successors, and assigns, or their respective employees, officers, and directors, or the property of any Channeling Injunction Beneficiaries, their respective predecessors, successors, and assigns, or their respective employees, officers, and directors, with respect to any such Channeled Claim; and

(f)     asserting, implementing or effectuating any Channeled Claim of any kind against:

1)     any obligation due any Channeling Injunction Beneficiaries, their respective predecessors, successors, and assigns, or their respective employees, officers, and directors;

2)     any Channeling Injunction Beneficiaries, their respective predecessors, successors, and assigns, or their respective employees, officers, and directors; or

3)     the property of any Channeling Injunction Beneficiaries, their respective predecessors, successors, and assigns, or their respective employees, officers and directors, with respect to any such Channeled Claim.

To the extent not otherwise enjoined in the Plan, assertion and enforcement of Channeled Claims, and any attempt to assert or enforce such Claims, by any Person or Entity, against a Released Party is hereby permanently stayed, enjoined, barred, and restrained.  A Settling Insurer is entitled to and hereby shall receive the benefits and protections of the injunctions in Sections 15.5, 15.6, 15.7 of the Plan.

Notwithstanding any provision of this Plan, the permanent injunctive relief granted to Entities described herein provides absolutely no protection to (i) a Person or Persons having personally committed an act or acts of Abuse resulting in a Claim against the Debtors or a Participating Party, (ii) the Congregation of Christian Brothers or any of its predecessors; (iii) the Congregational Leadership Teams (and any member thereof) of the Congregation of Christian Brothers or any of its (i.e. the Congregational Leadership Teams) predecessors, (iv) a successor or predecessor of the Debtors to the extent of such successor's or predecessor's independent liability for an act or acts of Abuse, (v) the Christian Brothers Schools and (vi) the Holy See.

As set forth above in Section VIII.B.5, the Plan contemplates that third parties may become Participating Parties after approval of the Disclosure Statement.  Agreements with such Participating Parties may contain additional injunctions and such injunctions will not affect, impair or diminish the releases contained in the Plan.

E.      **Release of Claims Against Participating Parties**

Except for obligations arising under any executory contract assumed by Reorganized Debtors, on the Effective Date, Debtors, Reorganized Debtors and the Estates waive, release and discharge any and all claims or causes of action of every kind and nature that Debtors, Reorganized Debtors, or the Estates have or may have against a Participating Party, including any Third Party Derivative Claims, Avoidance Claims, and any claim that such Participating Party or its assets are a part of or owned by Debtors or the Estates. No such claim will survive the Effective Date or be deemed to be assigned to the Trust.

The Plan contemplates that third parties may become Participating Parties after approval of the Disclosure Statement. Agreements with such Participating Parties may contain additional releases and such releases will not affect, impair or diminish the releases contained in the Plan.

F.      **Settling Insurer Injunction**

Article XV of the Plan contains a Settling Insurer injunction which permanently enjoins all persons or entities from asserting against a Settling Insurer any claim arising in any way from any insurance policies issued by a Settling Insurer.

XI.

**NON-MONETARY COMMITMENTS**

In order to further promote healing and reconciliation, and in order to continue the Plan Proponents' efforts to prevent sexual abuse from occurring in the Province or at Christian Brother Schools in the future, the Debtors, the Province and Reorganized Debtors agree that beginning thirty (30) days after the Effective Date (unless a different date is provided below).

The Province and the Debtors represent that they have implemented the Edmund Rice Christian Brothers North America Instruments of Hope and Healing Program; Protection of Children and Vulnerable Adults Province Policy Statement and Procedures; Ethics in Ministry Policy and Procedures for Positive Relationships Between Members and Minors and Vulnerable Adults is dated as of February 2013 (the "Policies and Procedures"). Full compliance with the Policies and Procedures' ZERO TOLERANCE policy is mandatory. The Child Protection Consultant (as defined below) will evaluate and be authorized to make non-public recommendations with respect to the Policies and Procedures and any of the Debtors' and/or Province's policies regarding protection of children and vulnerable adults.

As of the Effective Date, the Trust may retain, at its sole cost and expense, a third-party expert in the field of child protection that is collectively acceptable to the Province, the Debtors and the Trust (the "Child Protection Consultant") for the purpose of: evaluating and making non-public recommendations with respect to all current and child protection programs administered by the Debtors and/or the Province, including the current Policies and Procedures. Such non-public recommendations will be issued by the Child Protection Consultant within the later of sixty (60) days of the Effective Date or the Child Protection Consultant's retention; provided that the Child Protection Consultant shall have up to an additional sixty (60) days upon notice to parties in interest.

For a period of not less than ten (10) years after the Effective Date, the Province shall post through a prominent "one-click" link on the Province website's home page (www.ercbna.org) or its successor, a list of the names of all known Brothers, who are identified in at least two (2) Sexual Abuse Claims filed as proofs of claim (including proofs of claim for future claims). The Province will footnote that it has not tested the merits of any of the claims. The Committee and the Debtors shall meet and confer to identify such Brothers. If there is a disagreement about whether a Claim is a Sexual Abuse Claim for the purposes of this undertaking, Judge Elizabeth Stong, the mediator in these Cases, shall make the final determination. No determination of the character of a Claim shall be binding on any party except for the purposes of this undertaking. Notwithstanding anything contained herein, the Province shall not be required to list any Brother on account of Abuse Claims asserted in Canada after 1962. The following individuals shall not be listed pursuant to this undertaking pending completion of the Province's review of the Abuse Claims against them: Brothers (or former Brothers) T.I. Murphy (deceased); William M. Colford; Karl Jan Walczak; John Walderman, Patrick O'Toole, Paul Messick, Tim Turner, and Jerod Fallon. The foregoing names will not be listed on the non-monetary post required in paragraph 3 hereof. If the Province determines that one of the foregoing Brothers is/is not the perpetrator of a substantiated Sexual Abuse Claim, the Province will notify the Trustee and the Province promptly will add that Brother's name to the non-monetary post if the Sexual Abuse Claim is substantiated. After the Effective Date, the Province shall add any additional names to the list to the extent the criterion set forth above is satisfied. Notwithstanding the time limit set forth herein, the Province shall maintain the non-monetary post for any longer period of time if recommended by the U.S. Conference of Major Superiors of Men.

Within a reasonable time after the Effective Date, the Province's Team Leader shall send letters of apology to all Sexual Abuse Claimants or, if requested, to immediate family member(s); provided, however, that the Province's Team Leader shall have the discretion, but not the obligation, to send a letter of apology to any Sexual Abuse Claimant who asserts a claim based on sexual abuse that occurred in Canada after December 9, 1962.

After the Effective Date, a member of the Province's Leadership Team shall meet with each Sexual Abuse Claimant who desires to meet with a member of the Province's Leadership Team. The Sexual Abuse Claimant may be accompanied at the meeting by one person. The meeting shall be subject to all privileges related to mediation proceedings and settlement offers. The Province's Team Leader shall schedule meetings, at reasonable times and places, in each of the following locations (the "Meeting Locations"): St Johns, Newfoundland, Canada; New Rochelle, New York; Chicago, Illinois; Seattle, Washington and New Jersey (mutually agreeable location to be determined). All meetings shall be concluded within one (1) year after the Effective Date. The Province's Team Leader shall select a reasonable time and place for such meetings. Sexual Abuse Claimants who filed proofs of claim shall be informed of the date, time and address for each Meeting Location within thirty (30) days after the Effective Date and shall have up to 30 days to schedule a meeting at any of the Meeting Locations.

In regard to communications to/with the media, the Province and the Debtors shall institute a policy requiring all members of the Province, (including but not limited to the Province's Team Leader, the Province's Leadership Team, the Debtors' trustees, officer and directors, and the Province's or the Debtors' official spokespersons) not refer either verbally or in writing to Sexual Abuse Claimants who filed proofs of claim or proofs of future claims as "alleged" claimants,

"alleged" victims or "alleged" survivors and will require the same to refer to claimants as "survivors" or "survivors of sexual abuse." The communications may state that the Province has not tested the merits of any of the claims.

The Debtors and Province have represented that in February 2013, each Brother received revised Province Ethics Policies that included mandatory reporting laws for each US state and Canadian Province. The revised Policies require every Brother who has knowledge to report: "[A]ll allegations of sexual abuse that may have been committed by a Member shall be promptly reported to civil authorities (with full cooperation from the Province) in the jurisdiction in which the alleged incident occurred if the alleged victim is a minor at the time the allegation is being made." To remain in Ministry each Brother was required to sign a form stating that he has read, understands and will be in compliance with all policies. The Debtors and Province also have represented that their compliance with their child safety programs is audited by Praesidium, Inc. every three (3) years and that the audit is not made available to the general public.

Based on the foregoing representations, the Debtors and Province will provide the Trustee a copy of the next two (2) post-Effective Date audit(s) of their child safety programs. The Trustee may publish the audits if the audit finds that the Debtors and/or Province are not in compliance with the child safety programs.

The Debtors shall ask each of the Christian Brothers Schools to prominently display a plaque that states: "The abuse of the spiritual, emotional, physical and moral well-being of the children and young men [and women (if applicable)] of [name of school] shall not be tolerated." The Debtors will ask that each plaque be no less than 8.5 inches by 11 inches and placed next to the door of the principal's office without obstruction by plants, furniture, or any other items.

Upon written notification to counsel for the Debtors, any abuse survivor who has a confidentiality obligation pursuant to a prepetition settlement between a survivor and the Debtors and/or the Province is released from such obligation. Nothing contained herein releases the Debtors and/or Province of their confidentiality obligations under such settlements. Consistent with existing policies, the Province and the Debtors shall not include confidentiality provisions in any settlement agreement related to sexual abuse entered into by the Province and/or the Debtors except at the written request of the survivor claimant. The Province and/or the Debtors shall continue to require and fund annual mandatory reporting training for all of its Brothers who are in active ministry.

The Debtors and/or Province shall file a timely "no objection" to the pending motion by the Committee for the release of documents in the possession of counsel representing Abuse Claimants in Canada and which were produced to counsel through discovery. The Debtors and/or the Province shall perform this undertaking although an order confirming the Plan may not yet have been entered. If any non-Debtor codefendant in Abuse litigation agrees to produce its own documents as part of a settlement of Abuse Litigation, the Debtors and/or Province shall not object to any such production.

Pursuant to Rule 706 of the Federal Rules of Evidence, the Bankruptcy Court at the request of the Trustee shall appoint an expert witness to inspect all of the Debtors' and\or Province's books, records, documents, files and archives (subject to canonical privileges, if any, recognized by a court in the United States) for the sole purpose of obtaining direct or indirect evidence of liability

insurance of the Debtors, the Province or the Congregation providing insurance coverage for Sexual Abuse Claims. The Bankruptcy Court shall appoint an expert witness nominated by the Committee or the Trust. As set forth in F.R.E. 706, the witness shall advise the Trust and the Debtors of the witness' findings; provided, however, that any evidence of such insurance shall be redacted to exclude any information that is not directly or indirectly related to the existence of such insurance. The expert witness's fees and expenses shall be borne by the Trust and not by the Debtors or the Province.

The Province shall publish on the Province's website home page, or its successor, as standalone documents, these non-monetary stipulations for a period of five (5) years after the Effective Date.

The Bankruptcy Court shall retain jurisdiction to adjudicate disputes that arise with respect to these non-monetary undertakings. The Bankruptcy Court may appoint a special master or arbitrator to adjudicate any such disputes or implement these undertakings.

The Trust shall have standing and shall be authorized, but not directed, to seek enforcement of any of the terms of these non-monetary undertakings.

## XII.

## CERTAIN OTHER GENERAL PROVISIONS OF THE PLAN

The Plan contains other provisions consistent with the requirements of chapter 11 of the Bankruptcy Code as set forth below:

### 1.    Causes of Action/Avoidance Actions

Except as otherwise provided herein, the Reorganized Debtors shall retain and exclusively enforce the Debtors' Causes of Action (but not the Trust's Causes of Action), whether arising before or after the Petition Date, in any Court or other tribunal, including without limitation, an adversary proceeding filed in these cases. Since more than two (2) years has elapsed since the Petition Date, and the Debtors have not commenced any preferential or fraudulent conveyance actions, these Claims are time barred. However, the Creditors' Committee commenced and action entitled, *The Official Committee of Unsecured Creditors of the The Christian Brothers' Institute and The Christian Brothers of Ireland, Inc., v. All Hallows Institute, Adv. No. 13-08229-(RDD)*. The Plan provides that this fraudulent conveyance action will be transferred to the Trust and the Trust substituted as Plaintiff. The Trust shall retain all decision making authority as to whether to continue to prosecute the litigation or settle same. All proceeds from recovery and or settlement shall belong to the Trust and distributed in accordance with the Plan and the Trust Documents. All claims or causes of action that may be asserted by the Debtors, whether known or unknown and including any claims that are not released or exculpated pursuant to the Plan, shall be assigned to the Trust.

2.      **Retention of Jurisdiction**

Notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date:

Except as otherwise set forth in the Plan or in the Confirmation Order, the Bankruptcy Court will retain jurisdiction over all matters arising under, in furtherance of, or in connection with the Plan, including, but not limited to, the following:

(a)      The determination of objections to Disputed Claims;

(b)      The determination of requests for payment of Claims entitled to priority under Section 507 of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

(c)      The resolution of controversies and disputes regarding interpretation and implementation of this Plan and the Plan Documents;

(d)      The granting of relief in aid of this Plan and the Plan Documents including the entry of appropriate orders (which may include contempt or other sanctions) to protect the Reorganized Debtors, the Participating Parties, the Settling Insurers, and  the Released Parties from actions prohibited under this Plan or the Plan Documents;

(e)      Amendments to and modifications of this Plan;

(f)      Subject to the limitations and exclusions described above, the determination of any and all applications, adversary proceedings, and contested or litigated matters pending on the Effective Date; and

(g)      The closing of these Cases.

3.      **Remand of Removed Actions**

On the Effective Date, all actions removed by the Debtors or any other co-defendant during these Cases shall be remanded to the court from which they were removed and can continue against the Debtors and any other Entity who is not a Participating Party or a Settling Insurer, only to the extent set forth in the Plan.

4.      **Modification of the Plan**

The Proponents reserve the right, in accordance with the Bankruptcy Code, to amend, modify or withdraw this Plan prior to the entry of the Confirmation Order.  After the entry of the Confirmation Order, the Proponents may, upon order, amend or modify this Plan in accordance with Section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

5.      **Severability**

If, before confirmation, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision. That term or provision will then be applicable as altered or interpreted, except if such term or provision is inconsistent with the intent of any of the Plan Proponents, in which case the term or provision may be unilaterally withdrawn by such Plan Proponent. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated. The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with this Article, is valid and enforceable under its terms. In the event of a successful collateral attack on any provision of this Plan (*i.e.*, an attack other than through a direct appeal of the Confirmation Order), the remaining provisions of this Plan will remain binding on the Debtors, the Reorganized Debtors, the Participating Parties, the Settling Insurers, the Trustee, the Committee, all Claimants, all Creditors, and all other parties in interest.

6.      **Section 1146 Exemption**

Pursuant to Bankruptcy Code Section 1146(c) any transfer of property pursuant to the Plan including any transfer of the Properties by the Trust (*i.e.*, the Rochester Property, the lower portion of the Esopus Property and the Bronx Property), will not be subject to any document, recording tax, stamp tax, or similar tax, mortgage tax, real estate transfer tax, or other governmental assessment in the United States, and the Confirmation Order will direct the appropriate state or local governmental officials and/or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

7.      **Management of the Reorganized Debtors**

The Reorganized Debtors shall continue to be managed by their current Board of Trustees which consists of the following individuals: (i) Brother Hugh O'Neill; (ii) Brother Kevin Griffith; (iii) Brother Barry Lynch; (iv) Brother Dan Casey; (v) Brother Anthony Murphy; and (vi) Brother Raymond Vercruysse. All of these individuals have been involved in the Debtors' affairs for many years and are well suited to continue the Debtors' mission.

## XIII.

## CONFIRMATION PROCEDURES

In order for the Plan to be confirmed by the Bankruptcy Court, all of the applicable requirements of Bankruptcy Code §1129 must be met. These include, among others, requirements that the Plan: (i) is accepted by all impaired Classes or, if rejected by an impaired Class, "does not discriminate unfairly" and is "fair and equitable" as to each rejecting Class; (ii) is feasible; and (iii) is in the best interests of holders of Claims in each impaired Class.

### A.    Solicitation of Votes; Acceptance

The Plan Proponents are soliciting the acceptance of the Plan from all holders of Claims in Classes that are impaired under the Plan and receiving Distributions thereunder.  Using these criteria, holders of only Claims in Classes 4,5,6, and 8, are entitled to vote on the Plan.  In addition, a vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured or made in good faith or in accordance with the applicable provisions of the Bankruptcy Code.

Classes 4,5,6, and 8 will be deemed to have accepted the Plan if the Plan is accepted by holders of at least two-thirds in dollar amount and more than one-half in number of the Claims in that Class that have cast ballots on the Plan and that are eligible to vote for or against the Plan.  The Plan Proponents intend to file a motion to estimate each Class 4 Claim at $1.00 each for voting purposes only.  The actual amount payable to holders of Allowed Class 4 Claims will exceed $1.00 This is consistent with the procedure followed in other mass tort bankruptcy cases and the Sexual Abuse Proof of Claim forms intentionally did not provide for a dollar amount for the Claims as the Claims are, by their nature, unliquidated tort claims.  As such, Class 4 will have deemed to have accepted the Plan if more than one half of the Claimants vote to accept the Plan.

### B.    Confirmation Hearing

Bankruptcy Code §1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan (the "**Confirmation Hearing**") after the period for submission of Ballots has expired.  The Confirmation Hearing may be postponed from time to time by the Bankruptcy Court without further notice except for an announcement of the postponement made at the Confirmation Hearing.  Bankruptcy Code § 1128(b) provides that any party in interest may object to confirmation of the Plan.  Objections must be made in writing, specifying in detail the name and address of the person or entity objecting, the grounds for the objection and the nature and amount of the Claim held by the objector, and must otherwise comply with the requirements of the Bankruptcy Rules and the Local Bankruptcy Rules.  Objections must be filed with the Clerk of the Bankruptcy Court, with a courtesy copy delivered to the chambers of the Honorable Robert D. Drain, and served upon the parties so designated in the Order and Notice accompanying this Disclosure Statement on or before the time and date designated in such Order and Notice.  **FAILURE TO TIMELY FILE AND SERVE AN OBJECTION TO CONFIRMATION MAY BE DEEMED BY THE BANKRUPTCY COURT TO BE CONSENT TO CONFIRMATION OF THE PLAN.**

At the Confirmation Hearing, the Bankruptcy Court will determine, among other things, whether the following confirmation requirements specified in Bankruptcy Code Section 1129 have been satisfied:

1.    The Plan complies with the applicable provisions of the Bankruptcy Code.

2.    The Debtors have complied with the applicable provisions of the Bankruptcy Code.

3.    The Plan has been proposed in good faith and not by any means proscribed by law.

4.      Any payment made or promised by the Debtors for services or for costs and expenses in, or in connection with, these Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to approval of, the Bankruptcy Court as reasonable.

5.      The Debtors have disclosed the identity and affiliations of all individuals proposed to serve, after confirmation, as directors or officers of the Debtor and the appointment to or continuance in such positions by those individuals is consistent with the interests of creditors and with public policy; and (b) the Debtors have disclosed the identities of any insider(s) that will be employed or retained by the Reorganized Debtors and the nature of any proposed compensation for such insider(s).

6.      Each holder of a Claim in an impaired Class either has accepted the Plan or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code.  See "Best Interests Test" below.

7.      Unless the Debtors are required to seek nonconsensual confirmation of the Plan, each Class of Claims has either accepted the Plan or is not impaired under the Plan.

8.      Except to the extent that the holder of a Claim has agreed to different treatment, the Plan provides that: (a) Allowed Administrative Claims will be paid in full on the later of the Effective Date, or the date the Claim is Allowed; (b) other Priority Claims will be paid in full on the Effective Date; and (c) Priority Tax Claims will receive payment in full plus interest over five (5) years.

9.      At least one impaired Class has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

10.     Confirmation of the Plan is not likely to be followed by the liquidation of or the need for further financial reorganization by the Debtors or the Reorganized Debtors.

11.     The Debtors believe that the Plan has been submitted in good faith and that, upon acceptance of the Plan by the voting Class, the Plan will satisfy all of the foregoing statutory requirements.

## C.      Best Interests Test

As mentioned above, confirmation of the Plan requires that each holder of a Claim in an impaired Class must either: (i) accept the Plan; or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

The Plan Proponents believe that this analysis is hypothetical in these Cases, because, as nonprofit entities, the Debtors' Cases cannot be converted from chapter 11 to chapter 7 without the Debtors' consent.  As such, the Debtors submit that the best interests of creditors test in these Cases may be analogous to such analysis in a chapter 9 case.  One court has noted that

> While the best interests of the creditors test is an elusive standard in [Chapter 9] nevertheless the concept is not without meaning… The concept should be interpreted to mean that the plan must be better than the alternative that creditors have.  In the chapter 9 context, the alternative is dismissal of the case, permitting every creditor to fend for itself in the race to obtain the mandamus remedy and to collect the proceeds… [The courts] must apply **the test to require a reasonable effort by the municipal debtor that is a better alternative to the creditors than dismissal of the case.**

*In re County of Orange*, 191 B.R. 1005, 1020 (Bankr. C.D. Ca. 1996) (emphasis added).

As such, it is the Debtors' position that the best interest of creditors standard to compare the Plan to is the only true alternative of dismissal and a race to the courthouse which generally benefits the first to sue and obtain judgments over the Claims of other similarly situated creditors, while at the same time eroding the Debtors' value through continuing litigation costs.  Nevertheless, the Plan Proponents believe that in a hypothetical liquidation all creditors will receive less than they will likely receive under the Plan.  A chapter 7 liquidation carries potential costs and risks that are resolved through the Plan, as follows:

1.  In a chapter 7 liquidation, the Committee believes that there is a risk (and the Debtors believes a likelihood) that Maintenance Claims will be allowed in full and share along with other unsecured claims.  The Debtors and Brothers assert that the Maintenance Claims are allowable in the amount of approximately $130,000,000.  If such claims are allowed in full, they will significantly dilute the amount available from the $16.5 million pool available to pay Abuse Claims and the $50,000 pool available to pay general unsecured claims.  While the scope of the dilution is difficult to quantify due to the inherent complexity in valuing unique and personal Abuse Claims, adding $130,000,000 of Maintenance Claims will have a significant material impact on recoveries.

2.  The Plan incorporates the Allocation Plan, which was negotiated by counsel representing in excess of 75% of Abuse Claimants.  There is a likelihood that a chapter 7 trustee will be unable to implement the Allocation Plan or a similar plan in the absence of a confirmed chapter 11 plan.  As such, substantial estate resources would likely be expended adjudicating or analyzing Abuse Claims in a chapter 7 case.

3.  A chapter 7 trustee would be entitled to compensation of a percentage of all funds distributed to parties in interest, excluding the Debtors, pursuant to 11 U.S.C. § 326.  Any such payment would dilute the amount of funds available to pay creditors.

In addition, it is unlikely that the Participating Parties and Providence Washington would voluntarily contribute without the corresponding benefit of final resolution of Abuse Claims.  Annexed hereto as **<u>Exhibit C</u>** is a liquidation analysis.  The liquidation analysis indicates that in a

liquidation, holders of Unsecured Claims would receive a lesser distribution than provided under the Plan.

**D.    Feasibility**

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  Because (x) the all Abuse Claims will be resolved pursuant to the Plan, (y) the Reorganized Debtors will not be financially liable on account of any Abuse Claims that occurred prior to the Petition Date except as provided in the Plan, and (z) distributions will be made only to the extent of existing assets or future recoveries and Maintenance Claims will be paid in the ordinary course of business by CSC and the Reorganized Debtors, the Plan Proponents believe the Plan is feasible.

**E.    Cram Down**

The Bankruptcy Code provides a mechanism by which a plan may be confirmed even if it has been rejected by an impaired class of claims.  Under the "cram down" provisions of the Bankruptcy Code (§1129(b)), the proponent of the Plan (in this case the Debtors and the Creditors' Committee) may request that it be confirmed despite its rejection by an impaired class, and the court will confirm the Plan if it (i) does not discriminate unfairly against a dissenting impaired class and (ii) is fair and equitable with respect to such class.

The Bankruptcy Code sets forth specific guidelines for determining whether a plan is fair and equitable with respect to a particular class of claims.  For unsecured claims, as are those in Classes 4,5,6 and 8, a plan must provide that equity interest holders do not receive or retain any property on account of their interest.  The Debtors submit that this test which is applied to traditional corporations is inapplicable to not-for-profit corporations as there are no equity interests or junior creditors or the holders of Claims that are junior to Claims of a non-accepting class are not receiving any property under the Plan.  Here, members of the not-for-profit entities in these Cases (individual Christian Brothers) have no personal interest in the property of the corporate entities. For secured claims, as are in Class 2, a plan must provide that the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of such claims and that the holders of such claims receive on account of such claims of a value, as of the Effective Date of the Plan, of at least the value of such holders interest in the estate's interest in the property securing the lien.  In other words, the secured creditor must receive the present value of the Allowed Amount of its Secured Claim which Allowed Amount is dependent upon the value of the property securing the claim.

Under the Plan, all secured creditors in Class 2, will retain their liens to secure the full amount of their Allowed Secured Claim and receive payments over time equal to the present value of the Allowed Amount of their Secured Claim as of the Effective Date of the Plan.  In the event the Bankruptcy Court refuses to impose a "cram down" on the rights of a non-consenting class unless certain modifications are made to the terms and conditions of such non-consenting class' treatment under the Plan, the Plan Proponents reserve the right, without re-solicitation, to propose such modification to such non-consenting class' treatment and to confirm the Plan, provided such modification does not result in total extinguishment of the non-consenting class' claim.

**XIV.**

**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

The Plan Proponents have evaluated numerous alternatives to the Plan, including, without limitation, proposing competing plans by the Debtors and the Committee, and the conversion of the Cases to cases under chapter 7 of the Bankruptcy Code and subsequent liquidation of the Debtors by a chapter 7 trustee.  After studying these alternatives, the Plan Proponents have concluded that the Plan is the best alternative and will maximize recoveries of holders of Claims.  The following discussion provides a summary of the analysis of the Plan Proponents supporting their conclusion that a chapter 7 liquidation of the Debtors or an alternative chapter 11 plan for the Debtors will not provide higher value to holders of Claims.

**A.  Liquidation under Chapter 7 of the Bankruptcy Code**

If no chapter 11 plan can be confirmed, the Cases of the Debtors may be converted to a case under chapter 7 (assuming the Debtors consent), in which event a trustee would be elected or appointed to liquidate the Debtors' assets for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  In addition to the factors discussed in Section XII(C) above, the Plan Proponents believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because of (1) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee for bankruptcy and professional advisors to such trustee; (2) the erosion in value of assets in the context of the expeditious liquidation required under chapter 7 and the "forced sale" environment in which such a liquidation would likely occur; and (3) the substantial increases in claims which may have to be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases, such as Maintenance Claims.  Accordingly, the Plan Proponents have determined that confirmation of the Plan will provide each holder of a Claim or Equity Interest with a greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7.

A discussion of the effects that a chapter 7 liquidation would have on the holders of Claims is set out in the Liquidation Analysis, attached as **Exhibit C** hereto.

**B.  Alternative Chapter 11 Plans**

If the Plan is not confirmed, any other party in interest could undertake to formulate a different chapter 11 plan.  Such a chapter 11 plan might involve either a reorganization and continuation of the business of the Debtors or an orderly liquidation of the properties and interests in property of the Debtors.  With respect to an alternative chapter 11 plan, the Plan Proponents have examined various other alternatives in connection with the process involved in the formulation and development of the Plan.  The Plan Proponents believe that the Plan, as described herein, enables holders of Claims to realize the best recoveries under the present circumstances.

# XV.

## CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN.  ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO SUCH HOLDER.  NEITHER THE DEBTORS NOR DEBTORS' COUNSEL MAKES ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO THE DEBTORS OR ANY CREDITOR.

Under the Internal Revenue Code of 1986, as amended (the "**Code**"), there may be significant federal income tax issues arising under the Plan described in this Disclosure Statement that affect Creditors in these cases.

## A.  **The Trust**

The Trust is a "qualified settlement fund" ("**QSF**") within the meaning Treasury Regulations enacted under Internal Revenue Code Section 486B(g).  The Trust is characterized as a QSF because:

1.  The Trust is established pursuant to an order of, or is approved by, the United States, any state or political subdivision thereof, or any agency or instrumentality (including a court of law) of any of the foregoing and is subject to the continuing jurisdiction of that governmental authority;

2.  The Trust is established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event that has occurred and that has given rise to at least one claim asserting liability arising out of, among other things, a tort, breach of contract, or violation of law (but excluding non-tort obligations of the Debtors to make payments to its general trade creditors or debt holders that relates to: a case under Title 11 of the United States Code, a receivership, foreclosure of similar proceeding in a Federal or State court, or a workout); and

3.  The Trust is a trust under state law.

The primary tax consequences of the Trust being characterized as a QSF are the following:

1.  The Trust must use a calendar taxable year and the accrual method of accounting.

2.  If the Debtors fund the Trust with appreciated property, the Debtors are deemed to sell the property to the Trust.  Accordingly, any gain or loss from the deemed sale must be reported by the Debtors.

3.  The Trust takes a fair market value basis in property contributed to it by the Debtors.

4.   The Trust's gross income less certain modifications is taxable at the highest federal tax rate applicable to trusts and estates (currently 35%). The Debtors' funding of the Trust with cash and other property is not reported by the Trust as taxable income. However, earnings recognized from, for example, the short-term investment of the Trust's funds will be subject to tax.

5.   The Trust may deduct from its gross income a limited number of administrative expenses; the Trust in not entitled to deduct distributions paid to its beneficiaries.

6.   The Trust will have a separate taxpayer identification number and will be required to file annual tax returns (which are due on March 15). The Trust will also be required to comply with a number of other administrative tax rules including filing information returns (generally IRS Form 1099) when approved payments are made to claimants.

### B.   Federal Income Tax Consequences to Holders of Claims

The Federal income tax consequences to a holder of a Claim receiving, or entitled to receive, a Distribution in partial or total satisfaction of a Claim may depend on a number of factors, including the nature of the Claim, the Claimholders' method of accounting, and its own particular tax situation. Because Claimholders' tax situations differ, Claimholders should consult their own tax advisors to determine how the Plan affects them for federal, state and local tax purposes, based on their particular tax situations.

Among other things, the federal income tax consequences of a Distribution to a Claimholder may depend initially on the nature of the original transaction pursuant to which the Claim arose. For example, a Distribution in repayment of the principal amount of a loan is generally not included in the Claimholder's gross income. Distributions to Abuse Claimants may not be taxable as they may be considered compensation for personal injuries.

The federal income tax consequences of a Distribution to a Claimholder may also depend on whether the item to which the Distribution relates has previously been included in the Claimholder's gross income or has previously been subject to a loss or bad debt deduction. For example, if a Distribution is made in satisfaction of a receivable acquired in the ordinary course of the Claimholder's trade or business, and the Claimholder had previously included the amount of such receivable Distribution in its gross income under its method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, the receipt of the Distribution should not result in additional income to the Claimholder but may, as discussed below, result in a loss. Conversely, if the Claimholder had previously claimed a loss or bad debt deduction with respect to the item previously included in income, the Claimholder generally would be required to include the amount of the Distribution in income when received.

A Claimholder receiving a Distribution in satisfaction of its Claim generally may recognize taxable income or loss measured by the difference between (i) the cash and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the Claim. For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item. This income or loss may be ordinary income or loss if the

Distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the Claimholder's trade or business for the performance of services or for the sale of goods or merchandise.  In addition, if a Claimholder had claimed an ordinary bad debt deduction for the worthlessness of its Claim in whole or in part in a prior taxable year, any income realized by the Claimholder as a result of receiving a Distribution may be taxed as ordinary income to the extent of the ordinary deduction previously claimed.  Generally, the income or loss will be capital gain or loss if the Claim is a capital asset in the Claimholder's hands.

## XVI.

## <u>VOTING INSTRUCTIONS</u>

Creditors should complete and sign the enclosed Ballot and return it to Omni Management Group, 5955 DeSoto Avenue, Suite 100, Woodland Hills, CA 91367, Attn: Katie Nownes, the Debtors' claims and noticing agent.

A Ballot is enclosed with each copy of this Disclosure Statement being sent to all holders of Impaired Claims that filed Proofs of Claim or were scheduled by the Debtors.  Ballots must be received on or before 5:00 p.m. Eastern Time on January 3, 2014.

If a Ballot is damaged or lost, or if you have any questions concerning any voting procedures, you may contact Tarter Krinsky & Drogin LLP, attorneys for the Debtors, 1350 Broadway, 11th Floor, New York, New York 10018 (212) 216-8000, Attention: Scott S. Markowitz, Esq., or Pachulski Stang Ziehl & Jones LLP, attorneys for the Committee, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA 90067-4100 (310) 277-6910, Attention: James I. Stang, Esq.

-- Rest of Page Intentionally Left Blank --

## XVII.

### CONCLUSION

The Plan Proponents believe that confirmation and implementation of the Plan is preferable to any other alternative. Accordingly, the Plan Proponents urge holders of Claims to vote to accept the Plan by so indicating on their Ballots and returning them as specified in the Order accompanying this Disclosure Statement.

Dated: New York, New York
          December 6, 2013

**THE CHRISTIAN BROTHERS'**                    TARTER KRINSKY & DROGIN LLP
**INSTITUTE & THE CHRISTIAN**
**BROTHERS OF IRELAND, INC.**
*Debtors and Debtors-in-Possession*              */s/  Scott S. Markowitz*
                                                 Anthony Dougherty, Esq.
                                                 Scott S. Markowitz, Esq.
By:  */s/  Kevin Griffith*                       1350 Broadway, 11th Floor
Brother Kevin Griffith                           New York, New York 10018
Vice President

                                                 Attorneys for The Christian Brothers' Institute
                                                 and
                                                 The Christian Brothers of Ireland, Inc.


                                                 PACHULSKI STANG ZIEHL & JONES LLP


                                                 */s/  James I. Stang*
                                                 James I. Stang, Esq.
                                                 Ilan D. Scharf, Esq.
                                                 780 Third Avenue, 36th Floor
                                                 New York, New York 10017
                                                 (212) 561-7700

                                                 Attorneys for the Official Committee of
                                                 Unsecured Creditors